# EXHIBIT A

HARTFORD FIRE INSURANCE COMPANY

PROGRAM MANAGER'S AGREEMENT

With

THE EVERGREEN ORGANIZATION, INC.

Evergreen PMA 9-18-02

**CONFIDENTIAL**

HE 300001

# PROGRAM MANAGER'S AGREEMENT - TABLE OF CONTENTS

Term of Agreement ................................................................................................................ 1

Appointment of Manager; Lines of Authority ...................................................................... 1

    Lines of Authority ............................................................................................................. 1
    Territory ............................................................................................................................. 1
    Restrictions ........................................................................................................................ 1
    Reinsurance Availability .................................................................................................... 1
    Exclusive Agreement ........................................................................................................ 2

Manager's Duties and Responsibilities ................................................................................ 2

    Solicitation ......................................................................................................................... 2
    Servicing Business ............................................................................................................ 2
    Binding of Risks ................................................................................................................ 2
    Policy Issuance ................................................................................................................. 2
    Risks Bound ...................................................................................................................... 2
    Premium Rates .................................................................................................................. 2
    Compliance with Manuals ................................................................................................. 2
    Sub-producers ................................................................................................................... 3
    Premiums ........................................................................................................................... 3
    Accounting ......................................................................................................................... 3
    Fiduciary Capacity - Premium Trust Fund ........................................................................ 4
    Copies of Policies ............................................................................................................. 4
    Credit Extensions .............................................................................................................. 4
    Business Data Confidentiality ........................................................................................... 4
    Manager Expenses ........................................................................................................... 5
    Legal Compliance ............................................................................................................. 5
    Governmental Contacts .................................................................................................... 5
    Premium Financing ........................................................................................................... 5
    Competent Staff ................................................................................................................ 6
    Company Interests ............................................................................................................ 6
    Company Interface ............................................................................................................ 6
    Accurate Records .............................................................................................................. 6
    Audit .................................................................................................................................. 6
    Licenses ............................................................................................................................ 6
    Policy Cancellation ........................................................................................................... 7
    Prohibited Actions ............................................................................................................. 7

Claims Settlement ................................................................................................................ 8

Manager's Compensation ..................................................................................................... 8

Advertising ........................................................................................................................... 8

Representation With Respect to Policies .............................................................................. 8

Evergreen PMA 9-18-02

(i)

**CONFIDENTIAL**

HE 300002

Annual Standards for Volume, Mix and Profitability of Business ................................ 8

Insurance of Manager ................................................................................ 9
    Errors and Omissions ................................................................ 9
    General Liability ........................................................................ 9
    Employee Dishonesty ................................................................ 9

Indemnification ...................................................................................... 9
    Manager .................................................................................... 9
    Company .................................................................................. 10

Flat Cancellations .................................................................................. 10

Suspension of Manager's Authority ........................................................ 10
    Loss of Reinsurance ................................................................ 10
    Administrative Action .............................................................. 10
    Indictment ................................................................................ 10
    Grounds for Immediate Termination ........................................ 10
    Default ...................................................................................... 11
    Termination by Manager .......................................................... 11
    Dispute Over Termination ........................................................ 11
    Premium Limitations ................................................................ 11

Termination of Agreement ...................................................................... 11
    Company .................................................................................. 11
        Immediate ........................................................................ 11
        Thirty (30) Days Notice .................................................... 12
    Company or Manager .............................................................. 13

Continuing Duties of Manager after Termination ...................................... 13

Waiver of Statutory Termination Rights of Manager .................................. 14

Ownership of Expirations ........................................................................ 14

Offset .................................................................................................... 15

Arbitration ............................................................................................ 15
    Submission to Arbitration ........................................................ 15
    Sole Remedy .......................................................................... 16
    Notice ...................................................................................... 16
    Discovery ................................................................................ 16
    Arbitration Board Membership ................................................ 16
    Submission of Briefs ................................................................ 16
    Arbitration Award .................................................................... 16
    Confirming Court Order ............................................................ 17
    Arbitration Expense ................................................................ 17

Evergreen PMA 9-18-02

CONFIDENTIAL

HE 300003

Arbitration Governance ................................................................................. 17
Survival ....................................................................................................... 17

Miscellaneous Terms ..................................................................................... 17

APPLICABLE LAW ...................................................................................... 17
Waiver........................................................................................................ 17
Conflict with Law ....................................................................................... 17
No Assignment........................................................................................... 18
Notices and Service of Process ................................................................ 18
Severability................................................................................................ 18
Entire Agreement; Modifications ............................................................... 19
Negotiated Agreement .............................................................................. 19
Independent Contractor ............................................................................ 19
Promptly ..................................................................................................... 19
Headings .................................................................................................... 19
Honorable Undertaking ............................................................................. 19
Counterparts .............................................................................................. 19

EXHIBIT A ....................................................................................................... 1

EXHIBIT B ....................................................................................................... 3

**CONFIDENTIAL**

HE 300004

## PROGRAM MANAGER'S AGREEMENT

THIS PROGRAM MANAGER'S AGREEMENT ("Agreement") between The Evergreen Organization, Inc., with offices located at 910 Evergreen Lane, Chester Springs, PA 19425 ("Manager"), and Hartford Fire Insurance Company and its affiliates and subsidiaries with offices located at 2 Park Avenue, New York City, New York (all individually and collectively referred to as "Company"). Manager and Company agree as follows:

### ARTICLE I.    Term of Agreement

This Agreement begins on September 24, 2002. It will continue until terminated under the provisions of ARTICLE XIII.

### ARTICLE II.    Appointment of Manager; Lines of Authority

Company appoints Manager as an exclusive manager for the Hartford Financial Products division of Company as follows:

A.    Lines of Authority.  Manager's appointment and authority extends to the classes of business, policies of insurance, including all endorsements, (the "Policies"); and lines and limits of insurance described in Exhibit A attached to this Agreement for which Manager holds all appropriate licenses (the "Business").

B.    Territory.    Manager's appointment and authority extends to risks principally located in the following jurisdictions for which it holds appropriate licenses and for which it is properly appointed by Company:

The United States, Puerto Rico and Canada.

C.    Restrictions.  Manager's appointment and authority is subject to any restrictions set forth in Exhibit A.

D.    Reinsurance Availability.    Manager's appointment and authority for Business written under this Agreement is subject to the following:

1.    Company is able to obtain and maintain in force at all times reinsurance satisfactory to Company for the Business.

2.    Obtaining reinsurance is the sole responsibility of Company. When Company obtains satisfactory reinsurance for all or some of the Business, Company will give Manager written notice that Manager may write and bind those classes of business, Policies, and lines and limits of insurance for which reinsurance has been obtained.

Evergreen PMA 9-18-02

**CONFIDENTIAL**

HE 300005

3.    If reinsurance is terminated or no longer in full force and effect for all or any part of the **Business**, **Manager's** authority for the **Business** affected shall be suspended, or limited immediately upon notice to **Manager** from **Company**, until further notice.

E.    Exclusive Agreement: This **Agreement** is exclusive and the company agrees not to appoint other agents, brokers or producers to conduct the **Business** subject to this **Agreement** in the territory covered by this **Agreement**.

**ARTICLE III.    Manager's Duties and Responsibilities**

**Manager** will faithfully perform all of its duties to the best of its professional knowledge, skill and judgment. The **Manager's** duties include the following:

A.    Solicitation. To solicit risks and classes of risks at limits and for lines of insurance authorized in Exhibit A, that in their pricing and insurability meet or exceed the underwriting and pricing standards from time to time established by **Company**, in writing.

B.    Servicing Business. To provide for all usual and customary services to **Sub-producers**, insureds and policyholders including delivery of **Policies**, return of premiums due insureds or policyholders, premium audits on **Policies**, and timely, appropriate responses to inquiries and complaints from **Sub-producers** insureds or policyholders or members of the public, and comply with any service standards set forth in Exhibit A.

C.    Binding of Risks. To bind risks only in accordance with Exhibit A and any other underwriting and pricing standards from time to time established by **Company**, in writing, and to forward to **Company** for acceptance all other risks.

D.    Policy Issuance. To timely and properly issue, deliver and execute or countersign **Policies**, certificates, endorsements, binders and related documents on forms approved by **Company** and appropriate regulatory authorities, as required by law, for the **Business** described in Exhibit A. **Manager** shall obtain all required **Policy** countersignatures, as required by law.

E.    Risks Bound. To give **Company** notice within thirty (30) calendar days, for each risk or **Policy** bound or written under this **Agreement**.

F.    Premium Rates. To quote accurate and adequate premiums and rates for **Policies** bound or written under this **Agreement** in compliance with the approved and applicable rating manuals or rating plans of **Company**.

G.    Compliance with Manuals. To comply fully, timely and promptly with all manuals, rules, regulations, guidelines, instructions and directions issued by **Company** relating to the **Business** covered by this **Agreement**.

Evergreen PMA 9-18-02

**CONFIDENTIAL**

HE 300006

H.    Sub-producers.  To accept Business on behalf of **Company** written by properly licensed and qualified, professional insurance agents, solicitors and brokers ("**Sub-producers**"), and to direct, supervise and coordinate the efforts of **Sub-producers**. **Manager** is responsible for all commissions earned by **Sub-producers**. **Manager** is not authorized to appoint agents for **Company** or to accept **Business** produced by other agents or brokers. **Manager** will accept **Business** only from **Sub-producers** who have agreed in advance in writing to return unearned commissions on canceled **Policies**.

I.    Premiums.  To charge, collect, receive and receipt for all premiums, including but not limited to premium surcharges, fire district and other taxes or assessments levied by any jurisdiction and required to be collected in addition to stated premiums, due on all **Policies** bound or written under this **Agreement**, and pay **Company** in accordance with ARTICLE III.J.

J.    Accounting.  To timely account for the **Business** as follows:

1.    **Manager** shall prepare and forward to **Company** on a monthly basis, within fifteen (15) days of the end of each calendar month a detailed premium bordereau and statement of account for the prior month period (the "**Account**") in a format acceptable to the **Company**.

