# EXHIBIT D

**In the Matter of the Arbitration Between**

---

**Hartford Fire Insurance Company,**
**Claimant and Counter Respondent**

Bernd G. Heinze, Arbitrator

**And**

Andrew S. Walsh, Arbitrator

David Thirkill, Umpire

**The Evergreen Organization, Inc.**
**Charles Caronia, Sr.**
**Charles Caronia, Jr.**
**Gary Uphouse**
**Andrejs Krutainis**
**Respondents and Counter Claimants.**

---

## INTERIM FINAL ORDER

This Panel was convened on February 25, 2005 to resolve disputes, initially, between Hartford Fire Insurance Company and The Evergreen Organization. Subsequently, and following a court order to the effect, certain individuals were joined as additional parties. The disputes arose out of a Program Management Agreement (PMA) and Claims Servicing Agreement (CSA) both effective originally July 1, 2000.

The Panel conducted a hearing in this arbitration from January 8 to 12, 2007 during which extensive documentary evidence was presented and numerous witnesses heard. Additional testimony and Post Hearing briefs have been presented to the Panel.

The Panel having considered the testimony, documentary evidence, briefs and relevant case law, met thereafter, now issues this following Final Order:

1. Hartford sought relief for unauthorized diversion of premium trust funds involving a variety of issues (including profit commission and fees related to claims administration, terrorism, counter signatories etc.). Evergreen made certain counter claims in these regards. The Panel paid particular attention to the issues of claims administration. It noted that the contract is imprecise but the course of conduct appeared to be that payments to Evergreen (at least to December 2003) were on claims closed with payment only. But Evergreen did administer certain claims which closed without payment albeit the Panel could not ascertain exactly which or how many. The Panel accordingly awards Hartford the sum of $440,000 plus interest in the amount of $117,000. All other claims of Hartford and all other counter-claims of Evergreen in this respect are denied.

2. Hartford sought interest on unauthorized payment of Reliance claims. Previously, Hartford had sought a principal amount but withdrew that at the hearing on the basis that it is seeking (or had already received) recovery from Reliance. It is advised to seek interest from Reliance also. Its claim in this respect is denied.

3. Hartford sought damages in the amount of $93,894.50 for certain costs in defending claims in a, so-called, MMCA litigation. Hartford failed to convince the Panel that Evergreen or the individuals did not comply with Article 3-N(4) of the PMA and therefore concludes that neither Evergreen nor any of the individuals breached any fiduciary duty. Hartford's request is denied.

4. Evergreen sought damages in the amount of $80,750.00 for funds owed to Arch Insurance Company that were allegedly part of the funds that were frozen by the Federal District Court as part of the proceedings leading up to this arbitration. Evergreen produced no proof that the premiums allegedly owed to Arch Insurance Company were held in a premium trust account for the benefit of Arch Insurance Company. Evergreen's request is denied.

5. Hartford sought relief in an amount of $4,796,243 for alleged wrongful acts of Evergreen related to the so-called JM&A account:

    i.     The PMA states that instructions and directions issued in writing by Hartford shall bind Evergreen.

    ii.    By letter dated December 19 2001, Hartford instructed Evergreen that all "Private Label" programs be submitted to Hartford for its approval.

    iii.   In July 2001, Hartford rejected Evergreen's proposal to write a "JM &A" program. The individual who made that decision was Andrejs Krutainis, then a Hartford employee.

    iv.   In December 2001, Hartford advised Evergreen it was suspending Evergreen's duties under the PMA.

    v.    That suspension was eventually lifted partly because Evergreen, at the insistence of Hartford, hired Mr. Krutainis to take over certain duties at Evergreen, including underwriting responsibilities, previously, the responsibilities of Gary Uphouse.

    vi.   During the summer of 2002, Mr. Uphouse underwrote a JM&A account. That account was clearly Private Label business.

    vii.   The Panel believes that Mr. Uphouse deliberately concealed his actions from Mr. Krutainis. It concludes that had he referred the matter to Mr. Krutainis, as he should have done, Mr. Krutainis would most likely have rejected it, as he had done before.

    viii.  The Panel is also of the opinion that Mr. Uphouse knew that even had Mr. Krutainis changed his mind, he would have first referred the matter to Hartford (as Evergreen was obliged to do) and that, in all probability, Hartford would have rejected the proposal on the terms presented.

ix.   The Panel believes Mr. Uphouse acted deliberately and willfully wrongly and in utter and reckless disregard of his and Evergreen's duties under the PMA.

x.    By virtue of its agency agreement with Evergreen, Hartford who had never wished to have the JM&A business, became "stuck" with it and, not unreasonably in the circumstances, determined that it had little chance to cancel it under applicable state cancellation laws and regulations, so made no attempt to do so.

xi.   Evergreen, by virtue of the unauthorized and willful actions of its President, Mr. Uphouse, breached its duty of care under the PMA contract and is responsible for the loss Hartford has sustained from it. Accordingly, Evergreen is hereby ordered to pay the sum of $4,796,243 to Hartford.

