# EXHIBIT C

ARBITRATION BOARD CONVENED IN
NEW YORK, NEW YORK

-------------------------------------------------------------x
                                     :

In the Matter of the Arbitration of        :
                                       :

HARTFORD FIRE INSURANCE COMPANY  :   **DEMAND FOR ARBITRATION**
                                       :   **AND STATEMENT OF CLAIM**
                    Claimant,  :

        - against -          :

THE EVERGREEN ORGANIZATION, INC.,  :
CHARLES CARONIA, SR., GARY UPHOUSE;  :
CHARLES CARNOIA, JR.; and        :
ANDREJS KRUTAINIS,            :
                                       :

                  Respondent.  :
-------------------------------------------------------------x

     **PLEASE TAKE NOTICE** that Claimant Hartford Fire Insurance Company

("Hartford") hereby demands that Respondents The Evergreen Organization, Inc.

("Evergreen"), Charles Caronia, Sr. (Caronia, Sr.), Gary Uphouse ("Uphouse"), Charles

Caronia, Jr. (Caronia, Jr.) and Andrejs Krutainis ("Krutainis") arbitrate Hartford's claims

against them before an arbitration board consisting of two arbitrators and an umpire convened

in New York, New York, pursuant to Section XVIII of the Program Manager's Agreement

("PMA")[1] between Hartford and Evergreen.

---

[1]  A true and correct copy of the PMA is attached as Exhibit A to this Demand for Arbitrati·

50239489v1

## ALLEGATIONS DIRECTED TO ALL CLAIMS

### THE PARTIES

1. Hartford is, and at all relevant times herein was, a Delaware corporation organized under the laws of the State of Delaware with its principal place of business in Hartford, Connecticut. Hartford Financial Products, Inc. ("HFP") is a wholly-owned subsidiary corporation of Hartford. HFP is, and at all times relevant hereto was, a New York corporation with its principal place of business in New York, New York.

2. Hartford is informed and believes and thereon alleges that Evergreen is, and at all relevant times was, a corporation organized under the laws of the State of Pennsylvania, with its principal place of business in Chester Springs, Pennsylvania.

3. Hartford is informed and believes and thereon alleges that Caronia, Sr.[2] is, and at all relevant times stated herein was, the Chairman of the Board and Chief Executive Officer of Evergreen, and a principal shareholder of Evergreen.

4. Hartford is informed and believes and thereon alleges that Uphouse is, and at a relevant times was, the President of Evergreen, and a principal shareholder of Evergreen.

5. Hartford is informed and believes and thereon alleges that Caronia, Jr. is, and has been since late 2001, the Vice-President of Claims and at the relevant times mentioned herein was an officer of Evergreen.

---

[2] Caronia, Sr., Uphouse, Caronia, Jr. and Krutainis are sometimes collectively referred to herein as the "Individual Respondents."

6.      Hartford is informed and believes and thereon alleges that Krutainis is, and since

at least the early part of 2002 was, the Executive Vice-President of Evergreen, and at the

relevant times mentioned herein was an officer of Evergreen.

## SUBMISSION OF DISPUTE TO ARBITRATION

7.      The PMA provides in relevant part that Evergreen and Hartford shall resolve

any breaches of the PMA through binding arbitration as follows:

> ARTICLE XVIII. Arbitration  A.  Submission to Arbitration.  In
> the event of any dispute between the Company and the Manager
> with reference to the interpretation, application, formation,
> enforcement or validity of this Agreement or any other agreement
> between them, or their rights with respect to any transaction
> involved, whether such dispute arises before or after termination
> of this Agreement, such dispute, upon written request of either
> party, shall be submitted to the decision of a board of arbitration
> composed of two arbitrators and an umpire meeting at the
> Company's offices in New York unless otherwise mutually
> agreed.  Notwithstanding the generality of the foregoing, the
> Company's right to exercise any of the options contained in
> ARTICLES XII., XIII., or XVI. shall not be limited by the
> submission of any dispute to arbitration.
>
> ... B.  Sole Remedy.  The parties agree that arbitration pursuant
> to the terms of this Article is the sole remedy for the resolution of
> disputes between them under this Agreement or any other
> agreement between them.  The board of arbitration will have
> complete and exclusive jurisdiction over the entire matter in
> dispute, including any question as to its arbitrability, and shall
> only conduct the arbitration proceeding to resolve disputes
> between the parties to the Agreement, and not as a class action
> involving other parties.

PMA, Article XVIII (A) and (B).

-3-

8.      Hartford is an insurance company that provides various forms of insurance to businesses throughout the United States. One of the lines of insurance written by Hartford is "GAP" insurance for vehicles. GAP insurance generally provides insurance coverage for the monetary difference between the outstanding balance of a vehicle loan or lease and the actual cash value of that vehicle at the time of a covered loss to the vehicle. A different, primary insurer provides coverage for the actual cash value of the vehicle in the event of a loss.

9.      During all relevant times mentioned herein, HFP managed Hartford's GAP Program.

10.     Evergreen is an insurance brokerage firm that is licensed as an insurance agent by the Pennsylvania Department of Insurance. Evergreen acted as Hartford's Program Manager and Claims Servicing Agent with regard to the administration of Hartford's GAP Program from July 2000 through February 24, 2004.

11.     In the late 1990s, Reliance Insurance Company ("Reliance") issued GAP insurance policies. During that time, Evergreen, pursuant to a Program Manager's Agreement and a Claims Service Agreement (collectively the "Reliance Agreements") between Reliance and Evergreen, acted as Reliance's Managing General Agent ("MGA") with regard to the GAP insurance policies issued by Reliance.

12.     On or about June 30, 2000, Hartford purchased certain renewal rights in certain lines of Reliance's business, including Reliance's GAP Insurance Program. In connection therewith, Reliance, Hartford and Evergreen entered into an amendment to the Reliance

-4-

Agreements whereby Reliance assigned to Hartford all of its rights and obligations under the Reliance Agreements until such time as Hartford and Evergreen executed replacement agreements.

13.    In September 2002, Hartford and Evergreen executed a replacement Program Manager's Agreement ("PMA") and a Claims Servicing Agreement ("CSA") (collectively the "Hartford Agreements"). The Hartford Agreements are substantially similar to the Reliance Agreements.

14.    Pursuant to the PMA, Evergreen had, *inter alia*, the following specific obligations to Hartford: to bind risks in accordance with Hartford's underwriting and pricing standards; to quote accurate and adequate premiums and rates for policies in accordance with Hartford's underwriting and pricing standards; to comply fully, timely and promptly with all manuals, rules, regulations, guidelines, instructions and directions issued by Hartford; to timely account for and report to Hartford on the business; to act as a fiduciary for Hartford and to hold all premiums and any other amounts collected and received on policies for Hartford in a fiduciary account; to maintain a competent staff; to promote and safeguard the best interests and good name of Hartford; and to terminate policies as required by applicable underwriting standards and consistent with applicable regulatory and policy conditions. Evergreen was also responsible for accepting business on behalf of Hartford written by properly licensed and qualified sub-producers, and was obligated to direct, supervise and coordinate the efforts of such sub-producers. Evergreen was not, however, authorized to appoint agents for Hartford or to accept business produced by other agents or brokers.

-5-

50239489v1

15.    Pursuant to the Claims Servicing Agreements, Evergreen had the authority and responsibility to provide claims services to Hartford in connection with the GAP business underwritten by Hartford pursuant to the PMA. Under the Claims Servicing Agreements, Evergreen was specifically required to handle claims on a prompt basis, to properly and timely investigate claims, to obtain the necessary documentation to justify the proper decision on the claim, to pay only those claims that Hartford is legally obligated to pay, and to notify Hartford of the claims in a timely fashion.

## INDIVIDUAL RESPONDENTS' DUTIES TO EVERGREEN

16.    Hartford is informed and believes, and based thereon alleges, that The Individual Respondents operated, dominated and controlled Evergreen such that Evergreen transacted business solely for their personal benefits and thereby became their alter ego.

