UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In the Matter of the Application of

HARTFORD FIRE INSURANCE
COMPANY,

                        Petitioner,

       -against-

THE EVERGREEN ORGANIZATION, INC.,
CHARLES CARONIA, GARY UPHOUSE,
CHARLES CARONIA, JR., and
ANDREJS KRUTAINIS,

                      Respondents.
-----------------------------------------------------------X

Civil Action No. 07-CV-7977 (RJS)

================================================================

**RESPONDENTS' MEMORANDUM OF LAW IN *SUPPORT* OF CROSS-PETITION FOR
JUDGMENT CONFIRMING ARBITRATION AWARD AND IN *OPPOSTION* TO
HARTFORD'S PETITION FOR JUDGMENT CONFIRMING ARBITRATION AWARD**

================================================================

Christopher T. Bradley (CB-4725)
MARSHALL, CONWAY, WRIGHT & BRADELY, P.C.
Attorneys for Respondents Evergreen,
Charles A. Caronia, Sr., Gary Uphouse,
Charles Caronia, Jr., and Andrejs Krutainis
116 John Street, 4th Floor
New York, NY 10038
(212) 619-4444

# Table of Contents

I.     Preliminary Statement..................................................................1

II.    Background Facts.....................................................................1
       A.    Hartford's Demand for Arbitration and Statement of Claim.................1
       B.    Hartford's Third Amended Statement of Damages............................2
       C.    The Final Interim Order....................................................2
       D.    The Second Interim Final Order.............................................4
       E.    The Amended Second Interim Final Order.....................................4

III.   The Present Dispute..................................................................4

IV.    Argument..............................................................................5
       A.    The Court Must Enter Judgment As Set Forth in the Arbitration Panel's
             Orders...........................................................................5
                    1.    The Standard of a Motion to Confirm....................6
                    2.    The Court Has Authority to Enter Judgment on
                          Arbitration Awards.....................................6
                    3.    The Court Must Enter Judgment Against Evergreen
                          in the Amount of $557,000 for Premium Remittance
                          as set forth in the Arbitration Award..................8
                    4.    The Court Must Enter Judgment Against Evergreen
                          in the Amount of $4,796,243 for the JM&A
                          Account as set forth in the Arbitration Award.........9
                    5.    The Court Must Enter Judgment Against Evergreen
                          in the Amount of $807,307.91 for Attorneys' Fees
                          and Costs as set forth in the Arbitration Awards....9
                    6.    The Court Must Enter Judgment Against Evergreen
                          and Mr. Uphouse Jointly and Severally in the
                          Amount of $601,210 as set forth in the Arbitration
                          Award..................................................10
       B.    Judgment Must *Not* Be Entered Against Mr. Uphouse or Mr. Caronia, Sr.
             for the Award of $6,160,550.91 against
             Evergreen........................................................................10
       C.    The Court Must *Not* Enter Judgment Against Charles Caronia, Sr., Charles
             Caronia, Jr., and Andrejs Krutainis as Set Forth in the Arbitration Panel's
             Orders...........................................................................12
                    1.    No Award was Made Against Charles Caronia,
                          Sr......................................................12
                    2.    No Award was Made Against Charles Caronia, Jr.
                          or Andrejs Krutainis....................................13
       D.    Hartford's Motion to Confirm Must be Denied as Contradictory to the
             Arbitration Panel's Orders.........................................................13
                    1.    The True Nature of the Awards..........................13

E.    The Additional and Unwarranted Relief Hartford Seeks.................…...**14**

F.    A Motion to Confirm is Not the Appropriate Forum In Which to Litigate
(Or, In This Instance, Re-litigate) Veil-Piercing..............................**15**

G.    The Awards are Final and Have Res Judicata Effect as to the Issues
Hartford Seeks to Raise........................................................….....**16**

V.    Conclusion.....................................................................................**21**

## Table of Authorities

### Cases

*Barbier v. Shearson Lehman Hutton, Inc.,* 948 F.2d 117, 121 (2d Cir.1991) ……...….**5, 6**

*Bear Sterns & Co. Inc. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005)………**7**

*Drexel Burnham Lambert Group, Inc. v. DBL Liquidating Trust,* 161 B.R. 902, 906-07 (S.D.N.Y.1993)……………………………………………………………………………..**16**

*Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 176 (2d Cir.1984)…………………….…..**5, 6**

*Folkways Music Publishers v. Weiss,* 989 F.2d 108, 111 (2d Cir.1993)………………….**6**

*In re Marine Pollution Serv., Inc.,* 857 F.2d 91, 94 (2d Cir.1988)………………..…….**5, 6**

*Jacobson v. Fireman's Fund Ins. Co.,* 111 F.3d 261, 267-68 (2d Cir.1997)……….........**16**

*John T. Brady & Co. v. Form-Eze Sys., Inc.,* 623 F.2d 261, 264 (2d Cir.1980)……......**5, 7**

*Landy Michaels Realty Corp. v. Local 32B-32J, Service Employees Int'l Union,* 954 F.2d 794, 797 (2d Cir.1992)……………………………………………………………………**5**

*Mancini v. Hardscrabble Commons Assocs.*, 820 N.Y.S.2d 284, 2006 WL 2065259 (2d Dep't  July 25, 2006)…………………………………………………………………..…….**16**

*Matter of Arbitration Between Andros Compania Maritima,* 579 F.2d 691, 704……..**6, 7**

*O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (1981)………………………………..**17**

*Orion Shipping & Trading Co. v. Eastern States Petroleum Corp.,* 312 F.2d 299, 301 (2d Cir. 1963), *cert. den.,* 373 U.S. 949, 83 S.Ct. 1679 (1963)………………………………...**16**

*Sewell v. New York City Transit Auth.*, 809 F.Supp. 208, 213-14 (E.D.N.Y.1992)…………………………………………………………………………..**16**

*Smiga v. Dean Witter Reynolds, Inc.,* 766 F.2d 698, 707 (2d Cir.1985), *cert. denied,* 475 U.S. 1067, 106 S. Ct. 1381, 89 L.Ed.2d 607 (1986)……………………………………..….**7**

*Sobel v. Hertz, Warner & Co.,* 469 F.2d 1211, 1216 (2d Cir.1972)………………………**5**

*Twin City Fire Ins. Co. v. Mitsubishi Motors Credit of America, Inc.*, CV04-0043…….**2**

*Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,* 103 F.3d 9, 12
(2d Cir.1997)...............................................................................**5, 7**

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.,* 126 F.3d 15, 23 (2d Cir. 1997)......**5**

## Statutes

9 U.S.C. § 9.................................................................................**5, 6, 8**

Fed R.Civ.P. 11(b)(3).....................................................................**13**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of<br><br>HARTFORD FIRE INSURANCE COMPANY,<br><br>                   Petitioner,<br><br>      - against -<br><br>THE EVERGREEN ORGANIZATION, INC.,<br>CHARLES CARONIA, SR., GARY UPHOUSE,<br>CHARLES CARONIA, JR., and ANDREJS<br>KRUTAINIS,<br><br>                   Respondents. | Civil Action No.07-CV-7977 (RJS)<br><br>**RESPONDENTS'<br>MEMORANDUM OF LAW IN<br>*SUPPORT* OF CROSS-PETITION<br>FOR JUDGMENT CONFIRMING<br>ARBITRATION AWARD AND IN<br>*OPPOSTION* TO HARTFORD'S<br>PETITION FOR JUDGMENT<br>CONFIRMING ARBITRATION<br>AWARD** |

## I.    PRELIMINARY STATEMENT.

In an effort to obtain a judgment from this Court that grants it relief that was requested from and denied by the Arbitration Panel, Hartford has intentionally and grossly mischaracterized the underlying arbitration award. Hartford's attempt to distort the underlying award should be rejected for a variety of grounds as set forth below. Its attempt to confirm an award it wishes it had obtained, as opposed to the actual award, should be denied. The actual awards should be confirmed.

## II.    BACKGROUD FACTS

### A.    Hartford's Demand For Arbitration and Statement of Claim.

Hartford's Demand for Arbitration and Statement of Claim contained seven causes of action, seeking *well over* $50 million in damages. These causes of action were: breach of the Program Manager's Agreement ("PMA"); breach of the Claims Serving Agreement ("CSA"); breach of fiduciary duty; professional negligence; conversion,

fraud; and accounting. *See* Hartford's Demand for Arbitration and Statement of Claim, p. 20-26 attached as Exhibit A.

### B.    Hartford's Third Amended Statement of Damages.

Hartford particularized its damages in its Third Amended Statement of Damages. *See* Third Amended Statement of Damages, attached as Exhibit B. Hartford alleged the following items of damages: (1) $1,025,793.72 for the alleged improper diversion of Hartford premium trust funds; (2) $1,065,025 plus interest for the alleged unauthorized payment of Reliance Insurance Company ("Reliance") claims; (3) $5,377,357 plus interest for claims arising from the JM&A account; (4) $93,894.50 for alleged breaches of fiduciary duty in connection with the discovery in the *Twin City Fire Ins. Co. v. Mitsubishi Motors Credit of America, Inc.*, CV04-0043 ("MMCA litigation"); (5) $100,000 in attorneys' fees and costs; and (6) damages "likely in excess of $5,000,000" for the alleged failure to maintain adequate insurance coverage. *See id.*

### C.    The Interim Final Order.

The Arbitration Panel awarded Hartford $557,000 ($440,000 plus $117,000 in interest) with respect to the alleged unauthorized diversion of premium trust.[1]  *See* Interim Final Order, ¶ 1, attached as Exhibit C.

On the fourth day of the hearing, Hartford unilaterally withdrew its claim in the amount of $1,065,025 for the alleged unauthorized payment of Reliance claims, after Mr. David McElory, the President of Hartford Specialty, admitted under oath that Hartford

---

[1] Indeed, this amount, minus the interest, is coincidentally nearly the precise amount maintained in the escrow account established by the District Court in response to Hartford's application for a Preliminary Injunction Order and Attachment Order in Aid of Arbitration, which was predicated on Hartford's representation that it was missing "at least $10 million and probably in excess of that." *See* Hearing Trans. p. 17:21-24, attached as Exhibit D.

