# EXHIBIT B

ARBITRATION BOARD CONVENED IN
NEW YORK, NEW YORK

------------------------------------------------------------------x
                                         :

| | | |
|---|---|---|
| In the Matter of the Arbitration of | : | |
| | : | |
| HARTFORD FIRE INSURANCE COMPANY | : | **HARTFORD FIRE INSURANCE** |
| | : | **CO.'S THIRD AMENDED** |
| Claimant, | : | **STATEMENT OF DAMAGES** |
| - against - | : | |
| | : | |
| THE EVERGREEN ORGANIZATION, INC., | : | |
| CHARLES CARONIA, SR., GARY UPHOUSE; | : | |
| CHARLES CARONIA, JR.; and | : | |
| ANDREJS KRUTAINIS, | : | |
| | : | |
| Respondent. | : | |

------------------------------------------------------------------x

       Hartford Fire Insurance Company ("Hartford") submits the following Third Amended Statement of Damages. Hartford reserves the right to supplement and/or modify this Statement.

## THIRD AMENDED STATEMENT OF DAMAGES

Respondents owed certain duties, fiduciary and otherwise, to Hartford under the

Program Managers Agreement ("PMA") and Claims Servicing Agreement ("CSA") between

Hartford and Evergreen. Respondents breached those duties by their wrongful conduct

including, but not limited to, underwriting of accounts that were not within the underwriting

criteria provided by Hartford, setting inadequate rates for GAP products, failing to properly

monitor the Hartford GAP account and its profitability, failing to properly follow claims

procedures and directives established by Hartford and to enforce same with Hartford's insureds

and producers, and paying claims and/or overpaying claims that were not properly presented.

The following are specific items of damages caused by Respondents' conduct.

### A.    Improper Diversion of Hartford Trust Funds

The Evergreen Organization, Inc. ("Evergreen") and the Individual Respondents

(Charles Caronia, Sr., Gary Uphouse, Andrejs Krutainis and Charles Caronia, Jr.) (collectively

"Individual Respondents")[1] improperly diverted and retained premium trust funds collected on

behalf of Hartford. These premium trust funds were to be held in a separate fiduciary account

pursuant to the Program Manager's Agreement ("PMA") between Hartford and Evergreen .

In January 2004, Evergreen refused to submit premium trust funds in the amount of

$696,453.34 claiming it was entitled to an offset for claims servicing fees, profit participation

and countersignature fees. This was an improper offset both procedurally and substantively.

Hartford is entitled to a return of those funds ($696,453.34), plus interest at 10% for three years

(1/04 through 1/07) ($208,936) for a total of $905,389.34.

---

[1] Evergreen and the Individual Respondents are collectively referred to herein as
"Respondents".

10 2 5,793.72

In February 2004, Evergreen again refused to submit premium trust funds in the amount of $93,208.06 claiming it was entitled to an offset for claims servicing fees and photocopy expenses. This was an improper offset both procedurally and substantively. Hartford is entitled to a return of those funds ($93,208.06), plus interest at 10% for two years and eleven months (2/04 through 1/07) ($27,196.32) for a total of $120,404.38.

69 6 493.34

B.    **Wrongful Payment of Reliance Insurance Company's Claims**

Evergreen, through its principals, used Hartford funds to pay $1,065,025 in GAP claims under policies issued to insureds of Reliance Insurance Company (the predecessor insurer of GAP that went into liquidation in 2000). Respondents paid these claims out of a Zero-Balance account at Fleet Bank that was set up by Hartford for payment of Hartford claims only. Hartford had no obligation in fact or law to be charged for such claims. Respondents diverted such funds to insureds of Reliance for Evergreen's marketing purposes. Respondents specifically used Hartford money so Evergreen's producers and their clients could avoid having their Reliance claims delayed or unpaid in the Reliance liquidation process. Respondents have admitted that they paid Reliance claims to "curry favor" with GAP insurance producers and insureds. Such conduct was in violation of the CSA and a breach of fiduciary duty.

Hartford is entitled to the full amount of the Reliance claims paid with Hartford funds ($1,065,025) plus interest thereon at the rate of 10% per annum.

Respondents owed certain duties, fiduciary and otherwise, to Hartford under the PMA and Claims Servicing Agreement ("CSA") between Hartford and Evergreen. Respondents breached those duties by their wrongful conduct including, but not limited to, underwriting of accounts that were not within the underwriting criteria provided by Hartford, setting inadequate rates for GAP products, failing to properly monitor the Hartford GAP account and its

-3-

profitability, failing to properly follow claims procedures and directives established by Hartford and to enforce same with Hartford's insureds and producers, and paying claims and/or overpaying claims that were not properly presented.

**C.    Underwriting of JM&A Account and Payment of Claims Thereunder**

In July 2001, Evergreen made a proposal to Hartford to underwrite substantial GAP business from the JM&A Group ("JM&A"). Hartford, through Andrejs Krutainis, its lead underwriter at the time, rejected Evergreen's proposal to write business through JM&A. Hartford instructed Evergreen not to write that business with JM&A at the rates proposed.

Despite this explicit instruction, Caronia Sr. and Uphouse, on behalf of Evergreen, signed an agreement in early 2002 with JM&A to write its GAP business at a below market rate and without having proper supporting documentation from JM&A. Shortly after joining Evergreen, Krutainis was advised of Evergreen's writing of the JM&A account. In July 2002, Evergreen issued policies for JM&A customers and began accepting enrollments. Evergreen set the pricing on JM&A account enrollments for both Basic and Broad Form GAP coverage at prices substantially below what it should have written the business at.

In September 2002, Hartford learned for the first time that Evergreen had begun to issue policies and accept enrollments from JM&A, contrary to Hartford's earlier instructions to Evergreen to not write the account. Hartford demanded that Evergreen provide an underwriting and pricing analysis and provide back-up documentation to support the JM&A underwriting performed by Evergreen. Evergreen promised that it had the information, and later backpedaled that it would get it, but never did. In fact, Evergreen never performed an adequate and proper underwriting and pricing analysis and had underwritten the JM&A business without proper supporting underwriting information and documentation.

-4-

In early 2003, Hartford advised Evergreen that it was going to cancel the JM&A policies, but Evergreen advised that the policies could not be cancelled before the 1-year anniversary date of the policies. Ultimately, the JM&A policies were cancelled and no further enrollments were accepted past 2003.

Evergreen should never have underwritten the JM&A business at the rate it offered ($37 per enrollment) JM&A. Its failure to perform basic and adequate underwriting and then to offer a discount rate for volume business was not only a serious breach of duty but was compounded by the Individual Respondents' acceptance of tens of thousands of enrollments while knowing that the underwriting had not been done and that there was no legitimate basis for the price it was charging. As a side note, ACE Insurance agreed to underwrite the JM&A account in the Fall of 2003 at a $65 per enrollment rate with other underwriting restrictions.

The amount of Hartford's damages for Evergreen's unauthorized, reckless and negligent underwriting of the JM&A business is approximately $5,377,357 (i.e., paid losses to date less enrollment fees), plus interest thereon at the rate of 10% per annum.

D.    Breaches of Fiduciary Duty In MMCA Litigation.

As Hartford's fiduciary, the Individual Respondents owed Hartford a duty of undivided and undiluted loyalty, which included a duty to maintain the confidentiality of certain proprietary information and confidential information of Hartford's other insureds. The Individual Respondents repeatedly violated these duties in connection with discovery in the *Twin City Fire Insurance Co. v. Mitsubishi Motors Credit of America, Inc.*, CV04-0043 litigation pending in the United States District Court for the Central District of California ("MMCA Litigation").

-5-

In the MMCA Litigation, Twin City (the Hartford subsidiary that was the issuing company for GAP policies) filed a complaint in federal court against Mitsubishi Motors Credit of America, Inc. ("MMCA") for various claims including rescission, breach of contract, fraud, etc. In response to that complaint, MMCA filed a counter-claim against Twin City and Hartford for bad faith and violation of California Business and Professions Code Section 17200. MMCA also filed a separate counterclaim against Evergreen. While MMCA claimed that it served Evergreen with the counterclaim, Evergreen never appeared in the MMCA Litigation and instead negotiated a "deal" with MMCA whereby MMCA would ultimately dismiss Evergreen from the MMCA Litigation if Evergreen - and specifically the Individual Respondents - "cooperated" in providing deposition testimony and affidavits supporting MMCA's counterclaims against Hartford/ Twin City.

MMCA sought to obtain third party documents regarding specific insureds (other than MMCA) from Twin City/Hartford and moved the Court to compel their production based upon its 17200 claim. The Federal Magistrate in the MMCA Litigaiton specifically denied MMCA's efforts. MMCA served subpoenas on Evergreen for all of its files relating to the GAP program. Twin City filed objections to the subpoenas and notified Evergreen that it was not authorized to release such documentation. Respondents said nothing.

However, Hartford later learned that the Individual Respondents in direct contravention of Hartford's instructions, and in complete derogation of its continuing obligations under the PMA and CSA, provided MMCA with the same boxes of documents Evergreen provided to Hartford regarding the entire GAP program (i.e., thousands of confidential documents and files relating to Hartford's non-MMCA GAP business and particularly private, confidential information about Hartford's other GAP insureds) that the federal court would not compel

-6-

Hartford to produce. The documents requested of Evergreen by MMCA were not ordered by the Court to be produced, but instead were voluntarily provided to MMCA by the Individual Respondents over Hartford's specific objections.    Indeed, the federal court ultimately determined that many of the documents produced were not subject to discovery in the MMCA Litigation.

In addition, MMCA's counsel prepared affidavits (aka declarations) for Messrs. Krutainis and Uphouse regarding positions that MMCA desired to take in the MMCA Litigation that it produced to them to sign. Krutainis and Uphouse executed those affidavits under penalty of perjury. Those affidavits revealed confidential, proprietary information regarding the Hartford GAP program and, in particular, dealings with other private Hartford insureds. In some cases, confidential non-MMCA documents were attached to these affidavits.

As a result of the Respondents' wholesale production of all of its documents regarding the GAP Program to MMCA, MMCA alleged a pattern and practice regarding its claims handling obligations to Hartford's other insureds. While the Court ultimately dismissed MMCA's 17200 claim as completely meritless, MMCA was able to engage in substantial discovery based on the confidential documents Evergreen produced, which never would have been possible had Respondents not voluntarily provided MMCA with Hartford's confidential, proprietary information related to its other insureds.

As a result of this breach of duty, Hartford was forced to incur unnecessary legal fees and costs in defending itself against MMCA's baseless allegations fueled by Evergreen's production of confidential information and documentation. Hartford incurred additional attorneys fees in the amount of $93,894.50 as a result of Respondents conduct in this regard.

