# EXHIBIT E

In the Matter of the Arbitration Between

---

**Hartford Fire Insurance Company,**
**Claimant and Counter Respondent**

                                   **Bernd G. Heinze, Arbitrator**

**And**                                **Andrew S. Walsh, Arbitrator**
                                   **David Thirkill, Umpire**

**The Evergreen Organization, Inc.**
**Charles Caronia, Sr.**
**Charles Caronia, Jr.**
**Gary Uphouse**
**Andrejs Krutainis**
**Respondents and Counter Claimants.**

---

## 2nd INTERIM FINAL ORDER

1. Evergreen is ordered to pay 75% of Hartford's attorney's fees and costs as submitted by Hartford but only after Hartford has deducted certain costs associated with Mr. Walsh in Hartford's Amended Statement of Costs, namely (1) a 3/22/05 entry for Mr. Walsh's arbitrator's fee ($8,082.63), and (2) an 8/26/04 entry for $180.97.

2. The panel retains jurisdiction of this Matter until it has been advised by the parties that all payments ordered in this Order and any prior or subsequent Order have been paid.


**FOR AND ON BEHALF OF THE PANEL**

**Dated: July 9, 2007**

David Thirkill, Umpire

# EXHIBIT **F**

In the Matter of the Arbitration Between

---

**Hartford Fire Insurance Company,**
**Claimant and Counter Respondent**

**And**

**Bernd G. Heinze, Arbitrator**
**Andrew S. Walsh, Arbitrator**
**David Thirkill, Umpire**

**The Evergreen Organization, Inc.**
**Charles Caronia, Sr.**
**Charles Caronia, Jr.**
**Gary Uphouse**
**Andrejs Krutainis**
**Respondents and Counter Claimants.**

---

## AMENDED 2nd INTERIM FINAL ORDER

1.  Hartford's allowable attorney's fees and costs in this proceeding are $1,076,307.91.
    Evergreen is ordered to pay $807,307.91 (representing 75% of such fees and costs).
    Mr. Uphouse is ordered to pay attorneys' fees and costs of $100,000.

2.  The panel retains jurisdiction of this Matter until it has been advised by the parties
    that all payments ordered in this Order and any prior or subsequent Order have been
    paid.

**FOR AND ON BEHALF OF THE PANEL**

**Dated: July 21, 2007**

---

David Thirkill, Umpire

# EXHIBIT G

# HARTFORD FIRE INSURANCE COMPANY

## PROGRAM MANAGER'S AGREEMENT

### With

### THE EVERGREEN ORGANIZATION, INC.

## PROGRAM MANAGER'S AGREEMENT - TABLE OF CONTENTS

Term of Agreement............................................................................................................. 1

Appointment of Manager; Lines of Authority.................................................................... 1

    Lines of Authority ......................................................................................................... 1
    Territory........................................................................................................................ 1
    Restrictions .................................................................................................................. 1
    Reinsurance Availability ............................................................................................... 1
    Exclusive Agreement.................................................................................................... 2

Manager's Duties and Responsibilities ............................................................................ 2

    Solicitation.................................................................................................................... 2
    Servicing Business ....................................................................................................... 2
    Binding of Risks ........................................................................................................... 2
    Policy Issuance ............................................................................................................ 2
    Risks Bound ................................................................................................................. 2
    Premium Rates ............................................................................................................ 2
    Compliance with Manuals ............................................................................................ 2
    Sub-producers.............................................................................................................. 3
    Premiums ..................................................................................................................... 3
    Accounting ................................................................................................................... 3
    Fiduciary Capacity - Premium Trust Fund................................................................... 4
    Copies of Policies......................................................................................................... 4
    Credit Extensions ......................................................................................................... 4
    Business Data Confidentiality ...................................................................................... 4
    Manager Expenses ...................................................................................................... 5
    Legal Compliance ........................................................................................................ 5
    Governmental Contacts ............................................................................................... 5
    Premium Financing ...................................................................................................... 5
    Competent Staff........................................................................................................... 6
    Company Interests ....................................................................................................... 6
    Company Interface........................................................................................................ 6
    Accurate Records......................................................................................................... 6
    Audit............................................................................................................................. 6
    Licenses....................................................................................................................... 6
    Policy Cancellation ...................................................................................................... 6
    Prohibited Actions ........................................................................................................ 7

Claims Settlement............................................................................................................. 8

Manager's Compensation ................................................................................................. 8

Advertising ........................................................................................................................ 8

Representation With Respect to Policies........................................................................... 8

Evergreen PMA 9-18-02

Annual Standards for Volume, Mix and Profitability of Business ................................ 8

Insurance of Manager ................................................................................................. 9

   Errors and Omissions ............................................................................................... 9
   General Liability ....................................................................................................... 9
   Employee Dishonesty .............................................................................................. 9

Indemnification .......................................................................................................... 9

   Manager ................................................................................................................... 9
   Company ................................................................................................................. 10

Flat Cancellations .................................................................................................... 10

Suspension of Manager's Authority ......................................................................... 10

   Loss of Reinsurance .............................................................................................. 10
   Administrative Action ............................................................................................. 10
   Indictment .............................................................................................................. 10
   Grounds for Immediate Termination ...................................................................... 10
   Default .................................................................................................................... 11
   Termination by Manager ........................................................................................ 11
   Dispute Over Termination ...................................................................................... 11
   Premium Limitations .............................................................................................. 11

Termination of Agreement ....................................................................................... 11

   Company ................................................................................................................ 11
      Immediate ........................................................................................................ 11
      Thirty (30) Days Notice ................................................................................... 12
   Company or Manager ............................................................................................ 13

Continuing Duties of Manager after Termination ..................................................... 13

Waiver of Statutory Termination Rights of Manager ................................................ 14

Ownership of Expirations ......................................................................................... 14

Offset ....................................................................................................................... 15

Arbitration ................................................................................................................ 15

   Submission to Arbitration ....................................................................................... 15
   Sole Remedy ......................................................................................................... 16
   Notice .................................................................................................................... 16
   Discovery ............................................................................................................... 16
   Arbitration Board Membership ............................................................................... 16
   Submission of Briefs ............................................................................................. 16
   Arbitration Award .................................................................................................. 16
   Confirming Court Order ......................................................................................... 17
   Arbitration Expense ............................................................................................... 17

Evergreen PMA 9-18-02

Arbitration Governance ........................................................................................ 17
Survival ............................................................................................................... 17
Miscellaneous Terms ............................................................................................. 17
APPLICABLE LAW ............................................................................................ 17
Waiver ................................................................................................................. 17
Conflict with Law ................................................................................................ 17
No Assignment .................................................................................................... 18
Notices and Service of Process ......................................................................... 18
Severability .......................................................................................................... 18
Entire Agreement; Modifications ......................................................................... 19
Negotiated Agreement ......................................................................................... 19
Independent Contractor ....................................................................................... 19
Promptly ............................................................................................................... 19
Headings .............................................................................................................. 19
Honorable Undertaking ........................................................................................ 19
Counterparts ........................................................................................................ 19

EXHIBIT A ................................................................................................................ 1

EXHIBIT B ................................................................................................................ 3

Evergreen PMA 9-18-02

# PROGRAM MANAGER'S AGREEMENT

THIS PROGRAM MANAGER'S AGREEMENT ("Agreement") between The Evergreen Organization, Inc., with offices located at 910 Evergreen Lane, Chester Springs, PA 19425 ("Manager"), and Hartford Fire Insurance Company and its affiliates and subsidiaries with offices located at 2 Park Avenue, New York City, New York (all individually and collectively referred to as "Company"). Manager and Company agree as follows:

## ARTICLE I.    Term of Agreement

This Agreement begins on September 24, 2002. It will continue until terminated under the provisions of ARTICLE XIII.

## ARTICLE II.    Appointment of Manager; Lines of Authority

Company appoints Manager as an exclusive manager for the Hartford Financial Products division of Company as follows:

A.    Lines of Authority.    Manager's appointment and authority extends to the classes of business, policies of insurance, including all endorsements, (the "Policies"); and lines and limits of insurance described in Exhibit A attached to this Agreement for which Manager holds all appropriate licenses (the "Business").

B.    Territory.    Manager's appointment and authority extends to risks principally located in the following jurisdictions for which it holds appropriate licenses and for which it is properly appointed by Company:

The United States, Puerto Rico and Canada.

C.    Restrictions.    Manager's appointment and authority is subject to any restrictions set forth in Exhibit A.

D.    Reinsurance Availability.    Manager's appointment and authority for Business written under this Agreement is subject to the following:

1.    Company is able to obtain and maintain in force at all times reinsurance satisfactory to Company for the Business.

2.    Obtaining reinsurance is the sole responsibility of Company. When Company obtains satisfactory reinsurance for all or some of the Business, Company will give Manager written notice that Manager may write and bind those classes of business, Policies, and lines and limits of insurance for which reinsurance has been obtained.

3.    If reinsurance is terminated or no longer in full force and effect for all or any part of the **Business**, **Manager's** authority for the **Business** affected shall be suspended, or limited immediately upon notice to **Manager** from **Company**, until further notice.

E.    Exclusive **Agreement**: This **Agreement** is exclusive and the company agrees not to appoint other agents, brokers or producers to conduct the **Business** subject to this **Agreement** in the territory covered by this **Agreement**.

## ARTICLE III.    Manager's Duties and Responsibilities

**Manager** will faithfully perform all of its duties to the best of its professional knowledge, skill and judgment. The **Manager's** duties include the following:

A.    Solicitation. To solicit risks and classes of risks at limits and for lines of insurance authorized in Exhibit A, that in their pricing and insurability meet or exceed the underwriting and pricing standards from time to time established by **Company**, in writing.

B.    Servicing Business. To provide for all usual and customary services to **Sub-producers**, insureds and policyholders including delivery of **Policies**, return of premiums due insureds or policyholders, premium audits on **Policies**, and timely, appropriate responses to inquiries and complaints from **Sub-producers** insureds or policyholders or members of the public, and comply with any service standards set forth in Exhibit A.

C.    Binding of Risks. To bind risks only in accordance with Exhibit A and any other underwriting and pricing standards from time to time established by **Company**, in writing, and to forward to **Company** for acceptance all other risks.

D.    Policy Issuance. To timely and properly issue, deliver and execute or countersign **Policies**, certificates, endorsements, binders and related documents on forms approved by **Company** and appropriate regulatory authorities, as required by law, for the **Business** described in Exhibit A. **Manager** shall obtain all required **Policy** countersignatures, as required by law.