The **Account** shall include for each insurance company and authorized line of insurance and should company so request, separately by facultative and treaty lines of reinsurance such information as **Company** may request, and the following:

a. Net written premium,

b. **Policies** issued or bound by insured including location, limits, and effective date,

c. **Policies** canceled,

d. Premium adjustments due to endorsements, audits, or otherwise,

e. Premium surcharges, fire district and other taxes or assessments levied by any jurisdiction,

f. Losses paid,

2.    The **Manager** shall pay **Company** balances due within thirty (30) days of the end of each calendar month.

3.    Cumulative reports from the beginning of each calendar year shall also be made on a quarterly and annual basis.

Evergreen PMA 9-18-02

**Page 3 of 20**

**CONFIDENTIAL**

HE 300007

K.    Fiduciary Capacity - Premium Trust Fund.  To act as a  fiduciary for the **Company** and to hold all premiums and any other amounts collected and received on **Policies** for **Company** in a fiduciary account separate and apart from all other funds of **Manager** or others in a bank which is a member of the Federal Reserve System and insured by the Federal Deposit Insurance Corporation and which is approved in writing by **Company**.  The bank account shall be designated by **Manager** in such a manner as to clearly establish that **Manager** is holding and acting as trustee for **Company** with respect to the funds in the account.  Interest or other income, if any, accruing on these premium trust funds may be retained by **Manager** for its own account so long as **Manager** is current in all accounts with **Company**.  The trust funds so held may be used by **Manager** as necessary to return and refund premiums, net of return commissions to policyholders or their authorized representatives.  The Premium Trust Fund shall be subject to periodic audits performed by the **Company**.  In addition, **Manager** shall submit copies of banking statements with respect to the Premium Trust Fund on a quarterly basis to **Company**.  If **Manager** fails to pay **Company** any premiums or monies when due, except as to those amounts about which there is honest, good faith dispute by **Manager**, **Company** shall be entitled to seek the issuance of an injunction to obtain such premiums or monies.  Commissions payable to the **Manager** are debts due to **Manager** by **Company** and privilege herein granted of deducting commissions from said premiums should not be taken as a waiver by the **Company** of its exclusive ownership rights of premiums as provided herein.

L.    Copies of Policies.    To forward to **Company** promptly copies of all **Policies**, endorsements, rating worksheets and related documents, **Policy** cancellations and other terminations processed by the **Manager**.

M.    Credit Extensions.  To assume the obligation for any extensions of credit to insureds, policyholders and **Sub-producers**, and to be fully responsible for the full amount of the premium due **Company** on **Policies** written or bound under this **Agreement** whether or not **Manager** has collected the premium due from policyholders or **Sub-producers**.  The **Manager** will accept **Business** only from **Sub-producers** who have agreed in advance and in writing to return unearned commissions on canceled **Policies**.

N.    Business Data Confidentiality.  During the course of this **Agreement**, either party may learn confidential, patent or copyright, business, trade secret, proprietary or other like information belonging to the other or to a third party, including information about the party's software, customers and business. Notwithstanding anything to the contrary, the parties agree that their remedies for breach of this confidentiality obligation shall not be limited by, but shall be in addition to, all rights and remedies provided under the laws of the State of New York.  Both parties agree that all information exchanged between them shall be deemed confidential if so identified by either in writing or verbally, as, by its nature, should be deemed to be confidential.  The parties shall make best efforts

Evergreen PMA 9-18-02

CONFIDENTIAL

HE 300008

to maintain the confidentiality of all information supplied to and used by each other in the performance of this **Agreement** and shall exercise at least the same level of care with respect to the other party's confidential information as it exercises with respect to its own.  The parties agrees that such information learned or acquired will be used only in the course of the performance of this **Agreement**, and that each party will keep such information only for its own use and will not disclose it or provide it to any other person or entity without the prior written consent of the party.  Notwithstanding the foregoing, neither party shall be liable for a disclosure  to others of information (1) that was generally available to the public prior to the release of said information; (2) that was received from a third party having no obligation to the other party(ies) (known by the recipient) to hold said information in confidence; (3) that is independently developed by such party; or (4) that is required to be disclosed by court order or operation of law.

O.    <u>Manager Expenses.</u>  To pay, assume the obligation for and to be fully responsible for all costs and expenses associated with the **Manager's** performance under  this **Agreement** including: **Sub-producer** commissions, travel expense, employee salaries, benefits, fees, countersignature fees and expense, postage, advertising, exchanges, and license fees.  **Company** shall be responsible only for its own costs and expenses unless otherwise agreed by **Company.** In the event **Company** is required to pay any costs or expenses that are the responsibility of the **Manager**, the **Manager** shall promptly reimburse **Company** for its payments.

P.    <u>Legal Compliance.</u>  To keep fully informed of and comply fully with all applicable laws and regulations.  This includes, but is not limited to compliance with all laws and regulations applicable to insurance producers in the state(s) where the **Business** is located.  **Manager** shall not solicit or bind any risks in any state until all applicable laws, regulations and ISO/NCCI or other bureau rules have been complied with.  **Manager** agrees to be responsible for the payment of any applicable surplus lines taxes and the filing of all affidavits as required by the appropriate surplus lines governmental entities and jurisdictions and shall provide **Company** with written evidence of such payments and compliance on a quarterly basis.

Q.    <u>Governmental Contacts.</u>  To promptly notify **Company** of all contacts and correspondence received from insurance regulatory or other governmental authorities, to forward promptly upon receipt all summonses, complaints, subpoenas or other court documents, and to cooperate fully with **Company** in making any responses.

R.    <u>Premium Financing.</u>  To promptly and appropriately respond to all correspondence and notices related to financing or proposed financing of premiums on **Policies** issued under this **Agreement**, and forward copies of all notices and finance agreements to **Company.**

CONFIDENTIAL

HE 300009

S.    <u>Competent Staff.</u> To maintain sufficient supplies and equipment and a staff of competent and trained personnel, to produce, develop, underwrite, and supervise the **Business** covered by this **Agreement**.

T.    <u>Company Interests.</u> To promote and safeguard the best interests and good name of **Company**.

U.    <u>Company Interface.</u> To interface at all times with **Company** through **Company's** "WINS" system and other means mutually agreed to in advance by **Company** and **Manager**. **Manager** represents that data it inputs into the WINS system shall average no less than ninety per cent (90%) error-free transmissions on critical data elements as defined by the Company and thereafter errors shall be corrected within five (5) business days. **Manager** further represents that its work product will contain no matter which is libelous or otherwise contrary to law.

V.    <u>Accurate Records.</u> To keep and maintain, for as long as **Company** requires, separate, identifiable, orderly, accurate, complete and timely records and accounts of all **Business** and transactions pertaining to **Policies** bound or written and claims adjusted under this **Agreement** including complete underwriting, claim and rate files. Such records and files shall be the property of **Company**. Upon request by **Company** or the insurance regulator or Commissioner of any state having jurisdiction over **Company** ("Commissioner"), all records and reports maintained pursuant to this ARTICLE III, shall be provided as hard copies or in an electronic/computer format usable by **Company** and the Commissioner.

W.    <u>Audit.</u> To permit **Company** during the term of this **Agreement** and as long and frequently as **Company** considers necessary, to visit, inspect, examine, audit and verify, at **Manager's** offices or elsewhere, quarterly and at such additional times and as often as **Company** may deem appropriate, with or without prior notice any of the properties, accounts, premium trust funds, files, documents, books, reports, work papers and other records belonging to or in the possession or control of **Manager** or of any other person relating to the **Business** covered by this **Agreement**. **Company** may make copies and extracts as may be reasonably necessary. **Company** may conduct any audit through any person or persons it may designate. The Insurance Department of any state having jurisdiction over this **Agreement** shall have the right to exercise **Company's** rights of audit under this Section after consultation with the **Company**.

X.    <u>Licenses.</u> To obtain and provide **Company**, with copies of all licenses and permits required by **Manager** for the proper conduct of its duties under this **Agreement**. **Manager** agrees that it will not transact any **Business** in any jurisdiction covered under this **Agreement** until **Manager** has obtained all required licenses and permits, and is properly appointed to represent the **Company** in such jurisdiction.

Evergreen PMA 9-18-02

CONFIDENTIAL

HE 300010

Y.    Policy Cancellation.  To cancel or otherwise terminate **Policies** bound or written by or through **Manager** as required by applicable underwriting standards and consistent with applicable regulatory and **Policy** conditions. **Company** shall always retain the right to direct the cancellation or termination of **Policies** by **Manager** or to cancel or terminate **Policies** by direct notice to insureds or policyholders.     **Manager** shall not make, permit, or cause general or indiscriminate cancellations, terminations or replacements of **Policies**. **Manager** shall consult with **Company** before canceling **Policies** for reasons other than non-payment of premium.     **Manager** shall be responsible for notifying governmental agencies or other persons for whom **Manager** has certified coverage or provided evidence of insurance.  No **Policy** canceled or terminated by or at the direction of the **Company** may be reinstated without the prior written approval of **Company**.

Z.    Prohibited Actions.  The **Manager** shall have no authority to:

1.    Bind any reinsurance or retrocessions, including, but not limited to, facultative or treaty, on behalf of **Company**;

2.    Commit **Company** to participate in insurance or reinsurance syndicates;

3.    Appoint any producer or **Sub-producer** without reasonable assurance that such producer or **Sub-producer** is lawfully licensed to transact the insurance business for which it has been appointed;

4.    Pay or commit the **Company** to pay any claim, except as authorized by Company;

5.    Collect any payment from a reinsurer or commit the **Company** to any claim settlement with a reinsurer, without prior approval of the **Company**.  If prior approval is given, a report must be promptly forwarded to the **Company**;

6.    Permit any of its **Sub-producers** to serve on **Company's** Board of Directors;

7.    Jointly employ an individual who is employed on a full-time basis with **Company**; and

8.    Appoint a sub-Managing General Agent or Program Administrator. Notwithstanding the foregoing, Private Label and GAP Administrators that do not have underwriting authority shall be considered **Sub-producers** hereunder, and not sub-Managing General Agents or Program Administrators.