6. Hartford also asserted that Messrs Uphouse, Caronia Sr., Krutainis and Caronia, Jr. ("the Individuals") should be held personally liable for the damages alleged by Hartford in this arbitration. The Individuals assert they are protected by the corporate structure they had created.

   i.    After much deliberation and extensive review of the cases cited by the parties, the majority of the Panel are of the opinion that Messrs Uphouse and Caronia, the shareholders of the corporation, disregarded the corporate form of Evergreen in virtually all respects. They treated the corporation as their "personal sand box". Accordingly the Panel finds that Messrs Uphouse and Caronia Sr. are not protected by the Evergreen corporate structure.

   ii.   In respect of JM&A account (and in respect of that account only), the majority of the Panel concludes, that Gary Uphouse, by his actions and by virtue of the lack of corporate protection, both as outlined above, is individually and personally liable. He is hereby held jointly (with Evergreen Organization) and severally liable for damages in the amount of $501,210 (an amount based on a $3 enrollment fee multiplied by 167,070 enrollments

   iii.  Mr. Caronia Sr. was aware of the fact that Mr. Uphouse underwrote the JM&A account, and may even have assisted him in doing so. He certainly benefited thereby. However, the Panel is not convinced that Mr. Caronia Sr. was aware that Mr. Uphouse had acted wrongly and does not find him personally liable.

7. Although Messrs. Caronia, Sr., Krutainis and Caronia, Jr. may well have benefited from Mr. Uphouse's wrongful actions, in exactly the same way they would have benefited had Mr. Uphouse acted correctly, there is no evidence that any other of them knew of, or supported, or encouraged, or condoned, Mr. Uphouse's actions. Indeed, it is possible that the relationship between Hartford and Evergreen may well have continued to all their greater benefit had Mr. Uphouse not acted as he did. No award is therefore made against them personally.

8. Evergreen is ordered to pay 75% of Hartford's attorney's fees and costs (excluding costs related to Mr. Walsh) in this proceeding. Mr. Uphouse is held jointly (with Evergreen Organization) and severally liable for said attorneys' fees and costs up to a maximum of $100,000

9. Hartford is directed to submit a statement of its attorneys fees and costs to this Panel within fifteen (15) days of the date of this Order, at which time the Panel will issue a further Order in accordance with the finding in Paragraph 7, above.

10. All amounts ordered to be paid in this Order in paragraphs 1, 4 and 5 shall be paid within thirty (30) days of the date of this Order.

11. The panel retains jurisdiction of this Matter until it has been advised by the parties that the payments ordered in this Order and any subsequent Order called for in Paragraph 8 have been paid.

12. Any and all other claims not including any relating to those specifically referred to above are denied.


**BY A MAJORITY OF THE PANEL**
**Dated: April 2, 2007**


_____
**David Thirkill, Umpire**


_____
**Andrew S. Walsh, Arbitrator**


**Concurring and Dissenting Opinion by Bernd G. Heinze, attached.**

In the Matter of the Arbitration Between

---

Hartford Fire Insurance Company,
Claimant and Counter Respondent

And

Bernd G. Heinze, Arbitrator
Andrew S. Walsh, Arbitrator
David Thirkill, Umpire

The Evergreen Organization, Inc.
Charles Caronia, Sr.
Charles Caronia, Jr.
Gary Uphouse
Andrejs Krutainis
Respondents and Counter Claimants.

---

## CONCURRING & DISSENTING OPINION OF
## BERND G. HEINZE, ESQUIRE

     The Arbitration Panel convened in respect of this matter has worked diligently throughout the last almost three (3) years in coordinating and managing the arbitration process, as well as the events, rulings and deliberations taking place prior to and after the arbitration itself in January 2007. The many conference calls and meetings of the Panel have always been congenial and complemented by the professionalism and experience of my colleagues.

     However, as related to the final determinations of the Panel following the Hearing, I am in concurrence with many of the decisions reached and amounts awarded, but constrained to respectfully dissent on the remaining issues; namely (a) the amount of offset damages awarded to Hartford; (b) the resolution of whether the Hartford Insurance Company (Hartford) is entitled to damages as the result of the adverse performance of the JM&A book of business, and (c) the piercing of the corporate veil and the imposition of personal liability on Respondent Gary Uphouse.

     I do not come by these conclusions lightly, having spent a substantial amount of time reviewing the transcript of the arbitration proceedings, the exhibits presented at the Hearing and the briefs and additional materials presented thereafter.

     As noted by the Majority's Final Order, the Panel spent considerable time reviewing the allegations, testimony, case law and scholarly articles pertaining to the issue of whether adequate and credible evidence had been produced to substantiate facts enabling the determination to be made that the actions of Mr. Uphouse enabled the Panel to pierce the corporate veil of the Evergreen Organization (Evergreen) and impose personal liability upon him. I do not agree with the Majority's determination that this heavy burden of proof has been satisfied, and that the credible facts permit the onerous sanction of personal liability to be imposed.