17.    Pursuant to the relationship between Evergreen and Hartford, and as set forth in their agreements, Evergreen was an agent of Hartford and owed Hartford a fiduciary duty. The Individual Respondents were subagents of Hartford and thereby owed duties, including a fiduciary duty to Hartford.

18.    Hartford is informed and believes, and based thereon alleges as set forth herein, that Evergreen committed breaches of fiduciary duty and fraud which were directed, implement and ratified by the Individual Respondents thereby creating their individual liability for the torts committed against Hartford as set forth herein.

-6-

FEES PAID TO EVERGREEN

19.     Under the PMA, Evergreen was paid a flat fee for any vehicle enrolled under a GAP policy issued by Evergreen on behalf of Hartford.  Under the Claims Servicing Agreement, Evergreen was paid a flat fee for every claim that was paid.

## CANCELLATION AND TERMINATION OF AGREEMENTS

20.     On or about January 10, 2003, Hartford provided written notice to Evergreen that Hartford was immediately terminating the PMA because of (1) the loss of satisfactory reinsurance and (2) Evergreen's failure to perform its duties under the PMA as provided in Section XII of the PMA (Default).  However, and pursuant to the PMA, Evergreen continued to have and provide certain duties and obligations under the PMA, including the charging, collection, receipt, accounting and reporting for all premiums collected on policies written under the agreement.  Evergreen also remained obligated to act as a fiduciary with respect to such premiums.

21.     On February 5, 2004, Evergreen gave written notice to Hartford that it was canceling its Claims Servicing Agreement with Hartford effective April 9, 2004.

22.     On January 29, 2004 Evergreen notified Hartford that it was retaining certain premium funds due Hartford for enrollments under GAP policies as an "offset" for fees it claimed it was owed from Hartford.  Hartford immediately demanded that Evergreen remit the proper premiums and warned Evergreen that the withholding of premiums was a clear breach of the PMA.

-7-

23.    On February 17, 2004, Evergreen served Hartford with a Demand for Arbitration with respect to premium fees it had withheld from Hartford.

24.    On February 18, 2004, Hartford gave written notice that it was terminating its Claims Servicing Agreement with Evergreen effective February 25, 2004.  Hartford immediately thereafter notified all producers and sub-producers that: (1) Evergreen was no longer authorized by Hartford to receive or accept any applications for insurance, enrollments pertaining to existing policies, GAP waivers or any other documentation relating to Hartford policies; (2) Evergreen was no longer authorized to bind coverage, issue certificates or policies of insurance or obligate Hartford in any way; (3) all remittances for premiums or other sums due and/or owing pursuant to any policies or accounts written under the Hartford Gap Program should be sent to Hartford's new representative, Lee & Mason Financial Services, Inc.; (4) Evergreen was no longer authorized to act on behalf of Hartford with respect to any claims made under Hartford policies; and (5) notice of claims, or communication of any kind with regard to claims under Hartford policies, should be forwarded directly to Lee & Mason.

25.    Evergreen refused, and continues to refuse, to fully cooperate with Hartford in transferring all files relating to Hartford's GAP business to Lee & Mason and/or Hartford as necessary for the timely and orderly administration of Hartford's GAP business.

## EVERGREEN'S BREACHES OF ITS DUTIES TO HARTFORD

### Evergreen's Breaches of Duty in Connection With Its Role as Program Manager

26.    In connection with its role as Program Manager, Evergreen failed to produce business in accordance with the terms of the Program Manager's agreement, and completely

-8-

failed to oversee and monitor the business generated under such agreements. Specifically, Evergreen failed to fulfill its duties under the PMA with respect to the management of the following accounts. The following accounts are examples of Evergreen's complete failure to fulfill its role as the Program Manager of Hartford's GAP business:

### MMCA Account

27.     Evergreen entered into an agreement with insurance broker TriArc Financial Services, Inc. ("TriArc") on or about March 10, 1997, in which Evergreen authorized Tri-Arc to produce qualified insurance business for placement by or through Evergreen.

28.     In late 1999, Tri-Arc submitted to Evergreen an application by Mitsubishi Motors Credit of America, Inc. ("MMCA") for GAP insurance. Evergreen submitted MMCA's application to Reliance, which, based on that application, issued its GAP Insurance Policy No. NZB 635 6121 to MMCA effective May 1, 2000.

29.     In or about July 1, 2000, based upon MMCA's 1999 application for GAP Insurance submitted to Reliance, Twin City Fire Insurance Company (a wholly owned subsidiary of Hartford) issued MMCA GAP Insurance Policy No. NZB552517("the MMCA Policy") for the period "July 1, 2000 until cancelled." The MMCA Policy remained in effect until the first quarter of 2002, when MMCA notified Hartford that it was canceling the Policy and was in the process of obtaining replacement GAP coverage.

30.     Under the PMA, Evergreen was to process enrollments under Hartford's GAP policies, like the MMCA policy, and accept premium remittances for those enrollments.

-9-

50239489v1

Evergreen was further required to monitor the enrollments as they were submitted to Evergreen from Tri-Arc and ensure that they met the requirements under the MMCA Policy.

31.    Pursuant to the MMCA Policy, MMCA was required to submit to Hartford, through Evergreen, a monthly premium remittance report listing each vehicle to be covered under the GAP program and the appropriate premium.  MMCA failed to submit timely notification of enrollments to Evergreen as required under the MMCA Policy.

32.    Evergreen failed to properly monitor enrollments submitted under the MMCA Policy and failed to require MMCA to provide the necessary information regarding the enrollments submitted under the MMCA Policy.  Evergreen failed to obtain and maintain proper records of enrollment information that was transmitted to it regarding enrollments under the MMCA Policy.

33.    Pursuant to the PMA and CSA, Evergreen was responsible for certain claims handling duties with respect to GAP claims reported under the MMCA Policy.  Specifically, Evergreen was to initiate and maintain a claim file for each reported claim and obtain the necessary documentation and claim information to process the claim pursuant to the terms of the MMCA Policy, the PMA and accepted industry claims handling procedures.  Upon information and belief, Evergreen authorized and caused to be paid claims under the MMCA policy which were not covered and/or which did not have the necessary and proper supporting documentation to pay the claims.

34.    Evergreen was required under the PMA and CSA to monitor and evaluate the enrollments under the MMCA Policy and advise Hartford when the enrollments being presented were materially different from the business that had been presented by MMCA in its

-10-

application. Evergreen was required under the PMA and CSA to promptly notify Hartford of the loss experience under the MMCA Policy.

35.    Evergreen failed to promptly and adequately advise Hartford of the change in the nature of the GAP business reflected in the enrollments submitted by MMCA and failed to promptly advise Hartford of the losses being reported under the MMCA Policy. Indeed, in the first half of 2002, within weeks of MMCA canceling the MMCA Policy, Evergreen breached its duty by accepting approximately 23,000 enrollments that did not comply with Hartford underwriting guidelines.

36.    Had Evergreen performed its duties under the PMA and CSA, Hartford would have been able to minimize the losses it has experienced, and continues to experience, under the MMCA Policy. As a result of Evergreen's breach of duties, Hartford has been forced to institute litigation against MMCA to mitigate its damages and has, and will in the future, incur attorneys fees and costs in pursuing claims against MMCA.

### Beacon Account

37.    On or about July 1, 2000, Hartford issued Twin City Fire Insurance Company Policy NZB 1552396 to Beacon Industries, Inc. ("Beacon") effective July 1, 2000, until cancelled (the "Beacon Policy"). The Beacon Policy includes endorsements listing a number of car dealerships as additional insureds. It also includes an undated endorsement naming American Auto Guardian of Mount Prospect, Illinois ("AAG") as an additional insured. The Beacon Policy did not include a theft/etch protection endorsement. The Beacon Policy did not provide for any return of premium in the event the policy was cancelled, or enrollments were cancelled.