2

and Reliance were working out (and then miraculously worked out) this issue. Despite this, Hartford continued to seek interest. The Arbitration Panel denied Hartford's request. *See id.* at ¶ 2. The Arbitration Panel also denied Hartford's request for alleged breaches of fiduciary duty in connection with the MMCA litigation. *See id* at ¶ 3.

The Arbitration Panel did award Hartford $4,796,243 in reimbursement for claims paid with regard to the JM&A account. This amount was awarded *only* against Evergreen. *See id.* at ¶ 5.xi.

"In respect of the JM&A account (and in respect of that account only)," the Panel found Mr. Gary Uphouse "jointly (with Evergreen) and severally liable for damages in the amount of $501,000 (an amount based on a $3 enrollment fee multiplied by 167,000 enrollments[)]." *Id.* at ¶ 6.ii.

The Arbitration Panel made no award of any kind, in any capacity, against Messrs. Caronia, Sr. Krutainis and Caronia, Jr. *See id.* at ¶ 6.iii. ("[Panel] does not find [Mr. Caronia, Sr.] personally liable[.]") and ("No award is therefore made against [Messrs. Caronia, Sr., Krutainis, and Caronia, Jr.] personally.").

The Arbitration Panel awarded Hartford certain of its attorneys' fees and costs "in this proceeding", allocating 75% to Evergreen. Mr. Uphouse was also found "jointly (with Evergreen Organization) and severally liable for said attorneys' fees and costs up to maximum of $100,000." *Id.* at ¶ 8. The Panel specifically denied "[a]ny and all other claims . . . ." *id* at ¶ 12.

**D.    The Second Interim Final Order.**

The Arbitration Panel then issued a 2nd Interim Final Order that reduced Hartford requested attorneys' fees and costs. See 2nd Interim Final Order at ¶ 1, attached as Exhibit E.

**E.    Amended Second Interim Final Order.**

After deducting certain costs, the Arbitration Panel then issued an Amended 2nd Interim Final Order that set forth "Hartford's allowable attorney's fees and costs in this proceeding . . . ." Amended 2nd Interim Final Order at ¶ 1, attached as Exhibit F. This Order then allocated 75% of "Hartford's allowable attorney's fees and costs" to Evergreen. *Id.* This Order also provided that "Mr. Uphouse is ordered to pay attorneys' fees and costs of $100,000." *Id.*

**III.    THE PRESENT DISPUTE.**

The present dispute involves the Hartford's disingenuous attempt to enforce a portion of the award rendered solely against Evergreen as against Mr. Uphouse and Mr. Caronia, Sr. This is directly contrary to the Panel's Orders.

The Hartford seeks to confirm $6,160,550.91 against Evergreen. Respondents do not oppose this aspect of Hartford's Petition.

The Hartford seeks to confirm $601, 210 against Evergreen and Mr. Uphouse jointly and severally. Respondents do not oppose this aspect of Hartford's Petition.

The Hartford seeks to confirm $6,160,550.91 against Mr. Uphouse and Mr. Caronia, Sr. personally. Respondents oppose this aspect of Hartford's Petition because it is directly contrary to the Panel's Orders.

## IV.    ARGUMENT.

### A.    The Court Must Enter Judgment as Set Forth in the Arbitration Panel's Orders.

#### 1.    The Standard on a Motion to Confirm.

Normally, confirmation of an arbitration award is "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court," *Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 176 (2d Cir.1984), and the court "must grant" the award "unless the award is vacated, modified, or corrected." 9 U.S.C. § 9. The arbitrator's rationale for an award need not be explained, and the award should be confirmed " 'if a ground for the arbitrator's decision can be inferred from the facts of the case.' " *Barbier v. Shearson Lehman Hutton, Inc.,* 948 F.2d 117, 121 (2d Cir.1991) (quoting *Sobel v. Hertz, Warner & Co.,* 469 F.2d 1211, 1216 (2d Cir.1972)). Only "a barely colorable justification for the outcome reached" by the arbitrators is necessary to confirm the award. *Landy Michaels Realty Corp. v. Local 32B-32J, Service Employees Int'l Union,* 954 F.2d 794, 797 (2d Cir.1992). A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high. *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir.1997).

As stated by the Second Circuit in *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.,* 126 F.3d 15, 23 (2d Cir. 1997):

> More particularly, "[t]his court has generally refused to second guess an arbitrator's resolution of a contract dispute." *John T. Brady & Co. v. Form-Eze Sys., Inc.,* 623 F.2d 261, 264 (2d Cir.1980). As we have explained: "An arbitrator's decision is entitled to substantial deference, and the arbitrator need only explicate his reasoning under the contract 'in terms that offer even a barely colorable justification for the outcome reached' in order to withstand judicial scrutiny." *In re Marine Pollution Serv., Inc.,* 857 F.2d 91, 94 (2d Cir.1988)

5

(quoting *Andros Compania,* 579 F.2d at 704).

### 2.    The Court Has Authority to Enter Judgment on the Arbitration Awards.

This Arbitration was subject to arbitration provisions of the Hartford-Evergreen

PMA, which is governed by the Federal Arbitration Act ("FAA"). The Hartford-

Evergreen PMA provides that: "Either party may apply to the United States District for

the Southern District of New York . . . for an order confirming the award . . . . The parties

consent to the jurisdiction of any such court . . . ." *See* PMA at Article XVIII Arbitration,

¶ H, attached as Exhibit G.

Moreover, between the Hartford and the Individual Respondents, non-signatories

to the Hartford-Evergreen PMA, jurisdiction in this case is based on forum diversity of

citizenship, and the transactions in question involve interstate commerce. Accordingly,

the provisions of the FAA are applicable. *Barbier v. Shearson Lehman Hutton, Inc.,* 948

F.2d 117, 120 (2d Cir.1991).

Confirmation of an arbitration award is "a summary proceeding that merely

makes what is already a final arbitration award a judgment of the court," *Florasynth, Inc.

v. Pickholz,* 750 F.2d 171, 176 (2d Cir.1984), and the court "must grant" the award

"unless the award is vacated, modified, or corrected." 9 U.S.C. § 9.  Notably, neither the

Hartford nor Evergreen seek to vacate, modify or correct the award. Both the Hartford

and Evergreen seek only to confirm the award.  "Arbitration awards are subject to very

limited review in order to avoid undermining the twin goals of arbitration, namely,

settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music

Publishers v. Weiss,* 989 F.2d 108, 111 (2d Cir.1993). Only a barely "colorable

justification for the outcome reached" by the arbitrators is necessary to confirm the

award. *Matter of Arbitration Between Andros Compania Maritima*, 579 F.2d 691, 704 (2d Cir.1978); *see also Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir.1997). More particularly, "[t]his court has generally refused to second guess an arbitrator's resolution of a contract dispute." *John T. Brady & Co. v. Form-Eze Sys., Inc.*, 623 F.2d 261, 264 (2d Cir.1980). An "arbitrator's decision must be confirmed if there is any basis for upholding the decision and if there is even a barely colorable justification for the outcome reached." *Bear Sterns & Co. Inc. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005). The district court's task is to confirm the arbitrator's final award as mandated by section 9 of the Act. *Smiga v. Dean Witter Reynolds, Inc.*, 766 F.2d 698, 707 (2d Cir.1985), *cert. denied*, 475 U.S. 1067, 106 S. Ct. 1381, 89 L.Ed.2d 607 (1986).

We agree with Hartford in that the arbitration awards here satisfy the minimal requirements for summary confirmation. The arbitration hearing lasted for a full week in which the Arbitration Panel heard live testimony, including direct and cross-examination of eight live witnesses and three witnesses whose deposition testimony was made part of the record. The Arbitration Panel itself questioned many of the live witnesses to clarify specific portions of their testimony and to resolve its own questions. Extensive documentary evidence, including over 300 marked exhibits, was also presented for the Arbitration Panel's consideration. In addition, prior to the arbitration hearing, the parties submitted, and the Panel reviewed, extensive pre-arbitration hearing briefs with exhibits and excerpts from sworn deposition testimony. After the hearing, and at the request of the Arbitration Panel, the parties submitted extensive closing briefs. Thus, the Arbitration Panel's awards clearly meet the requirements for summary confirmation. We

reiterate that Hartford has not applied to either vacate or modify the award. The

Respondents likewise do not seek to vacate or modify the awards. Accordingly, because

neither of the parties seek to vacate or modify the awards and, indeed, both seek

confirmation, this Court "must grant such an order." 9 U.S.C. § 9.

> **3.    The Court Must Enter Judgment against
> Evergreen in the Amount of $557,000 for
> Premium Remittance as set forth in the
> Arbitration Award.**

Hartford initially sought $1,025,793.72 for the unauthorized diversion of premium

trust fund dollars. *See* Exhibit B. Evergreen made certain counterclaims with respect to

its entitlement to offset certain amounts for claims servicing fees on paid and

administered claims.

The Arbitration Panel unanimously found that Evergreen was entitled to offsets

for claims serving fees on paid claims for November and December 2003 ($159,480);

paid claims in December of 2003 ($15,290); and claims administered ($174,680). *See*

Exhibit C at Heinze concurring and dissenting opinion. Recognizing that Evergreen was

entitled to these offsets, the Arbitration Panel awarded Hartford "the sum of $440,000

plus interest in the amount of $117,000." *Id.* at ¶ 1. The Arbitration Panel specifically

denied "[a]ll other claims of Hartford and all other counter-claims of Evergreen in this

respect . . . ." *Id.* The Arbitration Panel's award against Evergreen in the amount of

$557,000 must be confirmed.

8

### 4. The Court Must Enter Judgment against Evergreen in the Amount of $4,796,243 for the JM&A Account as set forth in the Arbitration Award.