In addition to the foregoing breach of fiduciary duty, the Individual Respondents engaged in further breaches by executing affidavits that were contrary to the PMA and CSA and contain statements that are directly contrary to the sworn deposition testimony that was provided by the Individual Respondents in this arbitration and in the MMCA Litigation. The declarations (as well as the deposition testimony provided in the MMCA Litigation) contained false information and were executed by the Individual Respondents in order to fulfill their agreement with MMCA to "cooperate" so that Evergreen would be dismissed from the MMCA Litigation.

Hartford is not seeking at this time a specific amount of damages for the egregious and unprofessional conduct of the Individual Respondents in conspiring with MMCA to manipulate the facts surrounding the Hartford GAP business to be presented to the Court in the MMCA Litigation. Nevertheless, this conduct is relevant to the credibility of the Individual Respondents and their propensity to breach their duties to Hartford in connection with the Hartford GAP business.

E.    **Attorneys Fees and Costs**

Hartford has and will continue to sustain damages equal to the amount of the attorneys' fees and costs it has and will incur in pursuit of its claims against the Respondents in this arbitration. That amount is a moving target because of the pendency of this matter. However, Hartford has incurred in excess of $100,000 in attorneys fees and costs thus far.

F.    **Failure To Maintain Adequate Insurance Coverage**

Evergreen was required by the PMA/CSA to maintain at least $5,000,000 in errors and omissions insurance coverage each year during the term of its agreements with Evergreen. Evergreen has admitted to only maintaining $1,000,000 in insurance coverage that expired

-8-

before the term of the PMA/CSA had ended.  This insurance was to be placed and secured by the Individual Respondents. Hartford's damages due to Respondents' breach of contract, negligence, breach of fiduciary duty and conversion are in excess of $1,000,000, and likely in excess of $5,000,000. Thus, to the extent that Evergreen is unable to pay the amount of any award in this matter – either through its own assets or its errors and omissions coverage – Respondents will be personally liable for any difference because of their failure to maintain adequate insurance for Evergreen.

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP
JAMES E. FITZGERALD
S.V. STUART JOHNSON
REID A. WINTHROP

By: _____
Reid A. Winthrop
Attorneys for Claimant
Hartford Fire Insurance Company

50346601v1

# EXHIBIT C

In the Matter of the Arbitration Between
_____

Hartford Fire Insurance Company,
Claimant and Counter Respondent

And

The Evergreen Organization, Inc.
Charles Caronia, Sr.
Charles Caronia, Jr.
Gary Uphouse
Andrejs Krutainis
Respondents and Counter Claimants.
_____

Bernd G. Heinze, Arbitrator
Andrew S. Walsh, Arbitrator
David Thirkill, Umpire

## INTERIM FINAL ORDER

This Panel was convened on February 25, 2005 to resolve disputes, initially, between Hartford Fire Insurance Company and The Evergreen Organization. Subsequently, and following a court order to the effect, certain individuals were joined as additional parties. The disputes arose out of a Program Management Agreement (PMA) and Claims Servicing Agreement (CSA) both effective originally July 1, 2000.

The Panel conducted a hearing in this arbitration from January 8 to 12, 2007 during which extensive documentary evidence was presented and numerous witnesses heard. Additional testimony and Post Hearing briefs have been presented to the Panel.

The Panel having considered the testimony, documentary evidence, briefs and relevant case law, met thereafter, now issues this following Final Order:

1. Hartford sought relief for unauthorized diversion of premium trust funds involving a variety of issues (including profit commission and fees related to claims administration, terrorism, counter signatories etc.). Evergreen made certain counter claims in these regards. The Panel paid particular attention to the issues of claims administration. It noted that the contract is imprecise but the course of conduct appeared to be that payments to Evergreen (at least to December 2003) were on claims closed with payment only. But Evergreen did administer certain claims which closed without payment albeit the Panel could not ascertain exactly which or how many. The Panel accordingly awards Hartford the sum of $440,000 plus interest in the amount of $117,000. All other claims of Hartford and all other counter-claims of Evergreen in this respect are denied.

2. Hartford sought interest on unauthorized payment of Reliance claims. Previously, Hartford had sought a principal amount but withdrew that at the hearing on the basis that it is seeking (or had already received) recovery from Reliance. It is advised to seek interest from Reliance also. Its claim in this respect is denied.

3. Hartford sought damages in the amount of $93,894.50 for certain costs in defending claims in a, so-called, MMCA litigation. Hartford failed to convince the Panel that Evergreen or the individuals did not comply with Article 3-N(4) of the PMA and therefore concludes that neither Evergreen nor any of the individuals breached any fiduciary duty. Hartford's request is denied.

4. Evergreen sought damages in the amount of $80,750.00 for funds owed to Arch Insurance Company that were allegedly part of the funds that were frozen by the Federal District Court as part of the proceedings leading up to this arbitration. Evergreen produced no proof that the premiums allegedly owed to Arch Insurance Company were held in a premium trust account for the benefit of Arch Insurance Company. Evergreen's request is denied.

5. Hartford sought relief in an amount of $4,796,243 for alleged wrongful acts of Evergreen related to the so-called JM&A account:

    i.    The PMA states that instructions and directions issued in writing by Hartford shall bind Evergreen.

    ii.   By letter dated December 19 2001, Hartford instructed Evergreen that all "Private Label" programs be submitted to Hartford for its approval.

    iii.  In July 2001, Hartford rejected Evergreen's proposal to write a "JM &A" program. The individual who made that decision was Andrejs Krutainis, then a Hartford employee.

    iv.   In December 2001, Hartford advised Evergreen it was suspending Evergreen's duties under the PMA.

    v.    That suspension was eventually lifted partly because Evergreen, at the insistence of Hartford, hired Mr. Krutainis to take over certain duties at Evergreen, including underwriting responsibilities, previously, the responsibilities of Gary Uphouse.

    vi.   During the summer of 2002, Mr. Uphouse underwrote a JM&A account. That account was clearly Private Label business.

    vii.  The Panel believes that Mr. Uphouse deliberately concealed his actions from Mr. Krutainis. It concludes that Mr. Uphouse knew that had he referred the matter to Mr. Krutainis, as he should have done, Mr. Krutainis would most likely have rejected it, as he had done before.

    viii. The Panel is also of the opinion that Mr. Uphouse knew that even had Mr. Krutainis changed his mind, he would have first referred the matter to Hartford (as Evergreen was obliged to do) and that, in all probability, Hartford would have rejected the proposal on the terms presented.

ix.    The Panel believes Mr. Uphouse acted deliberately and willfully wrongly and in utter and reckless disregard of his and Evergreen's duties under the PMA.

x.    By virtue of its agency agreement with Evergreen, Hartford who had never wished to have the JM&A business, became "stuck" with it and, not unreasonably in the circumstances, determined that it had little chance to cancel it under applicable state cancellation laws and regulations, so made no attempt to do so.

xi.    Evergreen, by virtue of the unauthorized and willful actions of its President, Mr. Uphouse, breached its duty of care under the PMA contract and is responsible for the loss Hartford has sustained from it. Accordingly, Evergreen is hereby ordered to pay the sum of $4,796,243 to Hartford.

6. Hartford also asserted that Messrs Uphouse, Caronia Sr., Krutainis and Caronia, Jr. ("the Individuals") should be held personally liable for the damages alleged by Hartford in this arbitration. The Individuals assert they are protected by the corporate structure they had created.

i.    After much deliberation and extensive review of the cases cited by the parties, the majority of the Panel are of the opinion that Messrs Uphouse and Caronia, the shareholders of the corporation, disregarded the corporate form of Evergreen in virtually all respects. They treated the corporation as their "personal sand box". Accordingly the Panel finds that Messrs Uphouse and Caronia Sr. are not protected by the Evergreen corporate structure.

ii.    In respect of JM&A account (and in respect of that account only), the majority of the Panel concludes, that Gary Uphouse, by his actions and by virtue of the lack of corporate protection, both as outlined above, is individually and personally liable. He is hereby held jointly (with Evergreen Organization) and severally liable for damages in the amount of/$501,210 (an amount based on a $3 enrollment fee multiplied by 167,070 enrollments

iii.    Mr. Caronia Sr. was aware of the fact that Mr. Uphouse underwrote the JM&A account, and may even have assisted him in doing so. He certainly benefited thereby. However, the Panel is not convinced that Mr. Caronia Sr. was aware that Mr. Uphouse had acted wrongly and does not find him personally liable.

7. Although Messrs. Caronia, Sr., Krutainis and Caronia, Jr. may well have benefited from Mr. Uphouse's wrongful actions, in exactly the same way they would have benefited had Mr. Uphouse acted correctly, there is no evidence that any other of them knew of, or supported, or encouraged, or condoned, Mr. Uphouse's actions. Indeed, it is possible that the relationship between Hartford and Evergreen may well have continued to all their greater benefit had Mr. Uphouse not acted as he did. No award is therefore made against them personally.

8. Evergreen is ordered to pay 75% of Hartford's attorney's fees and costs (excluding costs related to Mr. Walsh) in this proceeding. Mr. Uphouse is held jointly (with Evergreen Organization) and severally liable for said attorneys' fees and costs up to a maximum of $100,000

9. Hartford is directed to submit a statement of its attorneys fees and costs to this Panel within fifteen (15) days of the date of this Order, at which time the Panel will issue a further Order in accordance with the finding in Paragraph 7, above.

10. All amounts ordered to be paid in this Order in paragraphs 1, 4 and 5 shall be paid within thirty (30) days of the date of this Order.

11. The panel retains jurisdiction of this Matter until it has been advised by the parties that the payments ordered in this Order and any subsequent Order called for in Paragraph 8 have been paid.

12. Any and all other claims not including any relating to those specifically referred to above are denied.


BY A MAJORITY OF THE PANEL
Dated: April 2, 2007


_____

David Thirkill, Umpire


_____

Andrew S. Walsh, Arbitrator


Concurring and Dissenting Opinion by Bernd G. Heinze, attached.

In the Matter of the Arbitration Between
_____

Hartford Fire Insurance Company,
Claimant and Counter Respondent

And                                              Bernd G. Heinze, Arbitrator
                                                 Andrew S. Walsh, Arbitrator
                                                 David Thirkill, Umpire
The Evergreen Organization, Inc.
Charles Caronia, Sr.
Charles Caronia, Jr.
Gary Uphouse
Andrejs Krutainis
Respondents and Counter Claimants.
_____

## CONCURRING & DISSENTING OPINION OF
## BERND G. HEINZE, ESQUIRE

The Arbitration Panel convened in respect of this matter has worked diligently throughout the last almost three (3) years in coordinating and managing the arbitration process, as well as the events, rulings and deliberations taking place prior to and after the arbitration itself in January 2007. The many conference calls and meetings of the Panel have always been congenial and complemented by the professionalism and experience of my colleagues.