E.    Risks Bound. To give **Company** notice within  thirty (30) calendar days, for each risk or **Policy** bound or written under this **Agreement**.

F.    Premium Rates. To quote accurate and adequate premiums and rates for **Policies** bound or written under this **Agreement** in compliance with the approved and applicable rating manuals or rating plans of **Company**.

G.    Compliance with Manuals. To comply fully, timely and promptly with all manuals, rules, regulations, guidelines, instructions and directions issued by **Company** relating to the **Business** covered by this **Agreement**.

Evergreen PMA 9-18-02

H.   Sub-producers.  To accept Business on behalf of Company written by properly licensed and qualified, professional insurance agents, solicitors and brokers ("Sub-producers"), and to direct, supervise and coordinate the efforts of Sub-producers.  Manager is responsible for all commissions earned by Sub-producers.  Manager is not authorized to appoint agents for Company or to accept Business produced by other agents or brokers.  Manager will accept Business only from Sub-producers who have agreed in advance in writing to return unearned commissions on canceled Policies.

I.   Premiums.  To charge, collect, receive and receipt for all premiums, including but not limited to premium surcharges, fire district and other taxes or assessments levied by any jurisdiction and required to be collected in addition to stated premiums, due on all Policies bound or written under this Agreement, and pay Company in accordance with ARTICLE III.J.

J.   Accounting.  To timely account for the Business as follows:

1.   Manager shall prepare and forward to Company on a monthly basis, within fifteen (15) days of the end of each calendar month a detailed premium bordereau and statement of account for the prior month period (the "Account") in a format acceptable to the Company.

The Account shall include for each insurance company and authorized line of insurance and should company so request, separately by facultative and treaty lines of reinsurance such information as Company may request, and the following:

a. Net written premium,

b. Policies issued or bound by insured including location, limits, and effective date,

c. Policies canceled,

d. Premium adjustments due to endorsements, audits, or otherwise,

e. Premium surcharges, fire district and other taxes or assessments levied by any jurisdiction,

f. Losses paid,

2.   The Manager shall pay Company balances due within thirty (30) days of the end of each calendar month.

3.   Cumulative reports from the beginning of each calendar year shall also be made on a quarterly and annual basis.

Evergreen PMA 9-18-02

K.  **Fiduciary Capacity - Premium Trust Fund**  To act as a fiduciary for the **Company** and to hold all premiums and any other amounts collected and received on **Policies** for **Company** in a fiduciary account separate and apart from all other funds of **Manager** or others in a bank which is a member of the Federal Reserve System and insured by the Federal Deposit Insurance Corporation and which is approved in writing by **Company**. The bank account shall be designated by **Manager** in such a manner as to clearly establish that **Manager** is holding and acting as trustee for **Company** with respect to the funds in the account. Interest or other income, if any, accruing on these premium trust funds may be retained by **Manager** for its own account so long as **Manager** is current in all accounts with **Company**. The trust funds so held may be used by **Manager** as necessary to return and refund premiums, net of return commissions to policyholders or their authorized representatives. The Premium Trust Fund shall be subject to periodic audits performed by the **Company**. In addition, **Manager** shall submit copies of banking statements with respect to the Premium Trust Fund on a quarterly basis to **Company**. If **Manager** fails to pay **Company** any premiums or monies when due, except as to those amounts about which there is honest, good faith dispute by **Manager**, **Company** shall be entitled to seek the issuance of an injunction to obtain such premiums or monies. Commissions payable to the **Manager** are debts due to **Manager** by **Company** and privilege herein granted of deducting commissions from said premiums should not be taken as a waiver by the **Company** of its exclusive ownership rights of premiums as provided herein.

L.  **Copies of Policies.**  To forward to **Company** promptly copies of all **Policies**, endorsements, rating worksheets and related documents, **Policy** cancellations and other terminations processed by the **Manager**.

M.  **Credit Extensions.**  To assume the obligation for any extensions of credit to insureds, policyholders and **Sub-producers**, and to be fully responsible for the full amount of the premium due **Company** on **Policies** written or bound under this **Agreement** whether or not **Manager** has collected the premium due from policyholders or **Sub-producers**. The **Manager** will accept **Business** only from **Sub-producers** who have agreed in advance and in writing to return unearned commissions on canceled **Policies**.

N.  **Business Data Confidentiality.**  During the course of this **Agreement**, either party may learn confidential, patent or copyright, business, trade secret, proprietary or other like information belonging to the other or to a third party, including information about the party's software, customers and business. Notwithstanding anything to the contrary, the parties agree that their remedies for breach of this confidentiality obligation shall not be limited by, but shall be in addition to, all rights and remedies provided under the laws of the State of New York. Both parties agree that all information exchanged between them shall be deemed confidential if so identified by either in writing or verbally, as, by its nature, should be deemed to be confidential. The parties shall make best efforts

Evergreen PMA 9-18-02

to maintain the confidentiality of all information supplied to and used by each other in the performance of this **Agreement** and shall exercise at least the same level of care with respect to the other party's confidential information as it exercises with respect to its own. The parties agrees that such information learned or acquired will be used only in the course of the performance of this **Agreement**, and that each party will keep such information only for its own use and will not disclose it or provide it to any other person or entity without the prior written consent of the party. Notwithstanding the foregoing, neither party shall be liable for a disclosure to others of information (1) that was generally available to the public prior to the release of said information; (2) that was received from a third party having no obligation to the other party(ies) (known by the recipient) to hold said information in confidence; (3) that is independently developed by such party; or (4) that is required to be disclosed by court order or operation of law.

O.     Manager Expenses.   To pay, assume the obligation for and to be fully responsible for all costs and expenses associated with the **Manager's** performance under this **Agreement** Including: **Sub-producer** commissions, travel expense, employee salaries, benefits, fees, countersignature fees and expense, postage, advertising, exchanges, and license fees. **Company** shall be responsible only for its own costs and expenses unless otherwise agreed by **Company.** In the event **Company** is required to pay any costs or expenses that are the responsibility of the **Manager,** the **Manager** shall promptly reimburse **Company** for its payments.

P.     Legal Compliance.   To keep fully informed of and comply fully with all applicable laws and regulations. This includes, but is not limited to compliance with all laws and regulations applicable to insurance producers in the state(s) where the **Business** is located. **Manager** shall not solicit or bind any risks in any state until all applicable laws, regulations and ISO/NCCI or other bureau rules have been complied with. **Manager** agrees to be responsible for the payment of any applicable surplus lines taxes and the filing of all affidavits as required by the appropriate surplus lines governmental entities and jurisdictions and shall provide **Company** with written evidence of such payments and compliance on a quarterly basis.

Q.     Governmental Contacts.   To promptly notify **Company** of all contacts and correspondence received from insurance regulatory or other governmental authorities, to forward promptly upon receipt all summonses, complaints, subpoenas or other court documents, and to cooperate fully with **Company** in making any responses.

R.     Premium Financing.   To promptly and appropriately respond to all correspondence and notices related to financing or proposed financing of premiums on **Policies** issued under this **Agreement,** and forward copies of all notices and finance agreements to **Company.**

Evergreen PMA 9-18-02

S.    Competent Staff.  To maintain sufficient supplies and equipment and a staff of competent and trained personnel, to produce, develop, underwrite, and supervise the **Business** covered by this **Agreement**.

T.    Company Interests.  To promote and safeguard the best interests and good name of **Company**.

U.    Company Interface.  To interface at all times with **Company** through **Company**'s "WINS" system and other means mutually agreed to in advance by **Company** and **Manager**. **Manager** represents that data it inputs into the WINS system shall average no less than ninety per cent (90%) error-free transmissions on critical data elements as defined by the Company and thereafter errors shall be corrected within five (5) business days. **Manager** further represents that its work product will contain no matter which is libelous or otherwise contrary to law.

V.    Accurate Records.  To keep and maintain, for as long as **Company** requires, separate, identifiable, orderly, accurate, complete and timely records and accounts of all **Business** and transactions pertaining to **Policies** bound or written and claims adjusted under this **Agreement** including complete underwriting, claim and rate files. Such records and files shall be the property of **Company**. Upon request by **Company** or the insurance regulator or Commissioner of any state having jurisdiction over **Company** ("Commissioner"), all records and reports maintained pursuant to this ARTICLE III, shall be provided as hard copies or in an electronic/computer format usable by **Company** and the Commissioner.

W.    Audit.  To permit **Company** during the term of this **Agreement** and as long and frequently as **Company** considers necessary, to visit, inspect, examine, audit and verify, at **Manager's** offices or elsewhere, quarterly and at such additional times and as often as **Company** may deem appropriate, with or without prior notice any of the properties, accounts, premium trust funds, files, documents, books, reports, work papers and other records belonging to or in the possession or control of **Manager** or of any other person relating to the **Business** covered by this **Agreement**. **Company** may make copies and extracts as may be reasonably necessary. **Company** may conduct any audit through any person or persons it may designate. The Insurance Department of any state having jurisdiction over this **Agreement** shall have the right to exercise **Company**'s rights of audit under this Section after consultation with the **Company**.

X.    Licenses.  To obtain and provide **Company**, with copies of all licenses and permits required by **Manager** for the proper conduct of its duties under this **Agreement**. **Manager** agrees that it will not transact any **Business** in any jurisdiction covered under this **Agreement** until **Manager** has obtained all required licenses and permits, and is properly appointed to represent the **Company** in such jurisdiction.

Evergreen PMA 9-18-02

Y.    **Policy Cancellation.** To cancel or otherwise terminate **Policies** bound or written by or through **Manager** as required by applicable underwriting standards and consistent with applicable regulatory and **Policy** conditions. **Company** shall always retain the right to direct the cancellation or termination of **Policies** by **Manager** or to cancel or terminate **Policies** by direct notice to insureds or policyholders.    **Manager** shall not make, permit, or cause general or indiscriminate cancellations, terminations or replacements of **Policies**. **Manager** shall consult with **Company** before canceling **Policies** for reasons other than non-payment of premium.    **Manager** shall be responsible for notifying governmental agencies or other persons for whom **Manager** has certified coverage or provided evidence of insurance. No **Policy** canceled or terminated by or at the direction of the **Company** may be reinstated without the prior written approval of **Company**.