Evergreen PMA 9-16-02

CONFIDENTIAL

HE 300011

**ARTICLE IV.    Claims Settlement**

Manager has no authority to adjust, compromise, settle, pay or commit the Company to pay any claim made on the **Policies** written or bound under this Agreement except as specifically set forth in a Claims Service Agreement between Manager and Company, of even date herewith.

**ARTICLE V.    Manager's Compensation**

Company will pay the **Manager** as full compensation for all of its duties and responsibilities under this **Agreement**, a profit share as more particularly described in Exhibit B hereto.

**ARTICLE VI.    Advertising**

Manager will not refer to Company (or any division or affiliate of **Company**) in any advertisement, promotional letter, circular, pamphlet or other publication or promotional statement without the prior written consent of **Company**. Provided Company gives its consent to the content and cost of such advertising materials, Company and Manager agree to share advertising expense on a dollar for dollar basis up to an aggregate of $20,000 per party, per annum. Advertising expense, in excess of Company's aggregate limit of liability, shall be at the sole expense of **Manager** and shall remain subject to **Company's** consent to the content of such advertising materials.

**ARTICLE VII.    Representation With Respect to Policies**

Manager will not make nor allow **Sub-producers** or any other person to make any representation to applicants, insureds, policyholders or claimants as to the existence or extent of coverage either available from **Company** or under a **Policy** that is not consistent with the terms and conditions of coverages available from **Company** or of a **Policy**. Manager shall establish procedures to ensure that **Manager** and **Manager's** employees and all **Sub-producers** will make known to any applicant, insured or policyholder the full scope and effect of all exclusions and limitations upon or under coverage provided under the **Policy**.

**ARTICLE VIII.    Annual Standards for Volume, Mix and Profitability of Business**

A.    Manager will comply with any annual maximum and minimum standards of production for premium volume and profitability of **Business**, that are made a part of Exhibit A.

Evergreen PMA 9-18-02

CONFIDENTIAL

HE 300012

B.    Notwithstanding any standards of production, **Manager** will immediately comply with any notice from **Company** requiring **Manager** to cease or suspend writing or binding any new or renewal **Business**.

C.    Should the **Manager** at the end of any calendar quarter directly or indirectly produce an amount of direct written premium equal to or in excess of five percent (5%) of the policyholder's surplus for any of the insurance companies for which **Manager** is authorized under this **Agreement** as determined by the last annual statement of the insurance company filed with the company's state of domicile, and the **Manager** either directly or through affiliated companies administers claims or negotiates reinsurance, then **Company** shall notify the **Manager** and any applicable state regulatory authorities that the **Manager** is a Managing General Agent, and both the **Manager** and **Company** shall take whatever steps may be necessary to comply with each state's laws and regulations applicable to a Managing General Agency including any amendments to this **Agreement** as may be required to comply.

## ARTICLE IX.    Insurance of Manager

**Manager** will maintain for as long as this **Agreement** remains in force with unaffiliated insurers and on forms acceptable to **Company**:

A.    Professional errors and omissions policy in an amount of five million dollars ($5,000,000), or the minimum amount required by the insurance regulatory authorities of the state, whichever is greater; and

B.    Comprehensive general liability or umbrella liability insurance policy in an amount of five million dollars ($5,000,000), or the minimum amount required by the insurance regulatory authorities of the state, whichever is greater.

C.    Blanket employee dishonesty bond covering all employees of **Manager** in an amount of three million dollars ($3,000,000), or the minimum amount required by the insurance regulatory authorities of the state, whichever is greater.

**Company** shall require certificates of insurance or other evidence that the insurance required by this Article is and remains in force. **Manager** shall provide such certificates of insurance on an annual basis.

## ARTICLE X.    Indemnification

A.    **Manager** shall be responsible to **Company** and shall indemnify, save, defend and hold **Company**, including its affiliates, and all officers, directors, and employees harmless against any and all claims, suits, hearings, actions, damages of any kind, liability, fines, penalties, loss or expense, including attorney's fees caused by or resulting from any allegation of any misconduct, error, omission or other act; or breach of this Agreement by **Manager**, or

Evergreen PMA 9-18-02

CONFIDENTIAL

HE 300013

Manager's employees, or representatives, or **Sub-producers** unless the conduct giving rise to the allegation was performed at the specific direction of **Company**.

B.    **Company** shall be responsible to **Manager** and shall indemnify, save, defend and hold **Manager** harmless against any and all claims, suits, hearings, actions, damages of any kind, liability, fines, penalties, loss or expense, including attorney's fees caused by or resulting from any allegation of any direct misconduct, error, omission, or other act by **Company**, provided **Manager** has not contributed to or compounded the act alleged. ·

## ARTICLE XI.    Flat Cancellations

A.    If a **Policy** is canceled flat, the originals of the canceled **Policy** or a lost **Policy** release shall be promptly forwarded by **Manager** to **Company**. **Manager** will not cancel flat a **Policy** after it has been in effect for more that thirty (30) days without the prior written consent of **Company**.

B.    An appropriate premium charge shall be made for any **Policy** in force for a period in excess of thirty (30) days.

C.    **Manager** agrees to report to Company, on a monthly basis, all **Policy** numbers that have been voided or cancelled.

## ARTICLE XII.    Suspension of Manager's Authority

**Company** may, by immediate notice to **Manager**, suspend any part or all of **Manager's** authority under this **Agreement** for such time as **Company** may deem necessary to protect its interests or reputation if any of the following occur:

A.    Loss of Reinsurance. In accordance with ARTICLE II.D.3; or

B.    Administrative Action. An administrative accusation of violation of insurance law or regulation against **Manager** or any of **Manager's** executive officers by an insurance regulatory agency; or

C.    Indictment. **Manager** or any of **Manager's** executive officers is indicted for a criminal offense, the conviction of which would permit termination of **Manager** under this **Agreement**.

D.    Grounds for Immediate Termination. For any reason that would permit termination of **Manager** under this Agreement under ARTICLE XIII.A.1; or

Evergreen PMA 9-18-02

CONFIDENTIAL

HE 300014

E.    <u>Default.</u> The failure of Manager to perform its duties and responsibilities under this Agreement including the timely remitting of accounts and monies to **Company**, insureds or policyholders and timely and full compliance with **Company** directives, rules, regulations or manuals; or

F.    <u>Termination by Manager.</u> If the Manager gives notice of termination under ARTICLE XIII.B; or

G.    <u>Dispute Over Termination.</u> In the event of a dispute over the reason for termination of the Agreement; or

H.    <u>Premium Limitations.</u> In the event the **Company** decides in its sole discretion to restrict its premiums for the **Business** written under this **Agreement.**

## ARTICLE XIII.    Termination of Agreement

A.    Company may terminate this Agreement as follows:

1.    Immediately upon written notice to **Manager** in the event of:

a.    <u>License Suspension or Revocation.</u> An order of suspension or revocation of Manager's license by any insurance regulatory authority;

b.    <u>Misapplication of Funds.</u> A misapplication, misdirection or misappropriation by Manager of funds or property of **Company** or funds received for it or policyholders by Manager, or in the event of failure by Manager to remit to **Company** or policyholders, funds due promptly after written demand therefore by **Company**;

c.    <u>Violation of Law.</u> A charge brought against **Manager** or any of Manager's executive officers of violation of the insurance laws or regulations of any jurisdiction, or of any law constituting a felony in the jurisdiction in which committed, or of any law whose violation reflects adversely upon the honesty or integrity of **Manager** or any of **Manager's** executive officers whether or not classified as a felony;

d.    <u>Insolvency.</u> The Manager shall become insolvent or make a general assignment for the benefit of creditors; if a petition is filed for bankruptcy or other law providing for its reorganization, dissolution or liquidation; or a trustee or receiver is appointed for the Manager, its assets or a substantial part thereof;

e.    <u>Loss of Reinsurance.</u> In accordance with ARTICLE II.D.3; or

Evergreen PMA 9-16-02

CONFIDENTIAL

HE 300015

2.    Upon thirty (30) days written notice to Manager in the event of:

a.    Excessive Complaints.  The number of complaints received by Company relating to Manager's performance and service to insureds, policyholders, Sub-producers or members of the public exceeds one-half of one percent (.5%) of certificates issued with respect to Policies written in any given three month period;

b.    Adverse Legislation.  Enactment of legislation which in the opinion of Company would adversely affect Company' rights under this Agreement or liabilities under the Policies;

c.    Conflict with Law.  As provided for in ARTICLE XIX.C;

d.    Default.  The failure of Manager to perform its duties and responsibilities under this Agreement including the timely remittance of accounts and monies to Company, insureds or policyholders and timely and full compliance with Company directives, rules, regulations or manuals;

e.    Insufficient or Inaccurate Data.  The failure of the Manager to properly compute and report all required Account data as required by ARTICLE III.J;

f.    Ownership Change.  A significant change in the ownership or management of or in the event of the execution of an agreement of sale, transfer or merger of Manager without prior notice and consent of Company;

g.    Loss of Key Personnel.  The death, disability, retirement, resignation or termination of both Charles Caronia, Sr. and Andrejs Krutainis. For purposes of this section, "disability" shall be defined to mean a physical or mental condition which prevents any person named above from performing substantially all the same business duties and activities at the same pace as prior to the onset of the disability. In the event of death, disability, retirement, resignation or termination of one of the key personnel listed above, Manager shall make every reasonable effort to hire a replacement that is mutually agreeable to Manager and Company.

h.    Compliance.  Manager's failure to promptly take and complete action to correct any regulatory or statutory violation relating in any way to the subject matter of this Agreement of which the Manager has received notice from any source.

i.    Illegal or Unenforceable.  If it is determined or ordered by a court or regulatory body that any substantive provisions or term of

**CONFIDENTIAL**

HE 300016

this Agreement is found illegal or unenforceable, so that this Agreement is impaired to the extent to make the performance of either party impossible or impractical under original parties.