1.    Calculation of the Offset Issues Claimed

The Majority's Final Order awards the sum of $440,000 plus interest of $117,000 for a total of $557,000 to Hartford. While the Final Order does not delineate an itemization of these funds, and as I have a differing view on some of the categories, they will be specifically noted below:

- Evergreen claim servicing fees for invoices on paid claims for November and December 2003 of $159,480.
  - The Panel is unanimous that these sums were properly earned by Evergreen and need not be paid back to Hartford.
- Reliance National Insurance Company (Reliance) July and August 2002 claim invoices in the amount of $5,460.
  - The Panel is unanimous that these sums should be paid by Evergreen to Hartford.
- Evergreen claims paid in December on the invoiced amount of $15,290.
  - The Panel is unanimous that these sums were properly earned by Evergreen and need not be paid back to Hartford.
- The balance of the offsets taken by Evergreen in which it administered Canadian claims, but did not split out the specific categories in the amount of $5,400.
  - The Panel is unanimous that these sums should be paid by Evergreen to Hartford.
- Evergreen servicing fees on claims administered without payment in the amount of $174,680.
  - The Panel is unanimous that these sums were properly earned by Evergreen and need not be paid back to Hartford.
- The balance of offsets taken by Evergreen on claims administered but not split out as to the specific categories as invoiced in January 2004 in the amount of $92,400, and the offsets noted in Exhibit 3 in the amount of $93,208.06
  - While the Majority would award these sums to Hartford, my review of the record and testimony provides adequate substantiation for the fact these fees were within the expectations of the parties and properly earned by Evergreen. Therefore, I would allow Evergreen to keep these offsets for its own account and not be required to pay them to Hartford. While not specified as to their exact categories, I found no credible argument, testimony or evidence presented against the fact that Evergreen performed these services for which it properly invoiced Hartford and had a reasonable expectation to be paid for them pursuant to the Claims Services Agreement, or to require disgorgement of these funds.

The net award to Hartford on these items as awarded by the Majority of the Panel is $196,468.06, plus interest of $52,401.82 for a total of **$248,869.88**.

My calculation of damages awardable to Hartford for the reasons stated above amount to $10,860, plus interest (using the ratio of interest to principal claimed in Hartford's brief on this issue) of $2,896.52, for a total of **$13,756.52**.

- Other Offsets:

  - I agree with the Majority that adequate credible evidence and testimony was presented at the Hearing to substantiate Evergreen not being entitled to offsets and that the following additional damages be awarded to Hartford:

    | | | |
    |---|---|---|
    | o | Terrorism project expenses of: | $    5,284.34 |
    | o | Countersignature fees of: | $  48,148.00 |
    | o | Profit sharing fees of: | $189,681.00 |
    | | | $243,113.34 |
    | o | Plus interest of: | $  64,841.97 |
    | | Total of other offset amounts: | **$307,955.31** |

The Majority awarded total damages on the offset claims in the amount of **$556,826.25**.

My calculation of damages awardable to Hartford for the reasons stated above amount to **$321,711.83.**

I agree with the Majority on the following additional items of damages demanded:

(a)    Hartford sought interest on unauthorized payment of Reliance claims. Previously, Hartford had sought a principal amount but withdrew that at the Hearing on the basis that it is seeking (or had already received) recovery from Reliance. The Panel unanimously agreed and suggested Hartford seek interest damages from Reliance and, thereby denied Hartford's claim on this issue.

(b)    Hartford sought damages in the amount of $93,894.50 for certain costs in defending claims in the MMCA litigation. Hartford failed to convince the Panel that Evergreen or the Individual Respondents did not comply with Article 3-N(4) of the Program Managers Agreement and, therefore, concluded that neither Evergreen nor any of the Individuals breached any fiduciary duty. Hartford's claim for these funds was denied.

(c)   Evergreen sought damages in the amount of $80,750.00 for funds owed
to Arch Insurance Company that were allegedly part of the funds that
were frozen by the Federal District Court as part of the proceedings
leading up to this arbitration. The record reflects Evergreen did not
produce credible evidence or testimony to carry its burden of proof that
the premiums allegedly owed to Arch Insurance Company were held in
a premium trust account for the benefit of Arch Insurance Company
and, therefore, the Panel denied Evergreen's request.

2.    The JM&A Account

Substantial testimony was elicited at the Arbitration Hearing in respect of the
underwriting of this account by the Evergreen Organization. While recollections of the
witnesses were not always consistent, I have compared the testimony of each witness
against the letters, briefs and other tangible evidence submitted to the Panel on this issue.

The credible evidence reveals this portfolio of GAP insurance business was first
presented to Evergreen in or around June 2001 and was declined by the Hartford's
Andrejs Krutainis. Mr. Krutainis testified he became concerned over the comments made
by the claims manager of JM&A at the time as to the amount of claim payments currently
being experienced and wanted to make further inquiries to determine how the program
might adversely impact the entire book of business.

A differing book of business produced by JM&A was again offered to Evergreen
in the summer of 2002. Respondent Gary Uphouse was the key person in underwriting
this program. The Panel reviewed the record in forensic detail, but has arrived at differing
conclusions.