-11-

50239489v1

38.    Enrollments under the Beacon Policy were submitted on a monthly bordereau to Evergreen. The bordereau included the consumer purchaser/lessee's name and other information such as the VIN (vehicle identification number) number of the vehicle, and the premium amount. Beacon submitted a total premium amount to Evergreen with the monthly bordereau which represented a flat fee per enrollment less cancellations of enrollments.

39.    For those purchaser/lessee's enrolled under the Beacon Policy, Beacon had issued a debt waiver contract which allowed the borrower to cancel the GAP waiver at any time during the term of the finance contract on a prorated basis. Hartford is informed and believes that in the event of cancellation of a debt waiver, Beacon would receive a prorated refund of the insurance premium for that enrollment from Evergreen. Even though the Beacon Policy does not provide for a refund of unearned premium, Hartford is informed and believes that Evergreen charged Hartford for the return of premium and deducted that charge from the premium remittance to Hartford.

40.    The Beacon Policy did not contain an etch endorsement. Hartford is informed and believes and thereon alleges that Evergreen accepted enrollments from Beacon for etch coverage from the inception of the Beacon Policy.

41.    Upon information and belief, on or about January 8, 2001, Beacon, AAG and American Payment Guardian, Inc. ("APG") formed a Management Agreement, which included AAG's automotive retail affiliates who were involved in the sale of GAP and theft protection/etch programs. Pursuant to that agreement, Beacon agreed to provide management services, including claims processing, for AAG's GAP and etch business in exchange for a fee and paid commission to AAG. Hartford was not a party to the AAG Management Agreement,

-12-

and was not notified of its existence. Evergreen was fully aware of the AAG Management

Agreement and failed to inform Hartford of the existence and terms of the agreement.

42.    Hartford is informed and believes and thereon alleges that on or about

September 19, 2001, at Beacon's request, Evergreen issued Hartford GAP Policy 0205746 (the

"5746 Policy") to AAG as the named insured, with a retroactive effective date of August 31,

2001. Upon information and belief, Evergreen collected no premium for the 5746 Policy and

there were no enrollments submitted and no claims made or paid under that policy. Hartford is

informed and believes that Evergreen treated AAG as an insured under the Beacon Policy and

enrollments submitted by AAG were put on the Beacon bordereau and claims were paid under

the Beacon Policy, but no premium was ever collected for those enrollments.

43.    Hartford is further informed and believes that on or about September 19, 2001,

at Beacon's Request, Evergreen issued Hartford Gap Policy 0205747 (the "5747 Policy")

naming National Theft Deterrent Systems ("NTDS") to NTDS as the named insured, with a

retroactive effective date of August 31, 2001.  Upon information and belief, Evergreen

collected no premium for the 5747 Policy and there were no enrollments submitted and no

claims made or paid under that policy. Hartford is informed and believes that Evergreen

treated NTDS as an insured under the Beacon Policy and enrollments submitted by NTDS were

put on the Beacon bordereau and claims were paid under the Beacon Policy, but no premium

was ever collected for those enrollments.

44.    Hartford is further informed and believes and thereon alleges that Evergreen

allowed Beacon to issue endorsements to policies, which were not known, authorized or

approved by Hartford.

-13-

45. Hartford is informed and believes that Evergreen accepted premiums from Beacon which it failed to remit to Hartford.

### DMS Account

46. Hartford is informed and believes and thereon alleges that Evergreen entered into a sub-producer's agreement with DMS Inc. ("DMS") on or about October 25, 1998, in which Evergreen authorized DMS to produce qualified insurance business for placement by or through Evergreen. Evergreen caused to be issued Hartford GAP policies to clients of DMS. DMS would submit monthly bordereaus and a premium remittance to Evergreen.

47. Hartford is informed and believes and thereon alleges that Evergreen failed to follow appropriate pricing standards in binding risks and quoting accurate rates for business generated by DMS. Hartford is informed and believes that DMS submitted enrollments for finance contracts with a loan or lease amount that was greatly in excess of the value of the vehicle and in some cases was 150% or more of the NADA or MSRP stated value of the vehicle, thereby greatly increasing the GAP risk to Hartford.

48. Hartford is further informed and believes and thereon alleges that Evergreen failed to properly monitor the business being produced by DMS. Specifically, Evergreen allowed DMS to write policies and/or submit enrollments that did not include a mandatory cap on the loan or lease amount. Hartford is informed and believes that even after Hartford specifically told Evergreen it could no longer accept enrollments without a cap, Evergreen continued to accept enrollments on DMS policies that did not have the appropriate cap and continued to pay claims thereunder. Hartford is further informed and believes, that Evergreen accepted enrollments past the date on which all business was to be cancelled, thereby

-14-

perpetuating a non-profitable book of business in direct contravention of directives from Hartford.

### JM&A Account

49.    Hartford is informed and believes and thereon alleges that Evergreen entered into a sub-producer's agreement with JM&A Group ("JM&A") in which Evergreen authorized JM&A to produce qualified insurance business for placement by or through Evergreen. This business was presented by Evergreen to Hartford in 2001 and was rejected by Hartford as an unacceptable risk. In or about the summer of 2002, despite Hartford's prior instructions not to write the JM&A account, Evergreen began accepting enrollments from JM&A and later notified Hartford that it had issued policies for JM&A customers and was accepting enrollments.

50.    Hartford is informed and believes and thereon alleges that Evergreen failed to follow appropriate pricing standards in binding risks and quoting accurate rates for business generated by JM&A. As a result, the premiums received for enrollments from JM&A were grossly insufficient to pay the substantial claims that resulted.

51.    Hartford is further informed and believes and thereon alleges Evergreen has breached its fiduciary obligations to Hartford as Evergreen failed to properly monitor the business being produced by JM&A under JM&A's sub-producer's agreement with Evergreen. Specifically, Evergreen allowed enrollments by JM&A that were not approved by Hartford. Evergreen also concealed the volume of JM&A's enrollments, which increased from approximately 4,600 in August 2002 to approximately 15,000 in September 2002. During this time, the mix of coverage on JM&A's enrollments changed dramatically as well. In August

-15-

2002, JM&A's enrollments were approximately 40% basic coverage and 60% broad coverage. However, in September, October, and November 2002, new policy enrollments were 100% broad coverage, which caused a substantial increase in the GAP risk to Hartford. Despite this, Evergreen did not commensurately adjust the premium received on enrollments from JM&A.

52.     Hartford is informed and believes that Evergreen allowed this substantial change in business from JM&A to occur without first obtaining sufficient underwriting information from JM&A. Specifically, Hartford is informed and believes that Evergreen never reviewed any verified, historical enrollment and loss detail data prior to accepting such a change in the volume and mix of enrollments from JM&A.

53.     Evergreen's negligent and reckless conduct in the acceptance, and its woefully inadequate and improper management, of the JM&A account has caused Hartford to sustain GAP losses far in excess of multiples of the premium received.

### Powerguard Account

54.     Hartford is informed and believes and thereon alleges that Evergreen entered into a sub-producer's agreement with Powerguard International ("Powerguard") in which Evergreen authorized Powerguard to produce qualified insurance business for placement by or through Evergreen.

55.     Hartford is informed and believes and thereon alleges that Caronia, Jr. was at all relevant times the Evergreen officer who handled the Hartford claims on a day-to-day basis, including claims submitted by Powerguard. At the same time Caronia, Jr. was acting in his capacity as the gatekeeper of claims, he was also a principal owner in Powerguard. Neither

-16-

Evergreen nor Caronia, Jr. ever disclosed this clear conflict of interest to Hartford. Evergreen and Caronia, Jr. have breached their fiduciary duty to Hartford by their concealment of Caronia, Jr.'s ownership interest in Powerguard.

56.    Hartford is further informed and believes that Powerguard retained a majority of the money received from a borrower for the GAP premium, paid a commission to Evergreen, and then remitted to Hartford no more than 10% of the amount received from the borrower. Hartford received approximately $600,000 in premium for enrollments under Powerguard policies, but has incurred more than $2.2 million in losses to date, while Evergreen and/or Powerguard have profited many millions of dollars from this account.