The Arbitration Panel found that: "Evergreen, by virtue of the unauthorized and willful actions of its President, Mr. Uphouse, breached its duty of care under the PMA contract and is responsible for the loss Hartford has sustained from it." Exhibit C at ¶ 5. xi. Based on this, "Evergreen is ordered to pay the sum of $4,796,243." *Id.* The Arbitration Panel's award against Evergreen in the amount of $4,796, 243 must be confirmed.

### 5. The Court Must Enter Judgment Against Evergreen in the Amount of $807,307.91 for Attorneys' Fees and Costs as set forth in the Arbitration Awards.

"Evergreen is ordered to pay 75% of Hartford's attorney's fees and costs (excluding costs related to Mr. Walsh) in this proceeding." Exhibit C at ¶ 8. Hartford submitted an application for its attorneys' fees and costs, which Respondents opposed. After deducting certain costs (*see* Exhibit F at ¶ 1), the Arbitration Panel found "Hartford allowable attorney's fees and costs in this proceeding are $1,076,307.91." Exhibit F at ¶ 1. From this, "Evergreen is ordered to pay $807,307.91 (representing 75% of such fees and costs)[]", as set forth in the Interim Final Order (Exhibit C).[2]  The Arbitration Panel's award against Evergreen in the amount of $807,307.91 must be confirmed.

---

[2] We note that 75% of $1,076,307.91 is actually $807,230.93.

6.    **The Court Must Enter Judgment Against
Evergreen and Mr. Uphouse Jointly and
Severally in the Amount of $601,210 as set forth
in the Arbitrator Awards.**

We do not oppose Hartford's request to confirm the amount of $601,210 against

Evergreen and Mr. Uphouse jointly and severally as set forth in the Arbitration Panel's

Orders.

B.    **Judgment Must _Not_ Be Entered Against Mr. Uphouse
or Mr. Caronia, Sr. for the Award of $6,160,550.91
against Evergreen.**

The arbitration awards total $6,160,550.91 against Evergreen and $601,210

jointly and severally against Evergreen and Mr. Uphouse. Hartford, nonetheless, now

audaciously attempts to enter judgment against Evergreen _and_ Mr. Caronia, Sr. _and_ Mr.

Uphouse for the entire amount awarded against Evergreen.[3] The Arbitration Panel

explicitly rejected precisely what Hartford is attempting to do here.

The Arbitration Panel's award against Evergreen consists of three components:

(1) $557,000 (unauthorized diversion of premium plus interest) Exhibit C at ¶ 1; (2)

$4,796,243 (JM&A) Exhibit C at ¶ 5. xi; and (2) $807,307.91 (attorneys' fees and costs)

Exhibit F. The Panel's award for the unauthorized diversion of premium trust funds was

made only against Evergreen. This makes perfect sense because the PMA obligated

---

[3] Hartford characterizes the arbitration awards as amounting to "$6,661,760.91 in
damages, attorney's fees, and costs against Respondents." Hartford's Petition for
Judgment Confirming Arbitration Award at ¶32, attached as Exhibit H. Hartford defines
"Respondents" to include Mr. Caronia, Sr. _See id._ at ¶ 4. Moreover, Hartfords
"[Proposed] Judgment Confirming Arbitration Award" seeks to enter a judgment "in
favor or Hartford against: (1) Respondents Evergreen, Gary Uphouse and Charles A
Caronia, Sr. in the amount of $6,060,550.91[.]" Hartford's [Proposed] Judgment
Confirming Arbitration Award, attached as Exhibit I. We note that this [Proposed]
Judgment Confirming the Arbitration Award was filed under the previous docket.

Evergreen to maintain a separate fiduciary account for premium trust funds. Exhibit G at Article III, ¶ K.

With respect to category (2), the Arbitration Panel found Evergreen liable "for the sum of $4,796,243 to Hartford." Exhibit C at ¶ 5. The Panel then made a separate, distinct and specific award against Mr. Uphouse, finding him jointly (with Evergreen) and severally liable for $501,210. The Arbitration Panel's award against Evergreen and Mr. Uphouse was predicated on the fact that Mr. Uphouse concealed the underwriting of the JM&A account from Mr. Krutainis (*see Id. at* ¶ 5. vii.), who most likely would have either rejected it or referred it to the Hartford. *See Id.* at ¶¶ 5. vii., viii. In its Interim Final Order, The Arbitration Panel found:

> In respect of the JM&A account (and in respect of that account only), the majority of the Panel concludes, that Gary Uphouse, by his actions and by virtue of the lack of corporate protection, both as outlined above, is individually and personally liable. (at ¶ 6.ii)

Based on this, the Panel fashioned an equitable remedy to divest Mr. Uphouse of ill gotten gains. "He is hereby held jointly (with Evergreen Organization) and severally liable for damages in the amount of $501,210 (an amount based on a $3 enrollment fee multiplied by 167,070 enrollments[)]." *Id.* The Arbitration Panel used testimony from the hearing that Evergreen received $3 per enrollment and multiplied that by the 167,000 enrollments to fashion a separate, distinct and specific award against Mr. Uphouse and Evergreen jointly and severally. The Arbitration Panel did not find Mr. Uphouse jointly and severally liable with Evergreen for the entire amount of the JMA& losses, as Hartford contends. This would render the phrases "by his actions" and "[h]e is hereby held jointly (with Evergreen Organization) and severally liable for damages in the amount of $501,210 (an amount based on a $3 enrollment fee multiplied by 167,070

11

enrollments" mere surplusage. Indeed, it would render the Arbitration Panel's separate,

distinct, specific award against Mr. Uphouse nonsensical.

With respect to (3), the Panel specifically found Mr. Uphouse jointly and

severally liable for "attorneys' fees and costs of $100,000." Exhibit F; Exhibit C at ¶ 8.

Indeed, if the Panel had intended to hold Mr. Uphouse liable for the $807,307.91

(attorneys' fees and costs), it would make no sense whatsoever for the Panel to render a

separate and specific award against Mr. Uphouse that was cappe d at $100,000. Indeed,

the very fact that Mr. Uphouse's liability for attorney's fees and costs was capped belies

Hartford's attempt to hold him responsible for the $807,307.91.

Lastly, the Arbitration Panel denied all other claims. *See* Exhibit C at ¶ 12.

In two places, the Arbitration Panel explicitly rejected Hartford's request to

impose personal liability on Mr. Caronia, Sr. "[T]he Panel is not convinced that Mr.

Caronia, Sr. was aware that Mr. Uphouse had acted wrongly and *does not find him*

*personally liable*." *Id.* at ¶ 6.iii. In the very next paragraph, the Arbitration Panel

explicitly ruled: "No award is therefore made against [Mr. Caronia, Sr.] personally." *Id.*

at ¶ 7. In addition, the Arbitration Panel denied all other claims. *See id.* at ¶ 12.

### C.    The Court Must *Not* Enter Judgment Against Charles Caronia, Sr., Charles Caronia, Jr., and Andrejs Krutainis as Set forth in the Arbitration Panel's Orders.

#### 1.    No Award was Made Against Charles Caronia, Sr.

In two places, the Arbitration Panel explicitly rejected Hartford's request to

impose personal liability on Mr. Caronia, Sr. "[T]he Panel is not convinced that Mr.

Caronia, Sr. was aware that Mr. Uphouse had acted wrongly and *does not find him*

*personally liable*." *Id.* at ¶ 6.iii. In the very next paragraph, the Arbitration Panel found:

"No award is therefore made against [Mr. Caronia, Sr.] personally." *Id.* at ¶ 7. In addition, the Arbitration Panel denied all other claims. *See id.* at ¶ 12.

### 2. No Award was Made Against Charles Caronia, Jr. or Andrejs Krutainis.

Recognizing that the Arbitration Panel made no award against Charles Caronia, Jr. or Andrejs Krutainis, Hartford is not seeking to enforce any portion of the arbitration award against them. Indeed, the Arbitration Panel found: "No award is therefore made against [Mr. Caronia, Jr. or Mr. Krutainis] personally." *Id.* at ¶ 7. In addition, the Arbitration Panel denied all other claims. *See id.* at ¶ 12.

### D. Hartford's Motion to Confirm Must be Denied as Contradictory to the Arbitration Panel's Orders.

#### 1. The True Nature of the Awards.

Hartford goes horribly awry from the outset. In the third paragraph of its Petition, Hartford states: "Evergreen and its principals, Charles Caronia, Sr., Charles Caronia, Jr., Gary Uphouse, and Andrejs Krutainis (collectively, the "Principals") materially breached obligations under the [Program Manager's Agreement] and [Claims Servicing Agreement] as well as their fiduciary duties owed to Hartford that arise out of those agreements." Exhibit H. Shockingly, this representation to the Court has no "evidentiary support." Fed R.Civ.P. 11(b)(3).

The Court will undoubtedly review the handful of pages that constitute the three awards from the arbitration panel. At a minimum, it will find no mention at all that: (1) Charles Caronia, Jr. is a principal of Evergreen; (2) Andrejs Krutainis is a principal of Evergreen; (3) Charles Caronia, Sr. "materially breached obligations" under the agreements; (4) Charles Caronia, Jr. "materially breached obligations" under the

13

agreements; (5) Andrejs Krutainis "materially breached obligations" under the agreements; (6) Charles Caronia, Sr. "materially breached" any "fiduciary duties"; (7) Charles Caronia, Jr. "materially breached" any "fiduciary duties"; and (8) Andrejs Krutainis "materially breached" any "fiduciary duties." That is a lot for Hartford to be wrong about by only the third paragraph. For good measure, Hartford repeats essentially the same allegation in Paragraph 19 of its Petition. No matter how often Hartford says it, however, it just isn't true.

The awards taken together indicate that the Panel denied all the damages sought by Hartford except for three items: (1) approximately 50% of the disputed items taken as offsets against premium funds; (2) damages for the actions of Evergreen's President, Gary Uphouse, who caused Evergreen to underwrite a single account that it should not have – the "JM&A" account; and (3) a portion of Hartford's attorney's fees and costs relating to the arbitration.