However, as related to the final determinations of the Panel following the Hearing, I am in concurrence with many of the decisions reached and amounts awarded, but constrained to respectfully dissent on the remaining issues; namely (a) the amount of offset damages awarded to Hartford; (b) the resolution of whether the Hartford Insurance Company (Hartford) is entitled to damages as the result of the adverse performance of the JM&A book of business, and (c) the piercing of the corporate veil and the imposition of personal liability on Respondent Gary Uphouse.

I do not come by these conclusions lightly, having spent a substantial amount of time reviewing the transcript of the arbitration proceedings, the exhibits presented at the Hearing and the briefs and additional materials presented thereafter.

As noted by the Majority's Final Order, the Panel spent considerable time reviewing the allegations, testimony, case law and scholarly articles pertaining to the issue of whether adequate and credible evidence had been produced to substantiate facts enabling the determination to be made that the actions of Mr. Uphouse enabled the Panel to pierce the corporate veil of the Evergreen Organization (Evergreen) and impose personal liability upon him. I do not agree with the Majority's determination that this heavy burden of proof has been satisfied, and that the credible facts permit the onerous sanction of personal liability to be imposed.

The net award to Hartford on these items as awarded by the Majority of the Panel is $196,468.06, plus interest of $52,401.82 for a total of **$248,869.88**.

My calculation of damages awardable to Hartford for the reasons stated above amount to $10,860, plus interest (using the ratio of interest to principal claimed in Hartford's brief on this issue) of $2,896.52, for a total of **$13,756.52**.

- Other Offsets:

  - I agree with the Majority that adequate credible evidence and testimony was presented at the Hearing to substantiate Evergreen not being entitled to offsets and that the following additional damages be awarded to Hartford:

    | | | |
    |---|---|---|
    | o | Terrorism project expenses of: | $ 5,284.34 |
    | o | Countersignature fees of: | $ 48,148.00 |
    | o | Profit sharing fees of: | $189,681.00 |
    | | | $243,113.34 |
    | o | Plus interest of: | $ 64,841.97 |
    | | Total of other offset amounts: | **$307,955.31** |

The Majority awarded total damages on the offset claims in the amount of **$556,826.25**.

My calculation of damages awardable to Hartford for the reasons stated above amount to **$321,711.83**.

I agree with the Majority on the following additional items of damages demanded:

(a)   Hartford sought interest on unauthorized payment of Reliance claims. Previously, Hartford had sought a principal amount but withdrew that at the Hearing on the basis that it is seeking (or had already received) recovery from Reliance. The Panel unanimously agreed and suggested Hartford seek interest damages from Reliance and, thereby denied Hartford's claim on this issue.

(b)   Hartford sought damages in the amount of $93,894.50 for certain costs in defending claims in the MMCA litigation. Hartford failed to convince the Panel that Evergreen or the Individual Respondents did not comply with Article 3-N(4) of the Program Managers Agreement and, therefore, concluded that neither Evergreen nor any of the Individuals breached any fiduciary duty. Hartford's claim for these funds was denied.

    (c)    Evergreen sought damages in the amount of $80,750.00 for funds owed to Arch Insurance Company that were allegedly part of the funds that were frozen by the Federal District Court as part of the proceedings leading up to this arbitration. The record reflects Evergreen did not produce credible evidence or testimony to carry its burden of proof that the premiums allegedly owed to Arch Insurance Company were held in a premium trust account for the benefit of Arch Insurance Company and, therefore, the Panel denied Evergreen's request.

2.    The JM&A Account

Substantial testimony was elicited at the Arbitration Hearing in respect of the underwriting of this account by the Evergreen Organization. While recollections of the witnesses were not always consistent, I have compared the testimony of each witness against the letters, briefs and other tangible evidence submitted to the Panel on this issue.

The credible evidence reveals this portfolio of GAP insurance business was first presented to Evergreen in or around June 2001 and was declined by the Hartford's Andrejs Krutainis. Mr. Krutainis testified he became concerned over the comments made by the claims manager of JM&A at the time as to the amount of claim payments currently being experienced and wanted to make further inquiries to determine how the program might adversely impact the entire book of business.

A differing book of business produced by JM&A was again offered to Evergreen in the summer of 2002. Respondent Gary Uphouse was the key person in underwriting this program. The Panel reviewed the record in forensic detail, but has arrived at differing conclusions.

In my view of the record and in examining again the testimony as recorded in the transcript of the Hearing, one can arrive at a conclusion that this book of business, while within the pricing target of Hartford's premium numbers, was not underwritten with the same diligence as other risks of the program. There was a lack of trending data and, notwithstanding the relatively little "due diligence" undertaken by Mr. Uphouse, in light of the producer's prior program not being underwritten, a prudent underwriter would have demanded more. While Mr. Uphouse freely conceded he was not an underwriter by training, his experience at Evergreen and his familiarity with the program, the underwriting guidelines, audit results and additional communications with Hartford, certainly gave him a unique perspective of those risks that were appropriate to put under the Harford's umbrella.

As premium began flowing into the Hartford's account from the JM&A business, the policy numbers, premium payments, JM&A's producer status and the enrollment fees were all set forth on the monthly bordereaux produced by Evergreen and sent to Hartford. The record reflects complaints about this book of business arose only after losses were experienced. But even then, Hartford made no effort to start applying a tourniquet to stem the bleeding. Hartford's auditors continued making regular visits to the Evergreen's

offices, and even its own Vincent Vitiello testified he was supervising the program on virtually "a daily basis."

Other substantial reforms of the claims and underwriting process were demanded by Hartford throughout its relationship with Evergreen. In fact, the Hartford even cancelled the Program Manager's Agreement at one point for the deficiencies it found within the Evergreen's operations. The cancellation was lifted once Mr. Krutainis left the Hartford to become Evergreen's Chief Operations Officer. Had the JM&A book been profitable, or not have had as substantial losses as were experienced, one wonders whether this Arbitration would ever have been filed.

However, the relationship between an insurance carrier and its program manager is a mutual and reciprocal one. The Program Managers Agreement contains duties and responsibilities for both parties. There is no dispute that every risk insured will not be profitable. The basic tenet of insurance is that insurers provide coverage and accept premium from the many in order to pay the claims of the few.

Insurance carriers using program managers to obtain business from retail agents or producers do so with their eyes wide open. They utilize the program managers to market, acquire, bind and service their products, and entrust an underwriting pen delegated pursuant to underwriting guidelines. The relationship is complemented, as it was here, by regular communications and audits to ensure the expectations are being realized in both form and substance. Hartford's and Evergreen's witnesses all confirmed the insurer had taken "a hard line" with Evergreen based on the audits and findings on the performance of the overall GAP program; and yet they did not react, in my view, with a requisite degree of urgency to take positive action on the JM&A book of business when it knew it had been underwritten – regardless of not knowing how the program would eventually perform.

Mr. Uphouse knew Evergreen had a profit sharing arrangement with Hartford, which benefited both himself and Charles Caronia, Sr., the two principal shareholders of Evergreen's Subchapter S corporation. Having watched and evaluated Mr. Uphouse's testimony at the Hearing, I do not believe he would have put a program into Hartford that he knew or could have known would eventually turn unprofitable and, thus, causing him to potentially not be entitled to a share of its profitability; especially of the size and character of the JM&A portfolio.

Both parties testified the overall GAP program was one identified by Hartford as a "growth opportunity." I believe the record reflects the Evergreen took on this objective seriously. The Majority comments in its Opinion and Order that the JM&A portfolio was "private label" business. There is dispute on this in the record, based on the testimony that private label business must first be vetted by Hartford before it is underwritten. In his testimony, David McElroy of Hartford conceded the term "private label" business was not Hartford terminology, but rather one of Evergreen. Mr. Krutainis agreed, further offering that private label business was more definitional of financial institution business rather than that received from automobile dealerships like that of the JM&A account.

Regardless of the fact of whether the JM&A account was private label or not, in my view, Evergreen had been delegated underwriting authority by Hartford. It would indeed be serendipitous if each time an account of a program manager became unprofitable, the insurer could turn around after continuing to receive all the premium and investment income thereon, and visit those losses on the program manager. Once Hartford was advised the JM&A account had been underwritten, it had a decision to make if it truly believed the account had been underwritten outside the parameters of the delegated authority; it could either (a) stay on the account and see what happens or (b) find a way to cancel the program, sell the book of business to another carrier (e.g., testimony at the Hearing noted other carriers were also underwriting GAP business at the time), advise its reinsurer Swiss Reinsurance Company of the facts, or take affirmative action to mitigate potential damages going forward. For whatever reason, it took a passive approach.

The Majority notes in its Opinion and Order that Mr. Uphouse and Mr. Caronia "...treated the [Evergreen] corporation as their personal sandbox." (See Paragraph 6(i)). In my view, if one were to make such an observation, one must similarly conclude that the sandbox was squarely on the property of the Hartford and, at all times, under its direction and supervision. Under these facts as noted, I do not believe Hartford can now be heard to complain that it should be reimbursed for the total amount of the alleged $4,796,243 in losses sustained on the JM&A program.

Under the circumstances as noted, however, I do not believe Evergreen acted appropriately either. Diligent and prudent underwriting would dictate – under any circumstance – that having once been previously denied, the JM&A book should also have been reviewed by Mr. Krutainis in his position as chief operations officer of the corporation and/or to the Hartford. That would have been fair and proper – even though it was a differing book of business from the one previously offered and declined from the same producer.

As this is an arbitration proceeding, and without knowing the amount of investment interest enjoyed by Hartford on the JM&A premium, or the arrangement it may have with its 50% quota share reinsurer, the equities of the situation and facts in the record would best require the damages to be split equally between Evergreen and Hartford. All things being equal, and assuming interest amounts and other factors could not be determined, I would urge the parties to arrange an equal 50-50 split of the damages sustained. I believe this is an appropriate sum and result for Evergreen's breach of the Agreement (were one to agree the JM&A portfolio was "private label business"), and the failure of Hartford to take immediate steps to ameliorate the situation and mitigate its losses as soon as the facts came to its attention.

3.    Personal Liability of Gary Uphouse

As noted at the outset, after reviewing all the cases cited by the parties, reviewing the briefs, testimony and several law review articles on the subject, the Panel spent substantial amounts of time deliberating on the issue of whether to pierce the corporate

structure of Evergreen and impose personal liability on the Individual Respondents. The Majority has chosen to impose it only upon Mr. Uphouse for the reasons articulated in its Order.

    While the actions and inactions undertaken by Mr. Uphouse were perhaps somewhat less than stellar, I believe he at all times was acting within the course and scope of his employment with Evergreen. I do not believe the facts and actions were of such an outrageous nature or of such personal "opportunistic conduct" that would allow the Panel to permit Hartford to pierce Evergreen's corporate structure to reach the personal assets of Mr. Uphouse.