Z.    **Prohibited Actions.** The **Manager** shall have no authority to:

1.    Bind any reinsurance or retrocessions, including, but not limited to, facultative or treaty, on behalf of **Company**;

2.    Commit **Company** to participate in insurance or reinsurance syndicates;

3.    Appoint any producer or **Sub-producer** without reasonable assurance that such producer or **Sub-producer** is lawfully licensed to transact the insurance business for which it has been appointed;

4.    Pay or commit the **Company** to pay any claim, except as authorized by Company;

5.    Collect any payment from a reinsurer or commit the **Company** to any claim settlement with a reinsurer, without prior approval of the **Company**. If prior approval is given, a report must be promptly forwarded to the **Company**;

6.    Permit any of its **Sub-producers** to serve on **Company's** Board of Directors;

7.    Jointly employ an individual who is employed on a full-time basis with **Company**; and

8.    Appoint a sub-Managing General Agent or Program Administrator. Notwithstanding the foregoing, Private Label and GAP Administrators that do not have underwriting authority shall be considered **Sub-producers** hereunder, and not sub-Managing General Agents or Program Administrators.

Evergreen PMA 9-18-02

## ARTICLE IV.    Claims Settlement

Manager has no authority to adjust, compromise, settle, pay or commit the Company to pay any claim made on the **Policies** written or bound under this Agreement except as specifically set forth in a Claims Service Agreement between Manager and **Company**, of even date herewith.

## ARTICLE V.    Manager's Compensation

Company will pay the Manager as full compensation for all of its duties and responsibilities under this Agreement, a profit share as more particularly described in Exhibit B hereto.

## ARTICLE VI.    Advertising

Manager will not refer to Company (or any division or affiliate of Company) in any advertisement, promotional letter, circular, pamphlet or other publication or promotional statement without the prior written consent of Company. Provided Company gives its consent to the content and cost of such advertising materials, Company and Manager agree to share advertising expense on a dollar for dollar basis up to an aggregate of $20,000 per party, per annum. Advertising expense, in excess of Company's aggregate limit of liability, shall be at the sole expense of Manager and shall remain subject to Company's consent to the content of such advertising materials.

## ARTICLE VII.    Representation With Respect to Policies

Manager will not make nor allow Sub-producers or any other person to make any representation to applicants, insureds, policyholders or claimants as to the existence or extent of coverage either available from Company or under a Policy that is not consistent with the terms and conditions of coverages available from Company or of a Policy.    Manager shall establish procedures to ensure that Manager and Manager's employees and all Sub-producers will make known to any applicant, insured or policyholder the full scope and effect of all exclusions and limitations upon or under coverage provided under the Policy.

## ARTICLE VIII.    Annual Standards for Volume, Mix and Profitability of Business

A.    Manager will comply with any annual maximum and minimum standards of production for premium volume and profitability of Business, that are made a part of Exhibit A.

Evergreen PMA 9-18-02

B.    Notwithstanding any standards of production, **Manager** will immediately comply with any notice from **Company** requiring **Manager** to cease or suspend writing or binding any new or renewal **Business.**

C.    Should the **Manager** at the end of any calendar quarter directly or indirectly produce an amount of direct written premium equal to or in excess of five percent (5%) of the policyholder's surplus for any of the insurance companies for which **Manager** is authorized under this **Agreement** as determined by the last annual statement of the insurance company filed with the company's state of domicile, and the **Manager** either directly or through affiliated companies administers claims or negotiates reinsurance, then **Company** shall notify the **Manager** and any applicable state regulatory authorities that the **Manager** is a Managing General Agent, and both the **Manager** and **Company** shall take whatever steps may be necessary to comply with each state's laws and regulations applicable to a Managing General Agency including any amendments to this **Agreement** as may be required to comply.

## ARTICLE IX.    Insurance of Manager

**Manager** will maintain for as long as this **Agreement** remains in force with unaffiliated insurers and on forms acceptable to **Company:**

A.    Professional errors and omissions policy in an amount of five million dollars ($5,000,000), or the minimum amount required by the insurance regulatory authorities of the state, whichever is greater; and

B.    Comprehensive general liability or umbrella liability insurance policy in an amount of five million dollars ($5,000,000), or the minimum amount required by the insurance regulatory authorities of the state, whichever is greater.

C.    Blanket employee dishonesty bond covering all employees of **Manager** in an amount of three million dollars ($3,000,000), or the minimum amount required by the insurance regulatory authorities of the state, whichever is greater.

**Company** shall require certificates of Insurance or other evidence that the insurance required by this Article is and remains in force. **Manager** shall provide such certificates of insurance on an annual basis.

## ARTICLE X.    Indemnification

A.    **Manager** shall be responsible to **Company** and shall indemnify, save, defend and hold **Company,** including its affiliates, and all officers, directors and employees harmless against any and all claims, suits, hearings, actions, damages of any kind, liability, fines, penalties, loss or expense, including attorney's fees caused by or resulting from any allegation of any misconduct, error, omission or other act; or breach of this **Agreement** by **Manager,** or

Evergreen PMA 9-18-02

Manager's employees, or representatives, or **Sub-producers** unless the conduct giving rise to the allegation was performed at the specific direction of **Company**.

B.     **Company** shall be responsible to **Manager** and shall indemnify, save, defend and hold **Manager** harmless against any and all claims, suits, hearings, actions, damages of any kind, liability, fines, penalties, loss or expense, including attorney's fees caused by or resulting from any allegation of any direct misconduct, error, omission, or other act by **Company**, provided **Manager** has not contributed to or compounded the act alleged. ·

## ARTICLE XI.     Flat Cancellations

A.     If a **Policy** is canceled flat, the originals of the canceled **Policy** or a lost **Policy** release shall be promptly forwarded by **Manager** to **Company**. **Manager** will not cancel flat a **Policy** after it has been in effect for more that thirty (30) days without the prior written consent of **Company**.

B.     An appropriate premium charge shall be made for any **Policy** in force for a period in excess of thirty (30) days.

C.     **Manager** agrees to report to Company, on a monthly basis, all **Policy** numbers that have been voided or cancelled.

## ARTICLE XII.     Suspension of Manager's Authority

Company may, by immediate notice to **Manager**, suspend any part or all of **Manager's** authority under this **Agreement** for such time as **Company** may deem necessary to protect its interests or reputation if any of the following occur:

A.     Loss of Reinsurance.  In accordance with ARTICLE II.D.3; or

B.     Administrative Action.  An administrative accusation of violation of insurance law or regulation against **Manager** or any of **Manager's** executive officers by an insurance regulatory agency; or

C.     Indictment.  **Manager** or any of **Manager's** executive officers is Indicted for a criminal offense, the conviction of which would permit termination of **Manager** under this **Agreement**.

D.     Grounds for Immediate Termination.  For any reason that would permit termination of **Manager** under this **Agreement** under ARTICLE XIII.A.1; or

Evergreen PMA 9-18-02

E.    Default.  The failure of Manager to perform its duties and responsibilities under this Agreement including the timely remitting of accounts and monies to Company, insureds or policyholders and timely and full compliance with Company directives, rules, regulations or manuals; or

F.    Termination by Manager.  If the Manager gives notice of termination under ARTICLE XIII.B; or

G.    Dispute Over Termination.  In the event of a dispute over the reason for termination of the Agreement; or

H.    Premium Limitations.  In the event the Company decides in its sole discretion to restrict its premiums for the Business written under this Agreement.

ARTICLE XIII.   Termination of Agreement

A.    Company may terminate this Agreement as follows:

1.    Immediately upon written notice to Manager in the event of:

a.    License Suspension or Revocation.  An order of suspension or revocation of Manager's license by any insurance regulatory authority;

b.    Misapplication of Funds.  A misapplication, misdirection or misappropriation by Manager of funds or property of Company or funds received for it or policyholders by Manager, or in the event of failure by Manager to remit to Company or policyholders, funds due promptly after written demand therefore by Company;

c.    Violation of Law.  A charge brought against Manager or any of Manager's executive officers of violation of the insurance laws or regulations of any jurisdiction, or of any law constituting a felony in the jurisdiction in which committed, or of any law whose violation reflects adversely upon the honesty or integrity of Manager or any of Manager's executive officers whether or not classified as a felony;

d.    Insolvency.  The Manager shall become insolvent or make a general assignment for the benefit of creditors; if a petition is filed for bankruptcy or other law providing for its reorganization, dissolution or liquidation; or a trustee or receiver is appointed for the Manager, its assets or a substantial part thereof;

e.    Loss of Reinsurance, in accordance with ARTICLE II.D.3; or

Evergreen PMA 9-18-02

2.    Upon thirty (30) days written notice to **Manager** in the event of:

a.    <u>Excessive Complaints.</u> The number of complaints received by **Company** relating to **Manager's** performance and service to insureds, policyholders, **Sub-producers** or members of the public exceeds one-half of one percent (.5%) of certificates issued with respect to **Policies** written in any given three month period;

b.    <u>Adverse Legislation.</u> Enactment of legislation which in the opinion of **Company** would adversely affect **Company'** rights under this **Agreement** or liabilities under the **Policies**;

c.    <u>Conflict with Law.</u> As provided for in ARTICLE XIX.C;

d.    <u>Default.</u> The failure of **Manager** to perform its duties and responsibilities under this **Agreement** including the timely remittance of accounts and monies to **Company**, insureds or policyholders and timely and full compliance with **Company** directives, rules, regulations or manuals;

e.    <u>Insufficient or Inaccurate Data.</u> The failure of the **Manager** to properly compute and report all required **Account** data as required by ARTICLE III.J;

f.    <u>Ownership Change.</u> A significant change in the ownership or management of or in the event of the execution of an agreement of sale, transfer or merger of **Manager** without prior notice and consent of **Company**;

g.    <u>Loss of Key Personnel.</u> The death, disability, retirement, resignation or termination of both Charles Caronia, Sr. and Andrejs Krutainis. For purposes of this section, "disability" shall be defined to mean a physical or mental condition which prevents any person named above from performing substantially all the same business duties and activities at the same pace as prior to the onset of the disability. In the event of death, disability, retirement, resignation or termination of one of the key personnel listed above, **Manager** shall make every reasonable effort to hire a replacement that is mutually agreeable to **Manager** and **Company**.

h.    <u>Compliance.</u> **Manager's** failure to promptly take and complete action to correct any regulatory or statutory violation relating in any way to the subject matter of this **Agreement** of which the **Manager** has received notice from any source.

i.    <u>Illegal or Unenforceable.</u> If it is determined or ordered by a court or regulatory body that any substantive provisions or term of

Evergreen PMA 9-18-02

this **Agreement** is found illegal or unenforceable, so that this **Agreement** is impaired to the extent to make the performance of either party impossible or impractical under original parties.

B.    Either **Company** or **Manager** may terminate this **Agreement** after September 24, 2004 at any time upon One Hundred and Eighty (180) days prior notice. Termination may also be effective Immediately by mutual consent of both parties to this **Agreement**.