B.    Either **Company** or **Manager** may terminate this **Agreement** after September 24, 2004 at any time upon One Hundred and Eighty (180) days prior notice. Termination may also be effective immediately by mutual consent of both parties to this **Agreement.**

C.    If this **Agreement** is terminated for any reason, **Company** reserves the right to terminate **Manager's** appointments made with any state insurance producer licensing and appointment regulatory agencies.

D.    If this **Agreement** is terminated in accordance with ARTICLE XIII.B, **Business** shall be conducted during the notification period consistent with the same rates, rules and underwriting guidelines as were in effect at the time notice was given.

## ARTICLE XIV.    Continuing Duties of Manager after Termination

A.    If Company elects upon termination of this **Agreement,** and for as long as Company continues to desire the services of **Manager, Manager** will perform all of the duties necessary for the proper servicing of all **Policies** bound or written under this **Agreement** until all those **Policies** shall have expired or been terminated.    These services shall include canceling, issuing mandatory endorsements, collecting and returning premiums and forwarding notices of claims.

B.    So long as the **Manager** continues to perform duties in accordance with this **Article,** the **Manager** shall continue to receive the profit share set forth in Exhibit B hereto.

C.    Should **Manager** not continue to perform any duties for any reason, **Company** may discontinue payment of the profit share set forth in Exhibit B hereto.    Any payment of profit share that **Manager** may be entitled to for business written in accordance with the provisions contained in this **Agreement** prior to the termination of this **Agreement** shall not be affected.

D.    If this **Agreement** is terminated by **Company** for any reason under ARTICLE XIII, and **Company** is required to renew any **Policies** under the law of any jurisdiction the **Manager** will not be entitled to any profit share with respect to that renewal **Business.**

Evergreen PMA 9-18-02

CONFIDENTIAL

HE 300017

**ARTICLE XV.    Waiver of Statutory Termination Rights of Manager**

Both Manager and Company are aware that there are or may be laws or regulations in the various jurisdictions served by Manager that may be interpreted to provide Manager with certain rights of notice, "run-off", continuation of Business written through Manager, prevention of termination and regulatory review and possible disapproval of the termination of this Agreement. Because this Agreement has been mutually entered into for a special purpose, and places responsibilities, duties and obligations upon Manager both beyond those and different from those of a normal soliciting agent, Manager acknowledges that this therefore involves and necessitates a different relationship. Manager hereby specifically waives any and all rights with respect to termination of this Agreement that may now or hereafter be provided to Manager by statute or regulation in recognition of that different relationship, and agrees not to impose upon or require compliance by Company of any obligations relating to termination of this Agreement other than those provided for specifically in this Agreement.

**ARTICLE XVI.    Ownership of Expirations**

A.    Records of insureds, policyholders and Policies written or bound by or through Manager ("Expirations"), as between Manager and Company, shall be the sole and exclusive property of Manager except:

1.    Underwriting Records and Files as described in ARTICLE III.V above.

2.    Account and Payment Delinquency. If Manager's authority under this Agreement is suspended or terminated, in part or in full, and Manager fails to render all accounts due or pay any amounts due to Company, Company will be entitled to solicit, write and to sell insurance to any and all existing insureds or policyholders written by or through Manager. In such event the Expirations will vest in and become the sole and exclusive property of Company.

3.    Limited License. If the Manager's authority under this Agreement is suspended or terminated, in part or in full, and if any applicable insurance law or regulation prohibits Company from terminating any Policies or obligates Company to offer to continue or to renew, directly or through another producer of Company, any Policies, or insureds or policyholders previously bound or written under this Agreement, then Company shall be permitted and is hereby granted by Manager a limited license in, and a right to use the Expirations of those Policies, insureds and policyholders without any payment to Manager to permit Company to comply within its reasonable discretion and in good faith with any such insurance law or regulation.

Evergreen PMA 9-18-02

**CONFIDENTIAL**

HE 300018

4.    Default. If this Agreement is terminated by **Company** for a reason that permits immediate notice of termination to **Manager** under **ARTICLE XIII.A.1** the **Expirations** will vest in and become the sole and exclusive property of **Company.**

B.    Upon the occurrence of any event which gives rise to the vesting of the ownership of **Expirations** in **Company, Company** may take immediate possession of all records relating to those **Expirations** and **Manager** shall, upon request, immediately gather such records together at **Manager's** principal place of business and allow **Company** access to take possession of those records. **Company** may service those **Expirations** directly or dispose of them in any commercially reasonable manner. **Company** may collect premiums directly from any insured or policyholder who has not made payment to **Manager.**

C.    If **Company** disposes of **Manager's** records and **Expirations** and does not realize sufficient money to discharge in full any and all of **Manager's** indebtedness to **Company** (including any cost incurred by **Company** in connection with its recovery and disposal of the records and **Expirations**), **Manager** will remain liable to **Company** for the balance of the **Manager's** indebtedness to **Company.**

D.    If **Company** disposes of **Manager's** records and **Expirations** and there is any excess over the **Manager's** indebtedness to **Company** (including any cost incurred by **Company** in connection with its recovery and disposal of records and **Expirations**) realized by **Company,** the excess shall be remitted to **Manager.**

## ARTICLE XVII.  Offset

All amounts due **Manager** or **Company** under this Agreement or any other agreement between the parties shall be subject to the right of offset. For the purposes of this Article, **Company** and **Manager** shall include each of their respective affiliates.

## ARTICLE XVIII. Arbitration

A.    Submission to Arbitration. In the event of any dispute between the **Company** and the **Manager** with reference to the interpretation, application, formation, enforcement or validity of this **Agreement** or any other agreement between them, or their rights with respect to any transaction involved, whether such dispute arises before or after termination of this **Agreement,** such dispute, upon written request of either party, shall be submitted to the decision of a board of arbitration composed of two arbitrators and an umpire meeting at the **Company's** offices in New York unless otherwise mutually agreed. Notwithstanding the generality of the foregoing, the **Company's** right to exercise

CONFIDENTIAL

HE 300019

any of the options contained in ARTICLES XII., XIII., or XVI. shall not be limited by the submission of any dispute to arbitration.

B.    Sole Remedy. The parties agree that arbitration pursuant to the terms of this Article is the sole remedy for the resolution of disputes between them under this Agreement or any other agreement between them. The board of arbitration will have complete and exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability, and shall only conduct the arbitration proceeding to resolve disputes between the parties to this Agreement, and not as a class action involving other parties.

C.    Notice. The notice requesting arbitration shall state in particular all principal issues to be resolved, name the requesting party's arbitrator and shall set a date for the hearing, which date shall be no sooner than ninety (90) days and no later than one hundred twenty (120) days from the date that the notice requesting arbitration is mailed.

D.    Discovery. Each party may obtain discovery from the other through written interrogatories and through requests for documents, and may depose witnesses upon notice to the other. Any objections to production of documents or to the scope of discovery shall be submitted to the umpire for resolution. The umpire may schedule a conference at which the parties may present oral arguments and submit written briefs with respect to the production of documents or the scope of discovery. The umpire shall render a decision within two business days of the conference. The decision shall be binding on the parties.

E.    Arbitration Board Membership. The members of the board of arbitration shall be disinterested active or retired officers of insurance or reinsurance companies or lawyers, with at least ten (10) years of experience within the insurance or reinsurance industry. Each party shall appoint its own arbitrator. If the party receiving the notice of arbitration fails to appoint its arbitrator within 30 days after having received the written notice of arbitration, the party giving notice shall appoint the second arbitrator. The two arbitrators shall choose a third arbitrator as umpire within 30 days after appointment of the second arbitrator. If the two arbitrators fail to agree upon the appointment of the umpire within such 30 day period, either party may apply to the United States District Court for the Southern District of New York and the Court will appoint an umpire possessing the qualifications set forth above.

F.    Submission of Briefs. The parties shall submit their initial briefs within twenty (20) days from appointment of the umpire. Each may submit reply briefs within ten (10) days after filing the initial briefs.

G.    Arbitration Award. The board shall make an award with regard to the custom and usage of the insurance business which shall be in writing and shall state the factual and legal basis for the award. The board may award compensatory money damages and interest thereupon but may not award

CONFIDENTIAL

HE 300020

punitive, exemplary, extra-contractual, consequential or similar damages arising out of or in connection with a breach of this Agreement. The board may also make an award directing the Manager to provide Collateral under the terms of this Agreement. The award shall be based upon a hearing in which evidence may be introduced without following strict rules of evidence but in which cross examination and rebuttal shall be allowed. At its own election or at the request of the board, either party may submit a post-hearing brief for consideration by the board within twenty (20) days of the close of the hearing. The board shall make its award within thirty (30) days following the close of the hearing or the submission of post-hearing briefs, whichever is later, unless the parties consent to an extension. A decision by the majority of the members of the board shall become the award of the board and shall be final and binding upon all parties to the proceeding.

H.    Confirming Court Order. Either party may apply to the United States District Court for the Southern District of New York or to the Supreme Court of the State of New York, County of New York for an order confirming the award or to enforce any decision by the umpire with respect to discovery. The parties consent to the jurisdiction of any such court. A judgment of such Court shall thereupon be entered. If such an order is issued, the attorneys' fees of the party so applying and court costs will be paid by the party against whom confirmation is sought.

I.    Arbitration Expense. Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the expense of the umpire. The remaining costs of the arbitration proceedings or any other costs relating to the arbitration may be allocated by the board.

J.    Arbitration Governance. The Arbitration shall be governed by the United States Arbitration Act, Title 9 U. S.C. §1, et seq.