In my view of the record and in examining again the testimony as recorded in the
transcript of the Hearing, one can arrive at a conclusion that this book of business, while
within the pricing target of Hartford's premium numbers, was not underwritten with the
same diligence as other risks of the program. There was a lack of trending data and,
notwithstanding the relatively little "due diligence" undertaken by Mr. Uphouse, in light
of the producer's prior program not being underwritten, a prudent underwriter would
have demanded more. While Mr. Uphouse freely conceded he was not an underwriter by
training, his experience at Evergreen and his familiarity with the program, the
underwriting guidelines, audit results and additional communications with Hartford,
certainly gave him a unique perspective of those risks that were appropriate to put under
the Harford's umbrella.

As premium began flowing into the Hartford's account from the JM&A business,
the policy numbers, premium payments, JM&A's producer status and the enrollment fees
were all set forth in the monthly bordereaux produced by Evergreen and sent to Hartford.
The record reflects complaints about this book of business arose only after losses were
experienced. But even then, Hartford made no effort to start applying a tourniquet to stem
the bleeding. Hartford's auditors continued making regular visits to the Evergreen's

offices, and even its own Vincent Vitiello testified he was supervising the program on virtually "a daily basis."

Other substantial reforms of the claims and underwriting process were demanded by Hartford throughout its relationship with Evergreen. In fact, the Hartford even cancelled the Program Manager's Agreement at one point for the deficiencies it found within the Evergreen's operations. The cancellation was lifted once Mr. Krutainis left the Hartford to become Evergreen's Chief Operations Officer. Had the JM&A book been profitable, or not have had as substantial losses as were experienced, one wonders whether this Arbitration would ever have been filed.

However, the relationship between an insurance carrier and its program manager is a mutual and reciprocal one. The Program Managers Agreement contains duties and responsibilities for both parties. There is no dispute that every risk insured will not be profitable. The basic tenet of insurance is that insurers provide coverage and accept premium from the many in order to pay the claims of the few.

Insurance carriers using program managers to obtain business from retail agents or producers do so with their eyes wide open. They utilize the program managers to market, acquire, bind and service their products, and entrust an underwriting pen delegated pursuant to underwriting guidelines. The relationship is complemented, as it was here, by regular communications and audits to ensure the expectations are being realized in both form and substance. Hartford's and Evergreen's witnesses all confirmed the insurer had taken "a hard line" with Evergreen based on the audits and findings on the performance of the overall GAP program; and yet they did not react, in my view, with a requisite degree of urgency to take positive action on the JM&A book of business when it knew it had been underwritten – regardless of not knowing how the program would eventually perform.

Mr. Uphouse knew Evergreen had a profit sharing arrangement with Hartford, which benefited both himself and Charles Caronia, Sr., the two principal shareholders of Evergreen's Subchapter S corporation. Having watched and evaluated Mr. Uphouse's testimony at the Hearing, I do not believe he would have put a program into Hartford that he knew or could have known would eventually turn unprofitable and, thus, causing him to potentially not be entitled to a share of its profitability; especially of the size and character of the JM&A portfolio.

Both parties testified the overall GAP program was one identified by Hartford as a "growth opportunity." I believe the record reflects the Evergreen took on this objective seriously. The Majority comments in its Opinion and Order that the JM&A portfolio was "private label" business. There is dispute on this in the record, based on the testimony that private label business must first be vetted by Hartford before it is underwritten. In his testimony, David McElroy of Hartford conceded the term "private label" business was not Hartford terminology, but rather one of Evergreen. Mr. Krutainis agreed, further offering that private label business was more definitional of financial institution business rather than that received from automobile dealerships like that of the JM&A account.

Regardless of the fact of whether the JM&A account was private label or not, in my view, Evergreen had been delegated underwriting authority by Hartford. It would indeed be serendipitous if each time an account of a program manager became unprofitable, the insurer could turn around after continuing to receive all the premium and investment income thereon, and visit those losses on the program manager. Once Hartford was advised the JM&A account had been underwritten, it had a decision to make if it truly believed the account had been underwritten outside the parameters of the delegated authority; it could either (a) stay on the account and see what happens or (b) find a way to cancel the program, sell the book of business to another carrier (e.g., testimony at the Hearing noted other carriers were also underwriting GAP business at the time), advise its reinsurer Swiss Reinsurance Company of the facts, or take affirmative action to mitigate potential damages going forward. For whatever reason, it took a passive approach.

The Majority notes in its Opinion and Order that Mr. Uphouse and Mr. Caronia "...treated the [Evergreen] corporation as their personal sandbox." (See Paragraph 6(i)). In my view, if one were to make such an observation, one must similarly conclude that the sandbox was squarely on the property of the Hartford and, at all times, under its direction and supervision. Under these facts as noted, I do not believe Hartford can now be heard to complain that it should be reimbursed for the total amount of the alleged $4,796,243 in losses sustained on the JM&A program.

Under the circumstances as noted, however, I do not believe Evergreen acted appropriately either. Diligent and prudent underwriting would dictate – under any circumstance – that having once been previously denied, the JM&A book should also have been reviewed by Mr. Krutainis in his position as chief operations officer of the corporation and/or to the Hartford. That would have been fair and proper – even though it was a differing book of business from the one previously offered and declined from the same producer.