57.    Evergreen and Caronia, Jr. had a conflict of interest in having Caronia, Jr. process claims on policies written through a producer in which he was owner, or part-owner. Evergreen breached its duty to Hartford by inadequately pricing the Powerguard GAP coverage issued through Hartford and breached its fiduciary duty by failing to remit appropriate premium dollars while concealing the above-described conflict of interest.

58.    As a result of the breach of duty by Evergreen, Caronia, Jr. and other Individual Respondents, Hartford has been damaged and continues to be damaged from the Respondents' handling of the Powerguard account.

### Evergreen's Fraudulent and Improper Conduct in Processing Claims

59.    Hartford is informed and believes and thereon alleges that, in connection with Evergreen's servicing of claims on behalf of Hartford, Evergreen, as a matter of practice, simply paid claims without conducting a reasonable investigation into the validity of the

-17-

underlying claims. For example, enrollments under the Beacon Policy were made using a bordereau system that required the master insured to submit a disk to Evergreen containing lists of debt waivers that were being enrolled. Premium amounts were listed on the bordereau. However, upon information and belief, Evergreen did not have a verification process to ascertain enrollment status when a claim was made under a policy; Evergreen simply paid claims without verifying coverage.

60.    Hartford is informed and believes and thereon alleges that, in connection with Evergreen's servicing of claims on behalf of Hartford, Evergreen, as a matter of practice, failed to require and/or maintain the documentation required under the Claims Servicing Agreements, failed to follow the specific procedures set forth in such agreements for the processing of claims, and routinely paid claims for which Hartford had no obligation to pay.

61.    For example, the MMCA Policy provides that in the event of a constructive total loss to a vehicle covered under the MMCA Policy, MMCA is to provide Hartford with prompt notice of the loss and certain necessary documentation detailing the loss and the amount of the GAP claim. However, Hartford is informed and believes and thereon alleges that Evergreen, as a matter of course, paid claims to MMCA without requiring MMCA to provide the documentation mandated by the MMCA Policy. Evergreen also paid MMCA claims that were not promptly reported as required by the MMCA Policy. Hartford is informed and believes and thereon alleges that, as a result of Evergreen's failure to obtain proper documentation for claims and its payment of late claims, Evergreen paid MMCA claims for which Hartford had no obligation to pay.

-18-

62.     In addition, Hartford is informed and believes and thereon alleges that Evergreen's principals, including by not limited to Charles Caronia, Jr., instructed employees to change documentation regarding claims to fraudulently reflect that Hartford was obligated to pay claims in cases where no such obligation existed.  Upon information and belief, Evergreen instructed its employees to automatically provide coverage for up to sixty-day past-due payments, despite the fact that certain contracts do not provide for past-due coverage.  Upon information and belief, if a contract did not provide for past-due coverage, Evergreen instructed its employees to fraudulently replace the relevant portion of the contract relating to past-due coverage, located on the back of the contract, with language affording coverage.  And, upon information and belief, in situations where Evergreen employees had denied coverage on past due payments, they were instructed by Evergreen to whiteout the portion of the claims form reflecting the denial of coverage.  Hartford is further informed and believes and thereon alleges that Charles Caronia, Jr. specifically instructed Evergreen employees that if a contract did not provide for overdue payments, the employees were to photocopy the front of the contract while inserting a fraudulent back with language providing coverage, and then discard the original of the contract after replacing the original back portion of the contract.

63.     Hartford is informed and believes and thereon alleges that Evergreen has failed to process claims, or delayed processing of claims as required under the Claims Servicing Agreements, thereby exposing Hartford to potential breach of contract and bad faith claims.

64.     Hartford is informed and believes and thereon alleges that Evergreen has failed to report claims to Hartford in a timely manner thereby providing Hartford with a delayed and false picture of the loss ratios and preventing possible earlier cancellation/termination of the underlying GAP policies.

-19-

# FIRST CLAIM FOR RELIEF

## (Breach of Contract – Program Manager's Agreements)

65.    Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 64, inclusive, as if fully set forth herein.

66.    Evergreen has breached the Program Manager's Agreements by: not following appropriate pricing standards in binding risks and quoting accurate rates; not complying with Hartford's manuals, rules, regulations, guidelines, instructions and directions; not maintaining a competent staff; not following applicable underwriting standards and/or profitability requirements; not canceling or otherwise terminating policies that did not meet Hartford's underwriting guidelines; subjecting Hartford to risks it did not approve; accepting enrollments outside of Policy terms which greatly increased Hartford's risk exposure; failing to properly monitor sub-producers; appointing unqualified sub-producers; failing to properly account to Hartford; failing to properly handle funds belonging to Hartford; and subjecting Hartford to risks that were grossly unprofitable.

67.    Hartford has fully performed all conditions, covenants and promises it was required to perform in accordance with the Program Manager's Agreements, except to the extent prevented or excused by Evergreen's breaches of the Program Manager's Agreements.

68.    As a direct result of Evergreen's breaches of the Program Manager's Agreements, and as more fully set forth above, Hartford has suffered damages in an amount to be proven at the arbitration, but no less than $15,000,000.

-20-

50239489v1

## SECOND CLAIM FOR RELIEF

### (Breach of Contract – Claims Servicing Agreements)

69.    Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 64, inclusive, as if fully set forth herein.

70.    Evergreen breached the Claims Servicing Agreements by: failing to properly investigate claims; failing to obtain the documentation required under the Claims Servicing Agreements and under GAP policies issued by Hartford; failing to maintain proper file documentation; altering and/or destroying claim documents and concealing such conduct from Hartford; paying claims without performing adequate investigation; paying claims that Hartford had no obligation to pay; failing to report claims in a timely manner (thereby providing Hartford with a delayed and false picture of loss ratios and preventing possible earlier termination of the underlying GAP policies); and, failing to maintain the necessary licensure for the services it was performing, or supposed to be performing, for Hartford under the Claims Servicing Agreements.

71.    Hartford has fully performed all conditions, covenants, and promises it was required to perform in accordance with the Claims Servicing Agreements, except to the extent prevented or excused by Evergreen's breaches of the Claims Servicing Agreements.

72.    As a direct result of Evergreen's breaches of the Claims Servicing Agreements, and as more fully set forth above, Hartford has suffered damages in an amount to be proven at the arbitration.

## THIRD CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

73.    Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 64, inclusive, as if fully set forth herein.

74.    By virtue of the agency relationship that existed between Hartford and Evergreen – and by virtue of Hartford's having placed confidence in the fidelity and integrity of Evergreen and entrusting Evergreen to properly and adequately execute its duties under the Program Manager's Agreements and Claims Servicing Agreements – a confidential relationship existed at all times herein mentioned between Hartford and Evergreen, and Evergreen owed to Hartford a fiduciary duty. In addition, pursuant to the Program Manager's Agreements, Evergreen specifically agreed to act as a fiduciary for Hartford and to hold all premiums and any other amounts collected and received on policies for Hartford in a fiduciary account.

75.    Evergreen has breached its fiduciary duty to Hartford, at a minimum, by: failing to properly monitor Hartford's accounts to ensure that enrollments were being presented consistent with underwriting guidelines; accepting late enrollments, which did not have to be accepted under policy terms and were outside of underwriting guidelines; failing to consult with Hartford and obtain Hartford's permission before accepting such enrollments; paying claims that were not covered under the various GAP policies issued by Hartford; altering/destroying claim documents for the purpose of having Hartford pay claims for which Hartford had no liability to pay; paying claims where insufficient information to document the claim had been provided; paying claims without doing an adequate investigation as to the

-22-

validity of the claim; charging and receiving commissions that were disproportionate to what Evergreen should have received or was entitled to; failing to keep Hartford fully informed as to the business Evergreen was conducting on behalf of Hartford; and having undisclosed conflicts of interest which undermined the fiduciary obligations it had to Hartford.