## E.    The Additional and Unwarranted Relief Hartford Seeks.

Taken together, the arbitration awards total $6,160,550.91 against Evergreen and $601,210 jointly and severally against Evergreen and Mr. Uphouse. The awards support none of the additional relief that Hartford seeks. What is the additional relief that Hartford seeks? Hartford characterizes the arbitration awards as amounting to "$6,661,760.91 in damages, attorney's fees, and costs against Respondents." Exhibit H at ¶32. To be generous, this representation to the Court is, at best, wishful thinking. It is outright false to the extent that it attempts to portray that the arbitration awards were somehow made against all the Respondents as one might infer from the representation in Paragraph 3 of the Petition – four individuals and a corporation – or that liability for the

damages should be allocated in any manner other than that actually set forth in the awards – $6,160,550.91 against Evergreen and $601,210 jointly and severally against Evergreen and Mr. Uphouse.

More specifically, Hartford characterizes the awards as granting recovery against Respondent Gary Uphouse and Respondent Evergreen in the amount of $601,210. *See* Exhibit I. We do not contest this. But Hartford goes further and characterizes the remainder of the award as being against "Respondents Evergreen, Charles Caronia, Sr. and Gary Uphouse in the amount of $6,060,550.91." The Panel simply did not make any such award against Messrs. Caronia, Sr. and Uphouse. Moreover, seeking a judgment in this amount fails to credit Evergreen for its payment of $405,622.86 in early July 2007, which Hartford has acknowledged receiving. *Id.*

The Arbitration Panel was quite precise in its allocation of responsibility for damages and there are no grounds before the Court to alter that allocation in accord with what Hartford wishes it had obtained. Hartford's thinly-veiled attempt to re-litigate the veil-piercing issue or perhaps more precisely – to lull the Court into issuing a judgment that incorrectly embodies the arbitration award on this matter – must be rejected.

**F.    A Motion to Confirm is Not the Appropriate Forum
In Which to Litigate (Or, In This Instance, Re-litigate)
Veil-Piercing.**

A motion to confirm an arbitration award does not present an appropriate vehicle for Hartford to re-litigate the veil-piercing issue. Second Circuit jurisprudence narrowly confines the scope of issues that are properly before the court on a motion to confirm an arbitration award. It expressly excludes consideration of an attempt to pierce the corporate veil: "[W]e hold that an action for confirmation is not the proper time for a

15

District Court to 'pierce the corporate veil.' " *Orion Shipping & Trading Co. v. Eastern States Petroleum Corp.*, 312 F.2d 299, 301 (2d Cir. 1963), *cert. den.*, 373 U.S. 949, 83 S.Ct. 1679 (1963).

### G.    The Awards are Final and Have *Res Judicata* Effect as to the Issues Hartford Seeks to Raise.

As the period in which to "vacate, modify, or correct" the award has expired, the award is now final. Therefore, although unconfirmed, the award has preclusive effect through *res judicata* and collateral estoppel. *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 267-68 (2d Cir.1997) (holding that res judicata and collateral estoppel apply to issues resolved by arbitration when an award is a final determination on the merits, notwithstanding that the award is unconfirmed); *Drexel Burnham Lambert Group, Inc. v. DBL Liquidating Trust*, 161 B.R. 902, 906-07 (S.D.N.Y.1993) (holding that an unconfirmed arbitration award has preclusive effect under federal common law); *Sewell v. New York City Transit Auth.*, 809 F.Supp. 208, 213-14 (E.D.N.Y.1992) (holding that confirmation of an arbitration award is not required for preclusive effect). Accordingly, any attempt by Hartford to re-litigate the issue of "who is responsible for what" is precluded for this reason as well as discussed further below.

Under New York law, the preclusive effect of res judicata is broad. "Res judicata precludes all claims which could have been or should have been litigated in a prior proceedings." *Mancini v. Hardscrabble Commons Assocs.*, 820 N.Y.S.2d 284, 2006 WL 2065259 (2d Dep't July 25, 2006). New York has adopted a "transactional approach" to res judicata: "[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different

theories or if seeking a different remedy." *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357 (1981).

Moreover, Hartford's pleadings and briefing materials contain allegations, causes of action, and arguments against the Individual Respondents *in all capacities*. Hartford's Demand for Arbitration and Statement of Claim alleged that: "Charles Caronia, Sr.[] is, and at all relevant times stated herein was, the Chairman of the Board and Chief Executive Officer of Evergreen, and a principal shareholder of Evergreen[]"; "Uphouse is, and at all relevant times was, the President of Evergreen, and a principal shareholder of Evergreen[]"; "Caronia, Jr. is, and has been since late 2001, the Vice-President of Claims and at the relevant times mentioned herein was an officer of Evergreen[]", and "Andrejs Krutainis is, and since at least the early part of 2002 was, the Executive Vice-President of Evergreen, and at the relevant times mentioned herein was an Officer of Evergreen." Exhibit A at pp. 2-3. The Demand for Arbitration and Statement of Claim further alleged that: "Individual Respondents operated, dominated and controlled Evergreen such that Evergreen transacted business solely for their personal benefits and thereby became their alter ego"; and "Evergreen committed breaches of fiduciary duty and fraud which were directed, implemented and ratified by the Individual Respondents thereby creating their individual liability for the torts committed against Hartford as set forth herein. *Id.* at 6. These and other allegations formed the basis for seven causes of action, some of which were directed at the Individual Respondents in both their individual and corporate capacities. *See, e.g.*, Exhibit A.

In its Verified Petition, Hartford alleged that: "Charles Caronia, Sr. is a resident of the State of Pennsylvania[]"; "Charles Caronia, Jr. is a resident of the State of Pennsylvania[]"; "Gary Uphouse is a resident of the State of Pennsylvania[]"; and that "Andrejs Krutainis is a resident of the State of Pennsylvania." Attached as Exhibit J, at ¶¶7-10. The Petition also alleged that: "Respondents Charles Caronia, Sr., Charles Caronia, Jr., and Gary Uphouse are individuals who, at all times mentioned herein, acted as principles of Evergreen and officers and/or directors of Evergreen . . . . Andrejs Krutainis acted as a principal from Evergreen from 2001 to the present." *Id* at ¶11. The Verified Petition further alleged that: "[E]ach of the respondents named herein, at all times mentioned herein, were, and acted as, the alter egos and/or agents of the others. Each of the respondents is responsible in some manner for the events described herein, and is liable to Hartford for the damages it sustained." *Id*. at ¶12.

These precise allegations were repeated in Hartford's subsequent Petition to Compel Arbitration, the pleading through which the Individual Respondents were compelled to arbitrate. In addition to these allegations, Hartford also alleged that "each of the respondents operated, dominated and controlled Evergreen such that Evergreen was run for their personal benefit and thereby became their alter ego." Attached at Exhibit K at ¶36. "Charles Caronia, Sr. was the Chairman of the Board and Chief Executive Officer of Evergreen[]"; "Uphouse was the Chief Operating Officer and President, and the second shareholder of Evergreen. Uphouse was responsible for overseeing Evergreen's business and was the main point of contract for Hartford[]"; "Krutainis was hired as Executive Vice-President by Evergreen in or about February 2002 [and] Krutainis replaced Gary Uphouse as Chief Operating Officer at Evergreen[]"; and

"Caronia Jr. was Vice-President of Claims at Evergreen [and] . . . was in charge of overseeing all aspects of Evergreen's claim handling on behalf of Hartford." *Id.* at ¶¶37-40. Hartford further alleged that "the Principals diverted millions of dollars of Hartford trust funds to themselves for their own personal use and benefit." *Id.* at ¶42.

Many of these allegations were repeated in the Declaration of Vincent Vitiello II (Hartford's Vice-President of Claims) in support of Hartford's Petition to Compel Arbitration. Mr. Vitiello declared that he, "and others at Hartford, as of February 2002, had regular dealings with Evergreen and its employees, including, but not limited to, Evergreen's four senior executives: Caronia, Sr., Uphouse, Charles Caronia, Jr., . . . and Andrejs Krutainis . . . ." Attached as Exhibit L at ¶ 4. Mr. Vitiello further declared that "Caronia Sr., Uphouse, Krutainis, and Caronia Jr. ran Evergreen for their personal use and financial benefit." *Id.* at ¶ 8.

In its pre-hearing arbitration brief, the Hartford exhaustively argued that Evergreen's Principals, Caronia, Sr. and Uphouse, were personally liable because: (1) they aided and abetted Evergreen in breaching its fiduciary duties to Harford; (2) they were the subagents of Evergreen; and (3) they were personally liable for their fraudulent conduct. *See* Pre-Hearing Brief at 20-23, attached as Exhibit M.   In addition to these arguments, Hartford also argued that the Principals were personally liable as alter egos of Evergreen. *See id.* at 24-28.

These arguments were followed up in Hartford's post-hearing arbitration brief. Hartford extensively argued that Individual Respondents were personally liable for: (1) Evergreen's tortuous conduct; (2) aiding and abetting Evergreen's conduct; and (3) the authorized acceptance of new JM&A business as subagents. *See* Post-Hearing Brief, at

19

12-15, attached as Exhibit N. Hartford also argued that Caronia, Sr. and Uphouse were personally liable as alter egos of Evergreen. *See id.* at 22.

The Arbitration Panel carefully considered these pleadings, extensive sworn testimony, and over 330 exhibits marked in evidence, as well as voluminous pre and post hearing briefs.

The Arbitration Panel explicitly acknowledged that "Hartford also asserted that Messrs. Uphouse, Caronia, Sr., Krutainis and Caronia, Jr. ("the Individuals") should be held personally liable for the damages alleged by Hartford in this arbitration. Exhibit C at ¶6. The Arbitration Panel even found that "Messrs. Uphouse and Caronia, Sr. are not protected by the corporate structure." *Id.*, ¶ 6.i. Despite all of this, the Arbitration Panel explicitly ruled that it "is not convinced that Mr. Caronia, Sr. was aware that Mr. Uphouse had acted wrongly and does not find him personally liable." *Id.*, ¶ 6.iii. The Arbitration Panel further held that:

> Although Messrs. Caronia, Sr., Krutainis and Caronia, Jr. may well well have benefited from Mr. Uphouse's wrongful actions . . . there is no evidence that any of them knew or, or supported, or encourages, or condoned, Mr. Uphouse's actions. . . . No award is therefore made against them personally.