    The Majority fashioned an imposition of damages on Mr. Uphouse based on a calculation of enrollment fees multiplied against the total amounts of enrollments received and found Mr. Uphouse jointly and severally liable with Evergreen for damages in the amount of $501,210.

    I respectfully cannot agree with this conclusion as, in my view, a review of the complete record and testimony do not support the joinder of the Individual Respondents as parties to the Arbitration in the first instance, nor the imposition of personal liability against Mr. Uphouse. As noted at the outset, I did not come lightly to this opinion. It is based on the application of the governing law of New York as precedent and of other jurisdictions as added guidance or consideration. And it is further based on the conduct of Mr. Uphouse which, the Panel agrees was not appropriate or consistent with the expectation of professionalism. I simply do not believe it rose to the level of conduct required by the case law to permeate beyond the corporate structure.

    I would award relief as set forth herein.

                          Respectfully submitted,

                          Bernd G. Heinze
                          Arbitrator

EXHIBIT D

1

45IHHARA

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  HARTFORD FIRE INSURANCE COMPANY,

4                  Plaintiff,

5          v.                              04 Civ. 3333 (LAK)

6  THE EVERGREEN ORGANIZATION, INC.,
   CHARLES A. CARONIA, GARY UPHOUSE,
7  CHARLES CARONIA, JR.,
   ANDREJS KRUTAINIS,
8
                   Defendants.
9
   ------------------------------x
10

11                                   New York, N.Y.
                                     May 18, 2004
12                                   11:00 a.m.

13  Before:

14                     HON. LEWIS A. KAPLAN

15                                        District Judge

16                          APPEARANCES

17  STROOCK & STROOCK & LAVAN, LLP
          Attorneys for Plaintiff
18  BY:   JAMES E. FITZGERALD
          SEEMA ANITA MISRA
19
    LUBOJA & THAU, LLP
20        Attorneys for Defendants
    BY:   DAVID N. KITTREDGE
21
       -and-
22
    GILLIGAN & PEPPELMAN
23        Attorneys for Defendants
    BY:   PHILIP M. GILLIGAN
24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

2

45IHHARA

1              (In open court)

2              THE DEPUTY CLERK:  Hartford Fire Insurance Company v.

3    The Evergreen Organization et al.

4              Petitioner, are you ready?

5              MR. FITZGERALD:  Yes, we are.

6              THE DEPUTY CLERK:  Respondent, are you ready?

7              MR. KITTREDGE:  Yes, we are.

8              THE COURT:  Good morning.

9              Since I have already heard from the plaintiff, I guess

10   I may begin by hearing from Mr. Kittredge first.

11             MR. KITTREDGE:  Thank you, your Honor.

12             Just briefly, I would note that there is some

13   substantial background to this matter.  This did not come out

14   of the blue.  Hartford Fire Insurance and Evergreen have been

15.  in a contractual relationship since 2002.  In January of 2003,

16   and this is all in the petition, Hartford cancelled that

17   contract.  Now we are in May of 2004, some 16 months later, and

18   this is when Hartford comes to this court claiming, although it

19   is not explicitly set forth in any of Hartford's papers, but

20   the implication seems to be that we need the court's

21   extraordinary injunctive relief because of some sinister

22   financial transactions that are going on, that there has been

23   some kind of effort by Evergreen to conceal assets or that we

24   need this order of attachment because Evergreen is attempting

25   to perform some kind of fraud on Hartford.

45IHHARA

1          Now, if you take a look at all of the papers that

2   Hartford has submitted to this court, and there is quite a lot

3   of bulk there, but if you look at all of the substantive

4   factual allegations, there is nothing in there that would

5   warrant the court's extraordinary equitable relief that is

6   being requested here.  There is simply no allegation of any

7   kind of sinister or secret transactions to hide assets or to

8   take away Hartford's ability to recover at an arbitration

9   award.

10          THE COURT:  Well, in January you withheld as an offset

11  $700,000, right?

12          MR. KITTREDGE:  Yes, your Honor.  I have Mr. Gilligan

13  here who addressed the court at the initial TRO stage.  There

14  were some financial transactions that took place in January,

15  that became the source of a dispute between Hartford and

16  Evergreen, but that basically comes down to a contractual

17  dispute, your Honor.

18          THE COURT:  I know that is your position, but I asked

19  you a question.  You withheld $700,000, right?

20          MR. KITTREDGE:  That is correct.

21          THE COURT:  What did you withhold it from?

22          MR. KITTREDGE:  It is my understanding that -- again,

23  I have Mr. Gilligan here, and if the court would like more

24  detail --

25          THE COURT:  I would like a lawyer who knows something

45IHHARA

4

1   about the case to argue it.

2           MR. KITTREDGE:  Your Honor, it was withheld from

3   premiums that were collected by Evergreen as part of this whole

4   program.

5           THE COURT:  Was there a remittance to Hartford at that

6   time?

7           MR. KITTREDGE:  Yes, there was.

8           THE COURT:  Over and above the 700?

9           MR. KITTREDGE:  There was a remittance that was based

10  on an accounting that Evergreen performed based on its

11  understanding of what was due and owing to Hartford under the

12  program.

13          THE COURT:  How much was the remittance?

14          MR. KITTREDGE:  The remittance to Hartford was, as I

15  understand it, it was some $600,000.

16          THE COURT:  All right.  So am I correct in concluding

17  that as of January Evergreen acknowledges that it owed Hartford

18  a million three for premium and other moneys collected with

19  respect to these policies and that instead of remitting the

20  million three it remitted $600,000 holding back the $700,000 to

21  which we referred, is that correct?

22          MR. KITTREDGE:  I don't think it is correct, your

23  Honor, that Evergreen admitted owing to Hartford a million

24  three.

25          THE COURT:  How did you compute the 600,000?

45IHHARA

1    MR. KITTREDGE:  The 600,000 was computed based on

2   Evergreen's understanding as to what was owed to Hartford based

3   on the various allocations of profit and fees and so forth that

4   are set out.

5       THE COURT:  So to withhold $700,000 and to remit

6   $600,000 necessarily implies that Evergreen acknowledged that

7   there was a million three due to Hartford under this

8   arrangement subject to whatever right, if any, of offset

9   Evergreen has, is that correct?

10      MR. KITTREDGE:  That is correct.

11      THE COURT:  OK.  Now, therefore, if the offset was

12   inappropriate, the $700,000 offset, you owe Hartford that

13   $700,000, right?

14      MR. KITTREDGE:  Yes, and that is something that will

15   be determined --

16      THE COURT:  Where is the $700,000?  You don't have it.

17   In at least as far as you have disclosed to me, it's gone

18   except for 300 and some thousand.

19      MR. KITTREDGE:  Well, your Honor, these are all issues

20   that will be worked out at the arbitration hearing.

21      THE COURT:  Perhaps so, but you told me a moment ago

22   that I shouldn't be concerned about dissipation of assets or

23   some secret financial transactions, and what I now see is that

24   on the papers before me you withheld $700,000, of which

25   $400,000 at least is missing.

6

45IHHARA

1       MR. KITTREDGE:  Your Honor, all of this can be

2  addressed. ·Again, there is a whole discovery procedure set out

3  in the arbitration.

4       THE COURT:  I have a preliminary injunction motion

5  before me and you are the man who stood up and said there is

6  nothing suspicious here.  I am telling you that as far as I can

7  see there is something extremely suspicious here.  Now, I am

8  giving you the opportunity to address it.  Don't tell me we are

9  going to address it in the arbitration.  I can just grant the

10  relief today and then you can go play in the arbitration.

11       MR. GILLIGAN:  Your Honor, may I address that issue?

12       THE COURT:  Sure.

13       MR. GILLIGAN:  Thank you.  I am Philip Gilligan, your

14  Honor, and I want to thank you for listening to me on the phone

15  last week.  I know it was difficult.

16       In any event, that letter from Evergreen to Hartford

17  triggered a response from Hartford to them saying that in point

18  of fact we take issue with what you have done, however, we

19  concede that of the moneys that you have kept, certain of it

20  you are owed.  That letter was addressed to the head of

21  Evergreen.  My calculations, quickly --

22       THE COURT:  Mr. Gilligan, is that in the record here

23  before me?

24       MR. GILLIGAN:  Your Honor, I have a document in front

25  of me that is not before your Honor.  No, it is not.  I can

45IHHARA

1   only tell you that the relationship between the two parties was

2   an ongoing thing in the context of Mr. Fitzgerald's

3   relationship with Hartford and my relationship with Evergreen.

4   And it was agreed, after these letters between the principals

5   went back and forth, that some portion of that $700,000 which

6   was retained by them was in point of fact owed to Evergreen,

7   and incidentally, there are still monies as we go on into the

8   future after the termination of the relationship, monies by

9   their own agreement are still due and owing to Evergreen.

10           THE COURT:  Possibly so, but Hartford has come in here

11   and put in front of me a contract pursuant to which your client

12   agreed that every dime it ever collected from anybody in

13   relation to these contracts, the insurance contracts or

14   whatever they are, belong to Hartford and was held by your

15   client as trustee.  Your client has a right of offset with

16   respect to claims between Hartford and Evergreen, but as I read

17   the offset clause, the offset clause does not modify your

18   client's position as a trustee.  So what your client basically

19   did, as near as I can see, is breached its duty as a trustee by

20   offsetting against funds that your client held as trustee for

21   Hartford its own claims.  And if a lawyer did it, he would be

22   disbarred and indicted, and that seems to me to be the core of

23   the other side's case.

24           MR. GILLIGAN:  That is accurately stated, your Honor.

25   I am not going to argue with that.  However, once we got to the

45IHHARA

1    issue involved and once that correspondence continued, it was

2    pretty clear that the amount in controversy was significantly

3    less than $700,000. It was probably around the $300,000 or so,

4    something like that.

5        THE COURT: So we are now talking about how much your

6    client improperly grabbed.

7        MR. GILLIGAN: I think, your Honor, because we talked,

8    if you recall, last week about the fact that there was no

9    enforcement by Hartford of the failure for them to segregate

10    the funds. There is an element of trust, etc., that went on

11    here until the straw broke the camel -- whatever it was, the

12    relationship diminished and dissipated. The fact is, over the

13    course of several years the relationship was as it was and

14    without any complaint, as I understand it.