C.    If this **Agreement** is terminated for any reason, **Company** reserves the right to terminate **Manager's** appointments made with any state insurance producer licensing and appointment regulatory agencies.

D.    If this **Agreement** is terminated in accordance with ARTICLE XIII.B. Business shall be conducted during the notification period consistent with the same rates, rules and underwriting guidelines as were in effect at the time notice was given.

## ARTICLE XIV.    Continuing Duties of Manager after Termination

A.    If **Company** elects upon termination of this **Agreement**, and for as long as **Company** continues to desire the services of **Manager, Manager** will perform all of the duties necessary for the proper servicing of all **Policies** bound or written under this **Agreement** until all those **Policies** shall have expired or been terminated.    These services shall include canceling, issuing mandatory endorsements, collecting and returning premiums and forwarding notices of claims.

B.    So long as the **Manager** continues to perform duties in accordance with this Article, the **Manager** shall continue to receive the profit share set forth in Exhibit B hereto.

C.    Should **Manager** not continue to perform any duties for any reason, **Company** may discontinue payment of the profit share set forth in Exhibit B hereto.    Any payment of profit share that **Manager** may be entitled to for business written in accordance with the provisions contained in this **Agreement** prior to the termination of this **Agreement** shall not be affected.

D.    If this **Agreement** is terminated by **Company** for any reason under ARTICLE XIII, and **Company** is required to renew any **Policies** under the law of any jurisdiction the **Manager** will not be entitled to any profit share with respect to that renewal **Business**.

Evergreen PMA 9-18-02

## ARTICLE XV.    Waiver of Statutory Termination Rights of Manager

Both **Manager** and **Company** are aware that there or may be laws or regulations in the various jurisdictions served by **Manager** that may be interpreted to provide **Manager** with certain rights of notice, "run-off", continuation of **Business** written through **Manager**, prevention of termination and regulatory review and possible disapproval of the termination of this **Agreement**. Because this **Agreement** has been mutually entered into for a special purpose, and places responsibilities, duties and obligations upon **Manager** both beyond those and different from those of a normal soliciting agent, **Manager** acknowledges that this therefore involves and necessitates a different relationship. **Manager** hereby specifically waives any and all rights with respect to termination of this **Agreement** that may now or hereafter be provided to **Manager** by statute or regulation in recognition of that different relationship, and agrees not to impose upon or require compliance by **Company** of any obligations relating to termination of this **Agreement** other than those provided for specifically in this **Agreement**.

## ARTICLE XVI.    Ownership of Expirations

A.    Records of Insureds, policyholders and **Policies** written or bound by or through **Manager** ("**Expirations**"), as between **Manager** and **Company**, shall be the sole and exclusive property of **Manager** except:

1.    Underwriting Records and Files as described in ARTICLE III.V above.

2.    Account and Payment Delinquency. If **Manager's** authority under this **Agreement** is suspended or terminated, in part or in full, and **Manager** fails to render all accounts due or pay any amounts due to **Company**, **Company** will be entitled to solicit, write and to sell insurance to any and all existing insureds or policyholders written by or through **Manager**. In such event the **Expirations** will vest in and become the sole and exclusive property of **Company**.

3.    Limited License. If the **Manager's** authority under this **Agreement** is suspended or terminated, in part or in full, and if any applicable insurance law or regulation prohibits **Company** from terminating any **Policies** or obligates **Company** to offer to continue or to renew, directly or through another producer of **Company**, any **Policies**, or insureds or policyholders previously bound or written under this **Agreement**, then **Company** shall be permitted and is hereby granted by **Manager** a limited license in, and a right to use the **Expirations** of those **Policies**, insureds and policyholders without any payment to **Manager** to permit **Company** to comply within its reasonable discretion and in good faith with any such insurance law or regulation.

Evergreen PMA 9-18-02

4.    _Default._ If this Agreement is terminated by **Company** for a reason that permits immediate notice of termination to **Manager** under ARTICLE XIII.A.1 the **Expirations** will vest in and become the sole and exclusive property of **Company**.

B.    Upon the occurrence of any event which gives rise to the vesting of the ownership of **Expirations** in **Company**, **Company** may take immediate possession of all records relating to those **Expirations** and **Manager** shall, upon request, immediately gather such records together at **Manager's** principal place of business and allow **Company** access to take possession of those records. **Company** may service those **Expirations** directly or dispose of them in any commercially reasonable manner. **Company** may collect premiums directly from any insured or policyholder who has not made payment to **Manager**.

C.    If **Company** disposes of **Manager's** records and **Expirations** and does not realize sufficient money to discharge in full any and all of **Manager's** indebtedness to **Company** (including any cost incurred by **Company** in connection with its recovery and disposal of the records and **Expirations**), **Manager** will remain liable to **Company** for the balance of the **Manager's** indebtedness to **Company**.

D.    If **Company** disposes of **Manager's** records and **Expirations** and there is any excess over the **Manager's** indebtedness to **Company** (including any cost incurred by **Company** in connection with its recovery and disposal of records and **Expirations**) realized by **Company**, the excess shall be remitted to **Manager**.

## ARTICLE XVII. Offset

All amounts due **Manager** or **Company** under this **Agreement** or any other agreement between the parties shall be subject to the right of offset. For the purposes of this Article, **Company** and **Manager** shall include each of their respective affiliates.

## ARTICLE XVIII. Arbitration

A.    _Submission to Arbitration._   In the event of any dispute between the **Company** and the **Manager** with reference to the interpretation, application, formation, enforcement or validity of this **Agreement** or any other agreement between them, or their rights with respect to any transaction involved, whether such dispute arises before or after termination of this **Agreement**, such dispute, upon written request of either party, shall be submitted to the decision of a board of arbitration composed of two arbitrators and an umpire meeting at the **Company's** offices in New York unless otherwise mutually agreed. Notwithstanding the generality of the foregoing, the **Company's** right to exercise

Evergreen PMA 9-18-02

any of the options contained in ARTICLES XII., XIII., or XVI. shall not be limited by the submission of any dispute to arbitration.

B.    Sole Remedy. The parties agree that arbitration pursuant to the terms of this Article is the sole remedy for the resolution of disputes between them under this Agreement or any other agreement between them. The board of arbitration will have complete and exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability and shall only conduct the arbitration proceeding to resolve disputes between the parties to this Agreement and not as a class action involving other parties.

C.    Notice. The notice requesting arbitration shall state in particular all principal issues to be resolved, name the requesting party's arbitrator and shall set a date for the hearing, which date shall be no sooner than ninety (90) days and no later than one hundred twenty (120) days from the date that the notice requesting arbitration is mailed.

D.    Discovery. Each party may obtain discovery from the other through written interrogatories and through requests for documents, and may depose witnesses upon notice to the other. Any objections to production of documents or to the scope of discovery shall be submitted to the umpire for resolution. The umpire may schedule a conference at which the parties may present oral arguments and submit written briefs with respect to the production of documents or the scope of discovery. The umpire shall render a decision within two business days of the conference. The decision shall be binding on the parties.

E.    Arbitration Board Membership. The members of the board of arbitration shall be disinterested active or retired officers of insurance or reinsurance companies or lawyers, with at least ten (10) years of experience within the insurance or reinsurance industry. Each party shall appoint its own arbitrator. If the party receiving the notice of arbitration fails to appoint its arbitrator within 30 days after having received the written notice of arbitration, the party giving notice shall appoint the second arbitrator. The two arbitrators shall choose a third arbitrator as umpire within 30 days after appointment of the second arbitrator. If the two arbitrators fail to agree upon the appointment of the umpire within such 30 day period, either party may apply to the United States District Court for the Southern District of New York and the Court will appoint an umpire possessing the qualifications set forth above.

F.    Submission of Briefs. The parties shall submit their initial briefs within twenty (20) days from appointment of the umpire. Each may submit reply briefs within ten (10) days after filing the initial briefs.

G.    Arbitration Award. The board shall make an award with regard to the custom and usage of the insurance business which shall be in writing and shall state the factual and legal basis for the award. The board may award compensatory money damages and interest thereupon but may not award

Evergreen PMA 9-18-02

punitive, exemplary, extra-contractual, consequential or similar damages arising out of or in connection with a breach of this **Agreement**. The board may also make an award directing the **Manager** to provide **Collateral** under the terms of this **Agreement**. The award shall be based upon a hearing in which evidence may be introduced without following strict rules of evidence but in which cross examination and rebuttal shall be allowed. At its own election or at the request of the board, either party may submit a post-hearing brief for consideration by the board within twenty (20) days of the close of the hearing. The board shall make its award within thirty (30) days following the close of the hearing or the submission of post-hearing briefs, whichever is later, unless the parties consent to an extension. A decision by the majority of the members of the board shall become the award of the board and shall be final and binding upon all parties to the proceeding.

H.    Confirming Court Order. Either party may apply to the United States District Court for the Southern District of New York or to the Supreme Court of the State of New York, County of New York for an order confirming the award or to enforce any decision by the umpire with respect to discovery. The parties consent to the jurisdiction of any such court. A judgment of such Court shall thereupon be entered. If such an order is issued, the attorneys' fees of the party so applying and court costs will be paid by the party against whom confirmation is sought.

I.    Arbitration Expense. Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the expense of the umpire. The remaining costs of the arbitration proceedings or any other costs relating to the arbitration may be allocated by the board.

J.    Arbitration Governance. The Arbitration shall be governed by the United States Arbitration Act, Title 9 U. S.C. §1, et seq.

K.    Survival. This Article shall survive the termination of this **Agreement**.

## ARTICLE XIX.    Miscellaneous Terms

A.    **APPLICABLE LAW.** THE RIGHTS OF THE PARTIES TO THIS **AGREEMENT** SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO NEW YORK'S RULES ON CONFLICT OF LAWS.

B.    Waiver. The failure of the **Company** or **Manager** to insist on strict compliance with this **Agreement**, or to exercise any right or remedy shall not constitute a waiver of any rights provided under this **Agreement**, nor stop the parties from thereafter demanding full and complete compliance nor prevent the parties from exercising such a remedy in the future.

C.    Conflict with Law. If any provision of this **Agreement** should be declared invalid by a court of general jurisdiction and superseded by specific law or

Evergreen PMA 9-18-02

regulation, such law or regulation shall control to the extent of such conflict without affecting the remaining provisions of this Agreement. However, if either party believes that the voiding of any provision hereof materially affects the whole Agreement or the relationship of the parties under this Agreement, that party by notice may terminate this Agreement by giving thirty (30) days notice to the other.