K.    Survival. This Article shall survive the termination of this Agreement.

## ARTICLE XIX.   Miscellaneous Terms

A.    APPLICABLE LAW.    THE RIGHTS OF THE PARTIES TO THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO NEW YORK'S RULES ON CONFLICT OF LAWS.

B.    Waiver.    The failure of the Company or Manager to insist on strict compliance with this Agreement, or to exercise any right or remedy shall not constitute a waiver of any rights provided under this Agreement, nor stop the parties from thereafter demanding full and complete compliance nor prevent the parties from exercising such a remedy in the future.

C.    Conflict with Law.    If any provision of this Agreement should be declared invalid by a court of general jurisdiction and superseded by specific law or

Evergreen PMA 9-18-02

**CONFIDENTIAL**

HE 300021

regulation, such law or regulation shall control to the extent of such conflict without affecting the remaining provisions of this Agreement. However, if either party believes that the voiding of any provision hereof materially affects the whole Agreement or the relationship of the parties under this Agreement, that party by notice may terminate this Agreement by giving thirty (30) days notice to the other.

D.     No Assignment.  Neither this Agreement nor any rights or obligations under this Agreement may be assigned or delegated by Manager without the prior written consent of Company.

E.     Notices and Service of Process

Any notices given with regard to this Agreement (other than the Company's notices or invoices with respect to amounts due hereunder) shall be sent to the following addresses by U.S. mail or any other means calculated to provide notice:

To the Company:

Hartford Fire Insurance Company
Hartford Financial Products
2 Park Avenue
New York, New York 10016
Attn: Ian Steinberg


To the Manager:

The Evergreen Organization, Inc.
P.O. Box 129
910 Evergreen Lane
Chester Springs, PA 19425
Attn: Charles Caronia


The parties hereby consent to the exclusive jurisdiction of either the U.S. District Court of State Court for the Southern District of New York or the Supreme Court of the State of New York, County of New York regarding any disputes relating to or arising out of this Agreement.  For purposes of service of process related to disputes governed by this Agreement only, the parties agree to accept service of process by personal delivery, registered or certified U.S. mail or overnight courier/delivery service to the addresses specified above.

F.     Severability.  If any provision hereof is or shall at any time be deemed invalid and unenforceable then, to the fullest extent permitted by law, the other provisions hereof shall remain in full force and effect and shall be liberally

Evergreen PMA 9-18-02

CONFIDENTIAL

HE 300022

construed in favor of the **Company** in order to carry out the intentions of the parties hereto as nearly as may be possible.

G.    Entire Agreement; Modifications. This **Agreement** constitutes the entire agreement of the parties with respect to the subject matter herein and supersedes any other previous agreements or quotations, whether written or oral, between the **Company** and the **Manager**, unless specifically referred to within this **Agreement**. Except for termination in accordance with ARTICLE XIII, this **Agreement** may not be released, discharged, amended or modified except in writing signed by both parties.    Notwithstanding the foregoing, manuals, rules, regulations, guidelines, instructions and directions issued in writing by the **Company** from time to time as provided in this **Agreement**, shall bind the **Manager** as though a part of this **Agreement**.

H.    Negotiated Agreement.   This **Agreement** has been negotiated by the parties and the fact that the initial and final draft shall have been prepared by **Company** shall not be used in any forum in the construction or interpretation of this **Agreement** or any of its provisions.

I.    Independent Contractor. This **Agreement** is not a contract of employment and nothing contained in this **Agreement** shall be construed to create the relationship of joint venture, partnership, or employer and employee between **Company** and **Manager**. **Manager** is an independent contractor and shall be free, subject to the terms and conditions of this **Agreement**, to exercise judgement and discretion with regard to the conduct of business.

J.    Promptly. Unless the context and circumstances require action sooner, the term "promptly" in this **Agreement** shall be defined to mean "within five (5) business days".

K.    Headings. The headings preceding the text of the articles and paragraphs of this **Agreement** are intended and inserted solely for the convenience of reference and shall not affect the meaning, construction or effect of this **Agreement**.

L.    Honorable Undertaking. This **Agreement** shall be considered an honorable undertaking made in good faith and shall be subject to a liberal construction for the purpose of giving effect to the good faith and honorable intentions of **Manager** and **Company**.

M.    Counterparts. This **Agreement** may be executed in duplicate counterparts each of which shall be deemed an original but both of which when taken together shall be deemed one and the same document.

Evergreen PMA 9-18-02

Page 19 of 20

**CONFIDENTIAL**

HE 300023

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Agreement below.

Manager:

Company:

The Evergreen Organization, Inc.

Hartford Fire Insurance Company

By: Charles Caronia

By: DAVID H MCELROY

Title: Chairman and CEO

Title: Senior Vice President

Date: 9/24/02

Date: 9/24/02

WITNESS: _____

WITNESS: _____

Evergreen PMA 9-18-02

Page 20 of 20

CONFIDENTIAL

HE 300024

<u>EXHIBIT A</u>

to

Program Manager's Agreement

With

The Evergreen Organization, Inc.

Effective September 24, 2002

1.    Permissible Limits of Liability Per Vehicle: As per **Policy** filings.

2.    Pricing Standards:  As per **Policy** filings.

3.    Underwriting Standards:

    3.1    **Manager** is restricted to binding and writing Insurance **Policies** issued and covering only:

        Private passenger vehicles, trucks up to 75,000 GVW, recreational vehicles, motorcycles, ATV's, personal watercraft or similar vehicles, as per **Policy** filings.

    3.2    **Manager** may not bind or write Insurance **Policies** providing coverage for the following exposures:

        Vehicles or equipment other than specified in 3.3.1 above.

    3.3    **Manager** will use an underwriting worksheet and other file documentation forms approved by **Company**.

    3.4    **Manager** shall keep current records of net written premium distribution by state of **Policies** written under this **Agreement**. Gross net written premium on multi-state risks will be distributed in accordance with premium distribution methods developed by **Company**.

4.    Maximum **Policy** period:  "Until cancelled" subject to annual anniversary.

5.    **Policy** Forms: As filed and approved for **Company's** use.

6.    Exclusions:

    6.1    **Manager** shall not bind or write **Policies** with any of the following coverages:

**CONFIDENTIAL**

HE 300025

Coverage other than GAP or similar products.

6.2    Manager shall not bind or write coverage under any **Policy** covering risk(s) engaged in the following operations or activities:

6.3    Manager shall not bind or write coverage for more than one risk or asset class under a single **Policy**. For purposes of this paragraph, a risk consisting of wholly owned and affiliated business entities under the common control of a single ultimate controlling parent shall be deemed a single risk if any of the entities insured under the original **Policy** being insured are not affiliated, wholly owned, and under common control of a single ultimate controlling parent. **Risks** where the relationship is not clear should be referred to **Company** prior to binding or writing.

Issue/Process Endorsements Modification. This Exhibit A, or any portion thereof, may be modified by **Company** in its sole discretion from time to time by written notice to **Manager**. The Manager and Hartford Fire Insurance Company (Company), intending to be bound, have executed this Amendment in duplicate, each of which shall serve as an original.

| MANAGER: | COMPANY: |
|---|---|
| BY: | BY: |
| TITLE: CEO | TITLE: Senior Vice President |
| DATE: 9/24/02 | DATE: 9/24/02 |
| WITNESS: Ira Steinberg 9/24/02 | WITNESS: Ira Steinberg 9/24/02 |

**CONFIDENTIAL**

HE 300026

# EXHIBIT B

EXHIBIT B

to

Program Manager's Agreement

With

The Evergreen Organization, Inc.

Effective September 24, 2002


[Insert Profit Share Calculation]

CONFIDENTIAL

HE 300027

# CLAIMS
# SERVICING AGREEMENT

Between

## THE EVERGREEN ORGANIZATION, INC.

And

## HARTFORD FIRE INSURANCE COMPANY

A Connecticut company
having its principal offices at

690 Asylum Street
Hartford Plaza
Hartford, CT 06115

1

CONFIDENTIAL

HE 300028

## TABLE OF CONTENTS

| ARTICLE | SUBJECT |
|---------|---------|
| I | Commencement and Termination |
| II | Definitions |
| III | Warranty and Services Provided |
| IV | Discretionary Settlement Authority Limit |
| V | Proprietary Interest |
| VI | Independent Contractor Status |
| VII | Indemnification |
| VIII | Compensation |
| IX | Conditions and Limitations |
| Exhibit A | GAP Policy |
| Addendum #1 | Claims Procedures |
| Addendum #2 | Service Fee Agreement |
| Addendum #3 | Insurance of the Service Company |

2

CONFIDENTIAL

HE 300029

# CLAIMS SERVICING AGREEMENT

This Claims Servicing Agreement (hereinafter referred to as "Agreement") is made and entered into by and between Hartford Fire Insurance Company and its insurance company affiliates and subsidiaries (hereinafter referred to as "Insurer") and The Evergreen Organization, Inc. (hereinafter referred to as "Service Company").

WHEREAS, Insurer has issued an insurance Policy and is willing to grant Service Company the authority to provide claims adjusting and administrative services on its behalf with respect to said Policy under the terms and conditions hereinafter set forth; and

WHEREAS, Service Company is in the business of providing Claims Services on behalf of insurance companies and is willing to provide such Claims Services on behalf of Insurer in accordance with the terms and conditions set forth below for the Policy that is identified in Exhibit A attached to and forming a part of this Agreement.

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

*(Capitalized terms used herein are defined in Article II except for the terms set in quotation marks in the first paragraph of this Preamble).*

## ARTICLE I

COMMENCEMENT AND TERMINATION

A.    This Agreement is effective as of September 24, 2002 and will continue in full force and effect for a period of one year unless renewed or terminated as provided in this Article. If the Insurer chooses in its sole discretion not to renew this Agreement, it shall provide the Service Company with sixty (60) days prior written notice of such intent. Absent of any notice as provided herein, this Agreement shall terminate as of the sixtieth (60th) day following the anniversary of the Agreement.