As this is an arbitration proceeding, and without knowing the amount of investment interest enjoyed by Hartford on the JM&A premium, or the arrangement it may have with its 50% quota share reinsurer, the equities of the situation and facts in the record would best require the damages to be split equally between Evergreen and Hartford. All things being equal, and assuming interest amounts and other factors could not be determined, I would urge the parties to arrange an equal 50-50 split of the damages sustained. I believe this is an appropriate sum and result for Evergreen's breach of the Agreement (were one to agree the JM&A portfolio was "private label business"), and the failure of Hartford to take immediate steps to ameliorate the situation and mitigate its losses as soon as the facts came to its attention.

3.    Personal Liability of Gary Uphouse

As noted at the outset, after reviewing all the cases cited by the parties, reviewing the briefs, testimony and several law review articles on the subject, the Panel spent substantial amounts of time deliberating on the issue of whether to pierce the corporate

structure of Evergreen and impose personal liability on the Individual Respondents. The Majority has chosen to impose it only upon Mr. Uphouse for the reasons articulated in its Order.

While the actions and inactions undertaken by Mr. Uphouse were perhaps somewhat less than stellar, I believe he at all times was acting within the course and scope of his employment with Evergreen. I do not believe the facts and actions were of such an outrageous nature or of such personal "opportunistic conduct" that would allow the Panel to permit Hartford to pierce Evergreen's corporate structure to reach the personal assets of Mr. Uphouse.

The Majority fashioned an imposition of damages on Mr. Uphouse based on a calculation of enrollment fees multiplied against the total amounts of enrollments received and found Mr. Uphouse jointly and severally liable with Evergreen for damages in the amount of $501,210.

I respectfully cannot agree with this conclusion as, in my view, a review of the complete record and testimony do not support the joinder of the Individual Respondents as parties to the Arbitration in the first instance, nor the imposition of personal liability against Mr. Uphouse. As noted at the outset, I did not come lightly to this opinion. It is based on the application of the governing law of New York as precedent and of other jurisdictions as added guidance or consideration. And it is further based on the conduct of Mr. Uphouse which, the Panel agrees was not appropriate or consistent with the expectation of professionalism. I simply do not believe it rose to the level of conduct required by the case law to permeate beyond the corporate structure.

I would award relief as set forth herein.

Respectfully submitted,

Bernd G. Heinze
Arbitrator

EXHIBIT E

**In the Matter of the Arbitration Between**

---

**Hartford Fire Insurance Company,**
**Claimant and Counter Respondent**

**Bernd G. Heinze, Arbitrator**
**Andrew S. Walsh, Arbitrator**
**David Thirkill, Umpire**

**And**

**The Evergreen Organization, Inc.**
**Charles Caronia, Sr.**
**Charles Caronia, Jr.**
**Gary Uphouse**
**Andrejs Krutainis**
**Respondents and Counter Claimants.**

---

## 2nd INTERIM FINAL ORDER

1.  Evergreen is ordered to pay 75% of Hartford's attorney's fees and costs as submitted by Hartford but only after Hartford has deducted certain costs associated with Mr. Walsh in Hartford's Amended Statement of Costs, namely (1) a 3/22/05 entry for Mr. Walsh's arbitrator's fee ($8,082.63), and (2) an 8/26/04 entry for $180.97.

2.  The panel retains jurisdiction of this Matter until it has been advised by the parties that all payments ordered in this Order and any prior or subsequent Order have been paid.

**FOR AND ON BEHALF OF THE PANEL**

**Dated: July 9, 2007**

---

David Thirkill, Umpire

EXHIBIT F

**In the Matter of the Arbitration Between**

---

**Hartford Fire Insurance Company,**
**Claimant and Counter Respondent**

**And**

**The Evergreen Organization, Inc.**
**Charles Caronia, Sr.**
**Charles Caronia, Jr.**
**Gary Uphouse**
**Andrejs Krutainis**
**Respondents and Counter Claimants.**

**Bernd G. Heinze, Arbitrator**
**Andrew S. Walsh, Arbitrator**
**David Thirkill, Umpire**

---

## AMENDED 2nd INTERIM FINAL ORDER

1.  Hartford's allowable attorney's fees and costs in this proceeding are $1,076,307.91. Evergreen is ordered to pay $807,307.91 (representing 75% of such fees and costs). Mr. Uphouse is ordered to pay attorneys' fees and costs of $100,000.

2.  The panel retains jurisdiction of this Matter until it has been advised by the parties that all payments ordered in this Order and any prior or subsequent Order have been paid.


**FOR AND ON BEHALF OF THE PANEL**

**Dated: July 21, 2007**

---

David Thirkill, Umpire

EXHIBIT G



FILE COPY

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/17/05



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HARTFORD FIRE INSURANCE COMPANY,

                Petitioner,

92627

-against-

          04 Civ. 3333 (LAK)

THE EVERGREEN ORGANIZATION, INC., et al.,

                Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

            James E. Fitzgerald
            STROOCK & STROOCK & LAVAN LLP
            *Attorneys for Petitioner*

            Christopher T. Bradley
            MARSHALL, CONWAY & WRIGHT, P.C.
            *Attorneys for Respondents*

LEWIS A. KAPLAN, *District Judge.*

        On September 7, 2005, this Court entered an order granting the petition to compel arbitration (the "Order"). Respondents now move to dismiss the petition and/or to vacate the order.