76.    The breaches of fiduciary duties by Evergreen were committed and directed and controlled by the Individual Respondents, directors and officers of Evergreen. Accordingly, the breaches of fiduciary duties set forth herein were breaches of fiduciary duty by the Individual Respondents as well and for which they are liable.

77.    As a proximate result of the breaches of fiduciary duty owed by Evergreen and the Individual Respondents, Hartford has been damaged in an amount to be proven at arbitration, but no less than $15,000,000.

## FOURTH CLAIM FOR RELIEF

### (Professional Negligence)

78.    Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 64, inclusive, as if fully set forth herein.

79.    Evergreen owed a duty of care to Hartford to use such skill, prudence and diligence in connection with its role as agent, program manager, and claims servicing agent of Hartford as other members of the insurance brokering/agency profession commonly possess and exercise.

-23-

80.    As alleged herein, however, Evergreen repeatedly breached its duty of care and its fiduciary duty to Hartford.

81.    As a proximate result of Evergreen's acts and failures to act as set forth herein, Hartford has been damaged in an amount to be proven at arbitration, but no less than $15,000,000.

## FIFTH CLAIM FOR RELIEF

### (Conversion)

82.    Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 64, inclusive, as if fully set forth herein.

83.    As Program Manager for Hartford, Evergreen collected premiums on behalf of Hartford.  Hartford is informed and believes and thereon alleges that Evergreen has wrongfully exercised dominion and control over funds rightfully belonging to Hartford, that Evergreen has refused, and continues to refuse, to remit said monies to Hartford.

84.    As a proximate result of Evergreen's improper conversion of funds, Hartford has been damaged in an amount to be proven at arbitration.

## SIXTH CLAIM FOR RELIEF

### (Fraud)

85.    Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 64, inclusive, as if fully set forth herein.

-24-

86.    As set forth more fully above, Hartford is informed and believes and thereon alleges that Evergreen intentionally misrepresented the true nature of certain claims – and intentionally submitted fraudulently created and/or altered policies – to cause Hartford to pay claims for which Hartford was not obligated to pay. Such misrepresentations were material to Hartford. Hartford is informed and believes and thereon alleges that Evergreen made such representations for the purpose of inducing Hartford to rely thereon. Hartford was ignorant of the falsity of such misrepresentations, and justifiably relied on Evergreen's misrepresentations of material information when it paid claims presented to it through Evergreen.

87.    Hartford and the Individual Respondents made representations regarding the nature of the GAP Business they wrote on behalf of Hartford and the amount and level of premiums that such GAP business would bear in the GAP marketplace. Hartford is informed and believes that such representations were false and that indeed the premium dollars that producers/sub-producers were willing to pay, and did pay, for Hartford GAP policies were much greater than Evergreen and the Individual Respondents told Hartford. Hartford relied upon the representations of Evergreen and the Individual Respondents in making underwriting decisions and in establishing appropriate premium for GAP policies issued through Evergreen.

88.    As a proximate result of Evergreen's misrepresentations and fraudulent conduct, Hartford has been damaged in an amount to be proven at arbitration, but not less than $15,000,000.

-25-

## SEVENTH CLAIM FOR RELIEF

### (Accounting)

89.     Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 64, inclusive, as if fully set forth herein.

90.     The Program Manager's Agreements and the Claims Servicing Agreements provide Hartford with the right to an accounting.  In addition, Harford is further entitled to an accounting based upon Evergreen's role as fiduciary and agent to Hartford.

91.     Evergreen has refused upon repeated oral and written requests to provide Hartford with all documentation and records, electronic and otherwise, in order to perform a complete accounting of the Hartford GAP Business managed by Evergreen.

92.     An accounting is necessary to determine the proper amounts owed to Hartford, and to track the business transacted by Evergreen on Hartford's behalf.  To date, Hartford has been denied access to the records necessary to perform such an accounting.

WHEREFORE, Hartford respectfully requests that an award be granted in its favor:

On the First Claim for Relief

1.     For damages to be proven at the arbitration in an amount no less than $15,000,000;

2.     For attorneys' fees and costs of suit herein; and

3.     For such other and further relief as the panel deems just and proper.

-26-

On the Second Claim for Relief

    1.    For damages to be proven at the arbitration;

    2.    For attorneys' fees and costs of suit herein; and

    3.    For such other and further relief as the panel deems just and proper.

On the Third Claim for Relief

    1.    For damages to be proven at the arbitration in an amount no less than $15,000,000;

    2.    For attorneys' fees and costs of suit herein; and

    3.    For such other and further relief as the panel deems just and proper.

On the Fourth Claim for Relief

    1.    For damages to be proven at the arbitration in an amount no less than $15,000,000;

    2.    For attorneys' fees and costs of suit herein; and

    3.    For such other and further relief as the panel deems just and proper.

On the Fifth Claim for Relief

    1.    For damages to be proven at the arbitration;

    2.    For attorneys' fees and costs of suit herein; and

    3.    For such other and further relief as the panel deems just and proper.

On the Sixth Claim for Relief

    1.    For damages to be proven at the arbitration;

    2.    For attorneys' fees and costs of suit herein; and

    3.    For such other and further relief as the panel deems just and proper.

On the Seventh Claim for Relief

    1.    For an accounting to be conducted by Hartford's representatives;

    2.    For the sum due and owing to Hartford as a result of the accounting;

-27-

3.  For all fees and costs incurred by Hartford as a result of such an accounting;

4.  For attorneys' fees and costs of suit herein; and

5.  For such other and further relief as the panel deems just and proper.

## APPOINTMENT OF ARBITRATOR

Hartford elects to appoint as an arbitrator in this proceeding:

Andrew S. Walsh, Esq.
113 Cherry Lane
Berwyn, Pennsylvania 19312
Telephone:    610-644-6035
Facsimile:    267-200-0614

In the event that Evergreen fails to appoint an arbitrator within thirty (30) days after having received this notice, Hartford shall appoint a second arbitrator.

## LOCATION OF ARBITRATION

Pursuant to Section XVIII, subsection A, of the Program Administrator Agreement, the arbitration shall be held at Hartford's offices in New York City.

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP
JAMES E. FITZGERALD
S.V. STUART JOHNSON

By: _James E. Fitzgerald_____
James E. Fitzgerald
Attorneys for Claimant
Hartford Fire Insurance Company

-28-

# EXHIBIT D

In the Matter of the Arbitration Between

Hartford Fire Insurance Company,
Claimant and Counter Respondent

And

Bernd G. Heinze, Arbitrator
Andrew S. Walsh, Arbitrator
David Thirkill, Umpire

The Evergreen Organization, Inc.
Charles Caronia, Sr.
Charles Caronia, Jr.
Gary Uphouse
Andrejs Krutainis
Respondents and Counter Claimants.

## INTERIM FINAL ORDER

This Panel was convened on February 25, 2005 to resolve disputes, initially, between Hartford Fire Insurance Company and The Evergreen Organization. Subsequently, and following a court order to the effect, certain individuals were joined as additional parties. The disputes arose out of a Program Management Agreement (PMA) and Claims Servicing Agreement (CSA) both effective originally July 1, 2000.

The Panel conducted a hearing in this arbitration from January 8 to 12, 2007 during which extensive documentary evidence was presented and numerous witnesses heard. Additional testimony and Post Hearing briefs have been presented to the Panel.

The Panel having considered the testimony, documentary evidence, briefs and relevant case law, met thereafter, now issues this following Final Order:

1. Hartford sought relief for unauthorized diversion of premium trust funds involving a variety of issues (including profit commission and fees related to claims administration, terrorism, counter signatories etc.). Evergreen made certain counter claims in these regards. The Panel paid particular attention to the issues of claims administration. It noted that the contract is imprecise but the course of conduct appeared to be that payments to Evergreen (at least to December 2003) were on claims closed with payment only. But Evergreen did administer certain claims which closed without payment albeit the Panel could not ascertain exactly which or how many. The Panel accordingly awards Hartford the sum of $440,000 plus interest in the amount of $117,000. All other claims of Hartford and all other counter-claims of Evergreen in this respect are denied.