*Id.* at ¶ 7.

> Perhaps the Dissent best articulated the sentiment of the Arbitration Panel:

> As noted at the outset, after reviewing all of the cases cited by the parties, reviewing the briefs, testimony and several law review articles on the subject, the Panel spent substantial amounts of time deliberating on the issue of whether to pierce the corporate structure of Evergreen and impose personal liability on the Individual Respondents. The Majority has chosen to impose it only upon Mr. Uphouse for the reasons articulated in its Order.

*Id.* Dissent, ¶ 3 (Personal Liability).

Despite all of the foregoing, the Hartford has the temerity to ask this Honorable Court to confirm an award against "Gary Uphouse and Charles A. Caronia in the amount of $6,060,550.91[.]" Exhibit I. We submit that Hartford cannot, in good faith, seek such relief and that its Petition for Judgment Confirming Arbitration Award must be denied.

## V.    CONCLUSION

For the reasons stated herein, Respondents respectfully submit that this Court enter Judgment upon the Panel's Final Awards as follows:

(1)    Respondent Evergreen in the amount of $6,160,550.91;

(2)    Respondents Evergreen and Mr. Uphouse jointly and severally liable in the amount of $601,210;

(3)    Mr. Caronia, Sr. in the amount of $0.00;

(4)    Mr. Caronia, Jr. in the amount of $0.00; and

(5)    Mr. Krutainis in the amount of $0.00.

The Respondents also respectfully request that this Court deny Hartford's Petition for Judgment Confirming Arbitration Award to the extent it seeks an award against "Gary Uphouse and Charles A. Caronia in the amount of $6,060,550.91;" and grant any such other relief as this Court deems appropriate.

Dated: October 16, 2007
       New York, New York

Respectfully submitted,

By: _____
    Christopher T. Bradley (CTB-4725)

MARSHALL, CONWAY, WRIGHT & BRADELY, P.C.
Attorneys for Respondents Evergreen, Charles A.
Caronia, Sr., Gary Uphouse, Charles Caronia, Jr., and
Andrejs Krutainis
116 John Street, 4th Floor

21

New York, NY  10038
(212) 619-4444

# EXHIBIT A

ARBITRATION BOARD CONVENED IN
NEW YORK, NEW YORK

---------------------------------------------------------------x
                                                       :
In the Matter of the Arbitration of                    :
                                                       :
HARTFORD FIRE INSURANCE COMPANY                        :    DEMAND FOR ARBITRATION
                                                       :    AND STATEMENT OF CLAIM
                                    Claimant,          :
          - against -                                  :
                                                       :
THE EVERGREEN ORGANIZATION, INC.,                      :
CHARLES CARONIA, SR., GARY UPHOUSE;                    :
CHARLES CARNOIA, JR.; and                              :
ANDREJS KRUTAINIS,                                     :
                                                       :
                                    Respondent.        :
---------------------------------------------------------------x


PLEASE TAKE NOTICE that Claimant Hartford Fire Insurance Company

("Hartford") hereby demands that Respondents The Evergreen Organization, Inc.

("Evergreen"), Charles Caronia, Sr. (Caronia, Sr.), Gary Uphouse ("Uphouse"), Charles

Caronia, Jr. (Caronia, Jr.) and Andrejs Krutainis ("Krutainis") arbitrate Hartford's claims

against them before an arbitration board consisting of two arbitrators and an umpire convened

in New York, New York, pursuant to Section XVIII of the Program Manager's Agreement

("PMA")[1] between Hartford and Evergreen.

---

[1]  A true and correct copy of the PMA is attached as Exhibit A to this Demand for Arbitrati·

50239489v1

## ALLEGATIONS DIRECTED TO ALL CLAIMS

### THE PARTIES

1.    Hartford is, and at all relevant times herein was, a Delaware corporation organized under the laws of the State of Delaware with its principal place of business in Hartford, Connecticut. Hartford Financial Products, Inc. ("HFP") is a wholly-owned subsidiary corporation of Hartford. HFP is, and at all times relevant hereto was, a New York corporation with its principal place of business in New York, New York.

2.    Hartford is informed and believes and thereon alleges that Evergreen is, and at all relevant times was, a corporation organized under the laws of the State of Pennsylvania, with its principal place of business in Chester Springs, Pennsylvania.

3.    Hartford is informed and believes and thereon alleges that Caronia, Sr.[2] is, and at all relevant times stated herein was, the Chairman of the Board and Chief Executive Officer of Evergreen, and a principal shareholder of Evergreen.

4.    Hartford is informed and believes and thereon alleges that Uphouse is, and at a relevant times was, the President of Evergreen, and a principal shareholder of Evergreen.

5.    Hartford is informed and believes and thereon alleges that Caronia, Jr. is, and has been since late 2001, the Vice-President of Claims and at the relevant times mentioned herein was an officer of Evergreen.

---

[2]  Caronia, Sr., Uphouse, Caronia, Jr. and Krutainis are sometimes collectively referred to herein as the "Individual Respondents."

-2-

6.      Hartford is informed and believes and thereon alleges that Krutainis is, and since at least the early part of 2002 was, the Executive Vice-President of Evergreen, and at the relevant times mentioned herein was an officer of Evergreen.

## SUBMISSION OF DISPUTE TO ARBITRATION

7.      The PMA provides in relevant part that Evergreen and Hartford shall resolve any breaches of the PMA through binding arbitration as follows:

> ARTICLE XVIII. Arbitration A. Submission to Arbitration. In the event of any dispute between the Company and the Manager with reference to the interpretation, application, formation, enforcement or validity of this Agreement or any other agreement between them, or their rights with respect to any transaction involved, whether such dispute arises before or after termination of this Agreement, such dispute, upon written request of either party, shall be submitted to the decision of a board of arbitration composed of two arbitrators and an umpire meeting at the Company's offices in New York unless otherwise mutually agreed. Notwithstanding the generality of the foregoing, the Company's right to exercise any of the options contained in ARTICLES XII., XIII., or XVI. shall not be limited by the submission of any dispute to arbitration.
>
> ... B. Sole Remedy. The parties agree that arbitration pursuant to the terms of this Article is the sole remedy for the resolution of disputes between them under this Agreement or any other agreement between them. The board of arbitration will have complete and exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability, and shall only conduct the arbitration proceeding to resolve disputes between the parties to the Agreement, and not as a class action involving other parties.

PMA, Article XVIII (A) and (B).

50239489v1

## EVERGREEN'S DUTIES TO HARTFORD

8.    Hartford is an insurance company that provides various forms of insurance to businesses throughout the United States. One of the lines of insurance written by Hartford is "GAP" insurance for vehicles. GAP insurance generally provides insurance coverage for the monetary difference between the outstanding balance of a vehicle loan or lease and the actual cash value of that vehicle at the time of a covered loss to the vehicle. A different, primary insurer provides coverage for the actual cash value of the vehicle in the event of a loss.

9.    During all relevant times mentioned herein, HFP managed Hartford's GAP Program.

10.    Evergreen is an insurance brokerage firm that is licensed as an insurance agent by the Pennsylvania Department of Insurance. Evergreen acted as Hartford's Program Manager and Claims Servicing Agent with regard to the administration of Hartford's GAP Program from July 2000 through February 24, 2004.

11.    In the late 1990s, Reliance Insurance Company ("Reliance") issued GAP insurance policies. During that time, Evergreen, pursuant to a Program Manager's Agreement and a Claims Service Agreement (collectively the "Reliance Agreements") between Reliance and Evergreen, acted as Reliance's Managing General Agent ("MGA") with regard to the GAP insurance policies issued by Reliance.

12.    On or about June 30, 2000, Hartford purchased certain renewal rights in certain lines of Reliance's business, including Reliance's GAP Insurance Program. In connection therewith, Reliance, Hartford and Evergreen entered into an amendment to the Reliance

-4-

Agreements whereby Reliance assigned to Hartford all of its rights and obligations under the Reliance Agreements until such time as Hartford and Evergreen executed replacement agreements.

13.    In September 2002, Hartford and Evergreen executed a replacement Program Manager's Agreement ("PMA") and a Claims Servicing Agreement ("CSA") (collectively the "Hartford Agreements"). The Hartford Agreements are substantially similar to the Reliance Agreements.

14.    Pursuant to the PMA, Evergreen had, *inter alia*, the following specific obligations to Hartford: to bind risks in accordance with Hartford's underwriting and pricing standards; to quote accurate and adequate premiums and rates for policies in accordance with Hartford's underwriting and pricing standards; to comply fully, timely and promptly with all manuals, rules, regulations, guidelines, instructions and directions issued by Hartford; to timely account for and report to Hartford on the business; to act as a fiduciary for Hartford and to hold all premiums and any other amounts collected and received on policies for Hartford in a fiduciary account; to maintain a competent staff; to promote and safeguard the best interests and good name of Hartford; and to terminate policies as required by applicable underwriting standards and consistent with applicable regulatory and policy conditions. Evergreen was also responsible for accepting business on behalf of Hartford written by properly licensed and qualified sub-producers, and was obligated to direct, supervise and coordinate the efforts of such sub-producers. Evergreen was not, however, authorized to appoint agents for Hartford or to accept business produced by other agents or brokers.

-5-

15.     Pursuant to the Claims Servicing Agreements, Evergreen had the authority and responsibility to provide claims services to Hartford in connection with the GAP business underwritten by Hartford pursuant to the PMA.  Under the Claims Servicing Agreements, Evergreen was specifically required to handle claims on a prompt basis, to properly and timely investigate claims, to obtain the necessary documentation to justify the proper decision on the claim, to pay only those claims that Hartford is legally obligated to pay, and to notify Hartford of the claims in a timely fashion.

## INDIVIDUAL RESPONDENTS' DUTIES TO EVERGREEN

16.     Hartford is informed and believes, and based thereon alleges, that The Individual Respondents operated, dominated and controlled Evergreen such that Evergreen transacted business solely for their personal benefits and thereby became their alter ego.