15        THE COURT: I assume that is so.

16        MR. GILLIGAN: I think it was. So that now we come to

17    the final day of this thing -- and we are negotiating to agree,

18    incidentally, to put a certain amount of money into an escrow

19    account pending the outcome of the arbitration. That was my

20    suggestion. It was the framework of the agreement that I

21    thought I was working on with Mr. Fitzgerald. And really, I

22    think to get this without any warning whatsoever naming the

23    individuals as defendants, which we haven't objected to the

24    jurisdiction, but in doing that -- and we have segregated the

25    money, your Honor, which brings me to one other issue, your

45IHHARA

9

1   Honor.  You may have seen the affidavit we submitted by

2   Mr. Uphouse.

3          THE COURT:  I did.

4          MR. GILLIGAN:  Well, certain of the moneys that are in

5   that account are clearly owed, a significant amount, to Arch

6   Insurance Company, and they made a mistake.  They sent Hartford

7   a check after the order had been entered, and I advised them

8   they were in violation of the order and I said, Look, you have

9   to put that money back, which they did personally.  So I think

10  really that should be returned to them as well, your Honor.

11         The third thing is, of course, look, I think we are

12  entitled to have counsel fees come from that fund of money.  It

13  is the only asset they have.  They are being sued here on an

14  obligation that is arbitratable, but clearly not as quickly

15  stated as the petitioner would want you to believe, that my

16  client is absolutely wrong and has no day in court that is

17  worth an ounce of argument.

18         THE COURT:  I don't understand them to be saying that.

19  I understand that there are, not to use the term technically,

20  but cross-claims, competing arbitration claims.  I am not sure

21  it is in the papers, but it is my assumption they will be

22  consolidated and you folks will go at it and the commercial

23  dispute will be resolved.

24         MR. GILLIGAN:  Yes, your Honor.

25         THE COURT:  In the meantime, I am confronted with a

45IHHARA

1    situation which by your own admission your client is in breach

2    of its trust obligations and there is a lot of money that has

3    vanished.

4            MR. GILLIGAN:  I think, your Honor, to say that there

5    is $700,000 missing is ignoring the point that they have agreed

6    that certain of the $700,000 are owed to Evergreen.  That is

7    not an issue before the court.

8            THE COURT:  I'm sorry.  Unless I am missing something,

9    counsel, I don't see it that way.

10           There is $700,000 of trust funds missing, and if I

11   understand you properly, Hartford admits that it owes a certain

12   amount of money to Evergreen and it has other claims against

13   Evergreen in addition to the missing trust funds and presumably

14   that will get sorted out.  But there is $700,000 of trust funds

15   missing.

16           MR. GILLIGAN:  Well, if you start with that, yes.  But

17   what I am saying to you is that when they notified Hartford

18   what they were doing with that million three, Hartford

19   responded to them and said, Look, the way I read the letter, we

20   admit that certain of those monies in the 700 are owed to you.

21   All right.  So my calculations would suggest that the 700,000

22   is a figure that even they don't believe they are owed.

23           It doesn't excuse what they did with regard to the

24   fiduciary obligation they had with the account, but it may be a

25   breach without any significance because over the course of

45IHHARA

1  conduct of the parties they understood one with the other this
2  was a lot of money --

3        THE COURT:  I am sorry.  It is a breach of potentially
4  enormous significance, because as I understand the law, to the
5  extent your client had trust fund assets which it held as a
6  fiduciary, Hartford had no bankruptcy risk with respect to
7  those assets because it was Hartford's segregated property and
8  it would not have been an asset of the estate if Evergreen went
9  bankrupt.  But by commingling the funds, you have put Hartford
10  in the position where potentially it becomes a general creditor
11  of your client if it goes under sharing pari passu with other
12  general creditors or trying to establish that there is
13  traceable funds in the assets of the estate over which it has
14  some priority claim.  Right?

15        MR. GILLIGAN:  I agree.  You're right.  However, I
16  think the court should not ignore the fact that they admit that
17  certain of that $700,000 was owed to Evergreen.

18        THE COURT:  Do they admit that or do they admit that a
19  sum less than $700,000 was owed by Hartford to your client,
20  which is different than admitting that some of the trust funds
21  belong to your client?

22        MR. GILLIGAN:  Well, your Honor, that was the only
23  relationship between the parties.  They were given a complete
24  breakdown of the distribution every month.

25        THE COURT:  But the deal was, as I read the PMA, that

45IHHARA                                                                         12

1    what your client had was basically a chosen action against
2    Hartford for whatever monies Hartford was obliged to pay your
3    client and it did not have the right to help itself to
4    Hartford's money which it was holding to satisfy any such
5    obligation. Am I wrong?
6              MR. GILLIGAN: I think the way it worked with the
7    parties, your Honor, is that Evergreen deducted what they were
8    entitled to and sent them the remainder over the course of the
9    contract.
10             THE COURT: Possibly.
11             MR. GILLIGAN: I think they did.
12             THE COURT: But that is not what the agreement
13   contemplated.
14             MR. GILLIGAN: I agree with that as well.
15             THE COURT: OK. Is there anything else on your end?
16             MR. GILLIGAN: Not from my end, your Honor, except to
17   note those three items I brought up.
18             THE COURT: OK.
19             MR. GILLIGAN: Thank you, sir.
20             THE COURT: Thank you.
21             Mr. Fitzgerald, what about this course of dealing?
22             MR. FITZGERALD: First of all, your Honor, I don't
23   believe that the course of dealing always was we are going to
24   send you net premiums and we are going to deduct whatever we
25   think we are owed. We would get a separate billing for that

13

45IHHARA

1   and that is what would occur. That is my understanding of it

2   over the several-year period of time.

3        What strikes me as very strange here, and I think we

4   have said it in our reply, and we have heard sort of alluded to

5   the fact that Evergreen has got money. Well, where is it?

6        THE COURT: It sounded like, what was the name of that

7   Tom Cruz movie where somebody kept saying, show me the money?

8        MR. FITZGERALD: That is exactly right. We have

9   Mr. Uphouse who very carefully crafted a declaration which says

10  we have these three bank accounts, but it doesn't say that is

11  all their assets, it doesn't say they have CDs or another

12  account or money market accounts. I imagine they must have

13  funds someplace, because if they don't have funds someplace and

14  went out of business that fast and still owe other people

15  money, then that means that they have already done what we

16  feared, which is to transfer the assets someplace out of the

17  company, most likely to the principals, and that is our great

18  concern here.

19       So part of our preliminary injunction request of

20  course would be that they have to identify all of the assets of

21  the company and so we can find out if they have got them.

22       THE COURT: Where do you get the right to that?

23       MR. FITZGERALD: We get the right to that in aid of

24  arbitration, so that an arbitration award which is for millions

25  of dollars will not be rendered ineffectual. Because we have

14

45IHHARA

1    already seen by their own papers they are basically saying

2    here, we have got 350,000, that is all we have, so don't take

3    any of it because, gee, we have to pay our lawyers, too.

4              THE COURT:  You have certain discovery rights in the

5    arbitration.

6              MR. FITZGERALD:  Sure.

7              THE COURT:  What case, what statute, gives me the

8    authority to order what amounts to discovery here to protect

9    your ability to enforce an award if you get one?

10             MR. FITZGERALD:  I think, first of all, your Honor the

11   CPLR provides us that right to do it, number one.

12             THE COURT:  What section?

13             MR. FITZGERALD:  The Section 70 --

14             THE COURT:  7502(c) is that what you are referring to?

15             MR. FITZGERALD:  That is correct.

16             THE COURT:  Is there something in there about

17   discovery?

18             MR. FITZGERALD:  No, not about discovery.  I don't

19   treat this as discovery, your Honor.  What I treat this as is

20   this.  I think there is a right to freeze assets, and when the

21   other side doesn't disclose its assets, and in fact by

22   submitting the opposition that they did, I think very carefully

23   hide whatever other accounts they have from us, then rendering

24   a freezing of assets basically becomes not very effective in

25   this situation because we don't know where their accounts are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

45IHHARA

1   at.  We will find out more in the arbitration.

2              THE COURT:  I am not sure that is right.  If I issue

3   an order freezing their assets and you get an arbitration award

4   and seek to enforce it and find that there were assets that

5   were transferred in violation of the freeze order, you have

6   remedies in contempt.

7              MR. FITZGERALD:  That is true, your Honor.  The only

8   problem is that that won't happen and we won't find that out

9   for six months or so down the road after an arbitration is all

10  over with and the money may already have been diverted outside

11  of the country or beyond even the jurisdiction of the court.

12             THE COURT:  For all I know it is gone now.

13             MR. FITZGERALD:  We don't know.

14        What we want to do is prevent any further dissipation

15  if there has in fact been dissipation.  And if there hasn't

16  been dissipation, then we get back to the Tom Cruz question of

17  show me the money.  Where is it?  That is the problem that we

18  have here.  We have someone in our view, and especially in

19  light of the papers, who is not being frank, in fact, with the

20  court as to where this money is.  Obviously if we get an order

21  freezing assets, who do we serve that upon?

22             THE COURT:  You certainly serve it on the individual

23  defendants and on the company,

24             MR. FITZGERALD:  And where else?  For example, if we

25  want to go to freeze someone's accounts, how do we do that

45IHHARA

1    unless we know what the accounts are and where they have these

2    assets, and we don't know.

3            THE COURT:  I understand that.

4            MR. FITZGERALD:  The problem that we have with the

5    arbitration discovery aspect, which is why we are here, is that

6    we have just sent out a demand for arbitration.  Under the

7    procedures, we won't have an umpire and a panel in place

8    probably for another 60 days.  So we can't get that emergency

9    relief.  In the meantime, we can watch the money go by, and

10   that is what we are trying to prevent because there is a lot of

11   money at stake in these claims.  We already know that even

12   fiduciary moneys in our mind are missing.

13           Let me just raise one other thing.

14           THE COURT:  How much money?

15           MR. FITZGERALD:  Since Mr. Gilligan --

16           THE COURT:  Mr. Fitzgerald, how much money?

17           MR. FITZGERALD:  How much money is missing?

18           THE COURT:  How much money is at stake here?

19           MR. FITZGERALD:  At stake, we estimate, your Honor,

20   that it is anywhere, and we are still trying to be figure out

21   the damages and what they have done, but we have alleged at

22   least $15 million.

23           THE COURT:  Where does that come from?

24           MR. FITZGERALD:  That comes from the following.

25   Claims have been paid that should never have been paid, number

45IHHARA

1    one.  They were our claims representative.  There are

2    enrollments that were taken in, monies that were taken in in

3    violation of their underwriting guidelines.  We are just trying

4    at this point even to reconcile --

5            THE COURT:  I have asked the wrong question.  Forgive

6    me.

7            MR. FITZGERALD:  I'm sorry.

8            THE COURT:  How much was taken in that constituted

9    premiums or other payments to Evergreen on the policies that

10   has not been remitted to Hartford?

11           MR. FITZGERALD:  That has not been.  We don't know for

12   sure.