D.    No Assignment. Neither this Agreement nor any rights or obligations under this Agreement may be assigned or delegated by Manager without the prior written consent of Company.

E.    Notices and Service of Process

Any notices given with regard to this Agreement (other than the Company's notices or invoices with respect to amounts due hereunder) shall be sent to the following addresses by U.S. mail or any other means calculated to provide notice:

To the Company:

Hartford Fire Insurance Company
Hartford Financial Products
2 Park Avenue
New York, New York 10016
Attn: Ian Steinberg

To the Manager:

The Evergreen Organization, Inc.
P.O. Box 129
910 Evergreen Lane
Chester Springs, PA 19425
Attn: Charles Caronia

The parties hereby consent to the exclusive jurisdiction of either the U.S. District Court of State Court for the Southern District of New York or the Supreme Court of the State of New York, County of New York regarding any disputes relating to or arising out of this Agreement. For purposes of service of process related to disputes governed by this Agreement only, the parties agree to accept service of process by personal delivery, registered or certified U.S. mail or overnight courier/delivery service to the addresses specified above.

F.    Severability. If any provision hereof is or shall at any time be deemed invalid and unenforceable then, to the fullest extent permitted by law, the other provisions hereof shall remain in full force and effect and shall be liberally

Evergreen PMA 9-18-02

construed In favor of the **Company** In order to carry out the intentions of the parties hereto as nearly as may be possible.

G.    Entire Agreement; Modifications. This **Agreement** constitutes the entire agreement of the parties with respect to the subject matter herein and supersedes any other previous agreements or quotations, whether written or oral, between the **Company** and the **Manager**, unless specifically referred to within this **Agreement**. Except for termination in accordance with ARTICLE XIII, this **Agreement** may not be released, discharged, amended or modified except in writing signed by both parties.   Notwithstanding the foregoing, manuals, rules, regulations, guidelines, instructions and directions issued in writing by the **Company** from time to time as provided in this **Agreement**, shall bind the **Manager** as though a part of this **Agreement**.

H.    Negotiated Agreement.  This **Agreement** has been negotiated by the parties and the fact that the initial and final draft shall have been prepared by **Company** shall not be used in any forum in the construction or interpretation of this **Agreement** or any of its provisions.

I.    Independent Contractor.  This **Agreement** is not a contract of employment and nothing contained in this **Agreement** shall be construed to create the relationship of joint venture, partnership, or employer and employee between **Company** and **Manager**.  **Manager** Is an Independent contractor and shall be free, subject to the terms and conditions of this **Agreement**, to exercise judgement and discretion with regard to the conduct of business.

J.    Promptly.  Unless the context and circumstances require action sooner, the term "promptly" in this **Agreement** shall be defined to mean "within five (5) business days".

K.    Headings.  The headings preceding the text of the articles and paragraphs of this **Agreement** are intended and inserted solely for the convenience of reference and shall not affect the meaning, construction or effect of this **Agreement**.

L.    Honorable Undertaking.  This **Agreement** shall be considered an honorable undertaking made in good faith and shall be subject to a liberal construction for the purpose of giving effect to the good faith and honorable intentions of **Manager** and **Company**.

M.    Counterparts.  This **Agreement** may be executed in duplicate counterparts each of which shall be deemed an original but both of which when taken together shall be deemed one and the same document.

Evergreen PMA 9-18-02

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Agreement below.

Manager:

Company:

The Evergreen Organization, Inc.

By:  Charles Caronia

Title:  Chairman and CEO

Date:  9/24/02

WITNESS: _____

Hartford Fire Insurance Company

By:  DAVID H. McReADY

Title:  SENIOR VICE PRESIDENT

Date:  9/24/02

WITNESS: _____

@026

## EXHIBIT A

to

## Program Manager's Agreement

With

The Evergreen Organization, Inc.

Effective September 24, 2002

1.    Permissible Limits of Liability Per Vehicle: As per **Policy** filings.

2.    Pricing Standards:  As per **Policy** filings.

3.    Underwriting Standards:

     3.1   **Manager** is restricted to binding and writing insurance **Policies** issued and covering only:

         Private passenger vehicles, trucks up to 75,000 GVW, recreational vehicles, motorcycles, ATV's, personal watercraft or similar vehicles, as per **Policy** filings.

     3.2   **Manager** may not bind or write insurance **Policies** providing coverage for the following exposures:

         Vehicles or equipment other than specified in 3.3.1 above.

     3.3   **Manager** will use an underwriting worksheet and other file documentation forms approved by **Company**.

     3.4   **Manager** shall keep current records of net written premium distribution by state of **Policies** written under this **Agreement**. Gross net written premium on multi-state risks will be distributed in accordance with premium distribution methods developed by **Company**.

4.    Maximum Policy period:  "Until cancelled" subject to annual anniversary.

5.    **Policy** Forms: As filed and approved for **Company's** use.

6.    Exclusions:

     6.1   **Manager** shall not bind or write **Policies** with any of the following coverages:

Coverage other than GAP or similar products.

6.2    **Manager** shall not bind or write coverage under any **Policy** covering risk(s) engaged in the following operations or activities:

6.3    **Manager** shall not bind or write coverage for more than one risk or asset class under a single **Policy**. For purposes of this paragraph, a risk consisting of wholly owned and affiliated business entitles under the common control of a single ultimate controlling parent shall be deemed a single risk if any of the entities insured under the original **Policy** being insured are not affiliated, wholly owned, and under common control of a single ultimate controlling parent. Risks where the relationship is not clear should be referred to **Company** prior to binding or writing.

Issue/Process Endorsements Modification. This Exhibit A, or any portion thereof, may be modified by **Company** in its sole discretion from time to time by written notice to **Manager**.    The **Manager** and Hartford Fire Insurance Company (**Company**), intending to be bound, have executed this Amendment in duplicate, each of which shall serve as an original.

MANAGER:

BY: _____

TITLE: C E O

DATE: 9/24/02

WITNESS: _____ Inn Sreinberg  9/24/02

COMPANY:

BY: _____

TITLE: Senior Vice President

DATE: 9/24/02

WITNESS: _____ Ian Steinberg  9/24/02

# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Application of )

)                         Civil Action No. 04-CV-3333(LAK)
HARTFORD FIRE INSURANCE COMPANY, )

)                         **PETITION FOR JUDGMENT**
Petitioner,                    )    **CONFIRMING ARBITRATION**
                               )    **AWARD**
                               )
                               )
-against-                      )
                               )
THE EVERGREEN ORGANIZATION, INC. )
CHARLES A. CARONIA, GARY UPHOUSE, )
CHARLES CARONIA, JR., and ANDREJS )
KRUTAINIS,                     )
                               )
Respondents.                   )
                               )
                               )
                               )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Petitioner Hartford Fire Insurance Company ("Hartford"), through its attorneys Stroock

& Stroock & Lavan LLP, respectfully petitions this Court for entry of a final judgment

confirming the final awards made by the Arbitration Panel in this matter.

I.

## INTRODUCTION

1.    The subject of the arbitration in this matter is a dispute between Hartford Fire Insurance Company ("Hartford"), on the one hand, and The Evergreen Organization, Inc. ("Evergreen") and its principals, on the other hand, relating to their performance under a Program Manager's Agreement ("PMA") and a Claims Servicing Agreement ("CSA").

2.    Hartford issued GAP insurance policies to customers (the "GAP Program" or "Program") from July 2000 through early 2003. Evergreen acted as Hartford's Program Manager and Claims Servicing Agent with regard to the administration of Hartford's GAP insurance business from July 2000 through February 24, 2004.

3.    Evergreen and its principals, Charles Caronia, Sr., Charles Caronia, Jr., Gary Uphouse, and Andrejs Krutainis (collectively, the "Principals") materially breached obligations under the PMA and CSA as well as their fiduciary duties owed to Hartford that arise out of those agreements. True and correct copies of the PMA and CSA are attached hereto as Exhibits "A" and "B", respectively, and are incorporated by reference herein.

4.    In February 2004, the parties commenced arbitration and thereafter participated in an arbitration hearing in January 2007. A final award was rendered by the Arbitration Panel. Hartford seeks entry of judgment against Evergreen, Charles Caronia, Sr., and Gary Uphouse (collectively, the "Respondents") based on that final award.

II.

## THE PARTIES

5.    Hartford is, and at all relevant times herein was, an Indiana corporation organized under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.

6.    Hartford is informed and believes, and thereon alleges, that Respondent Evergreen was at all relevant times a corporation organized under the laws of the State of Pennsylvania, with its principal place of business in Chester Springs, Pennsylvania.

7.    Hartford is informed and believes, and thereon alleges, that respondent Charles Caronia, Sr. ("Caronia Sr.") is a citizen of the State of Pennsylvania.

8.    Hartford is informed and believes, and thereon alleges, that respondent Charles Caronia, Jr. ("Caronia Jr.") is a citizen of the State of Pennsylvania.

9.    Hartford is informed and believes, and thereon alleges, that respondent Gary Uphouse ("Uphouse") is a citizen of the State of Pennsylvania.

10.   Hartford is informed and believes, and thereon alleges, that respondent Andrejs Krutainis ("Krutainis") is a citizen of the State of Pennsylvania.

### III.

### JURISDICTION AND VENUE

11.   Jurisdiction exists by virtue of diversity of citizenship, pursuant to 28 U.S.C. §1332. The amount in controversy exceeds Seventy Five Thousand Dollars ($75,000), exclusive of interest and costs.  ·

12.   Venue is proper in this judicial district under the forum selection clause of the parties' arbitration agreement (the "Arbitration Agreement"), set forth in Article XVIII of the PMA, which states in relevant part:

> "Arbitration
> A. Submission to Arbitration. In the event of any dispute between the Company and the Manager with reference to the interpretation, application, formation, enforcement or validity of this Agreement or any other agreement between them, or their rights with respect to any transaction involved, whether such dispute arises before or after termination of this Agreement, such dispute, upon written request of either party, shall be submitted to the decision of a board of arbitration composed of two arbitrators

-3-

and an umpire meeting at the Company's offices in New York unless otherwise mutually agreed. Notwithstanding the generality of the foregoing, the Company's right to exercise any of the options contained in ARTICLES XII., XIII., or XVI. shall not be limited by the submission of any dispute to arbitration.

B.      Sole Remedy. The parties agree that arbitration pursuant to the terms of this Article is the sole remedy for the resolution of disputes between them under this Agreement or any other agreement between them. The board of arbitration will have complete and exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability, and shall only conduct the arbitration proceeding to resolve disputes between the parties to the Agreement, and not as a class action involving other parties."