B.    The Insurer shall have the right to terminate this Agreement upon thirty (30) days prior written notice to the Service Company in the event of:

3

CONFIDENTIAL

HE 300030

1.  A significant change in the ownership or management of or in the event of the execution of an agreement of sale, transfer or merger of the Service Company without prior notice and consent of the Insurer.

2.  The death, disability, retirement, resignation or termination of both Charles Caronia, Sr. and Andrejs Krutainis. For purposes of this section, "disability" shall be defined to mean a physical or mental condition which prevents any person named above from performing substantially all the same business duties and activities at the same pace as prior to the onset of the disability. In the event of death, disability, retirement, resignation or termination of one of the key personnel listed above, Service Company shall make every reasonable effort to hire a replacement that is mutually agreeable to Service Company and Insurer.

C.  Either the Insurer or the Service Company shall have the right to terminate this Agreement as follows:

1.  Upon thirty (30) days prior written notice to the other party in the event of a breach of this Agreement by the other party. However, either party shall have the opportunity to cure any breach of this Agreement, which is the basis for the assertion of such default. If such breach is not cured within thirty (30) days of such notice then the Agreement shall terminate.

2.  Immediately upon written notice to the other party in the event of the other party's fraud, abandonment, gross or willful misconduct, insolvency, or lack of legal capacity to act pursuant to the terms of this Agreement.

3.  After September 24, 2003, upon sixty (60) days prior written notice to the other party, for any other reason.

D.  Notwithstanding the termination of this Agreement as provided above, the provisions of this Agreement shall continue to apply to the extent needed for all obligations and liabilities incurred by each party hereunder prior to such termination to be fully performed and discharged by such parties. Subject to Article VIII, this will include, without limitation, the Service Company's obligation to Adjust to their conclusion all Claims incurred (including closed Claims that must be re-opened for additional handling) with respect to Policies prior to the effective date of any termination and to comply with all aspects of this Agreement with respect to the adjusting, reporting and settlement of such Claims, unless the Insurer has elected to terminate this Agreement, in which case the Insurer shall take over any and all outstanding Claims as of the termination effective date. The Service Company shall also have the responsibility to continue to provide the data as described in Article III.B hereof until such time as all open and closed Claim Files have been transmitted to the Insurer or its designated representative to handle to a conclusion.

4

CONFIDENTIAL

HE 300031

E.    Insurer will have the right in the event of a termination of this Agreement to possession of all Claim Files (hard copy and computer) and other records relating to such Claims and this right may be exercised at any time after the termination effective date. In the event the Insurer takes over handling of any or all outstanding Claims after the termination effective date, the Service Company agrees to cooperate with and instruct its employees to cooperate with the Insurer in connection with the handling of such Claims.

## ARTICLE II

**DEFINITIONS**

As used in this Agreement, the following terms shall have the following meanings:

A.    "Adjust" means the process, in accordance with Article III, of investigation, evaluation and disposition of a Claim alleging loss which may be covered by a Policy.

B.    "Case Reserve" means the reasonable estimate of the value of a Claim and its associated Loss Adjustment Expense.

C.    "Claim" means any monetary demand or suit arising out of or in connection with any actual or alleged loss incident, occurrence or accident, as such terms are defined in a Policy.

D.    "Claim File" means the accumulated documentation that evidences the Claim adjusting process, pursuant to Article III, arising from any single loss incident, occurrence or accident as such terms are defined in a Policy.

E.    "Loss Adjustment Expense" means direct expense allocated to a specific Claim for its investigation, settlement or defense, or any cost, fee or expense reasonably and customarily chargeable to the direct investigation, negotiation, settlement or defense of a Claim or loss, or to the protection or perfection of the Insurer's subrogation rights and/or the rights of the first named insured of a Policy.

F.    "Named Insured" means the entity as so defined in a Policy.

G.    "Policy" means a contract of insurance, including any and all endorsements thereof, in a form as so identified on the attached Exhibit A.

H.    "Claims Services" means those functions and procedures described in Article III.

5

CONFIDENTIAL

HE 300032

I.    "Service Fee" means the fee paid, pursuant to Article VIII and Addendum #2 of this Agreement, by the Insurer to the Service Company for the performance of Claims Services.

J.    "Systems" means computer programs (including modifications) and computer equipment which are necessary to meet the Claim reporting and data requirements under this Agreement.

## ARTICLE III

WARRANTY AND SERVICES PROVIDED

Service Company represents and warrants that it fully understands the provisions of all coverages associated with the Policy subject to this Agreement.

Subject to all other terms and conditions of this Agreement, Service Company shall have the authority and responsibility to provide the following Claim Services in connection with any Policy:

A.    "Claims" Handling Duties

1.    Adhere to Claims reporting and handling procedures as described in this Article and in Addendum #1 attached to and forming a part of this Agreement.

2.    Review all incidents and Claims against Insurer that are reported to Service Company pursuant to any Policy, including incidents that have been reported but for which no Claims have been made.

3.    Initiate and maintain a Claim file for each reported Claim. This information shall be available for Insurer's review during normal business hours after notice to Service Company and shall represent a true and complete record of all transactions and correspondence with the insured(s), claimants, agents, brokers, attorneys, adjusters, investigators, Insurer and any other person or entity regarding such Claims.

4.    With the prior written approval of Insurer, conduct, or engage the service of others to conduct appropriate investigation of such Claims.

5.    With the prior written approval of Insurer, secure Claims related services, where necessary, including but not limited to providing trained, competent and, where required, licensed claims adjusters, investigators or appraisers on a seven (7)-days-a-week/twenty-four (24) hour basis, and perform the services to be rendered hereunder in accordance with industry-wide

6

CONFIDENTIAL

HE 300033

standards, in good faith, and in accordance with all applicable laws and regulations.

6.  Determine and refer any actual or potential coverage issues arising out of or in connection with such Claims to Insurer. Service Company may make recommendations to Insurer regarding coverage, but Insurer shall retain final and sole discretion regarding such coverage.

7.  Establish an adequate Case Reserve for every Claim. Insurer retains the right to review and change the amount of the Case Reserve where it is deemed appropriate by Insurer.

8.  Adjust Claims within Service Company's discretionary settlement authority limits as defined in Article IV, and pursuant to the procedures as specified in Addendum #1 attached to and forming a part of this Agreement:

   a.  That in Service Company's judgment, Insurer is legally obligated to pay; or

   b.  That Insurer advises Service Company to pay.

Service Company will decline payment on Claims within such discretionary settlement authority limits, as defined in Article IV, that in Service Company's judgment, Insurer is not legally obligated to pay.

Service Company will adjust Claims in a timely manner in accordance with the procedures established by Insurer and Service Company as described in this Article and in Addendum #1 of this Agreement. In addition:

   a.  Service Company shall create, place in file(s) and furnish, on demand, to Insurer detailed documents pertaining to its investigation and evaluation of all claims, regardless of amount.

   b.  Insurer reserves the right to request a synopsis of the investigation and evaluation of all Claims and to direct Service Company on the adjustment of any Claim, regardless of the amount of the Claim or damage.

   c.  Service Company must notify Insurer, in advance, of taking any action on any Claim which:

      (1)  Service Company believes should be denied for lack of coverage; or

7

CONFIDENTIAL

HE 300034

(2)    Is a controverted Claim;

(3)    Service Company believes is fraudulent or involves material misrepresentation; and/or

(4)    Service Company believes Insurer or Service Company, on Insurer's behalf, should issue a reservation of rights letter.

Service Company will handle such Claim as mutually agreed at that time.

9.    Supervise all litigation or other proceedings involving any Claim and, where permitted, attend any judicial or administrative hearing involving any Claim, and participate in the prosecution of any fraudulent Claim.

10.   Unless Insurer advises Service Company in writing otherwise, fully investigate and report to Insurer and recommend settlement of Claims which exceed Service Company's discretionary settlement authority limits, as defined in Article IV. Insurer shall make all material decisions relative to final disposition of such Claims, and Service Company shall negotiate settlement of such Claims as directed by Insurer.

11.   Protect any subrogation rights which may be available to Insurer and pursue Insurer's subrogation, where applicable, through negotiation.

12    Furnish all forms necessary for proper Claims administration.

13.   Take responsibility for regulatory compliance concerning all matters for which it is responsible as a licensed adjuster and/or Claims administrator under this Agreement. Insurer shall be responsible for regulatory compliance concerning all matters relevant to the Policy.

14.   Adhere to Claims reporting and handling procedures as described in this Article and in Addendum #1 of this Agreement.

B.    Duties with respect to Claims Reporting:

1.    For so long as this Agreement shall be in effect and pursuant to the procedures described in Addendum #1 of this Agreement, Service Company agrees to input claim data, upon receipt, into Insurer's "WINS" system.

CONFIDENTIAL

8

HE 300035

2.   Service Company must also notify Insurer immediately and involve Insurer in the adjustment of a Claim when a reported Claim involves the following:

    (a).   Suits naming Service Company and/or Insurer as a defendant; or

    (b).   Coverage questions; or

    (c).   Punitive claims; or

    (d).   Denial of coverage.

D.   **Bad Faith Claims Handling**: Upon receipt of notice of any claim against Service Company or Insurer relating to a Claim administered by Service Company alleging bad faith on Insurer's part and/or Service Company's part in the handling of that Claim, Service Company will immediately send a copy of such notice, lawsuit and/or demand letter, along with a complete copy of the related Claim file to Insurer.

This clause shall survive the termination of this Agreement.

E.   **Claim File Management**: Service Company shall maintain copies of all correspondence and written analyses of Claim activity in a Claim file in ascending date receiving order for each Claim (or claimant), while such Claim is open.

F.   **Closed Claim Files**: Service Company will retain and store closed Claim files in their existing state at the time of closure for a period of three (3) years from the closure date, after which Service Company will return the Claim files to Insurer.