*Facts*

        This motion arises against the background of a dispute between Hartford Fire Insurance Company ("Hartford") and The Evergreen Organization, Inc. ("Evergreen"), which it had

2

retained to act and then terminated as program manager for its "GAP" insurance program for vehicles, and Evergreen's principals. The nub of the controversy is Hartford's claim that Evergreen failed to hold in trust certain funds belonging to Hartford, as required by their agreement, and that Evergreen's principals, the individual respondents here, diverted trust funds to their own use.[1] As the details are not material to this motion, there is no need to set them out here.

*The Early Proceedings in this Court*

On or about April 30, 2004, Hartford served a demand for arbitration on Evergreen and the individual respondents and filed a verified petition for provisional relief in aid of arbitration in this Court. On May 4, 2004, it moved for a temporary restraining order, a preliminary injunction, and an order of attachment in aid of arbitration against all of the respondents.

On May 14, 2004, respondents filed an affirmation in opposition to the motion. In addition, respondent Gary Uphouse, former president of Evergreen, filed a separate affirmation in opposition. None of the papers raised any objection to the personal jurisdiction of the Court over any of the respondents.

On May 18, 2004, the Court heard argument on the motion. During the hearing, counsel for respondents complained about the naming of the individual respondents, but immediately added that "we haven't objected to the jurisdiction."[2] The Court then granted

---

[1]    There is a further description in the Court's bench opinion granting Hartford's motion for provisional relief in aid of arbitration. Fitzgerald Aff. Ex. 4 (Vitello Aff. Ex. D, at 21-34).

[2]    *Id.* at 8.

petitioner's motion in substantial part, ultimately entering a written order on June 8, 2004. Respondents never filed an answer to the petition.

*The Arbitration*

The action then moved to the arbitration front, where a panel was constituted. At the organizational hearing, however, the individual respondents refused to submit to the panel's jurisdiction. In due course, petitioner's counsel informed the panel and the individual respondents that it would seek an order from this Court compelling the individuals to arbitrate. The individual respondents consented to a stay of the arbitration pending a decision by this Court.

*The Second Round in this Court*

On August 11, 2005, petitioner filed a second petition in this action.[3] Whereas the first petition had sought only provisional relief in aid of arbitration,[4] this one sought to compel the individual respondents to arbitrate. The respondents, then represented by new counsel,[5] first obtained the oral agreement of petitioner's counsel to an extension of time within which to answer the new petition and evidently obtained the signature of petitioner's counsel on a stipulation embodying that agreement. Shortly thereafter, however, the respondents' new attorney wrote to

---

[3]    Fitzgerald Aff. Ex. 3.

[4]    *Id.* Ex. 1.

[5]    The Court was unaware of the change of counsel, as respondents never sought court approval of the substitution as required by S.D.N.Y. Civ. R. 1.4.

4

petitioner's counsel and purported to reject the new petition, claiming that the new petition had been filed improperly and, for the first time, that the Court lacked personal jurisdiction over the individual respondents.[6] A few days later, respondents' counsel sent another letter to his adversary, this one stating that respondents "will not interpose a response [to the new petition] at this time due to the improper filing" and that respondents would not sign the stipulation embodying the extension of time that they previously had solicited.[7]

Respondents having refused to sign their own proposed stipulation and declined to respond to the new petition, the time to answer expired on September 6, 2005.[8] The Court, unaware of the events recited just above, entered the Order granting the petition.[9]

*The Present Motion*

Respondents now move to vacate the Order pursuant to Rules 60(b)(1) and 60(b)(4). They contend that it is void, and thus within Rule 60(b)(4), on the grounds that (1) the Court lacked personal jurisdiction over the individual respondents, and (2) the new petition was an amendment of the original and was filed without leave of court or respondents' agreement. Alternatively, they seek relief pursuant to Rule 60(b)(1), evidently on the ground that the Order was the product of excusable neglect.

---

[6]
    Gollub Decl. Ex. 8.

[7]
    *Id.* Ex. 9

[8]
    Respondents so concede. Resp. Mem. 15.

[9]
    *Id.* Ex. 11.

5

*Discussion*

*Rule 60(b)(4) – The Claim that the Order is Void*

    *1.   Personal Jurisdiction*

    The individual respondents' personal jurisdiction argument is entirely without merit.

The operative law was summarized in his characteristically apt way by Judge Haight:

> "A party not subject to the personal jurisdiction of a court has no duty to
> respond to its process or rules. Thus until proper service was made . . . [defendant]
> was under no obligation to respond. Rule 12(a) [which requires an answer or motion
> in response to a complaint] was simply inapplicable, for subjecting a party to the
> rules of the court presupposes the court's power over it. Of course, [defendant]
> could have chosen voluntarily to respond. Had it chosen to appear, it would have
> been subject to the familiar rule that a voluntary appearance made without objection
> to the court's personal jurisdiction constitutes submission to jurisdiction."[10]

    Here, the individual respondents appeared by counsel in opposition to the motion for

provisional relief. Indeed, Mr. Uphouse filed an affidavit in opposition to that application. Not only

did they make no objection to the Court's personal jurisdiction, their counsel affirmatively noted

their lack of any objection to it.