2. Hartford sought interest on unauthorized payment of Reliance claims. Previously, Hartford had sought a principal amount but withdrew that at the hearing on the basis that it is seeking (or had already received) recovery from Reliance. It is advised to seek interest from Reliance also. Its claim in this respect is denied.

3. Hartford sought damages in the amount of $93,894.50 for certain costs in defending claims in a, so-called, MMCA litigation. Hartford failed to convince the Panel that Evergreen or the individuals did not comply with Article 3-N(4) of the PMA and therefore concludes that neither Evergreen nor any of the individuals breached any fiduciary duty. Hartford's request is denied.

4. Evergreen sought damages in the amount of $80,750.00 for funds owed to Arch Insurance Company that were allegedly part of the funds that were frozen by the Federal District Court as part of the proceedings leading up to this arbitration. Evergreen produced no proof that the premiums allegedly owed to Arch Insurance Company were held in a premium trust account for the benefit of Arch Insurance Company. Evergreen's request is denied.

5. Hartford sought relief in an amount of $4,796,243 for alleged wrongful acts of Evergreen related to the so-called JM&A account:

    i.      The PMA states that instructions and directions issued in writing by Hartford shall bind Evergreen.

    ii.     By letter dated December 19 2001, Hartford instructed Evergreen that all "Private Label" programs be submitted to Hartford for its approval.

    iii.    In July 2001, Hartford rejected Evergreen's proposal to write a "JM &A" program. The individual who made that decision was Andrejs Krutainis, then a Hartford employee.

    iv.     In December 2001, Hartford advised Evergreen it was suspending Evergreen's duties under the PMA.

    v.      That suspension was eventually lifted partly because Evergreen, at the insistence of Hartford, hired Mr. Krutainis to take over certain duties at Evergreen, including underwriting responsibilities, previously, the responsibilities of Gary Uphouse.

    vi.     During the summer of 2002, Mr. Uphouse underwrote a JM&A account. That account was clearly Private Label business.

    vii.    The Panel believes that Mr. Uphouse deliberately concealed his actions from Mr. Krutainis. It concludes that Mr. Uphouse knew that had he referred the matter to Mr. Krutainis, as he should have done, Mr. Krutainis would most likely have rejected it, as he had done before.

    viii.   The Panel is also of the opinion that Mr. Uphouse knew that even had Mr. Krutainis changed his mind, he would have first referred the matter to Hartford (as Evergreen was obliged to do) and that, in all probability, Hartford would have rejected the proposal on the terms presented.

ix.     The Panel believes Mr. Uphouse acted deliberately and willfully wrongly and in utter and reckless disregard of his and Evergreen's duties under the PMA.

x.      By virtue of its agency agreement with Evergreen, Hartford who had never wished to have the JM&A business, became "stuck" with it and, not unreasonably in the circumstances, determined that it had little chance to cancel it under applicable state cancellation laws and regulations, so made no attempt to do so.

xi.     Evergreen, by virtue of the unauthorized and willful actions of its President, Mr. Uphouse, breached its duty of care under the PMA contract and is responsible for the loss Hartford has sustained from it. Accordingly, Evergreen is hereby ordered to pay the sum of $4,796,243 to Hartford.

6. Hartford also asserted that Messrs Uphouse, Caronia Sr., Krutainis and Caronia, Jr. ("the Individuals") should be held personally liable for the damages alleged by Hartford in this arbitration. The Individuals assert they are protected by the corporate structure they had created.

   i.      After much deliberation and extensive review of the cases cited by the parties, the majority of the Panel are of the opinion that Messrs Uphouse and Caronia, the shareholders of the corporation, disregarded the corporate form of Evergreen in virtually all respects. They treated the corporation as their "personal sand box". Accordingly the Panel finds that Messrs Uphouse and Caronia Sr. are not protected by the Evergreen corporate structure.

   ii.     In respect of JM&A account (and in respect of that account only), the majority of the Panel concludes, that Gary Uphouse, by his actions and by virtue of the lack of corporate protection, both as outlined above, is individually and personally liable. He is hereby held jointly (with Evergreen Organization) and severally liable for damages in the amount of/$501,210 (an amount based on a $3 enrollment fee multiplied by 167,070 enrollments

   iii.    Mr. Caronia Sr. was aware of the fact that Mr. Uphouse underwrote the JM&A account, and may even have assisted him in doing so. He certainly benefited thereby. However, the Panel is not convinced that Mr. Caronia Sr. was aware that Mr. Uphouse had acted wrongly and does not find him personally liable.

7. Although Messrs. Caronia, Sr., Krutainis and Caronia, Jr. may well have benefited from Mr. Uphouse's wrongful actions, in exactly the same way they would have benefited had Mr. Uphouse acted correctly, there is no evidence that any other of them knew of, or supported, or encouraged, or condoned, Mr. Uphouse's actions. Indeed, it is possible that the relationship between Hartford and Evergreen may well have continued to all their greater benefit had Mr. Uphouse not acted as he did. No award is therefore made against them personally.

8.  Evergreen is ordered to pay 75% of Hartford's attorney's fees and costs (excluding costs related to Mr. Walsh) in this proceeding. Mr. Uphouse is held jointly (with Evergreen Organization) and severally liable for said attorneys' fees and costs up to a maximum of $100,000

9.  Hartford is directed to submit a statement of its attorneys fees and costs to this Panel within fifteen (15) days of the date of this Order, at which time the Panel will issue a further Order in accordance with the finding in Paragraph 7. above.

10. All amounts ordered to be paid in this Order in paragraphs 1, 4 and 5 shall be paid within thirty (30) days of the date of this Order.

11. The panel retains jurisdiction of this Matter until it has been advised by the parties that the payments ordered in this Order and any subsequent Order called for in Paragraph 8 have been paid.

12. Any and all other claims not including any relating to those specifically referred to above are denied.

BY A MAJORITY OF THE PANEL
Dated: April 2, 2007

_____

David Thirkill, Umpire

_____

Andrew S. Walsh, Arbitrator

Concurring and Dissenting Opinion by Bernd G. Heinze, attached.

In the Matter of the Arbitration Between

---

Hartford Fire Insurance Company,
Claimant and Counter Respondent

And

The Evergreen Organization, Inc.
Charles Caronia, Sr.
Charles Caronia, Jr.
Gary Uphouse
Andrejs Krutainis
Respondents and Counter Claimants.

Bernd G. Heinze, Arbitrator
Andrew S. Walsh, Arbitrator
David Thirkill, Umpire

---

## CONCURRING & DISSENTING OPINION OF
## BERND G. HEINZE, ESQUIRE

The Arbitration Panel convened in respect of this matter has worked diligently throughout the last almost three (3) years in coordinating and managing the arbitration process, as well as the events, rulings and deliberations taking place prior to and after the arbitration itself in January 2007. The many conference calls and meetings of the Panel have always been congenial and complemented by the professionalism and experience of my colleagues.

However, as related to the final determinations of the Panel following the Hearing, I am in concurrence with many of the decisions reached and amounts awarded, but constrained to respectfully dissent on the remaining issues; namely (a) the amount of offset damages awarded to Hartford; (b) the resolution of whether the Hartford Insurance Company (Hartford) is entitled to damages as the result of the adverse performance of the JM&A book of business, and (c) the piercing of the corporate veil and the imposition of personal liability on Respondent Gary Uphouse.

I do not come by these conclusions lightly, having spent a substantial amount of time reviewing the transcript of the arbitration proceedings, the exhibits presented at the Hearing and the briefs and additional materials presented thereafter.

As noted by the Majority's Final Order, the Panel spent considerable time reviewing the allegations, testimony, case law and scholarly articles pertaining to the issue of whether adequate and credible evidence had been produced to substantiate facts enabling the determination to be made that the actions of Mr. Uphouse enabled the Panel to pierce the corporate veil of the Evergreen Organization (Evergreen) and impose personal liability upon him. I do not agree with the Majority's determination that this heavy burden of proof has been satisfied, and that the credible facts permit the onerous sanction of personal liability to be imposed.