17.     Pursuant to the relationship between Evergreen and Hartford, and as set forth in their agreements, Evergreen was an agent of Hartford and owed Hartford a fiduciary duty.  The Individual Respondents were subagents of Hartford and thereby owed duties, including a fiduciary duty to Hartford.

18.     Hartford is informed and believes, and based thereon alleges as set forth herein, that Evergreen committed breaches of fiduciary duty and fraud which were directed, implement and ratified by the Individual Respondents thereby creating their individual liability for the torts committed against Hartford as set forth herein.

-6-

## FEES PAID TO EVERGREEN

19.    Under the PMA, Evergreen was paid a flat fee for any vehicle enrolled under a GAP policy issued by Evergreen on behalf of Hartford.  Under the Claims Servicing Agreement, Evergreen was paid a flat fee for every claim that was paid.

## CANCELLATION AND TERMINATION OF AGREEMENTS

20.    On or about January 10, 2003, Hartford provided written notice to Evergreen that Hartford was immediately terminating the PMA because of (1) the loss of satisfactory reinsurance and (2) Evergreen's failure to perform its duties under the PMA as provided in Section XII of the PMA (Default).  However, and pursuant to the PMA, Evergreen continued to have and provide certain duties and obligations under the PMA, including the charging, collection, receipt, accounting and reporting for all premiums collected on policies written under the agreement.  Evergreen also remained obligated to act as a fiduciary with respect to such premiums.

21.    On February 5, 2004, Evergreen gave written notice to Hartford that it was canceling its Claims Servicing Agreement with Hartford effective April 9, 2004.

22.    On January 29, 2004 Evergreen notified Hartford that it was retaining certain premium funds due Hartford for enrollments under GAP policies as an "offset" for fees it claimed it was owed from Hartford.  Hartford immediately demanded that Evergreen remit the proper premiums and warned Evergreen that the withholding of premiums was a clear breach of the PMA.

-7-

23.    On February 17, 2004, Evergreen served Hartford with a Demand for Arbitration with respect to premium fees it had withheld from Hartford.

24.    On February 18, 2004, Hartford gave written notice that it was terminating its Claims Servicing Agreement with Evergreen effective February 25, 2004. Hartford immediately thereafter notified all producers and sub-producers that: (1) Evergreen was no longer authorized by Hartford to receive or accept any applications for insurance, enrollments pertaining to existing policies, GAP waivers or any other documentation relating to Hartford policies; (2) Evergreen was no longer authorized to bind coverage, issue certificates or policies of insurance or obligate Hartford in any way; (3) all remittances for premiums or other sums due and/or owing pursuant to any policies or accounts written under the Hartford Gap Program should be sent to Hartford's new representative, Lee & Mason Financial Services, Inc.; (4) Evergreen was no longer authorized to act on behalf of Hartford with respect to any claims made under Hartford policies; and (5) notice of claims, or communication of any kind with regard to claims under Hartford policies, should be forwarded directly to Lee & Mason.

25.    Evergreen refused, and continues to refuse, to fully cooperate with Hartford in transferring all files relating to Hartford's GAP business to Lee & Mason and/or Hartford as necessary for the timely and orderly administration of Hartford's GAP business.

## EVERGREEN'S BREACHES OF ITS DUTIES TO HARTFORD

### Evergreen's Breaches of Duty in Connection With Its Role as Program Manager

26.    In connection with its role as Program Manager, Evergreen failed to produce business in accordance with the terms of the Program Manager's agreement, and completely

-8-

50239489v1

failed to oversee and monitor the business generated under such agreements. Specifically, Evergreen failed to fulfill its duties under the PMA with respect to the management of the following accounts. The following accounts are examples of Evergreen's complete failure to fulfill its role as the Program Manager of Hartford's GAP business:

### MMCA Account

27.    Evergreen entered into an agreement with insurance broker TriArc Financial Services, Inc. ("TriArc") on or about March 10, 1997, in which Evergreen authorized Tri-Arc to produce qualified insurance business for placement by or through Evergreen.

28.    In late 1999, Tri-Arc submitted to Evergreen an application by Mitsubishi Motors Credit of America, Inc. ("MMCA") for GAP insurance. Evergreen submitted MMCA's application to Reliance, which, based on that application, issued its GAP Insurance Policy No. NZB 635 6121 to MMCA effective May 1, 2000.

29.    In or about July 1, 2000, based upon MMCA's 1999 application for GAP Insurance submitted to Reliance, Twin City Fire Insurance Company (a wholly owned subsidiary of Hartford) issued MMCA GAP Insurance Policy No. NZB552517("the MMCA Policy") for the period "July 1, 2000 until cancelled." The MMCA Policy remained in effect until the first quarter of 2002, when MMCA notified Hartford that it was canceling the Policy and was in the process of obtaining replacement GAP coverage.

30.    Under the PMA, Evergreen was to process enrollments under Hartford's GAP policies, like the MMCA policy, and accept premium remittances for those enrollments.

-9-

Evergreen was further required to monitor the enrollments as they were submitted to Evergreen from Tri-Arc and ensure that they met the requirements under the MMCA Policy.

31.    Pursuant to the MMCA Policy, MMCA was required to submit to Hartford, through Evergreen, a monthly premium remittance report listing each vehicle to be covered under the GAP program and the appropriate premium. MMCA failed to submit timely notification of enrollments to Evergreen as required under the MMCA Policy.

32.    Evergreen failed to properly monitor enrollments submitted under the MMCA Policy and failed to require MMCA to provide the necessary information regarding the enrollments submitted under the MMCA Policy. Evergreen failed to obtain and maintain proper records of enrollment information that was transmitted to it regarding enrollments under the MMCA Policy.

33.    Pursuant to the PMA and CSA, Evergreen was responsible for certain claims handling duties with respect to GAP claims reported under the MMCA Policy. Specifically, Evergreen was to initiate and maintain a claim file for each reported claim and obtain the necessary documentation and claim information to process the claim pursuant to the terms of the MMCA Policy, the PMA and accepted industry claims handling procedures. Upon information and belief, Evergreen authorized and caused to be paid claims under the MMCA policy which were not covered and/or which did not have the necessary and proper supporting documentation to pay the claims.

34.    Evergreen was required under the PMA and CSA to monitor and evaluate the enrollments under the MMCA Policy and advise Hartford when the enrollments being presented were materially different from the business that had been presented by MMCA in its

-10-

application. Evergreen was required under the PMA and CSA to promptly notify Hartford of the loss experience under the MMCA Policy.

35.    Evergreen failed to promptly and adequately advise Hartford of the change in the nature of the GAP business reflected in the enrollments submitted by MMCA and failed to promptly advise Hartford of the losses being reported under the MMCA Policy. Indeed, in the first half of 2002, within weeks of MMCA canceling the MMCA Policy, Evergreen breached its duty by accepting approximately 23,000 enrollments that did not comply with Hartford underwriting guidelines.

36.    Had Evergreen performed its duties under the PMA and CSA, Hartford would have been able to minimize the losses it has experienced, and continues to experience, under the MMCA Policy. As a result of Evergreen's breach of duties, Hartford has been forced to institute litigation against MMCA to mitigate its damages and has, and will in the future, incur attorneys fees and costs in pursuing claims against MMCA.

### Beacon Account

37.    On or about July 1, 2000, Hartford issued Twin City Fire Insurance Company Policy NZB 1552396 to Beacon Industries, Inc. ("Beacon") effective July 1, 2000, until cancelled (the "Beacon Policy"). The Beacon Policy includes endorsements listing a number of car dealerships as additional insureds. It also includes an undated endorsement naming American Auto Guardian of Mount Prospect, Illinois ("AAG") as an additional insured. The Beacon Policy did not include a theft/etch protection endorsement. The Beacon Policy did not provide for any return of premium in the event the policy was cancelled, or enrollments were cancelled.

-11-

38.    Enrollments under the Beacon Policy were submitted on a monthly bordereau to Evergreen. The bordereau included the consumer purchaser/lessee's name and other information such as the VIN (vehicle identification number) number of the vehicle, and the premium amount. Beacon submitted a total premium amount to Evergreen with the monthly bordereau which represented a flat fee per enrollment less cancellations of enrollments.

39.    For those purchaser/lessee's enrolled under the Beacon Policy, Beacon had issued a debt waiver contract which allowed the borrower to cancel the GAP waiver at any time during the term of the finance contract on a prorated basis. Hartford is informed and believes that in the event of cancellation of a debt waiver, Beacon would receive a prorated refund of the insurance premium for that enrollment from Evergreen. Even though the Beacon Policy does not provide for a refund of unearned premium, Hartford is informed and believes that Evergreen charged Hartford for the return of premium and deducted that charge from the premium remittance to Hartford.

40.    The Beacon Policy did not contain an etch endorsement. Hartford is informed and believes and thereon alleges that Evergreen accepted enrollments from Beacon for etch coverage from the inception of the Beacon Policy.

41.    Upon information and belief, on or about January 8, 2001, Beacon, AAG and American Payment Guardian, Inc. ("APG") formed a Management Agreement, which included AAG's automotive retail affiliates who were involved in the sale of GAP and theft protection/etch programs. Pursuant to that agreement, Beacon agreed to provide management services, including claims processing, for AAG's GAP and etch business in exchange for a fee and paid commission to AAG. Hartford was not a party to the AAG Management Agreement,

-12-

and was not notified of its existence. Evergreen was fully aware of the AAG Management Agreement and failed to inform Hartford of the existence and terms of the agreement.

42.    Hartford is informed and believes and thereon alleges that on or about September 19, 2001, at Beacon's request, Evergreen issued Hartford GAP Policy 0205746 (the "5746 Policy") to AAG as the named insured, with a retroactive effective date of August 31, 2001. Upon information and belief, Evergreen collected no premium for the 5746 Policy and there were no enrollments submitted and no claims made or paid under that policy. Hartford is informed and believes that Evergreen treated AAG as an insured under the Beacon Policy and enrollments submitted by AAG were put on the Beacon bordereau and claims were paid under the Beacon Policy, but no premium was ever collected for those enrollments.