13           THE COURT:  What is your best estimate?  You don't get

14   an order of attachment for an infinite sum of money.

15           MR. FITZGERALD:  Our best estimate, your Honor, and

16   you are just asking about premium that we didn't get as opposed

17   to claims that were paid that shouldn't have.

18           THE COURT:  Sure.  Because the former is a trust fund

19   asset, the latter is a contract claim that Hartford has against

20   these people.

21           MR. FITZGERALD:  With regard to premiums that we have

22   not gotten or at least we didn't get our fair share because

23   Evergreen took money, we are estimating that it is at least $10

24   million and probably in excess of that.

25           THE COURT:  Is there anything in the record that

18

45IHHARA

1    substantiates that?

2        MR. FITZGERALD:  No, we haven't come forth with an

3    accounting.  We have our demand for arbitration and we set

4    forth in the demand for arbitration, which is essentially the

5    same as in the petition, the various issues and various

6    accounts that they took.  Example, we have a case in federal

7    court that I am in charge of for the client in California.  We

8    have counterclaims that have just been filed against us with

9    regard to payment of claims that exceeds $10 million.  Just

10    that counterclaim.  Hard dollars, according to Mitsubishi's

11    account.  So there is a lot of money at stake here, and

12    Evergreen is at the root of it because they were our program

13    manager and our claims servicing agent.

14        One of the problems is, as we said before with regard

15    to the documents and producer agreements, we don't know

16    everything they did.  All we know is that we have been paying

17    out like a cash machine claims, and the claims, for example, on

18    one account are in excess of nine times what the premium was

19    collected on the whole program.  Those are what we call in the

20    insurance industry loss ratios, which shouldn't usually go

21    above 100 percent because obviously you are in the red.  We are

22    so far in excess it is not even funny.

23        THE COURT:  That happens in the insurance industry.

24        MR. FITZGERALD:  It does happen.

25        THE COURT:  You don't compute loss ratios policy by

45IHHARA

1  policy.

2      MR. FITZGERALD:  That is conceded, your Honor.

3      THE COURT:  Large numbers is what this industry is all

4  about.

5      MR. FITZGERALD:  That is true, your Honor.  But the

6  problem is part of the numbers here, and the reason they are so

7  large at most is because of Evergreen's misfeasance,

8  malfeasance, nonfeasance in remitting premiums, in paying

9  claims, and in underwriting the policies in the first place.

10      THE COURT:  OK.  Anything else?

11      MR. FITZGERALD:  The one thing I did want to mention,

12  and I think Mr. Kittredge said that the relationship somehow

13  ended I guess in January of 2003, all that meant was in January

14  of 2003 we instructed them to stop writing new policies.

15  However, the enrollments under those policies continued to come

16  in and Evergreen by letter was told, and they know it, they

17  were required to continue to act as a program manager in

18  certain parts but they were not to write any new business.  In

19  fact, obviously we know they did that because for the month of

20  November, which is the month of the one million three or so in

21  premium remittances, that was from new enrollments.  So they

22  continued to do business.

23      The other thing is, there was an additional offset

24  that they took from premium remittances the next month of about

25  $100,000, and we believe there probably are still but we

45IHHARA

1    haven't gotten monies from them past that.  We have got some

2    issues with regard to future remittances as well.  We are not

3    getting those.  So there is money that is not being put into

4    trust as it should and there is a lot more money at stake than

5    the $350,000 or so they claim is in these accounts, which we

6    don't know if those are all their accounts or all their assets

7    or what.

8              THE COURT:  Thank you.

9              MR. FITZGERALD:  Thank you, your Honor.

10             THE COURT:  Mr. Gilligan, anything else?

11             MR. GILLIGAN:  Your Honor, no.  Just to say that there

12   was an audit team at Evergreen, directed there by Hartford, for

13   over a year, and they went through every piece of business and

14   everything else.  I hear these generalities and I look at these

15   allegations made in the complaint, but we have never been privy

16   to any kind of an audit report that suggests where the

17   wrongdoing was.  And I might also add, your Honor, that they

18   had internal audits, Hartford sent people there themselves

19   during the course of the contract, and they raised none of

20   these objections at any time until this pleading was filed, and

21   it was, I can tell you, your Honor, it was an absolute surprise

22   to me and to my clients.  There is no warning at all.  So that

23   is all.  I think you understand the issue better than I do,

24   your Honor.

25             THE COURT:  I don't know about that.

45IHHARA                          Decision

1              I do think I am ready to rule on this now.

2              This is an action by Hartford Fire Insurance Company

3       as plaintiff against The Evergreen Organization and its

4       principals, Charles A. Caronia, Gary Uphouse, Charles A.

5       Caronia, Jr., and Andrejs Krutainis, in which Hartford seeks a

6       preliminary injunction and an order of attachment in an

7       arbitration.

8              Jurisdiction purportedly is based on diversity of

9       citizenship.  I note that the verified petition does not in

10      fact accurately allege diversity of citizenship because it

11      alleges only the residence rather than the citizenship of the

12      individual defendants, which is insufficient, but I believe

13      that undoubtedly can be cured by amendment.  In any case, it

14      hasn't been controverted so I will allow the plaintiff an

15      opportunity to file an amended petition to cure that defect,

16      and I find that it is likely that they will be able to do so.

17             The background of this dispute is that Hartford in

18      approximately 2000 appointed Evergreen to act as its program

19      manager and claims servicing agent with regard to the

20      administration of what it calls its GAP insurance business.

21      There is a program manager's agreement, which I will refer to

22      as the PMA, and a claims servicing agreement between Hartford

23      and Evergreen.  For present purposes I needn't go into the

24      details of these agreements to any significant extent at all.

25             Under the terms of the program manager's agreement,

45IHHARA                    Decision

1    the PMA, Evergreen was required to hold amounts collected in

2    respect of premium and other sums with respect to the policies

3    it was selling as agent for Hartford in a separate fiduciary

4    account as trust fund and gave Hartford the right to audit

5    books and records of Evergreen in relation to the GAP program.

6    In addition, under the PMA Evergreen was obliged to create and

7    maintain claims files.  Those files too are the property of

8    Hartford.

9         To make a very long story short, Hartford terminated

10   Evergreen under the PMA on January 10, 2003.  Subsequent to

11   that date, Evergreen in substance acknowledged that it was in

12   possession of premiums and other revenues on policies that it

13   had sold Hartford in the approximate amount of $1.3 million.

14   It offset against those funds a total of $696,000, which

15   Evergreen claimed to be owed by Hartford and sent Hartford a

16   check or other form of payment for the $600,000 balance.

17   Whatever may have gone before between those parties, that most

18   assuredly was inappropriate under the terms of the PMA for

19   reasons I will get to in more detail shortly.

20        To continue with the chronology of the dispute,

21   Evergreen in February of 2004 served a demand for arbitration

22   against Hartford.  Hartford the following day terminated the

23   claims servicing agreement.  Evergreen thereafter asserted

24   additional offsets against monies that belonged to Hartford.

25        On March 18th of 2004, Evergreen announced that it

45IHHARA                    Decision

1  would dissolve.  It in fact shut down its operations on April

2  8th.  Hartford subsequently made a demand for arbitration

3  against Evergreen.

4          In this proceeding Hartford claims that Evergreen

5  breached the PMA in the following, probably among other,

6  respects.  First, Hartford claims that Evergreen failed to

7  remit premium when due; second, it claims that Evergreen failed

8  to place the premium and other policy revenues in a trust

9  account and hold them for Hartford; third, it alleges breach of

10  the allegation to provide Hartford with access to records

11  regarding the GAP program; and fourth, it claims that Evergreen

12  had breached its obligation to administer claims properly

13  presumably under the claims servicing agreement.

14          It brings this proceeding ostensibly under Section

15  7502(c) of the New York Civil Practice Law and Proceedings.  It

16  here seeks an order requiring Evergreen to establish a

17  fiduciary account and to place in it such of Hartford's

18  property as it still possesses; second, to refrain from

19  dissipating any assets, which in substance is a request for an

20  order freezing Evergreen's assets; third, that I require

21  Evergreen to identify all of its assets.  It seeks an order of

22  attachment of Evergreen's assets.  Although it does not say so

23  in so many words, obviously that would be an order of

24  attachment of Evergreen assets in New York State, if any,

25  because an order of attachment issued under Rule 64 of the CPLR

45IHHARA                    Decision

1   would reach only Evergreen assets in New York State.  It also

2   seeks injunctive relief requiring Evergreen to permit access to

3   books and records, an antispoliation injunction, and a

4   mandatory injunction requiring Evergreen to maintain certain

5   basic services.

6       Evergreen's response, as nearly as I make it out, is

7   basically to argue that this is really only a contract dispute

8   and that Hartford is not entitled to any relief in order to

9   ensure collectability of an eventual arbitration award.  The

10  assertion is made in fairly conclusory terms that there is no

11  danger of any dissipation of assets and finally claims that it

12  claims it made various records available and will comply with

13  discovery orders in the arbitration.  So that is how the issue

14  is drawn.

15      Now, the first question that I see here is what law

16  governs the dispute.  Ultimately I conclude that I don't have

17  to resolve it, but the problem is as follows:  Hartford asks me

18  to apply CPLR 7502(c).  I think it probably invokes that

19  statute on the theory that it needn't show anything more to get

20  a preliminary injunction here and an order of attachment than

21  that it would be helpful to Hartford to have that relief in

22  order to ensure that any arbitration award it might obtain

23  otherwise might be rendered ineffectual.  This, in my view,

24  overlooks quite a few serious problems.

25      The first is that it is by no means clear to me that

1   CPLR 7502(c) applies in this proceeding.  Even if it does, I

2   think Hartford is mistaken about what it has to show to obtain

3   the relief it seeks.

4         To begin with, the PMA between Hartford and Evergreen

5   involved commerce, as that term is defined in Section 1 of the

6   Federal Arbitration Act, 9 U.S. Code, Section 1.  The Federal

7   Arbitration Act preempts New York law to the extent it is

8   inconsistent with the Federal Arbitration Act.  That is

9   established by, among other cases, *Fahnestock & Co. v. Waltman*,

10  935 F.2d 512, 517 (2d Cir. 1991).  In consequence, to the

11  extent federal law is inconsistent with CPLR 7502(c), federal

12  law preempts the state provision.  So if the federal standard

13  governing the availability of provisional remedies in aid of

14  arbitration is different from CPLR 7502(c), federal law would

15  govern.

16        In any case, even if I were to put aside the issue of

17  preemption, this is a diversity case.  I am obliged to apply

18  state substantive law and federal procedural law.  In

19  consequence, even putting aside the Federal Arbitration Act,

20  federal law governs the availability of provisional relief in

21  aid of arbitration.  At least that is my tentative conclusion.