The Arbitration Provision also states, "The Arbitration shall be governed by the United States Arbitration Act, Title 9. U.S.C §1, et seq."

## IV.

## BACKGROUND

13.     Hartford provides various forms of insurance to businesses throughout the United States. One of the lines of insurance written by Hartford was "GAP" insurance for vehicles. GAP insurance generally provides insurance coverage for the monetary difference between the outstanding balance of a vehicle loan or lease and the actual cash value of that vehicle at the time of a covered loss to the vehicle.

14.     In or about October 2000, Hartford entered into an agreement retaining Evergreen to act as a Program Manager for its GAP Program effective in or about July 2000. Evergreen was an insurance brokerage firm located in Chester Springs, Pennsylvania and was licensed as an insurance agent by the Pennsylvania Department of Insurance.

15.     Evergreen acted as Hartford's Program Manager for its GAP Program from July 2000 until January 2003. Pursuant to its role as Hartford's Program Manager for the GAP Program, Evergreen entered into the PMA with Hartford.

-4-

16.    Pursuant to the PMA, Evergreen agreed to faithfully perform the following duties for Hartford: solicitation of business, servicing of business, binding of risks, policy issuance, notice of risks bound, quotation of premium rates, collection and remittance of premiums for GAP business written, timely accounting for GAP business, act as a fiduciary for Hartford, maintain the confidentiality of all documents generated in conducting Hartford's GAP Program, promote and safeguard the best interests of Hartford, and keep and maintain for as long as Hartford requires complete records and accounts of all GAP business and transactions pertaining to policies written under the Hartford GAP Program.

17.    The PMA required Evergreen to, inter alia, hold amounts collected under Hartford's GAP Program in a separate fiduciary trust account and further provided Hartford the right to seek an injunction to obtain monies not properly paid to Hartford pursuant to the PMA.

18.    Pursuant to Article IV of the PMA, Evergreen had no authority to handle claims except as set forth in a Claims Service Agreement ("CSA") between Hartford and Evergreen. Pursuant to the CSA, Evergreen was to have the authority and responsibility to provide claims services in connection with the GAP business underwritten by Hartford pursuant to the PMA. Under the CSA, such claims servicing included creation and maintenance of claims files, both hard copy and computer on-line files, and storage of such files.

19.    The Respondents materially breached their obligations under the PMA and CSA and their fiduciary duties owed to Hartford that arose out of those agreements.

20.    On January 10, 2003, Hartford terminated the PMA and specifically canceled Evergreen's right to underwrite new insurance (issue policies) on Hartford's behalf. However, pursuant to the CSA, Evergreen continued to have and provide certain duties and obligations under the PMA, including the charging, collection, receipt, accounting and reporting for all premiums collected on policies written under the agreement. Evergreen remained obligated to act as a fiduciary with respect to such premiums.

-5-

21.    On or about February 17, 2004, Evergreen served Hartford with a Demand for Arbitration as to the issue of proper premium remittance.

22.    On February 18, 2004, Hartford gave written notice that it was terminating its Claims Servicing Agreement with Evergreen effective February 25, 2004.

23.    On or about March 18, 2004, Evergreen, through its counsel, informed Hartford that Evergreen would commence dissolution proceedings, but that it would continue to maintain its offices and meet its obligations under the PMA and CSA. Evergreen failed to honor that representation. Instead, on or about April 8 or 9, 2004, Evergreen shut its doors. For all intents and purposes, Evergreen vanished and ignored its obligations to Hartford.

24.    On April 30, 2004, Hartford served a Demand for Arbitration against the Respondents. Evergreen agreed to arbitrate the dispute with Hartford.

V.

## THE ARBITRATION

25.    Arbitrators were selected pursuant to the procedures contained in the Arbitration Agreement. Hartford appointed Andrew S. Walsh, Esq. as its party arbitrator. Evergreen appointed Bernd G. Heinze, Esq. as its party arbitrator. Pursuant to the Arbitration Agreement, the party arbitrators appointed David Thirkill as umpire.

26.    On February 25, 2005, arbitrators Thirkill, Walsh, and Heinz (collectively, the "Arbitration Panel") convened to resolve disputes, initially, between Hartford Fire Insurance Company and The Evergreen Organization.

27.    On or about September 8, 2005, Hartford obtained an Order from this Court compelling the Principals to participate in the arbitration. A true and correct copy of this

-6-

Court's September 8, 2005 Order is attached hereto as Exhibit "C."[1]  Thereafter, the Principals were joined as parties to the arbitration.

28.    Prior to an arbitration hearing, the parties conducted extensive discovery, including many the taking of many depositions. Thereafter, during the period January 8, 2007 through January 12, 2007, Hartford and Respondents participated in an arbitration hearing (the "Arbitration") before the duly convened Panel. The parties participated in a fundamentally fair hearing, had the opportunity to be heard, present evidence and argue their claims. The parties also prepared and submitted extensive post-arbitration hearing briefs.

29.    On April 2, 2007, the Arbitration Panel issued its Interim Final Award (the "First Award") in favor of Hartford and against Respondents and specified the damages, excluding attorney's fees and costs, for which the Panel said it would entertain a motion by Petitioner. A true and correct copy of the First Award is attached hereto as Exhibit "D."

30.    Hartford submitted a motion for an award of attorney's fees and costs, which was fully briefed by all parties. Thereafter, on July 9, 2007, the Arbitration Panel issued a Second Interim Final Award (the "Second Award"), which awarded Hartford its attorney's fees and costs. A true and correct copy of the Second Award is attached hereto as Exhibit "E."

31.    On July 21, 2007, the Arbitration Panel issued an Amended Second Interim Final Order, which set forth a specific dollar amount of the attorney's fees and costs awarded to Hartford. A true and correct copy of the Panel's Amended Second Interim Final Award is attached hereto as Exhibit "F".

32.    Pursuant to the Arbitration Panel's orders, Hartford has been awarded $6,661,760.91 in damages, attorney's fees, and costs against Respondents and ordered such

---

[1] This Court thereafter affirmed its Order when it denied Respondents motion to vacate the Court's Order compelling arbitration. A true and copy of this Court's Order denying Respondent's motion to vacate is attached hereto as Exhibit "G."

monies to be paid within 30 days of the award.

33.    In June 2007, Evergreen paid Hartford $405,622.86, thereby leaving an unpaid balance of $6,256,138.10.

## VI.

## COUNT I

34.    Hartford incorporates by reference each and every allegation set forth in paragraphs 1 through 30, inclusive, as if fully set forth herein.

35.    Pursuant to 9 U.S.C. § 9, Hartford is entitled to judicial confirmation of Arbitration Panel's Awards.

36.    Pursuant to the Awards and 9 U.S.C. §9, Judgment should be entered in favor of Hartford and against Respondents.

## PRAYER FOR RELIEF

WHEREFORE, Hartford demands judgment granting the Petition and awarding the following relief:

(1)    An Order confirming the Awards issued by the Arbitration Panel; and

(2)    Any such other relief as this Court deems appropriate.

Date August 22, 2007:                    Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP

By:    /s/ James E. Fitzgerald
       James E. Fitzgerald (JF–5594)
       (A Member of the Firm)
       Michele Jacobson (MJ–4297)
       Seema Misra (SM–2094)
       *Attorneys for Hartford Fire Insurance Company*
       180 Maiden Lane
       New York, New York 10038-4982
       (212) 806-5400

-8-

# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Application of     )

HARTFORD FIRE INSURANCE COMPANY,     )

                Petitioner,     )

        -against-     )

THE EVERGREEN ORGANIZATION, INC.     )
CHARLES A. CARONIA, GARY UPHOUSE,     )
CHARLES CARONIA, JR., and ANDREJS     )
KRUTAINIS,     )

           Respondents.     )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 04-CV-3333(LAK)

[PROPOSED] JUDGMENT
CONFIRMING ARBITRATION
AWARD

The Petition to Confirm Arbitration Award (the "Petition") of Petitioner Hartford

Fire Insurance Company ("Petitioner") came on for hearing on _____, 2007, in the United

States District Court, Southern District of New York, the Honorable Lewis A. Kaplan, presiding,

appearances being made by counsel for Petitioner Hartford and counsel for Respondents The

Evergreen Organization, Inc., Charles A. Caronia and Gary Uphouse.

1

50363728

After considering the Petition, all papers submitted in support of the Petition, as well as all papers and pleadings submitted in this action and all other matters presented, and, good cause appearing therefore,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Final Arbitration Awards filed by the Arbitration Panel in the arbitration captioned <u>Hartford Fire Insurance Company v. The Evergreen Organization, Inc. et al.</u> is hereby confirmed.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED AND DECREED** that judgment is entered in favor of Hartford against:

(1)     Respondents Evergreen, Gary Uphouse and Charles A. Caronia, Sr. in the amount of $6,060,550.91; and

(2)     Respondents Gary Uphouse and Evergreen in the amount of $601,210.

Dated: _____, 2007

_____
United States District Judge

2

50363728

EXHIBIT J



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE KAPLAN

- - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Application of )
)
HARTFORD FIRE INSURANCE COMPANY, )
)
                              Petitioner, )
)
                              04 CV 3333
)
        -against- )                    VERIFIED PETITION
)
THE EVERGREEN ORGANIZATION, INC., )
CHARLES A. CARONIA, GARY UPHOUSE, )
CHARLES CARONIA, JR., and ANDREIS )
KRUTAINIS, )
)
                              Respondents. )
)
)
- - - - - - - - - - - - - - - - - - - - - - - - - - x

ECF CASE

RECEIVED
MAY 03 2004
U.S.D.C. S.D. N.Y.
CASHIERS

Petitioner Hartford Fire Insurance Company ("Hartford"), by its attorneys Stroock &
Stroock & Lavan LLP, hereby alleges as and for its Verified Petition as follows:

# I.

## INTRODUCTION

1.    Hartford wrote GAP insurance (the "GAP Program" or "Program") from July 2000 through early 2003. Respondent The Evergreen Organization, Inc. ("Evergreen") acted as Hartford's Program Manager and Claims Servicing Agent with regard to the administration of Hartford's GAP insurance business from July 2000 through February 24, 2004.

2.    Evergreen and its principals, Charles Caronia, Sr., Charles Caronia, Jr., Gary Uphouse, and Andrejs Krutainis (collectively, the "Principals") have materially breached obligations under the parties' Program Manager's Agreement ("PMA") and Claims Service Agreement ("CSA") and their fiduciary duties owed to Hartford that arise out of those agreements.