G.   Service Company will provide Insurer with all the data required for reporting as required by state statute or regulation and as specified by Insurer.

## ARTICLE IV

DISCRETIONARY SETTLEMENT AUTHORITY LIMIT

A.   Service Company is granted the authority and responsibility within the discretionary settlement authority limit described in Addendum #1 to perform the Claim Services.

B.   Insurer reserves the right, on any particular Claim, and upon written notice to Service Company, to revoke the authority granted in this Article and treat said Claim as requiring Insurer's approval prior to final disposition.

9

CONFIDENTIAL

HE 300036

C.  In the event Insurer selects counsel for any Claim covered by this Agreement, the discretionary settlement authority limits set forth in this Article IV shall not apply, and Service Company's responsibility shall be limited to services set forth in Article III that will assist the selected counsel in adjustment of said Claim.

D.  Service Company shall have the right to consult with Insurer on coverage questions with respect to a specific Claim.

E.  Where appropriate, and in accordance with the procedures established by Insurer as described in Article III above and in Addendum #1 attached hereto and forming a part of this Agreement, Service Company may be given written authority by Insurer to issue payments on claims in amounts above Service Company's five thousand dollars ($5,000) settlement authority limit.

## ARTICLE V

PROPRIETARY INTEREST

A.  Ownership of Systems: All Systems created, purchased or licensed by Service Company and used in the performance of activities under this Agreement shall belong to Service Company, and remain its property, Insurer having no ownership interest therein. All Systems created, purchased or licensed by Insurer and which Insurer provides for Service Company's use in the performance of activities under this Agreement shall remain Insurer's property, Service Company having no ownership interest therein. Service Company will return Insurer's Systems to Insurer upon termination of this Agreement.

B.  Ownership of Claim Files: All Claim files and materials gathered by Service Company in the course of investigating, defending or settling any Claim under this Agreement shall be and remain Insurer's property.

C.  Accessibility of Data: The data gathered by Service Company in the course of investigating, defending or settling any Claim under this Agreement shall be made available to Insurer at the prescribed periods and intervals as described in Article III above and in Addendum #1 attached hereto and forming a part of this Agreement. From time to time Insurer may request additional reports and Service Company will cooperate with Insurer in furnishing such reports when such request is made.

D.  Protection of Data: Service Company shall make all reasonable efforts to ensure the availability and security of the computer data and operations of its computer hardware and software. Service Company shall designate a representative of senior management to remove computer data backup tapes on a daily basis and

10

CONFIDENTIAL

HE 300037

store the tapes at a secure location, to be approved by Insurer, for a period of ninety (90) days, prior to re-use of the tape.

E.     Confidentiality:  The parties to this Agreement acknowledge that during the course of this Agreement, either party may learn confidential, patent, copyright, business, trade secret, proprietary or other like information belonging to the other, including information about the other party's software, customers and business. Both parties warrant and represent that all information exchanged between them shall be deemed confidential.  The parties shall make all reasonable efforts to maintain the confidentiality of all information supplied to and used by each other in the performance of this Agreement.  Neither party will disclose information about the other party without its prior written consent.

The parties agree that such information learned or acquired will be used only in the course of the performance of this Agreement, and that each party will keep such information only for its own use and will not disclose it or provide it to any other person or entity without the prior written consent of the other party.

Notwithstanding the foregoing, neither party shall be liable for a disclosure to others of information (1) that was generally available to the public prior to the release of said information; (2) that was received from a third party having no obligation to the other party(ies) to hold said information in confidence; (3) that is independently developed by such party; or (4) that is required to be disclosed by court order or operation of law.

The parties agree to notify all of their respective employees, agents, representatives, clients and customers having access to information about the other that is learned in the course of the performance of this Agreement that such information is proprietary and confidential and shall not be reproduced, distributed, disclosed or used for any purpose except to fulfill the express purpose of this Agreement.

Service Company warrants and represents that all records, data, files, input materials, reports, forms and other data received, computed, developed, used or stored pursuant to this Agreement shall not be combined at a level which makes it possible for any third party to identify either a claimant, policyholder, account, company executing coverage, or organization providing any service whatsoever without Insurer's advance written consent.

## ARTICLE VI

INDEPENDENT CONTRACTOR STATUS

11

CONFIDENTIAL

HE 300038

Service Company, at all times, shall be an independent contractor, and its employees shall in no event be considered Insurer's employees. No agency relationship between the parties, except as expressly provided for herein, shall exist as a result of the execution of this Agreement or performance thereunder unless required by law or regulatory authority. Service Company reserves the right, in its sole discretion and at its own expense, to assign performance of activities under this Agreement to any of its personnel and, upon prior written notice to Insurer, to retain the services of subcontractors to perform any part or all of its duties under this Agreement, provided, however, that:

1. Any subcontracting by Service Company shall not relieve it of its obligations to Insurer under this Agreement; and

2. Insurer has the right to require Service Company to terminate any of its subcontractors in connection with such services.

## ARTICLE VII

INDEMNIFICATION

A. Insurer shall indemnify, defend and hold Service Company (and any of its parent companies, subsidiaries and affiliates, and each of its and their respective officers, directors, agents, employees, successors and assigns) harmless from any and all claims, suits, losses, judgments, damages, costs, administrative fines, penalties or expenses incurred by Service Company because of any of Insurer's or its employees' or agents' negligent acts or omissions or willful acts or a crime or civil wrong or because of Service Company's or its agents' or employees' negligent acts or omissions or willful acts or a crime or a civil wrong to the extent caused or committed by Service Company of its agents or employees at Insurer's specific direction in connection with Claims Services performed or executed under this Agreement.

B. While this Agreement is in effect and for five (5) years after its termination, Insurer shall indemnify, defend and hold harmless Service Company (and any of its parent companies, subsidiaries and affiliates) from any claim arising from premium taxes or "assessments" with respect to loss payments. Service Company shall promptly notify Insurer of such claim and shall afford Insurer the opportunity to join in any proceeding to contest such claim. For purposes of this paragraph "assessment" shall mean any assessment, tax or other charge imposed against Service Company as the insurer of record.

C. Service Company shall indemnify, defend and hold Insurer (and any of its parent companies, subsidiaries and affiliates, and each of its and their respective officers, directors, agents, employees, successors and assigns) harmless from any and all claims, suits, losses, judgments, damages, costs, administrative fines, penalties or

12

CONFIDENTIAL

HE 300039

expenses incurred by Insurer because of any of Service Company's employees' or agents' negligent acts or omissions or willful acts or a crime or civil wrong including but not limited to:

1.   Any embezzlement or other mismanagement by any of its employees or agents of loss payment funds; or

2.   Any failure to comply with Insurer's instructions or requirements as provided herein with respect to the disbursement of monies for loss payment; or

3.   Any violations of fair claims practices statutes or regulations

in connection with Claims Services Service Company performs or executes under this Agreement to the extent to which such negligent act or omission or willful act or a crime or a civil wrong was not at Insurer's specific direction.

## ARTICLE VIII

COMPENSATION

Insurer will pay Service Company a flat, per claim Service Fee as more particularly described in Addendum #2 attached hereto and made a part hereof. All necessary Loss Adjustment Expense shall be paid by Service Company from this Service Fee, and Insurer shall have no obligation or liability with respect to the payment of Loss Adjustment Expense.

## ARTICLE IX

CONDITIONS AND LIMITATIONS

A.   Service Company does not act as an insurer for any insured, and this Agreement shall not be construed as an insurance policy or any contract or agreement of indemnity; it being understood that Service Company is in no event financially responsible for payment or satisfaction of Claims, lawsuits, or any form of cause of action against any Named Insured under the Policies.

B.   Service Company shall in no event be engaged in the practice of law. The Claims Services to be provided by Service Company are not of a legal nature, and Service Company shall in no event give, or be required to give, any legal opinion or provide any legal representation to Insurer, nor may any communication prepared by Service Company be relied upon by Insurer as a legal opinion or interpretation. Service Company may, but shall be under no duty to recommend counsel to

13

CONFIDENTIAL

HE 300040

Insurer. Insurer, at all times, shall have full and sole discretion to select legal representative and counsel of its own choosing, and any selection of such representation of counsel shall be by separate agreement between Insurer and such counsel.

C.   Notwithstanding anything else stated herein to the contrary, Insurer will have the right and retain the ultimate authority to:

1.   Investigate, defend or settle any Claim under any Policy subject to this Agreement; and

2.   Assume control over any Claim under any Policy subject to this Agreement. The assumption of control shall include, but not be limited to, the investigation and settlement of any such Claim, the selection or retention of counsel and appeal of any judgment.

D.   As respects the Claims Services provided by Service Company under this Agreement:

1.   Service Company will obtain and hold the appropriate licenses, both corporate and individual, for all jurisdictions in which it performs Claims Services with respect to both adjusting and administering Claims.

2.   Any reports rendered to Insurer may be relied upon only to the extent of the express purpose of such reports, as such purpose may be from time to time set forth in writing by Service Company.

E.   Service Company shall not be liable for consequential damages, punitive damages, or damages of a similar nature that may be incurred by Insurer or any Named Insured under any Policy as a result of the Claims Services provided herein unless such damages are caused primarily by Service Company or its employees' or agents' negligence or willful misconduct. In no event will Service Company be liable for such damages resulting from its actions or inactions taken at Insurer's specific direction.

F.   This Agreement applies only to the activities expressly referred to herein. Service Company shall have no other obligations or responsibilities for Insurer's insurance, reinsurance or self-insurance programs.

G.   Insurer may, upon reasonable advance notice, inspect and audit Service Company's records with respect to any matter covered by this Agreement. Any such inspection or audit shall be conducted in a manner so as to not unnecessarily interfere with Service Company's business. These rights of audit shall survive the termination of this Agreement for a period of three (3) years.