    Individual respondents seek to avoid their explicit waiver of the defense by claiming

that they made a special appearance for the limited purpose of defending attached property, citing

N.Y. CPLR § 320(c). But this argument is devoid of merit.

    The individual respondents did not appear for the purpose of defending attached

property. They could not have done so for the simple reason that  no property had been attached at

---

[10]

    *Martocci v. Oceanus Mut. Underwriting Ass'n (Bermuda) Ltd.*, No. 84 Civ. 1025 (CSH),
1985 WL 402, at *2 (S.D.N.Y. Apr. 3, 1985). *See also Grammenos v. Lemos*, 457 F.2d
1067, 1070 (2d Cir. 1972).



6

the time of their appearance.[11] They appeared to oppose a motion for a temporary restraining order, a preliminary injunction, both of which were directed in part at them individually, and an order of attachment, which was directed only at Evergreen.[12] Thus, even if CPLR § 320(c) were applicable in federal court – which is doubtful[13] – it had no application here.

2.    *The Claim that the Second Petition Was Improper*

Respondents next seek vacatur of the Order on the theory that it is void *ab initio* because petitioner failed to obtain leave to amend as allegedly required by Fed. R. Civ. P. 15(a), which provides in relevant part that:

> "A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave to amend shall be freely given when justice so requires."

This argument is entirely baseless.

To begin with, the assumption that leave to amend was required rests on the premise that the respondents served a pleading responsive to the original petition. Parenthetically, this is a rather odd argument for respondents to make – if they served a responsive pleading, their failure to

---

[11]    So far as the record discloses, no property ever has been attached.

[12]    Fitzgerald Aff. Ex. 1, at 13.

[13]    *E.g., United States v. Balanovski*, 236 F.2d 298, 302 (2d Cir. 1956), *cert. denied*, 352 U.S. 968 (1957). It is worth noting that the author of *Balanovski* was the late Chief Judge Charles Clark, a principal architect of the Federal Rules of Civil Procedure.



7

object to personal jurisdiction would have waived that defense pursuant to Rule 12(h)(1), irrespective of any explicit waiver or consent to personal jurisdiction. In any case, however, the premise is flawed.

      While respondents filed papers in opposition to petitioner's motion for provisional relief,[14] they did not file an answer to the petition. Rule 7(a) makes clear that their opposition to the motion was not a pleading within the meaning of the Civil Rules.[15] Hence, it would not have been a responsive pleading for purposes of Rule 15(a) even if it had been a response to the petition rather than to the motion for provisional relief. As no pleading responsive to the original petition ever was served, petitioner was entitled to amend as of right.

      Respondents' argument is without merit on an independent basis. Even assuming that the Order was entered on the basis of an amended petition for which petitioner had failed to secure required leave of court, the failure of the respondents to answer and object to the amended petition waived any procedural irregularity, at least in view of the fact that they knew of the amended petition and deliberately refused to respond to it. It was not for respondents high-handedly to "reject" the new petition based on their unilateral (and incorrect) view of what Rule 15(a) required.

---

[14]      Gollub Decl. Ex. 15 (Vitiello Decl. ¶ 29).

[15]      Rule 7(a) provides:

      "There shall be a complaint and an answer; a reply to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint, if a person who was not an original party is summoned under the provisions of Rule 14; and a third-party answer, if a third-party complaint is served. No other pleading shall be allowed, except that the court may order a reply to an answer or a third-party answer."

      Thus, an opposition to a motion is not a "pleading" as used in the Rules of Civil Procedure. *See also, e.g.,* FED. R. CIV. P. 11(a) (distinguishing between pleadings and motions).

8

The proper course was to file an answer or motion raising the issue with the Court. Their considered failure to do so in a timely fashion would have deprived them of the opportunity to raise it now, even if the point had merit.

*Rule 60(b)(1)*

Having disposed of respondents' contention that the Order was void, I turn to the contention that it nevertheless should be vacated

Relief is available under Rule 60(b)(1) where the judgment in question was obtained in consequence of, *inter alia,* excusable neglect. Courts consider whether the default was wilful, whether the moving party has a meritorious defense, and the extent of any prejudice to the non-moving party.[16]

*1.    Wilfulness*

Here, the Order was issued in consequence of respondents' failure to answer the new or amended petition. That failure was the product of a deliberate decision to "reject" the new petition and to decline to respond to it because respondents (wrongly) thought its service improper absent leave of court.

The Second Circuit has made clear that "a default . . . that is more than merely negligent or careless" is wilful.[17] In view of the deliberate nature of the failure to respond, the

---

[16]

    *E.g., Pecarsky v. Galaxiworld.com Ltd.,* 249 F.3d 167, 171 (2d Cir. 2001).

[17]

    *SEC v. McNulty,* 137 F.3d 732, 738 (2d Cir. 1998).

default here unquestionably falls into that category.