The net award to Hartford on these items as awarded by the Majority of the Panel is $196,468.06, plus interest of $52,401.82 for a total of **$248,869.88.**

My calculation of damages awardable to Hartford for the reasons stated above amount to $10,860, plus interest (using the ratio of interest to principal claimed in Hartford's brief on this issue) of $2,896.52, for a total of **$13,756.52.**

- Other Offsets:

    - I agree with the Majority that adequate credible evidence and testimony was presented at the Hearing to substantiate Evergreen not being entitled to offsets and that the following additional damages be awarded to Hartford:

        | | | |
        |---|---|---|
        | o Terrorism project expenses of: | $ | 5,284.34 |
        | o Countersignature fees of: | $ | 48,148.00 |
        | o Profit sharing fees of: | $189,681.00 |
        | | $243,113.34 |
        | o Plus interest of: | $ 64,841.97 |
        | Total of other offset amounts: | $307,955.31 |

The Majority awarded total damages on the offset claims in the amount of **$556,826.25.**

My calculation of damages awardable to Hartford for the reasons stated above amount to **$321,711.83.**

I agree with the Majority on the following additional items of damages demanded:

(a)    Hartford sought interest on unauthorized payment of Reliance claims. Previously, Hartford had sought a principal amount but withdrew that at the Hearing on the basis that it is seeking (or had already received) recovery from Reliance. The Panel unanimously agreed and suggested Hartford seek interest damages from Reliance and, thereby denied Hartford's claim on this issue.

(b)    Hartford sought damages in the amount of $93,894.50 for certain costs in defending claims in the MMCA litigation. Hartford failed to convince the Panel that Evergreen or the Individual Respondents did not comply with Article 3-N(4) of the Program Managers Agreement and, therefore, concluded that neither Evergreen nor any of the Individuals breached any fiduciary duty. Hartford's claim for these funds was denied.

(c)    Evergreen sought damages in the amount of $80,750.00 for funds owed to Arch Insurance Company that were allegedly part of the funds that were frozen by the Federal District Court as part of the proceedings leading up to this arbitration. The record reflects Evergreen did not produce credible evidence or testimony to carry its burden of proof that the premiums allegedly owed to Arch Insurance Company were held in a premium trust account for the benefit of Arch Insurance Company and, therefore, the Panel denied Evergreen's request.

2.    The JM&A Account

Substantial testimony was elicited at the Arbitration Hearing in respect of the underwriting of this account by the Evergreen Organization. While recollections of the witnesses were not always consistent, I have compared the testimony of each witness against the letters, briefs and other tangible evidence submitted to the Panel on this issue.

The credible evidence reveals this portfolio of GAP insurance business was first presented to Evergreen in or around June 2001 and was declined by the Hartford's Andrejs Krutainis. Mr. Krutainis testified he became concerned over the comments made by the claims manager of JM&A at the time as to the amount of claim payments currently being experienced and wanted to make further inquiries to determine how the program might adversely impact the entire book of business.

A differing book of business produced by JM&A was again offered to Evergreen in the summer of 2002. Respondent Gary Uphouse was the key person in underwriting this program. The Panel reviewed the record in forensic detail, but has arrived at differing conclusions.

In my view of the record and in examining again the testimony as recorded in the transcript of the Hearing, one can arrive at a conclusion that this book of business, while within the pricing target of Hartford's premium numbers, was not underwritten with the same diligence as other risks of the program. There was a lack of trending data and, notwithstanding the relatively little "due diligence" undertaken by Mr. Uphouse, in light of the producer's prior program not being underwritten, a prudent underwriter would have demanded more. While Mr. Uphouse freely conceded he was not an underwriter by training, his experience at Evergreen and his familiarity with the program, the underwriting guidelines, audit results and additional communications with Hartford, certainly gave him a unique perspective of those risks that were appropriate to put under the Harford's umbrella.

As premium began flowing into the Hartford's account from the JM&A business, the policy numbers, premium payments, JM&A's producer status and the enrollment fees were all set forth on the monthly bordereaux produced by Evergreen and sent to Hartford. The record reflects complaints about this book of business arose only after losses were experienced. But even then, Hartford made no effort to start applying a tourniquet to stem the bleeding. Hartford's auditors continued making regular visits to the Evergreen's

offices, and even its own Vincent Vitiello testified he was supervising the program on virtually "a daily basis."

Other substantial reforms of the claims and underwriting process were demanded by Hartford throughout its relationship with Evergreen. In fact, the Hartford even cancelled the Program Manager's Agreement at one point for the deficiencies it found within the Evergreen's operations. The cancellation was lifted once Mr. Krutainis left the Hartford to become Evergreen's Chief Operations Officer. Had the JM&A book been profitable, or not have had as substantial losses as were experienced, one wonders whether this Arbitration would ever have been filed.

However, the relationship between an insurance carrier and its program manager is a mutual and reciprocal one. The Program Managers Agreement contains duties and responsibilities for both parties. There is no dispute that every risk insured will not be profitable. The basic tenet of insurance is that insurers provide coverage and accept premium from the many in order to pay the claims of the few.

Insurance carriers using program managers to obtain business from retail agents or producers do so with their eyes wide open. They utilize the program managers to market, acquire, bind and service their products, and entrust an underwriting pen delegated pursuant to underwriting guidelines. The relationship is complemented, as it was here, by regular communications and audits to ensure the expectations are being realized in both form and substance. Hartford's and Evergreen's witnesses all confirmed the insurer had taken "a hard line" with Evergreen based on the audits and findings on the performance of the overall GAP program; and yet they did not react, in my view, with a requisite degree of urgency to take positive action on the JM&A book of business when it knew it had been underwritten – regardless of not knowing how the program would eventually perform.

Mr. Uphouse knew Evergreen had a profit sharing arrangement with Hartford, which benefited both himself and Charles Caronia, Sr., the two principal shareholders of Evergreen's Subchapter S corporation. Having watched and evaluated Mr. Uphouse's testimony at the Hearing, I do not believe he would have put a program into Hartford that he knew or could have known would eventually turn unprofitable and, thus, causing him to potentially not be entitled to a share of its profitability; especially of the size and character of the JM&A portfolio.

Both parties testified the overall GAP program was one identified by Hartford as a "growth opportunity." I believe the record reflects the Evergreen took on this objective seriously. The Majority comments in its Opinion and Order that the JM&A portfolio was "private label" business. There is dispute on this in the record, based on the testimony that private label business must first be vetted by Hartford before it is underwritten. In his testimony, David McElroy of Hartford conceded the term "private label" business was not Hartford terminology, but rather one of Evergreen. Mr. Krutainis agreed, further offering that private label business was more definitional of financial institution business rather than that received from automobile dealerships like that of the JM&A account.

Regardless of the fact of whether the JM&A account was private label or not, in my view, Evergreen had been delegated underwriting authority by Hartford. It would indeed be serendipitous if each time an account of a program manager became unprofitable, the insurer could turn around after continuing to receive all the premium and investment income thereon, and visit those losses on the program manager. Once Hartford was advised the JM&A account had been underwritten, it had a decision to make if it truly believed the account had been underwritten outside the parameters of the delegated authority; it could either (a) stay on the account and see what happens or (b) find a way to cancel the program, sell the book of business to another carrier (e.g., testimony at the Hearing noted other carriers were also underwriting GAP business at the time), advise its reinsurer Swiss Reinsurance Company of the facts, or take affirmative action to mitigate potential damages going forward. For whatever reason, it took a passive approach.

The Majority notes in its Opinion and Order that Mr. Uphouse and Mr. Caronia "...treated the [Evergreen] corporation as their personal sandbox." (See Paragraph 6(i)). In my view, if one were to make such an observation, one must similarly conclude that the sandbox was squarely on the property of the Hartford and, at all times, under its direction and supervision. Under these facts as noted, I do not believe Hartford can now be heard to complain that it should be reimbursed for the total amount of the alleged $4,796,243 in losses sustained on the JM&A program.