43.    Hartford is further informed and believes that on or about September 19, 2001, at Beacon's Request, Evergreen issued Hartford Gap Policy 0205747 (the "5747 Policy") naming National Theft Deterrent Systems ("NTDS") to NTDS as the named insured, with a retroactive effective date of August 31, 2001. Upon information and belief, Evergreen collected no premium for the 5747 Policy and there were no enrollments submitted and no claims made or paid under that policy. Hartford is informed and believes that Evergreen treated NTDS as an insured under the Beacon Policy and enrollments submitted by NTDS were put on the Beacon bordereau and claims were paid under the Beacon Policy, but no premium was ever collected for those enrollments.

44.    Hartford is further informed and believes and thereon alleges that Evergreen allowed Beacon to issue endorsements to policies, which were not known, authorized or approved by Hartford.

-13-

45.    Hartford is informed and believes that Evergreen accepted premiums from Beacon which it failed to remit to Hartford.

### DMS Account

46.    Hartford is informed and believes and thereon alleges that Evergreen entered into a sub-producer's agreement with DMS Inc. ("DMS") on or about October 25, 1998, in which Evergreen authorized DMS to produce qualified insurance business for placement by or through Evergreen.    Evergreen caused to be issued Hartford GAP policies to clients of DMS. DMS would submit monthly bordereaus and a premium remittance to Evergreen.

47.    Hartford is informed and believes and thereon alleges that Evergreen failed to follow appropriate pricing standards in binding risks and quoting accurate rates for business generated by DMS.    Hartford is informed and believes that DMS submitted enrollments for finance contracts with a loan or lease amount that was greatly in excess of the value of the vehicle and in some cases was 150% or more of the NADA or MSRP stated value of the vehicle, thereby greatly increasing the GAP risk to Hartford.

48.    Hartford is further informed and believes and thereon alleges that Evergreen failed to properly monitor the business being produced by DMS.    Specifically, Evergreen allowed DMS to write policies and/or submit enrollments that did not include a mandatory cap on the loan or lease amount.    Hartford is informed and believes that even after Hartford specifically told Evergreen it could no longer accept enrollments without a cap, Evergreen continued to accept enrollments on DMS policies that did not have the appropriate cap and continued to pay claims thereunder.    Hartford is further informed and believes, that Evergreen accepted enrollments past the date on which all business was to be cancelled, thereby

-14-

perpetuating a non-profitable book of business in direct contravention of directives from Hartford.

### JM&A Account

49.    Hartford is informed and believes and thereon alleges that Evergreen entered into a sub-producer's agreement with JM&A Group ("JM&A") in which Evergreen authorized JM&A to produce qualified insurance business for placement by or through Evergreen. This business was presented by Evergreen to Hartford in 2001 and was rejected by Hartford as an unacceptable risk. In or about the summer of 2002, despite Hartford's prior instructions not to write the JM&A account, Evergreen began accepting enrollments from JM&A and later notified Hartford that it had issued policies for JM&A customers and was accepting enrollments.

50.    Hartford is informed and believes and thereon alleges that Evergreen failed to follow appropriate pricing standards in binding risks and quoting accurate rates for business generated by JM&A. As a result, the premiums received for enrollments from JM&A were grossly insufficient to pay the substantial claims that resulted.

51.    Hartford is further informed and believes and thereon alleges Evergreen has breached its fiduciary obligations to Hartford as Evergreen failed to properly monitor the business being produced by JM&A under JM&A's sub-producer's agreement with Evergreen. Specifically, Evergreen allowed enrollments by JM&A that were not approved by Hartford. Evergreen also concealed the volume of JM&A's enrollments, which increased from approximately 4,600 in August 2002 to approximately 15,000 in September 2002. During this time, the mix of coverage on JM&A's enrollments changed dramatically as well. In August

-15-

2002, JM&A's enrollments were approximately 40% basic coverage and 60% broad coverage. However, in September, October, and November 2002, new policy enrollments were 100% broad coverage, which caused a substantial increase in the GAP risk to Hartford. Despite this, Evergreen did not commensurately adjust the premium received on enrollments from JM&A.

52.    Hartford is informed and believes that Evergreen allowed this substantial change in business from JM&A to occur without first obtaining sufficient underwriting information from JM&A. Specifically, Hartford is informed and believes that Evergreen never reviewed any verified, historical enrollment and loss detail data prior to accepting such a change in the volume and mix of enrollments from JM&A.

53.    Evergreen's negligent and reckless conduct in the acceptance, and its woefully inadequate and improper management, of the JM&A account has caused Hartford to sustain GAP losses far in excess of multiples of the premium received.

### Powerguard Account

54.    Hartford is informed and believes and thereon alleges that Evergreen entered into a sub-producer's agreement with Powerguard International ("Powerguard") in which Evergreen authorized Powerguard to produce qualified insurance business for placement by or through Evergreen.

55.    Hartford is informed and believes and thereon alleges that Caronia, Jr. was at all relevant times the Evergreen officer who handled the Hartford claims on a day-to-day basis, including claims submitted by Powerguard. At the same time Caronia, Jr. was acting in his capacity as the gatekeeper of claims, he was also a principal owner in Powerguard. Neither

-16-

Evergreen nor Caronia, Jr. ever disclosed this clear conflict of interest to Hartford.  Evergreen
and Caronia, Jr. have breached their fiduciary duty to Hartford by their concealment of
Caronia, Jr.'s ownership interest in Powerguard.

56.     Hartford is further informed and believes that Powerguard retained a majority of
the money received from a borrower for the GAP premium, paid a commission to Evergreen,
and then remitted to Hartford no more than 10% of the amount received from the borrower.
Hartford received approximately $600,000 in premium for enrollments under Powerguard
policies, but has incurred more than $2.2 million in losses to date, while Evergreen and/or
Powerguard have profited many millions of dollars from this account.

57.     Evergreen and Caronia, Jr. had a conflict of interest in having Caronia, Jr.
process claims on policies written through a producer in which he was owner, or part-owner.
Evergreen breached its duty to Hartford by inadequately pricing the Powerguard GAP coverage
issued through Hartford and breached its fiduciary duty by failing to remit appropriate premium
dollars while concealing the above-described conflict of interest.

58.     As a result of the breach of duty by Evergreen, Caronia, Jr. and other Individual
Respondents, Hartford has been damaged and continues to be damaged from the Respondents'
handling of the Powerguard account.

### Evergreen's Fraudulent and Improper Conduct in Processing Claims

59.     Hartford is informed and believes and thereon alleges that, in connection with
Evergreen's servicing of claims on behalf of Hartford, Evergreen, as a matter of practice,
simply paid claims without conducting a reasonable investigation into the validity of the

-17-

underlying claims. For example, enrollments under the Beacon Policy were made using a bordereau system that required the master insured to submit a disk to Evergreen containing lists of debt waivers that were being enrolled. Premium amounts were listed on the bordereau. However, upon information and belief, Evergreen did not have a verification process to ascertain enrollment status when a claim was made under a policy; Evergreen simply paid claims without verifying coverage.

60.    Hartford is informed and believes and thereon alleges that, in connection with Evergreen's servicing of claims on behalf of Hartford, Evergreen, as a matter of practice, failed to require and/or maintain the documentation required under the Claims Servicing Agreements, failed to follow the specific procedures set forth in such agreements for the processing of claims, and routinely paid claims for which Hartford had no obligation to pay.

61.    For example, the MMCA Policy provides that in the event of a constructive total loss to a vehicle covered under the MMCA Policy, MMCA is to provide Hartford with prompt notice of the loss and certain necessary documentation detailing the loss and the amount of the GAP claim. However, Hartford is informed and believes and thereon alleges that Evergreen, as a matter of course, paid claims to MMCA without requiring MMCA to provide the documentation mandated by the MMCA Policy. Evergreen also paid MMCA claims that were not promptly reported as required by the MMCA Policy. Hartford is informed and believes and thereon alleges that, as a result of Evergreen's failure to obtain proper documentation for claims and its payment of late claims, Evergreen paid MMCA claims for which Hartford had no obligation to pay.

-18-

62.    In addition, Hartford is informed and believes and thereon alleges that Evergreen's principals, including by not limited to Charles Caronia, Jr., instructed employees to change documentation regarding claims to fraudulently reflect that Hartford was obligated to pay claims in cases where no such obligation existed. Upon information and belief, Evergreen instructed its employees to automatically provide coverage for up to sixty-day past-due payments, despite the fact that certain contracts do not provide for past-due coverage. Upon information and belief, if a contract did not provide for past-due coverage, Evergreen instructed its employees to fraudulently replace the relevant portion of the contract relating to past-due coverage, located on the back of the contract, with language affording coverage. And, upon information and belief, in situations where Evergreen employees had denied coverage on past due payments, they were instructed by Evergreen to whiteout the portion of the claims form reflecting the denial of coverage. Hartford is further informed and believes and thereon alleges that Charles Caronia, Jr. specifically instructed Evergreen employees that if a contract did not provide for overdue payments, the employees were to photocopy the front of the contract while inserting a fraudulent back with language providing coverage, and then discard the original of the contract after replacing the original back portion of the contract.

63.    Hartford is informed and believes and thereon alleges that Evergreen has failed to process claims, or delayed processing of claims as required under the Claims Servicing Agreements, thereby exposing Hartford to potential breach of contract and bad faith claims.

64.    Hartford is informed and believes and thereon alleges that Evergreen has failed to report claims to Hartford in a timely manner thereby providing Hartford with a delayed and false picture of the loss ratios and preventing possible earlier cancellation/termination of the underlying GAP policies.

-19-

## FIRST CLAIM FOR RELIEF

### (Breach of Contract – Program Manager's Agreements)

65.    Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 64, inclusive, as if fully set forth herein.