22        Finally, I think Hartford is mistaken in believing

23  that CPLR 7502(c) allows provisional relief in a case like this

24  upon a showing of nothing more than the possibility that an

25  award otherwise would be rendered ineffectual.  In *S.G. Cowen*

45IHHARA                    Decision

1   *Securities Corporation v. Messih*, 224 F.3d 79 (2d Cir. 2000),

2   the Court of Appeals held that in order to obtain provisional

3   relief under 7502(c), the movant must show not only that an

4   award could be rendered ineffectual absent a preliminary

5   injunction or an order of attachment, but also that it is

6   entitled to relief under CPLR Article 62 and/or 63 as

7   applicable.

8          Now, this little exegesis is of not any great

9   significance as regards an order of attachment because even if

10  we apply federal law, as I conclude I am bound to do, Rule 64

11  of the Federal Rules of Civil Procedure in effect tosses us

12  back into Article 62 of the CPLR with respect to attachment.

13  In other words, federal law with respect to attachment adopts

14  the law of the state.

15         The situation is otherwise with respect to a

16  preliminary injunction, but in the last analysis the nature of

17  the showing made here makes the precise standard applicable to

18  the preliminary injunction pretty much immaterial.  So I turn

19  first to the order of attachment.

20         In order to obtain and to maintain an order of

21  attachment the applicant must show the existence of grounds for

22  attachment, the need for an order of attachment, and the

23  likelihood of success on the merits.  *See* New York CPLR

24  6223(b).  The crux of the grounds for attachment asserted by

25  Hartford is that Evergreen falls within CPLR 6201, subdivision

45IHHARA                    Decision

1    3, which, broadly speaking, says that an order of attachment

2    can be granted where the plaintiff seeks a money judgment and

3    the defendant, with intent to defraud creditors or frustrate

4    the enforcement of a judgment that might be rendered in the

5    plaintiff's favor, has assigned, disposed of, encumbered or

6    secreted property or removed it from the state or is about to

7    do any of those acts.

8           I find that there is substantial reason to believe

9    that Evergreen has engaged and is likely to engage in behavior

10   that falls within CPLR 6201, subdivision 3.  It has announced

11   its intention to dissolve.  It has, in flat breach of the PMA,

12   engaged in self-help by taking offsets against trust funds

13   belonging to Hartford that were held by Evergreen to the extent

14   of at least $600,000.  When challenged by this motion and its

15   suggestion that there was diversion of funds or secreting of

16   funds, Evergreen's response, to the extent it was factual as

17   opposed to rhetorical, gave only more cause for concern along

18   these lines.  In an affidavit of Gary Uphouse, Evergreen

19   asserted that it has three bank accounts which it identified.

20   It is important to note that it did not assert that it has only

21   three bank accounts or that the three bank accounts that it

22   identified were all of its bank accounts.  Rather, it disclosed

23   the existence of three specific bank accounts, the aggregate

24   balances of which amounted to less than $400,000.

25           Now, one of two things must be true.  Either a

45IHHARA                    Decision

1    substantial part of the Hartford premium money against which

2    Evergreen improperly asserted the offset has disappeared from

3    Evergreen and does not appear in its bank accounts, or the

4    disclosure in the Uphouse affidavit, which in my view was

5    intended to imply that this was the totality of Evergreen's

6    assets, in fact was deceitful and that there are more assets

7    that were not disclosed.  But it doesn't much matter.

8         The long and the short of it is that viewing that

9    evidence in the light most favorable to Evergreen,

10   specifically, taking Mr. Uphouse's affidavit as truthfully

11   indicating that Evergreen has three and only three bank

12   accounts and that the aggregate balance is under $400,000,

13   there is at least $200,000 of Hartford trust fund moneys

14   missing.  Accordingly, I find a strong likelihood of success on

15   the proposition that Evergreen is engaged in behavior and but

16   for provisional relief will continue to engage in behavior that

17   falls within CPLR 6201, subdivision 3.  So there is in my view

18   clearly a ground for an order of attachment; secondly, there is

19   plainly a need for an order of attachment for exactly the same

20   reasons to which I have now adverted.

21        Finally, I will deal with the issue of likelihood of

22   success on the merits in the context of the preliminary

23   injunction application which requires a similar showing.

24        I should add that the matter of an order of attachment

25   is in all likelihood academic here.  As I indicated in the

45IHHARA                    Decision

1   colloquy with counsel, an order of attachment issued by this

2   court under CPLR Article 62 would reach only assets of

3   Evergreen located in the State of New York.  There is no

4   indication up until now that there are any.

5        That brings me to the portion of the preliminary

6   injunction motion which in substance seeks an order freezing

7   Evergreen's assets.  This is to be distinguished from the order

8   of attachment which is effectively an in rem sort of remedy

9   that operates on the assets.  The preliminary injunction which

10  will bind the company and all persons in active concert and

11  participation with it who receive actual notice of the order

12  operates in personam and would affect assets wherever located.

13       Now, at the outset, although the parties have not

14  mentioned the issue, there is this threshold question whether a

15  preliminary injunction could issue in order to ensure the

16  collectability of a money judgment or an arbitration award.  In

17  Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, 527

18  U.S. 308 (1999), the Supreme Court held that a federal court

19  does not have the power, in the exercise of its general

20  equitable jurisdiction, to issue a preliminary injunction in an

21  action for money damages to prevent a defendant from

22  transferring assets in which the plaintiff claims no lien or

23  equitable interest.  Parenthetically, the New York Court of

24  Appeals reaffirmed that same principle, as a matter of the law

25  of New York, a year later in Credit Agricole Indosuez v.

45IHHARA                    Decision

1    *Rossiyskiy Kredit Bank*, 94 N.Y.2d 541 (2000).  So the mere fact

2    that Hartford claims that a monetary arbitration award might be

3    uncollectable absent provisional relief in the form of a

4    preliminary injunction is not enough unless *Grupo Mexicano* is

5    distinguishable or there is an exception to it that applies.  I

6    find that there is.

7         It is important to recognize that this is not simply

8    an action for money damages.  In substance, what the Hartford

9    is seeking, only partially but nonetheless importantly, is to

10   impress a constructive trust on a property that was in

11   Evergreen's possession that according to the trust provision of

12   the PMA actually belonged to Hartford.  It is not simply a

13   general creditor with an unliquidated contract claim like

14   anyone else.  To the extent that Evergreen was in possession of

15   premium and other monies collected with respect to the policies

16   issued under the Hartford GAP program, the money and other

17   properties was the property of Hartford and Evergreen was

18   merely a trustee.

19        In *Deckert v. Independence Shares Corp.*, 311 U.S. 282,

20   the Supreme Court held that a federal court sitting in equity

21   has the power to grant provisional remedies in order to protect

22   its ability to grant the ultimate equitable relief, as distinct

23   from money damages.  In that case, rescission and restitution

24   in circumstances in which there was no adequate remedy in law.

25   I think that *Grupo Mexicano* therefore is clearly

31

45IHHARA                    Decision

1   distinguishable and this case is governed by *Deckert*.

2           What I am asked for here in respect of the freeze

3   order is to freeze assets which are or mainly include property

4   of the Hartford that was in Evergreen's possession as trustee.

5   I am asked to do that in aid of what in substance would be an

6   arbitration award equitable in nature imposing an equitable

7   lien or constructive trust on Hartford's property in the hands

8   of Evergreen.  So my view is that Grupo Mexicano is not an

9   obstacle to the freeze order that Hartford seeks.

10          Now, the standard that governs preliminary injunctions

11  in this circuit is that the applicant must show a threat of

12  irreparable injury and either a probability of success on the

13  merits or both the existence of substantial questions that are

14  fair ground for litigation and a balance of hardships that tips

15  decidedly in favor of the applicant.  Moreover, an analogous

16  standard governs attachment in the sense that the stronger the

17  likelihood of the showing of success, the lower the requisite

18  need for security.  *Pena v. Morgan*, 149 F.Supp.2d 91, 93,

19  (S.D.N.Y. 2001).

20          In this case it is undisputed that the PMA required

21  Evergreen to hold all premiums and other amounts collected and

22  received on the Hartford policies in a fiduciary account.  It

23  provides further that the account was to be so designated "as

24  to clearly establish that manager" -- in other words, Evergreen

25  -- "is holding and acting as trustee for Company," which is

45IHHARA                        Decision

1   Hartford, "with respect to the funds in the account.  While the

2   agreement also contains a provision making all amounts due from

3   equitable to Hartford and vice versa subject to the right

4   offset, that clause doesn't apply to the premium revenues and

5   other monies collected to the policies.  Those were not monies

6   owed to Hartford; they were money which under the terms of the

7   agreement belonged to Hartford from the moment they were placed

8   in Evergreen's possession.  They were held by Evergreen solely

9   as a trustee.  Thus, in my view Hartford is clearly likely to

10  prevail on the claim that Evergreen breached the PMA at least

11  by failing to hold the premiums in a fiduciary account and to

12  remit them free of offset to Hartford.

13          There is obviously a threat of irreparable injury on

14  the facts of this case, specifically the risk that money will

15  be dissipated, and I don't mean money in general, I mean money

16  that belonged to Hartford and was held by Evergreen as trustee.

17  Indeed, given the showing, it seems that money already has been

18  dissipated.  In consequence, Hartford is entitled to a

19  preliminary injunction freezing assets of Evergreen in order to

20  preserve the court's ability to enforce an arbitration award.

21  It is entitled also to an order of attachment.

22          We then come to the issue of the amount of the

23  attachment.  On the papers before me I see withholding or

24  diversion, however one characterizes it, in the neighborhood of

25  $600,000.  While there have been all sorts of protestation

45IHHARA                        Decision

1    made, there actually has been no further showing as to the

2    amount for the order of attachment.  So I am going to make the

3    order of attachment in the amount of $600,000 subject to the

4    applicant's right to make a further application to increase the

5    amount.  I would hope that such an application would not be

6    made simply for the exercise, but, rather, if and only if there

7    is really hope of attaching something in the State of New York,

8    which doesn't seem all that likely.

9         There are a couple of other branches to the

10   application for a preliminary injunction and other equitable

11   relief.  There is no serious dispute here or no serious

12   objection to provisions that would require Evergreen to give

13   Hartford access to the books and records of Evergreen that are

14   specified as being available to Hartford under the PMA, and so

15   I grant that aspect of the preliminary injunction.

16        I will clearly grant the antispoliation provision

17   because in my view the facts suggesting a likelihood that

18   Hartford will prevail in establishing that there has been

19   diversion of trust funds out of Evergreen and the reticence of

20   Evergreen to comply with Hartford's requests for access to

21   books and records make it reasonably likely that absent an

22   order of this court critical records will be altered or

23   destroyed.