3.    Within the past two weeks, Evergreen has abruptly shut its doors and refused to continue to meet its most basic continuing obligations under the PMA and CSA. Recent actions by Evergreen and its Principals (collectively, "Respondents") – including, but not limited to, the complete failure of Evergreen and its Principals to meet their most basic continuing obligations under the PMA and CSA – have seriously damaged and jeopardized Hartford's operation of its GAP Program. The Respondents' conduct threatens to irreparably harm Hartford's Gap Program (as well as the thousands of consumers enrolled under policies issued under the Program) and erode the good will Hartford has spent years creating and maintaining. Hartford, on its own and through outside counsel, has attempted to obtain Evergreen's cooperation in an orderly transition of the GAP Business. However, Hartford's



requests have been ignored. Hartford therefore respectfully requests that this Court take immediate action to prevent the wrongful harm to Hartford and consumers nationwide.

4.      Based on the past conduct of the Respondents, the nature of the insurance business, and the large sums of money at issue, Hartford is entitled to immediate relief so that any future arbitration award is not ultimately rendered ineffectual – and so that consumers are not prevented from properly recovering on any possible covered claims they may have as enrollees in policies issued under Hartford's GAP Program. Thus, Hartford brings this special proceeding pursuant to Section 7502(c) of the New York CPLR seeking, in aid of arbitration, a temporary restraining order, preliminary injunction, and order of attachment that provides for the following:

(a)      That Evergreen establish a fiduciary account naming Hartford as the exclusive beneficiary, in which all amounts previously collected, or to be collected, for policies issued on behalf of Hartford are to be deposited, without offset of any kind;

(b)      That Respondents refrain from dissipating any assets prior to the entry of an award in arbitration;

(c)      That Respondents identify all assets, including bank and deposit accounts, held in Evergreen's name or otherwise in its possession, custody, or control;

(d)      Attaching Evergreen's assets to prevent further dwindling or encumbering of said assets prior to an award in arbitration;

(e)      That Respondents and Evergreen's officers, directors, agents, and affiliates provide Hartford and/or its duly authorized representatives with access to and copies of any and all records, books, bank account records (whether stored on paper or other media such as computer files or electronic mail) relating in any way to policies issued on behalf of Hartford, including but not limited to all files and records reflecting agreements and dealings between Evergreen and producers and sub-producers of GAP Business;

(f)      That Respondents and Evergreen's officers, directors, agents, and affiliates preserve any and all records, books or bank account records (whether stored on paper or other media such as computer files or electronic mail) relating in any way to policies issued on behalf of Hartford;

(g)      That Evergreen be required to maintain basic services (e.g., telephone answering service (not voicemail), daily transmittal of mail concerning Hartford's GAP Business to Hartford, etc.) for the benefit of Hartford and in support of its continuing obligations under the PMA and CSA; and

(h)      That such other and further relief be ordered as this Court may deem just and proper.

## II.

## PARTIES AND VENUE

5.      Hartford is, and at all relevant times herein was, a Connecticut corporation organized under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.

6.      Hartford is informed and believes, and thereon alleges, that Respondent Evergreen is, and at all relevant times was, a corporation organized under the laws of the State of Pennsylvania, with its principal place of business in Chester Springs, Pennsylvania.

7.      Hartford is informed and believes, and thereon alleges, that respondent Charles Caronia, Sr. is a resident of the State of Pennsylvania.

8.      Hartford is informed and believes, and thereon alleges, that respondent Charles Caronia, Jr. is a resident of the State of Pennsylvania.

9.      Hartford is informed and believes, and thereon alleges, that respondent Gary Uphouse is a resident of the State of Pennsylvania.

10.     Hartford is informed and believes, and thereon alleges, that respondent Andrejs Krutainis is a resident of the State of Pennsylvania.

11.     Respondents Charles Caronia, Sr., Charles Caronia, Jr., and Gary Uphouse are individuals who, at all times mentioned herein, acted as principals of Evergreen and officers and/or directors of Evergreen. Hartford is informed and believes and thereon alleges that Charles Caronia, Sr. owns 60% of the stock of Evergreen, and that Gary Uphouse owns 40% of



the stock of Evergreen. Andrejs Krutainis acted as a principal of Evergreen from 2001 to the present.

12.    Hartford is informed and believes, and thereon alleges, that each of the respondents named herein, at all times mentioned herein, were, and acted as, the alter egos and/or agents of the others. Each of the respondents is responsible in some manner for the events described herein, and is liable to Hartford for the damages it sustained.

13.    Pursuant to the PMA, the parties have commenced arbitration proceedings. The arbitration will be held at Hartford's offices in New York, New York.

14.    Jurisdiction exists by virtue of diversity of citizenship, pursuant to 28 U.S.C. §1332. The amount in controversy exceeds Seventy Five Thousand Dollars ($75,000), exclusive of interest and costs. Venue is proper in this judicial district under the forum selection clause of the parties' arbitration agreement.

## III.

## STATEMENT OF FACTS

15.    Hartford provides various forms of insurance to businesses throughout the United States. One of the lines of insurance written by Hartford is "GAP" insurance for vehicles. GAP insurance generally provides insurance coverage for the monetary difference between the outstanding balance of a vehicle loan or lease and the actual cash value of that vehicle at the time of a covered loss to the vehicle.

16.    Beginning in July 2000, Hartford retained Evergreen to act as its exclusive Program Manager for its GAP Program. Evergreen is an insurance brokerage firm located in Chester Springs, Pennsylvania and is licensed as an insurance agent by the Pennsylvania Department of Insurance.

17.    Evergreen has been Hartford's exclusive Program Manager for its GAP Program since July 2000. Pursuant to its role as Hartford's Program Manager for the GAP Program, Evergreen entered into the PMA with Hartford, a true and correct copy of which is attached hereto as Exhibit "A" and is incorporated by reference herein.

18.    Pursuant to the PMA, Evergreen agreed to faithfully perform the following duties for Hartford: solicitation of business, servicing of business, binding of risks, policy issuance, notice of risks bound, quotation of premium rates, collection and remittance of premiums for GAP business written, timely accounting for GAP business, act as a fiduciary for Hartford, maintain the confidentiality of all documents generated in conducting Hartford's GAP Program, promote and safeguard the best interests of Hartford, and keep and maintain for as long as Hartford requires complete records and accounts of all GAP business and transactions pertaining to policies written under the Hartford GAP Program. (See Article III of PMA, Ex. A.)

19.    The PMA requires Evergreen to hold amounts collected under Hartford's GAP Program in a separate fiduciary trust account and further provides Hartford the right to seek an injunction to obtain monies not properly paid to Hartford pursuant to the PMA. Specifically, Article III of the PMA provides as follows:

> K.    Fiduciary Capacity – Premium Trust Fund.    [Evergreen will] *act as a fiduciary for [Hartford] and to hold all premiums* and any other amounts collected and received on Policies for [Hartford] *in a fiduciary account separate and apart from all other funds of [Evergreen] or others* in a bank which is a member of the Federal Reserve System and insured by the Federal Deposit Insurance Corporation and which is approved in writing by [Hartford]. *The bank account shall be designated by [Evergreen] in such a manner as to clearly establish that [Evergreen] is holding and acting as trustee for [Hartford] with respect to the funds in the account.* (Emphases added.)

*    *    *



20.    The PMA requires that Evergreen shall permit Hartford to audit the books and records of Evergreen relating to the Hartford GAP Program.  Specifically, Article III of the PMA provides as follows:

> W.    Audit.    [Evergreen will] permit [Hartford] during the term of this Agreement and as frequently as [Hartford] considers necessary, to visit, inspect, examine, audit and verify, at [Evergreen's] offices or elsewhere, quarterly and at such additional times and as often as [Hartford] may deem appropriate, with or without prior notice, any of the properties, accounts, premium trust funds, files, documents, books, reports, work papers and other records belonging to or in the possession or control of [Evergreen] or of any other person relating to the Business covered by this Agreement. [Hartford] may make copies and extracts as may be reasonably necessary. [Hartford] may conduct any audit through any person or person it may designate. The Insurance Department of any state having jurisdiction over this Agreement shall have the right to exercise [Hartford's] rights of audit under this Section after consultation with the [Hartford].

21.    Pursuant to Article IV of the PMA, Evergreen has no authority to handle claims except as set forth in a Claims Service Agreement ("CSA") between Hartford and Evergreen.  A true and correct copy of the CSA is attached hereto as Exhibit "B" and is incorporated by reference herein.  Pursuant to the CSA, Evergreen is to have the authority and responsibility to provide claims service in connection with the GAP business underwritten by Hartford pursuant to the PMA.  Under the CSA, such claims servicing includes creation and maintenance of claims files, both hard-copy and computer on-line files, and storage of such files.

22.    The CSA provides that all files concerning the claims handled by Evergreen shall be and remain the property of Hartford. (Article V-B of CSA.) The CSA further provides that all files concerning claims shall be made available to Hartford for any purpose and that Hartford may inspect and audit Evergreen's records "with respect to any matter covered by this Agreement." (Article V-C and IX-G, respectively, of CSA.)

23.    On or about January 10, 2003, Hartford terminated the PMA and specifically canceled Evergreen's right to underwrite new insurance (issue policies) on behalf of Hartford. However, pursuant to the CSA, Evergreen continued to have and provide certain duties and obligations under the PMA, including the charging, collection, receipt, accounting and reporting for all premiums collected on policies written under the agreement. Evergreen remained obligated to act as a fiduciary with respect to such premiums. (Article XIV, "Continuing Duties of Manager After Termination," PMA.)

24.    Hartford's GAP Program, administered through Evergreen, includes insurance written in almost all states in the United States. Hartford is required to investigate, process, and pay covered claims and to comply with the state regulations in each state in which it has its insurance issued. In order to properly fulfill its obligations to insureds, consumers, and state regulators, Hartford must have access to the books and records pertaining to the issuance of policies and the claims made thereunder so that it can properly account for policies and continue to process and pay claims thereunder. Hartford has had to rely on Evergreen for its records, and particularly the source documents regarding issuance of GAP policies, enrollments thereunder and claims (closed, open and pending).

25.    In August 2003, Hartford retained the independent auditing firm of Smart & Associates ("Smart") to inspect, review, and audit Evergreen's books, records, and files relating to the GAP business managed by Evergreen for Hartford. This inspection and audit has included review of underwriting records and files, premium reports, and closed and open/pending claims files and documentation. Smart developed a team of audit personnel who visited the Evergreen offices in Frazer, Pennsylvania on a daily basis and performed independent audit reviews at Evergreen's offices.