14

CONFIDENTIAL

HE 300041

H.    Service Company agrees to maintain at its expense insurance with respect to General Liability, Fidelity Bond, and Professional Errors and Omissions coverages which cover its operations, on the amounts set forth on Addendum #3 attached hereto and made a part hereof. Such insurance must be provided by financially secure insurance and/or bonding companies. Service Company shall submit proof of certificates evidencing said insurance to Insurer annually and upon written request.

I.    Neither this Agreement nor any rights thereunder shall be assigned by either party without the prior written consent of the other party first having been obtained.

J.    The terms of this Agreement shall be governed by the laws of the State of Connecticut. Any adjudication by any court of competent jurisdiction which invalidates any part of this Agreement shall not act to invalidate any other part thereof.

K.    This Agreement, including the Exhibits and Addenda which are attached to and form a part of this Agreement, referred to herein, constitutes the entire understanding and agreement between the parties, and supersedes all prior and contemporaneous agreements or understandings, written or oral, of the parties hereto with respect to the subject matter of the Agreement. This Agreement may be amended only in writing executed by the parties. No waiver of one or more provisions of this Agreement shall constitute waiver of any other provision hereto. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, legatees, representatives, successors and assigns. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

L.    All notices to be given pursuant to this Agreement shall be in writing, and shall be deemed to have been duly given when personally delivered or if mailed by registered or certified United States mail, return receipt requested, five (5) days following deposit in the mail. Notices shall be delivered or mailed to following addresses:

15

CONFIDENTIAL

HE 300042

If to Insurer:

Hartford Fire Insurance Company
c/o Hartford Financial Products
2 Park Avenue, 5th Floor
New York, NY 10016
Attn: Ian Steinberg

If to Service Company:

The Evergreen Organization, Inc.
P.O. Box 129
910 Evergreen Lane
Chester Springs, PA. 19425
Attn: Charles Caronia, Sr.

*IN WITNESS WHEREOF*, the parties have executed this Agreement on the day and year first above written.

The Evergreen Organization, Inc.

By Charles Caronia, Sr.
Name & Title CHARLES CARONIA CEO
Date 9/24/02

HARTFORD FIRE INSURANCE COMPANY

By
Name & Title Donald McElery Senior Vice Pres DM
Date 9/24/02

16

CONFIDENTIAL

HE 300043

EXHIBIT A

[Insert GAP Policy & Endorsements]

CONFIDENTIAL

HE 300044

ADDENDUM #1

Claims Procedures – Evergreen Organization

Evergreen to require, prior to payment, the following information and documentation:

1) Legible dated Gap Addendum/Waiver, or Certificates of Insurance/other bona-fide confirmation where "private label" coverage/"blanket" policies involved.
2) Legible dated Finance Contract and/or Lease
3) Legible copies of back-up documentation for payoff figure
4) Legible dated documentation evidencing cancellation of extended Warranty, Credit Life and Credit Disability coverages, and confirming calculation of applicable credit.
5) Legible evidence of primary insurance deductible
6) Legible evidence of primary insurance payment
7) Legible copy of Police report (Mandatory where theft involved)
8) Account number and specific name of lender's representative to receive the claim payment.

Evergreen to open file in WINS database immediately upon receipt of claim. Evergreen to input at time of opening, or if unavailable at that time, prior to processing of payment request, all categories of information called for in WINS data fields.

Evergreen to index new claims by file number upon receipt, and maintain separate open and closed files. For open claims, the procedure will include establishing a file number and placing in the file all checklists, notes, correspondence, faxes and materials of any other type pertinent to the claim. Open files to be organized as follows: WINS abstracts, copy of WINS screen print for payment request and copy of check abstract, claim notes, loss worksheet, Finance Contract/Lease, Gap Waiver or other coverage documentation, payoff back-up documentation, amortization figures/documentation, documentation confirming refunds attributable to cancelable coverages, primary insurer's payment and deductible documentation, NADA reports, police report and written confirmation of efforts to secure police report, and correspondence.

Closed files are to be indexed by claim number, and an index is to be prepared and updated monthly, listing closure date and file location.

CONFIDENTIAL

HE 300045

Addendum #1
September 24, 2002
Page 2

Evergreen established lines of authority on basis of severity to be $1,000 or less for Examiner; $1,001 - $2,500 for Claim Manager, $2,501 - $4,999 for Senior Management.

Examiner to complete coverage confirmation procedure for each claim. Legible signed and dated Gap Waiver/Addendum to be obtained. Where "private label" or "blanket coverage" is involved, secure Certificate of Insurance or other bona-fide confirmation of coverage, and place in file with signed and dated notes documenting confirmation of coverage.

Evergreen to complete claim adjustment checklist for each claim. Checklist form to be revised to include section entitled claim payment amount. Where the payoff amount used in adjusting the claim differs from the figure referenced in back-up documentation obtained from the bank/finance company, explanation to be inserted in additional comments section of form. Examiner and supervisor's names to be inserted on form, each form is to be dated and placed in the respective file.

Evergreen to place copies of fax/letter requests for additional documentation in claim files.

Evergreen to insert notes concerning all telephone conversations on telephone log sheet, and place log sheets in claim files. Examiner's name and date to be entered next to notes.

Evergreen to place all e-mails, faxes and correspondence exchanged to/from Hartford Home Office in claim files.

Evergreen to place all WINS abstracts, WINS screen print for each payment request and copies of check abstracts in claim files.

Member of Evergreen Senior Management to be designated to approve payment on all claims $2,501 to $4,999. Written documentation approving payment to be prepared, signed and dated, and placed in file.

Member of Evergreen Senior Management to be designated to committee all claims $2,501 and up prior to payment and or referral (where claim is $5,000 or greater), once those claims are reviewed by Charles Caronia Jr. and Kristi Rissell. Written notes confirming decision of Senior Management to be prepared, signed and dated, and placed in each file reviewed.

CONFIDENTIAL

HE 300046

Addendum #1
September 24, 2002
Page 3

All claims $5,000 and above are to be referred to New York Home Office for claims approval. Evergreen to furnish New York Home Office with complete copies of all file materials, including telephone log sheets, claim checklist forms, file notes, Senior Management's review notes and Large Loss Claim forms for these claims.

Evergreen to immediately implement formal internal diary system for all open claims. Files to be diaried on a thirty (30) day basis, or earlier if circumstances warrant. Diary dates to be recorded manually, and to be referenced on front of claim files. Diary review to be completed on a daily basis.

Members of Evergreen Senior Management to be designated to perform random internal audits of open unpaid Hartford claims less than $2,501 every thirty (30) days; and to perform internal audit of all open unpaid Hartford claims greater than $2,501 every thirty (30) days. Written documentation confirming completion of audit reviews and containing audit findings are to be prepared , signed and dated, and placed in files.

Evergreen to create database listing up to date addresses for banks and finance companies to whom payments have/will be made. Database to be accessed and payee address to be confirmed before claim payment requests are inputted in WINS.

When claim payment request is entered in WINS, Evergreen shall direct the payment to a specific contact representative, and when that information is unavailable, to the attention of Payoff Department.

Where Evergreen pays a claim which includes reimbursement of a deductible, Evergreen to forward to primary insurer within thirty (30) days of issuance of payment, notice of the payment, which notice shall include a request that the primary carrier keep Evergreen advised of its subrogation efforts and advise Evergreen immediately of any deductible recovery received.

All stop pay/check re-issuance transactions to be handled as follows, and documentation placed in file. Detailed file notes to be created substantiating reason for stop pay, and memorializing Evergreen's conversations with payee regarding non-receipt of check, and issuance of replacement check. Examiner's name to be inserted on notes, notes to be dated, and placed in file. Evergreen to send an e-mail to Hartford Home Office in New York identifying the Hartford claim number, Hartford policy number, payee name, check date, check number

CONFIDENTIAL

HE 300047

Addendum #1
September 24, 2002
Page 4

and check amount, and reason for void request. If an original check which was previously voided is returned to Evergreen, Evergreen shall mark the front of the check Void, and immediately return the check to Hartford Home Office in New York.

Evergreen Senior Management to perform random audits of closed Hartford claims within thirty (30) days of file closure to ensure compliance by Evergreen with best practices claims handling, and also to confirm claim trends. Written documentation confirming completion of audit reviews and containing audit findings are to be prepared, signed, dated and placed in each file reviewed.

Within twenty-four (24) hours of receipt of a request from Hartford Home Office for back-up documentation in connection with random check audits, Evergreen to fax to Hartford Home Office copies of all file documentation relating to the claim for which a WINS payment entry has been inputted.

In 2002, Hartford Financial Products will conduct on-site audits of Evergreen's operations and procedures on a Quarterly basis, or earlier, should circumstances warrant.

CONFIDENTIAL

HE 300048

## ADDENDUM #2

### Service Fee Agreement

Insurer, subject to its rights under this Agreement, shall pay Service Company a flat fee of Forty and no/100s ($40.00) dollars for each Claim administered pursuant to Article III hereof.

CONFIDENTIAL

HE 300049

## ADDENDUM #3

### Insurance of the Service Company

Professional errors and omissions policy in an amount of $5,000,000.

CONFIDENTIAL

HE 300050

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X
HARTFORD INSURANCE COMPANY,

                                    Petitioner,

                    -against-

THE EVERGREEN ORGANIZATION, INC., et al.,
                                    Respondents.
--------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:   9/8/05

04 **CIVIL** 3333 (LAK)

**JUDGMENT**

        Whereas the above-captioned action having come before this Court, and the matter having

been brought before the Honorable Lewis A. Kaplan, United States District Judge, and the Court,

on September 7, 2005, having issued its Order granting the petition to compel arbitration which is

not opposed, it is,

        **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Order dated September 7, 2005,  the petition to compel arbitration, which is not opposed,

is granted; accordingly, the case is closed.

**Dated:**  New York, New York
           September 8, 2005

                                            J. MICHAEL MCMAHON
                                    _____
                                            Clerk of Court

                            **BY:**
                                    _____
                                            Deputy Clerk

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____