This conclusion is supported also by another line of authority. In *Canfield v. Van Atta Buick/GMC Truck, Inc.,*[18] the Circuit held that counsel's failure to follow clear rules does not constitute excusable neglect for Rule 60(b)(1) purposes.[19] In this case, an answer or motion with respect to the amended or new petition was due within 10 days after service.[20] In declining to respond to that pleading within the 10 day period, respondents intentionally ignored a perfectly clear and unambiguous rule of civil procedure.

### 2. Prejudice

Vacating the Order would be highly prejudicial to Hartford. It has been seeking, without success, to have its disputes with Evergreen and its principals adjudicated for some time. It first demanded arbitration on April 30, 2004, almost two years ago. Respondents answered the demand on July 19, 2004, but then declined to proceed when the panel, on February 25, 2005, held its organizational meeting. Almost another year now has passed. If indeed the individual respondents diverted trust assets belonging to Hartford, they have every interest in stalling, at least in the hope that the delay will produce a settlement, as they rather than Hartford continue to have the use of the money. The prejudice of the additional delay that would result from vacating the Order is plain.

---

[18]     127 F.3d 248 (2d Cir. 1997).

[19]     *Accord In re Lynch,* 430 F.3d 600, 603 (2d Cir. 2005).

[20]     FED. R. CIV. P. 15(a).

3.   *Meritorious Defense*

The crux of the issue individual respondents seek to raise is whether they, as non-signatories to the agreement between Evergreen and Hartford that contains the arbitration clause, may be compelled to have Hartford's claims against them resolved by arbitration.  They claim that this may be done only if the corporate veil is pierced and that Evergreen's observance of corporate formalities forecloses such a conclusion.[21]

It does not take much to establish a meritorious defense for purposes of vacating a default judgment.  "In order to make a sufficient showing of a meritorious defense in connection with a motion to vacate a default judgment, the defendant need not establish his defense conclusively, but he must present evidence of facts that, if proven at trial, would constitute a complete defense."[22]  But the individual respondents have failed to do so here.

Contrary to respondents' assumption, a non-signatory to an arbitration agreement may be compelled to arbitrate regardless of any piercing of the corporate veil.  Indeed, the non-signatory need not even be a shareholder of a corporate party to an arbitration agreement.

In *Thomson-CSF*,[23] the Second Circuit described two different estoppel theories, each a sufficient basis for compelling arbitration between signatories and nonsignatories to an

---

[21]

Resp. Mem. 23-24; Reply Mem. 6-7; Uphouse Aff. *passim.*

[22]

*State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada,* 374 F.3d 158, 166 (2d Cir. 2004) (quoting *McNulty,* 137 F.3d at 740) (internal quotation marks omitted).

[23]

*Thomson-CSF, S.A. v. Am. Arb. Ass'n,* 64 F.3d 773, 776 (2d Cir. 1995).



11

agreement.[24] Under the first, a nonsignatory to an agreement containing an arbitration clause may be compelled to arbitrate with a signatory where the nonsignatory knowingly accepts benefits directly derived from the agreement.[25] Under the second, courts "have been willing to estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."[26]

In this case, the individual respondents have not addressed these points. There has been no allegation that they have not knowingly accepted benefits derived directly from the Hartford-Evergreen agreement, which is not surprising in light of the fact that they are the principals of Evergreen and, indeed, are alleged to have diverted from it trust funds that were in Evergreen's hands only by virtue of the agreement. Nor do they deny the obvious fact that the issues that Hartford is seeking to resolve in the arbitration are intertwined with the agreement that Evergreen signed. Accordingly, the individual respondents have not demonstrated a meritorious defense to the claim that they are obliged to arbitrate.

\*   \*   \*

In view of the fact that each of the considerations pertinent to whether respondents should be relieved of the consequences of their failure to answer the new petition militates against relief, no more need be said. Against the possibility that a reviewing court takes a different view

---

24

    *Id.* at 778-79.

    There are others, including corporate veil piercing. *E.g., Mag Portfolio Consult GmbH v. Merlin Biomed Group LLC,* 268 F.3d 58, 61 (2d Cir. 2001).

25

    *Id.*

26

    *Id.* at 779 (emphasis in original).

12

on the question whether the individual respondents have made out a meritorious defense, however, I should add that I would have reached the same result even if I thought that they had done so. The failure to respond was a deliberate and cavalier action by respondents' attorney. The Court of Appeals "consistently [has] declined to relieve a client under subsection (1) [of Rule 60(b)] of the burdens of a final judgment entered against him due to the mistake or omission of his attorney by reason of the latter's ignorance of the law or other rules of the court, or his inability to efficiently manage his caseload."[27] *A fortiori*, it should do so where the judgment is the product of a deliberate decision, especially where, as here, substantial prejudice would be suffered by the non-defaulting party in the event the judgment were vacated.

*Conclusion*

For the foregoing reasons, respondents' motion is denied in all respects.

SO ORDERED.

Dated:      January 17, 2006

_____
Lewis A. Kaplan
United States District Judge

---

[27]     *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986).