Under the circumstances as noted, however, I do not believe Evergreen acted appropriately either. Diligent and prudent underwriting would dictate – under any circumstance – that having once been previously denied, the JM&A book should also have been reviewed by Mr. Krutainis in his position as chief operations officer of the corporation and/or to the Hartford. That would have been fair and proper – even though it was a differing book of business from the one previously offered and declined from the same producer.

As this is an arbitration proceeding, and without knowing the amount of investment interest enjoyed by Hartford on the JM&A premium, or the arrangement it may have with its 50% quota share reinsurer, the equities of the situation and facts in the record would best require the damages to be split equally between Evergreen and Hartford. All things being equal, and assuming interest amounts and other factors could not be determined, I would urge the parties to arrange an equal 50-50 split of the damages sustained. I believe this is an appropriate sum and result for Evergreen's breach of the Agreement (were one to agree the JM&A portfolio was "private label business"), and the failure of Hartford to take immediate steps to ameliorate the situation and mitigate its losses as soon as the facts came to its attention.

3.      Personal Liability of Gary Uphouse

As noted at the outset, after reviewing all the cases cited by the parties, reviewing the briefs, testimony and several law review articles on the subject, the Panel spent substantial amounts of time deliberating on the issue of whether to pierce the corporate

structure of Evergreen and impose personal liability on the Individual Respondents. The Majority has chosen to impose it only upon Mr. Uphouse for the reasons articulated in its Order.

While the actions and inactions undertaken by Mr. Uphouse were perhaps somewhat less than stellar, I believe he at all times was acting within the course and scope of his employment with Evergreen. I do not believe the facts and actions were of such an outrageous nature or of such personal "opportunistic conduct" that would allow the Panel to permit Hartford to pierce Evergreen's corporate structure to reach the personal assets of Mr. Uphouse.

The Majority fashioned an imposition of damages on Mr. Uphouse based on a calculation of enrollment fees multiplied against the total amounts of enrollments received and found Mr. Uphouse jointly and severally liable with Evergreen for damages in the amount of $501,210.

I respectfully cannot agree with this conclusion as, in my view, a review of the complete record and testimony do not support the joinder of the Individual Respondents as parties to the Arbitration in the first instance, nor the imposition of personal liability against Mr. Uphouse. As noted at the outset, I did not come lightly to this opinion. It is based on the application of the governing law of New York as precedent and of other jurisdictions as added guidance or consideration. And it is further based on the conduct of Mr. Uphouse which, the Panel agrees was not appropriate or consistent with the expectation of professionalism. I simply do not believe it rose to the level of conduct required by the case law to permeate beyond the corporate structure.

I would award relief as set forth herein.

Respectfully submitted,

Bernd G. Heinze
Arbitrator

# EXHIBIT E

In the Matter of the Arbitration Between

**Hartford Fire Insurance Company,**
**Claimant and Counter Respondent**

                                    **Bernd G. Heinze, Arbitrator**

**And**                                   **Andrew S. Walsh, Arbitrator**

                                    **David Thirkill, Umpire**

**The Evergreen Organization, Inc.**
**Charles Caronia, Sr.**
**Charles Caronia, Jr.**
**Gary Uphouse**
**Andrejs Krutainis**
**Respondents and Counter Claimants.**

## 2nd INTERIM FINAL ORDER

1.    Evergreen is ordered to pay 75% of Hartford's attorney's fees and costs as submitted by Hartford but only after Hartford has deducted certain costs associated with Mr. Walsh in Hartford's Amended Statement of Costs, namely (1) a 3/22/05 entry for Mr. Walsh's arbitrator's fee ($8,082.63), and (2) an 8/26/04 entry for $180.97.

2.    The panel retains jurisdiction of this Matter until it has been advised by the parties that all payments ordered in this Order and any prior or subsequent Order have been paid.

**FOR AND ON BEHALF OF THE PANEL**

**Dated: July 9, 2007**

_____

David Thirkill, Umpire

# EXHIBIT F

In the Matter of the Arbitration Between

---

Hartford Fire Insurance Company,
Claimant and Counter Respondent

And

Bernd G. Heinze, Arbitrator
Andrew S. Walsh, Arbitrator
David Thirkill, Umpire

The Evergreen Organization, Inc.
Charles Caronia, Sr.
Charles Caronia, Jr.
Gary Uphouse
Andrejs Krutainis
Respondents and Counter Claimants.

---

## AMENDED 2nd INTERIM FINAL ORDER

1.  Hartford's allowable attorney's fees and costs in this proceeding are $1,076,307.91.
    Evergreen is ordered to pay $807,307.91 (representing 75% of such fees and costs).
    Mr. Uphouse is ordered to pay attorneys' fees and costs of $100,000.

2.  The panel retains jurisdiction of this Matter until it has been advised by the parties
    that all payments ordered in this Order and any prior or subsequent Order have been
    paid.

FOR AND ON BEHALF OF THE PANEL

Dated: July 21, 2007

---

David Thirkill, Umpire

# EXHIBIT G

ARBITRATION BOARD CONVENED IN
NEW YORK, NEW YORK

------------------------------------------------------------------x
                                       :

In the Matter of the Arbitration of      :    **STIPULATION RE PARTIAL**
                                         :    **SATISFACTION OF INTERIM**

HARTFORD FIRE INSURANCE COMPANY   :    **ARBITRATION AWARD**
                                         :

                          Claimant,      :
       - against -                   :
                                         :

THE EVERGREEN ORGANIZATION, INC.,   :
CHARLES CARONIA, SR., GARY UPHOUSE;   :
CHARLES CARONIA, JR.; and           :
ANDREJS KRUTAINIS,                :
                                       :
                     Respondents.   :
------------------------------------------------------------------x

WHEREAS, on April 2, 2007, the Arbitration Panel issued an Interim Arbitration

Award (the "Interim Award") in the above-captioned proceeding; and

WHEREAS, pursuant to the Interim Arbitration Award, Respondent The Evergreen

Organization, Inc. ("Evergreen") was found liable to Claimant Hartford Fire Insurance

Company ("Hartford") in an amount that is in excess of $405,622.86; and

WHEREAS, Evergreen has partially satisfied its obligations under the Award by

payment to Hartford of $405,622.86; and

WHEREAS, the undersigned are authorized to enter into this stipulation by and on

behalf of the parties herein,

IT IS HEREBY STIPULATED by and between Hartford and Evergreen, through their

respective counsel of record, that:

(1)    Evergreen has partially satisfied the Interim Arbitration Award as to Evergreen only in the amount of $405,622.86, and

(2)    all remaining obligations set forth in the Interim Arbitration Award remain in full force and effect.

IT IS SO STIPULATED.

DATED: July 3, 2007

STROOCK & STROOCK & LAVAN LLP
JAMES E. FITZGERALD
S.V. STUART JOHNSON

By: _____
    James E. Fitzgerald
    Attorneys for Claimant
    Hartford Fire Insurance Company


DATED: July ___, 2007

MARSHALL, CONWAY & WRIGHT, P.C.
CHRISTOPHER T. BRADLEY, ESQ.
MICHAEL S. GOLUB, ESQ.

By: _____
    Christopher T. Bradley, Esq.
    Attorneys for Respondents
    The Evergreen Organization, Inc., Charles
    Caronia, Sr., Gary Uphouse, Charles
    Caronia, Jr., and Andrejs Krutainis


DATED: July ___, 2007

GILLIGAN & PEPPELMAN
PHILIP M. GILLIGAN, ESQ

By: _____
    Philip M. Gilligan, Esq.
    Attorneys for Respondents
    The Evergreen Organization, Inc., Charles
    Caronia, Sr., Gary Uphouse, Charles
    Caronia, Jr., and Andrejs Krutainis