66.    Evergreen has breached the Program Manager's Agreements by: not following appropriate pricing standards in binding risks and quoting accurate rates; not complying with Hartford's manuals, rules, regulations, guidelines, instructions and directions; not maintaining a competent staff; not following applicable underwriting standards and/or profitability requirements; not canceling or otherwise terminating policies that did not meet Hartford's underwriting guidelines; subjecting Hartford to risks it did not approve; accepting enrollments outside of Policy terms which greatly increased Hartford's risk exposure; failing to properly monitor sub-producers; appointing unqualified sub-producers; failing to properly account to Hartford; failing to properly handle funds belonging to Hartford; and subjecting Hartford to risks that were grossly unprofitable.

67.    Hartford has fully performed all conditions, covenants and promises it was required to perform in accordance with the Program Manager's Agreements, except to the extent prevented or excused by Evergreen's breaches of the Program Manager's Agreements.

68.    As a direct result of Evergreen's breaches of the Program Manager's Agreements, and as more fully set forth above, Hartford has suffered damages in an amount to be proven at the arbitration, but no less than $15,000,000.

-20-

## SECOND CLAIM FOR RELIEF

### (Breach of Contract – Claims Servicing Agreements)

69.     Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 64, inclusive, as if fully set forth herein.

70.     Evergreen breached the Claims Servicing Agreements by: failing to properly investigate claims; failing to obtain the documentation required under the Claims Servicing Agreements and under GAP policies issued by Hartford; failing to maintain proper file documentation; altering and/or destroying claim documents and concealing such conduct from Hartford; paying claims without performing adequate investigation; paying claims that Hartford had no obligation to pay; failing to report claims in a timely manner (thereby providing Hartford with a delayed and false picture of loss ratios and preventing possible earlier termination of the underlying GAP policies); and, failing to maintain the necessary licensure for the services it was performing, or supposed to be performing, for Hartford under the Claims Servicing Agreements.

71.     Hartford has fully performed all conditions, covenants, and promises it was required to perform in accordance with the Claims Servicing Agreements, except to the extent prevented or excused by Evergreen's breaches of the Claims Servicing Agreements.

72.     As a direct result of Evergreen's breaches of the Claims Servicing Agreements, and as more fully set forth above, Hartford has suffered damages in an amount to be proven at the arbitration.

-21-

## THIRD CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

73.    Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 64, inclusive, as if fully set forth herein.

74.    By virtue of the agency relationship that existed between Hartford and Evergreen – and by virtue of Hartford's having placed confidence in the fidelity and integrity of Evergreen and entrusting Evergreen to properly and adequately execute its duties under the Program Manager's Agreements and Claims Servicing Agreements – a confidential relationship existed at all times herein mentioned between Hartford and Evergreen, and Evergreen owed to Hartford a fiduciary duty. In addition, pursuant to the Program Manager's Agreements, Evergreen specifically agreed to act as a fiduciary for Hartford and to hold all premiums and any other amounts collected and received on policies for Hartford in a fiduciary account.

75.    Evergreen has breached its fiduciary duty to Hartford, at a minimum, by: failing to properly monitor Hartford's accounts to ensure that enrollments were being presented consistent with underwriting guidelines; accepting late enrollments, which did not have to be accepted under policy terms and were outside of underwriting guidelines; failing to consult with Hartford and obtain Hartford's permission before accepting such enrollments; paying claims that were not covered under the various GAP policies issued by Hartford; altering/destroying claim documents for the purpose of having Hartford pay claims for which Hartford had no liability to pay; paying claims where insufficient information to document the claim had been provided; paying claims without doing an adequate investigation as to the

-22-

validity of the claim; charging and receiving commissions that were disproportionate to what Evergreen should have received or was entitled to; failing to keep Hartford fully informed as to the business Evergreen was conducting on behalf of Hartford; and having undisclosed conflicts of interest which undermined the fiduciary obligations it had to Hartford.

76.     The breaches of fiduciary duties by Evergreen were committed and directed and controlled by the Individual Respondents, directors and officers of Evergreen. Accordingly, the breaches of fiduciary duties set forth herein were breaches of fiduciary duty by the Individual Respondents as well and for which they are liable.

77.     As a proximate result of the breaches of fiduciary duty owed by Evergreen and the Individual Respondents, Hartford has been damaged in an amount to be proven at arbitration, but no less than $15,000,000.

## FOURTH CLAIM FOR RELIEF

### (Professional Negligence)

78.     Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 64, inclusive, as if fully set forth herein.

79.     Evergreen owed a duty of care to Hartford to use such skill, prudence and diligence in connection with its role as agent, program manager, and claims servicing agent of Hartford as other members of the insurance brokering/agency profession commonly possess and exercise.

-23-

50239489v1

80.    As alleged herein, however, Evergreen repeatedly breached its duty of care and its fiduciary duty to Hartford.

81.    As a proximate result of Evergreen's acts and failures to act as set forth herein, Hartford has been damaged in an amount to be proven at arbitration, but no less than $15,000,000.

## FIFTH CLAIM FOR RELIEF

### (Conversion)

82.    Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 64, inclusive, as if fully set forth herein.

83.    As Program Manager for Hartford, Evergreen collected premiums on behalf of Hartford. Hartford is informed and believes and thereon alleges that Evergreen has wrongfully exercised dominion and control over funds rightfully belonging to Hartford, that Evergreen has refused, and continues to refuse, to remit said monies to Hartford.

84.    As a proximate result of Evergreen's improper conversion of funds, Hartford has been damaged in an amount to be proven at arbitration.

## SIXTH CLAIM FOR RELIEF

### (Fraud)

85.    Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 64, inclusive, as if fully set forth herein.

-24-

86.    As set forth more fully above, Hartford is informed and believes and thereon alleges that Evergreen intentionally misrepresented the true nature of certain claims – and intentionally submitted fraudulently created and/or altered policies – to cause Hartford to pay claims for which Hartford was not obligated to pay. Such misrepresentations were material to Hartford. Hartford is informed and believes and thereon alleges that Evergreen made such representations for the purpose of inducing Hartford to rely thereon. Hartford was ignorant of the falsity of such misrepresentations, and justifiably relied on Evergreen's misrepresentations of material information when it paid claims presented to it through Evergreen.

87.    Hartford and the Individual Respondents made representations regarding the nature of the GAP Business they wrote on behalf of Hartford and the amount and level of premiums that such GAP business would bear in the GAP marketplace. Hartford is informed and believes that such representations were false and that indeed the premium dollars that producers/sub-producers were willing to pay, and did pay, for Hartford GAP policies were much greater than Evergreen and the Individual Respondents told Hartford. Hartford relied upon the representations of Evergreen and the Individual Respondents in making underwriting decisions and in establishing appropriate premium for GAP policies issued through Evergreen.

88.    As a proximate result of Evergreen's misrepresentations and fraudulent conduct, Hartford has been damaged in an amount to be proven at arbitration, but not less than $15,000,000.

-25-

## SEVENTH CLAIM FOR RELIEF

### (Accounting)

89.    Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 64, inclusive, as if fully set forth herein.

90.    The Program Manager's Agreements and the Claims Servicing Agreements provide Hartford with the right to an accounting. In addition, Harford is further entitled to an accounting based upon Evergreen's role as fiduciary and agent to Hartford.

91.    Evergreen has refused upon repeated oral and written requests to provide Hartford with all documentation and records, electronic and otherwise, in order to perform a complete accounting of the Hartford GAP Business managed by Evergreen.

92.    An accounting is necessary to determine the proper amounts owed to Hartford, and to track the business transacted by Evergreen on Hartford's behalf. To date, Hartford has been denied access to the records necessary to perform such an accounting.

WHEREFORE, Hartford respectfully requests that an award be granted in its favor:

On the First Claim for Relief

1.    For damages to be proven at the arbitration in an amount no less than $15,000,000;

2.    For attorneys' fees and costs of suit herein; and

3.    For such other and further relief as the panel deems just and proper.

-26-

On the Second Claim for Relief

    1.    For damages to be proven at the arbitration;

    2.    For attorneys' fees and costs of suit herein; and

    3.    For such other and further relief as the panel deems just and proper.

On the Third Claim for Relief

    1.    For damages to be proven at the arbitration in an amount no less than $15,000,000;

    2.    For attorneys' fees and costs of suit herein; and

    3.    For such other and further relief as the panel deems just and proper.

On the Fourth Claim for Relief

    1.    For damages to be proven at the arbitration in an amount no less than $15,000,000;

    2.    For attorneys' fees and costs of suit herein; and

    3.    For such other and further relief as the panel deems just and proper.

On the Fifth Claim for Relief

    1.    For damages to be proven at the arbitration;

    2.    For attorneys' fees and costs of suit herein; and

    3.    For such other and further relief as the panel deems just and proper.

On the Sixth Claim for Relief

    1.    For damages to be proven at the arbitration;

    2.    For attorneys' fees and costs of suit herein; and

    3.    For such other and further relief as the panel deems just and proper.

On the Seventh Claim for Relief

    1.    For an accounting to be conducted by Hartford's representatives;

    2.    For the sum due and owing to Hartford as a result of the accounting;

50239489v1

3.  For all fees and costs incurred by Hartford as a result of such an accounting;

4.  For attorneys' fees and costs of suit herein; and

5.  For such other and further relief as the panel deems just and proper.

## APPOINTMENT OF ARBITRATOR

Hartford elects to appoint as an arbitrator in this proceeding:

Andrew S. Walsh, Esq.
113 Cherry Lane
Berwyn, Pennsylvania 19312
Telephone:    610-644-6035
Facsimile:    267-200-0614

In the event that Evergreen fails to appoint an arbitrator within thirty (30) days after having received this notice, Hartford shall appoint a second arbitrator.

## LOCATION OF ARBITRATION

Pursuant to Section XVIII, subsection A, of the Program Administrator Agreement, the arbitration shall be held at Hartford's offices in New York City.

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP
JAMES E. FITZGERALD
S.V. STUART JOHNSON

By: _James E. Fitzgerald_
James E. Fitzgerald
Attorneys for Claimant
Hartford Fire Insurance Company

-28-

50239489v1