24        Having reflected on the matter, I think also that I

25   will grant the requested relief with respect to compelling

45IHHARA                    Decision                                    34

1    Evergreen to disclose the amount, whereabouts, and so forth of

2    its assets.  I think that absent doing so there would be a risk

3    that the court would be in a position nine months or a year

4    from now of attempting to find an effective remedy for a

5    contempt of the freeze order, whereas disclosure of the assets

6    now may enable Hartford to serve copies of the order on those

7    in whose possession the assets currently lie and thus

8    preventing improper transfers.

9          I see no justification for an order requiring

10   Evergreen to maintain services.

11         Those are my findings of fact and conclusions of law.

12         I will ask Hartford to submit an order promptly in

13   compliance with this decision.

14         The next question is the amount of the bond and the

15   attachment undertaking.  If counsel want to be heard on that, I

16   will hear them.

17         MR. FITZGERALD:  Your Honor, just two things.  When

18   you say the $600,000 amount, I think actually during the

19   argument you had said a couple of times 700,000, and I think in

20   Exhibit A to the declaration of Mr. Johnson filed in reply, the

21   third page --

22         THE COURT:  You are correct.  The amount of the

23   attachment will be $700,000, the order of attachment.

24         MR. FITZGERALD:  Thank you, your Honor.

25         With regard to the amount of the bonds, your Honor,

45IHHARA                    Decision

1   since in fact we have already filed a $10,000 bond, which
2   frankly we think is sufficient in light of the fact that the
3   amounts that we are talking about here and that are being
4   attached are trust fund moneys and the documents that we are
5   being asked that they not be spoiled, etc., basically Hartford
6   is entitled to them in any event.  That is our position on the
7   bond.

8           THE COURT:  I will hear the other side in a minute on
9   the injunction bond, but there needs to be a bond on the order
10  of attachment, a separate bond.  So inasmuch as I think the
11  order of attachment is going to turn out to be largely
12  academic, I am going to make that $1,000 subject to the right
13  of Evergreen to seek to have that increased in the event any
14  funds are ever attached.

15          Now I will hear you folks for Evergreen on the amount
16  of the preliminary injunction bond.

17          MR. KITTREDGE:  Your Honor, whatever the court deems
18  appropriate.  As counsel indicated, I understand there is a
19  $10,000 bond that's been filed.  We don't seek any increase on
20  that amount at this time.

21          THE COURT:  All right.  Then the preliminary
22  injunction bond will be $10,000.

23          Is there anything that I have failed to dispose of or
24  that I need to address further, counsel?

25          MR. KITTREDGE:  Your Honor, we would just seek

36

45IHHARA                    Decision

1    clarification from the court on the issue of counsel fees.  As

2    we indicated in our papers, we think that Evergreen ought to

3    have the ability to fund its defense of the arbitration and to

4    retain counsel.  Without that ability, it is going to be very

5    difficult For Evergreen to put on any kind of meaningful

6    presentation of both the defense of the claims by Hartford as

7    well as the counterclaims the court alluded to.  So we would

8    ask for some provision, and we would be happy to work with

9    counsel on that, to allow for some part of that $700,000 to be

10   made available to pay reasonable counsel fees.

11            THE COURT:  Some part of the $700,000?

12            MR. KITTREDGE:  To the extent that the court is

13   ordering attachment of $700,000 --

14            THE COURT:  You don't appreciate how that works,

15   counsel, I believe.  The order of attachment is court processed

16   effective within the State of New York which ties up attachable

17   property in the state in the hands of some third party served

18   with the order of attachment.  Now, to the extent your clients

19   have disclosed it in these papers, the only Evergreen assets

20   that exist are in Pennsylvania.  So the order of attachment

21   allows Hartford, if they can find it, to attach up to $700,000

22   of your client's property in New York.  But as of now they have

23   got nothing.

24            What has effect for your client, as I understand the

25   facts at the moment, is the preliminary injunction freezing the

45IHHARA                    Decision

1   assets of Evergreen.  If Mr. Uphouse's affidavit is full,

2   complete and accurate, that is not $700,000, it is in the

3   neighborhood of 300 and something.

4        MR. KITTREDGE:  Let me speak more clearly then, your

5   Honor.  To the extent that the court is freezing the assets,

6   apart from the order of attachment, we would like some relief

7   and respectfully request the court to grant some relief on that

8   freeze order to allow for counsel fees in the arbitration

9   proceeding that is going to go forward.

10       THE COURT:  Mr. Fitzgerald.

11       MR. FITZGERALD:  Your Honor, Hartford frankly has no

12  sympathy for that whatsoever because, as your Honor has said,

13  the $700,000 is trust money that was supposed to have been

14  remitted to Hartford back several months ago.  There are

15  contract disputes between them and moneys owing, that is one

16  thing.  This is trust money, and that is why they should not be

17  taking any payment of counsel fees out of that trust money.

18       THE COURT:  That is my view.  I am not going to have a

19  carve out for attorneys' fees.  Evergreen has principals.

20  Presumably they are well off.  There is reason to believe that

21  they probably have quite a bit of money that they took out of

22  this company already, and I am not doing a carve out.

23       I will say this much more.  I have granted the freeze

24  based on the premise that everything that Evergreen now has is

25  trust fund property and not simply to ensure the collectability

45IHHARA                          Decision

1    of an unliquidated money damages claim via the arbitration.  If

2    it is possible For Evergreen to show that any part of the money

3    that is frozen, whether it is this 300,000 or whether it is

4    more than that, because I don't know what is out there, in fact

5    is not trust assets, trust fund assets, then maybe there is a

6    basis for some modification of the freeze.  But on the basis of

7    what I have before me, I don't see any way to do that.  So I am

8    freezing it all as of now.

9              I would suggest that counsel might profitably discuss

10   the matter and see if something could be worked out.  As far as

11   I can see, as of now it seems likely that all or substantially

12   all of the money that I know about is diverted trust fund

13   assets and I don't see why Hartford should have to pay For

14   Evergreen's legal expenses here in defending itself against the

15   claim that Evergreen was stealing from Hartford.  Stealing

16   meaning offsetting its claims against Hartford, against

17   Hartford's property and not in the more usual sense.

18              Anything else?

19              MR. FITZGERALD:  Your Honor, there is just one other

20   thing.  I don't want Evergreen to get the idea by your

21   basically not granting paragraph 7 on the OSC, which has to do

22   with the maintaining basic services, which includes delivering

23   the mail that Evergreen has gotten with regard to our business,

24   that they just stop delivering it, and that is why we had it in

25   there.  We were asking that at least on a daily basis someone

45IHHARA                    Decision

1   stop off -- they are right down the road, we now know that --

2   pick it up from the P.O. Box and send it to Hartford as opposed

3   to waiting to whenever they feel like it.  It is serious

4   business, and it is claims and claims information, demands for

5   claims being paid and things of that nature.  We have to have

6   that information on a daily basis, not whenever they feel like

7   it.  That is the problem.

8        THE COURT:  Mr. Gilligan.

9        MR. GILLIGAN:  Your Honor, Hartford's a corporation.

10  So too is Evergreen.  Now Evergreen is dissolved and they are

11  basically out of business and they have no assets and they have

12  no money that they can use to do what they would request them

13  to do.  So I don't know how one can perform those tasks or have

14  an employee perform those tasks if that person isn't going to

15  have the opportunity to be paid by someone.

16       THE COURT:  Are you really seriously saying that you

17  can just allow that to sit there till hell freezes over?  Is

18  that really your position?

19       MR. GILLIGAN:  Your Honor, look at it from the

20  standpoint of the legality of it.  Evergreen's a corporation.

21       THE COURT:  Well, is it or is it now dissolved?

22       MR. GILLIGAN:  It is not officially dissolved.  It is

23  going out of business, really.  They no longer have an office.

24  They are out of business.

25       THE COURT:  And it's got shareholders.

40

45IHHARA                    Decision

1           MR. GILLIGAN:  It has shareholders.

2           THE COURT:  And if, as and when it dissolves, the

3      shareholders will be entitled to a distribution of anything

4      that remains net of allowed claims of creditors, right?

5           MR. GILLIGAN:  Well, it is a Pennsylvania corporation,

6      your Honor.  Under Pennsylvania law you have to file certain

7      requirements to dissolve a corporation. You have to publish

8      creditors' rights.  In the final analysis that probably would

9      be true, but it would take at least a year to do that.

10          THE COURT:  Mr. Gilligan, let me put it this way.

11          MR. GILLIGAN:  Yes, sir.

12          THE COURT:  I think it is in your client's

13     overwhelming interest to see that that mail gets picked up and

14     forwarded every day.  If I have to hear an application for an

15     injunction to get the mail picked up, they are not going to be

16     happy campers.

17          MR. GILLIGAN:  I agree with your Honor.  I wouldn't

18     take issue with that.

19          THE COURT:  So let's get that done.

20          MR. GILLIGAN:  I think so.  Your Honor, the only thing

21     I ask, and I did mention in my argument, your Honor, that

22     certain of these monies belong to another insurance company,

23     that they are traceable, and I don't want to address a petition

24     to the court on that.  Arch Insurance Company is now in the

25     same position Hartford was in.

41

45IHHARA                    Decision

1          THE COURT:  I suggest that you and Mr. Fitzgerald sit

2     down and maybe when your client opens its books, you will

3     figure out what is what and you will work out whatever needs to

4     be worked out.  If you can't, obviously you can come back to me

5     on that.

6          MR. GILLIGAN:  All right.

7          THE COURT:  But it is far easier for the two of you to

8     do it than it is for me.  I am going to wind up having to hire,

9     at somebody's expense, an accountant to go down and audit this

10    stuff so that I can verify that it is traceable money.  And you

11    are going to have to probably wind up bringing in the other

12    insurance company here and you probably don't want to do that.

13         MR. GILLIGAN:  Well, in any event, it is their money

14    and they have a claim to it.

15         THE COURT:  I understand that.

16         MR. GILLIGAN:  So I don't know whether they are going

17    to be interpleading in this thing somehow themselves.  I don't

18    know.

19         THE COURT:  Neither do I, but right now all I have is

20    I guess Mr. Uphouse's say-so that there is 80,000 in there that

21    belongs to somebody else.  Given what I have seen here, that

22    could easily amount to his saying I owe somebody else $80,000

23    and I would like to pay and they are more important to me than

24    the Hartford.

25         MR. GILLIGAN:  Your Honor, I agree you don't have that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

42

45IHHARA                    Decision

1   in front of you.   There is testimony to that.

2        What I am suggesting is if I can't work it out with

3   Mr. Fitzgerald, that is something we are going to have to come

4   back to the court with.

5        THE COURT:   I understand.

6        MR. GILLIGAN:   Thank you, your Honor.

7        THE COURT:   Thanks, folks.

8        (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25