26.    Part of the audit services Hartford requested Smart to perform involved the inspection and inventory of closed Hartford Gap claims, which are located in Evergreen's offsite storage units and its offices in Frazer, Pennsylvania, so as to reconcile the claims with underwriting and premium remittance files.

27.    Many of Hartford's own files regarding its GAP Business, and particularly those relating to policies issued in 2000 and 2001, were located at Hartford's offices in 7 World Trade Center, which was destroyed in the September 11, 2001 World Trade Center tragedy. Hartford has therefore relied on Evergreen's obligation to maintain its files and make them available as needed to process claims and run Hartford's GAP business.

28.    On January 15, 2004, Hartford, through its wholly-owned subsidiary, Twin City Fire Insurance Company, instituted an action in the United States District Court for the Central District of California against Mitsubishi Motor Credit of America, Inc. ("MMCA"). That case involves claims by Hartford against MMCA regarding the issuance of a GAP policy underwritten by Evergreen for Twin City and thousands of claims made under that policy. Hartford's prosecution of that case requires the use and access to underwriting and claims files maintained by Evergreen so that Federal Rule 26 disclosures and anticipated discovery can be properly handled. Evergreen's refusal to allow full access to its files by Hartford and its auditors will seriously jeopardize Hartford's (and Twin City's) preparation and prosecution of that case, as well as compliance with the disclosure and discovery requirements thereunder.

29.    On January 29, 2004, Evergreen notified Hartford that it was retaining certain premium funds due Hartford for enrollments under GAP policies as an "offset" for fees it claimed it was owed from Hartford. Hartford immediately demanded that Evergreen remit the




proper premiums and warned Evergreen that the withholding of premiums was a clear breach of the PMA.

30.    On February 5, 2004, Evergreen gave written notice to Hartford that it was canceling its agreements with Hartford.

31.    Hartford has been advised by the Smart representatives that, on or about February 11, 2004, Charles Caronia, Jr., the Evergreen Claims Manager informed the Smart auditors that the underwriting and business records relating to the GAP business would not be made available for Smart to review.

32.    On or about February 17, 2004, instead of returning to Hartford the proper premiums it had "offset" with its January 29, 2004 remittance, Evergreen served Hartford with a Demand for Arbitration as to the issue of proper premium remittance.

33.    On February 18, 2004, Hartford gave written notice that it was terminating its Claims Servicing Agreement with Evergreen effective February 25, 2004.  Hartford immediately thereafter notified all producers and sub-producers that: (1) Evergreen was no longer authorized by Hartford to receive or accept any applications for insurance, enrollments pertaining to existing policies, GAP waivers, or any other documentation relating to Hartford policies; (2) Evergreen was no longer authorized to bind coverage, issue certificates or policies of insurance, or obligate Hartford in any way; (3) all remittances for premiums or other sums due and/or owing pursuant to any policies or accounts written under the Hartford Gap Program should be sent to Hartford's new representative, Lee & Mason Financial Services, Inc.; (4) Evergreen was no longer authorized to act on behalf of Hartford with respect to any claims made under Hartford policies; and (5) notice of claims, or communication of any kind with regard to claims under Hartford policies, should be forwarded directly to Lee & Mason.



34.    On or about February 26, 2004, Evergreen notified Hartford that it was retaining additional premium funds due Hartford for enrollments under GAP policies as an "offset" for fees it claimed it was owed from Hartford.  Like its remittance at the end of January 2004, Evergreen's conduct in remitting less than the full premium remittance due Hartford was a direct and intentional violation of Evergreen's obligations under the PMA.  Evergreen's counsel has indicated to Hartford that this "offset" would be included within Evergreen's February 17, 2004 Demand for Arbitration.  Hartford is informed and believes that there are additional premiums due from Evergreen and that it has failed to remit them to Hartford or even notify Hartford what amounts are due.

35.    Evergreen has refused, and continues to refuse, to fully cooperate with Hartford in transferring all files relating to Hartford's GAP business to Lee & Mason and/or Hartford as necessary for the timely and orderly administration of Hartford's GAP business.

36.    Hartford is informed and believes and thereon alleges that Hartford is the only insurer for whom Evergreen handles GAP business.

37.    On or about March 18, 2004, Evergreen, through its counsel, informed Hartford that Evergreen was going to commence dissolution proceedings, but that it would continue to maintain its offices and meet its obligations under the PMA and CSA.  Evergreen has failed to honor that representation.  Instead, on or about April 8 or 9, 2004, Evergreen shut its doors and has failed to maintain the most basic services (e.g., mail delivery, telephone receptionist).  For all intents and purposes, Evergreen has vanished and ignored its continuing obligations to Hartford.

38.    On or about April 30, 2004, Hartford served Evergreen with a Demand for Arbitration.



## IV.

## HARTFORD IS ENTITLED TO THE PROVISIONAL RELIEF IT SEEKS

39.    New York CPLR 7502(c) states in pertinent part that:

> The supreme court in the county in which an arbitration is pending...may entertain an application for an order of attachment or for a preliminary injunction in connection with an arbitrable controversy, but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief.

N.Y.C.P.L.R. 7502(c).

40.    Based on the affidavits and affirmation submitted in support of this Verified Petition, Hartford is entitled to injunctive relief. Evergreen has breached its contractual and fiduciary obligations under the Agreements, including but not limited to Evergreen's obligation to: (1) remit premiums to Hartford within 30 days after the end of each reporting month; (2) preserve amounts received on Hartford's GAP Program for payment to Hartford in a separate fiduciary trust account for Hartford's benefit; (3) allow Hartford access to all of Evergreen's records relating to Hartford's GAP Program; and (4) timely and properly administer claims made relating to Hartford's GAP Program.

41.    Hartford is entitled to the protection provided for in the Program Manager's Agreement to ensure that the millions of dollars Evergreen has collected for policies issued on behalf of Hartford will not be dissipated when it ultimately prevails on its claims at the arbitration hearing.

42.    By granting an order forbidding Evergreen from dissipating its assets – and further compelling Evergreen to establish a fiduciary account for the sole benefit of Hartford and requiring Evergreen to deposit, in cash and without any offset, any amounts previously collected, currently due, or about to become due on policies written on Hartford's behalf –



between now and the arbitration award, the Court will create a fund that gives Hartford the assurance to which it is entitled under the contract as well as controlling fiduciary principles.

43.     As for permitting Hartford full access to Evergreen's files, the equities lie in Hartford's favor since Evergreen has already been compensated for its obligation to provide the information, and because it will not disrupt Evergreen's business to fulfill that obligation. If Evergreen cooperates, Hartford's investigation and copying can be completed very quickly. It is critical to Hartford – and insureds and their enrollees under Hartford GAP Policies – that the requested information be delivered as soon as possible to Hartford so that it can continue the proper processing of claims and the administration of Hartford's GAP insurance program. Issues concerning the payment of monies, underwriting, and administration under the parties' Agreements will ultimately be determined by the arbitration panel. However, until such a determination is made, Hartford is entitled to the protection provided for in the PMA such as permitting inspection of Evergreen's records to ensure that there is no violation of applicable state insurance laws and regulations and so that Hartford can respond adequately to claims under the Hartford GAP Policies.

44.     By granting an order compelling Evergreen to permit an immediate inspection of its records, this Court will ensure that the arbitration award that Hartford will receive at the conclusion of the arbitration will not be rendered ineffectual.

45.     Hartford, along with customers, policyholders, producers, and sub-producers, will suffer irreparable harm if Evergreen is allowed to dissipate all funds it received under GAP Policies prior to an award in arbitration.

46.     Hartford, along with customers, policyholders, producers, and sub-producers, will also suffer irreparable harm if Hartford is not allowed full access to Evergreen's files

regarding Hartford's GAP business so Hartford can properly verify underwriting information, enrollments under GAP policies, premium remittances, and claims files documentation. Moreover, Hartford will suffer irreparable harm to its relationships and reputation with state regulators and departments of insurance if it is stymied in its efforts to perform its auditing functions and claims processing obligations by not having full access to the files regarding its GAP business in the possession of Evergreen.

47.    Hartford has no adequate remedy at law.

48.    Hartford has made no prior application for the relief requested herein.

WHEREFORE, it is respectfully requested that this Court grant an order, pending issuance of an arbitration award, that provides as follows:

(a)    That Evergreen establish a fiduciary account naming Hartford as the exclusive beneficiary, in which all amounts previously collected, or to be collected, for policies issued on behalf of Hartford are to be deposited, without offset of any kind;

(b)    That Respondents refrain from dissipating any assets prior to the entry of an award in arbitration;

(c)    That Respondents identify all assets, including bank and deposit accounts, held in Evergreen's name or otherwise in its possession, custody, or control;

(d)    Attaching Evergreen's assets to prevent further dwindling or encumbering of said assets prior to an award in arbitration;

(e)    That Respondents and Evergreen's officers, directors, agents, and affiliates provide Hartford and/or its duly authorized representatives with access to and copies of any and all records, books, bank account records (whether stored on paper or other media such as computer files or electronic mail) relating in any way to policies issued on behalf of Hartford, including but not limited to all files and records reflecting agreements and dealings between Evergreen and producers and sub-producers of GAP Business;

(f)    That Respondents and Evergreen's officers, directors, agents, and affiliates preserve any and all records, books or bank account records (whether stored on paper or other media such as computer files or electronic mail) relating in any way to policies issued on behalf of Hartford;

 

  (g) That Evergreen be required to maintain basic services (e.g., telephone answering service (not voicemail), daily transmittal of mail concerning Hartford's GAP Business to Hartford, etc.) for the benefit of Hartford and in support of its continuing obligations under the PMA and CSA; and

  (h) That such other and further relief be ordered as this Court may deem just and proper.

Date: April 30, 2004       Respectfully submitted,

           STROOCK & STROOCK & LAVAN LLP

           By: _James E. Fitzgerald_
             James E. Fitzgerald (JF–5594)
             (A Member of the Firm)
             Michele Jacobson (MJ–4297)
             Seema Misra (SM–2094)
           *Attorneys for Hartford Fire Insurance Company*
           180 Maiden Lane
           New York, New York 10038-4982
           (212) 806-5400



## VERIFICATION

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )

Vincent A. Vitiello, II, being duly sworn, deposes and says:

I am the Vice-President of Claims for Hartford Financial Products, a division of Petitioner Hartford Fire Insurance Company. I have read the foregoing Verified Petition and know the contents thereof. The same is true to my own knowledge, except as to the matters stated therein to be alleged upon information and belief, and as to those matters I believe them to be true.

Sworn to before me this
30th day of April, 2004

_____
Vincent A. Vitiello, II

_____
Notary Public

50245121v3