# EXHIBIT K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Application of        )
                                           )
HARTFORD FIRE INSURANCE COMPANY,           )
                                           )
                         Petitioner,       )    No. 04-CV-3333 (LAK)
                                           )
                                           )
           -against-                       )    **PETITION TO COMPEL**
                                           )    **ARBITRATION**
THE EVERGREEN ORGANIZATION, INC.,          )
CHARLES A. CARONIA, GARY UPHOUSE,          )
CHARLES CARONIA, JR., and ANDREJS          )
KRUTAINIS,                                 )
                                           )
                        Respondents.       )
                                           )
                                           )
                                           )
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

Petitioner Hartford Fire Insurance Company ("Hartford"), through its attorneys Stroock & Stroock & Lavan LLP, by way of petition to compel Charles A. Caronia, Gary Uphouse, Charles Caronia, Jr., and Andrejs Krutainis (collectively the "Principals") to submit to arbitration, hereby alleges as follows:

# I.
## INTRODUCTION

1.  Hartford wrote GAP insurance (the "GAP Program" or "Program") from July 2000 through early 2003. Respondent The Evergreen Organization, Inc. ("Evergreen") acted as Hartford's Program Manager and Claims Servicing Agent with regard to the administration of Hartford's GAP insurance business from July 2000 through February 24, 2004.

2.  Evergreen and its principals, Charles Caronia, Sr., Charles Caronia, Jr., Gary Uphouse, and Andrejs Krutainis (collectively, the "Principals") materially breached obligations under the parties' Program Manager's Agreement ("PMA") and Claims Service Agreement ("CSA") and their fiduciary duties owed to Hartford that arise out of those agreements.

3.  On April 8, 2004, Evergreen abruptly shut its doors and refused to continue to meet its most basic continuing obligations under the PMA and CSA. The conduct of Evergreen and its Principals (collectively, "Respondents") seriously damaged and jeopardized Hartford's operation of its GAP Program. The Respondents' conduct irreparably harmed Hartford's GAP Program (as well as the thousands of consumers enrolled under policies issued under the Program) and eroded the good will Hartford spent years creating and maintaining. As a result of Respondents' conduct, Hartford has been damaged in the amount of at least $10,000,000.

4.  On April 30, 2004, Hartford served a Demand for Arbitration against the Respondents. Evergreen has agreed to arbitrate the dispute with Hartford. However, the Principals have refused to submit the dispute to arbitration.

## II.
## PARTIES AND VENUE

5.    Hartford is, and at all relevant times herein was, an Indiana corporation organized under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut.

6.    Hartford is informed and believes, and thereon alleges, that Respondent Evergreen was at all relevant times a corporation organized under the laws of the State of Pennsylvania, with its principal place of business in Chester Springs, Pennsylvania.

7.    Hartford is informed and believes, and thereon alleges, that respondent Charles Caronia, Sr. ("Caronia Sr.") is a citizen of the State of Pennsylvania.

8.    Hartford is informed and believes, and thereon alleges, that respondent Charles Caronia, Jr. ("Caronia Jr.") is a citizen of the State of Pennsylvania.

9.    Hartford is informed and believes, and thereon alleges, that respondent Gary Uphouse ("Uphouse") is a citizen of the State of Pennsylvania.

10.    Hartford is informed and believes, and thereon alleges, that respondent Andrejs Krutainis ("Krutainis") is a citizen of the State of Pennsylvania.

11.    Hartford is informed and believes, and thereon alleges, that each of the respondents named herein, at all times mentioned herein, were, and acted as, the alter egos and/or agents of the others. Each of the respondents is responsible in some manner for the events described herein, and is liable to Hartford for the damages it sustained.

-3-

12.     Pursuant to the PMA, Hartford commenced arbitration proceedings against Evergreen and the Principals. The arbitration will be held at Hartford's offices in New York, New York. The Principals have refused to arbitrate the dispute.

13.     Jurisdiction exists by virtue of diversity of citizenship, pursuant to 28 U.S.C. §1332. The amount in controversy exceeds Seventy Five Thousand Dollars ($75,000), exclusive of interest and costs. Venue is proper in this judicial district under the forum selection clause of the parties' arbitration agreement.

### III.
### AGREEMENTS AND ARBITRATION PROVISION

14.     Hartford provides various forms of insurance to businesses throughout the United States. One of the lines of insurance written by Hartford was "GAP" insurance for vehicles. GAP insurance generally provides insurance coverage for the monetary difference between the outstanding balance of a vehicle loan or lease and the actual cash value of that vehicle at the time of a covered loss to the vehicle.

15.     In or about October 2000, Hartford entered into an agreement retaining Evergreen to act as a Program Manager for its GAP Program effective in or about July 2000. Evergreen was an insurance brokerage firm located in Chester Springs, Pennsylvania and was licensed as an insurance agent by the Pennsylvania Department of Insurance.

16.     Evergreen acted as Hartford's Program Manager for its GAP Program from in or about July 2000 until on or about January 10, 2003. Pursuant to its role as Hartford's Program Manager for the GAP Program, Evergreen entered into the PMA with Hartford, a true and correct copy of which is attached hereto as Exhibit "A" and is incorporated by reference herein.

17.    Pursuant to the PMA, Evergreen agreed to faithfully perform the following duties for Hartford: solicitation of business, servicing of business, binding of risks, policy issuance, notice of risks bound, quotation of premium rates, collection and remittance of premiums for GAP business written, timely accounting for GAP business, act as a fiduciary for Hartford, maintain the confidentiality of all documents generated in conducting Hartford's GAP Program, promote and safeguard the best interests of Hartford, and keep and maintain for as long as Hartford requires complete records and accounts of all GAP business and transactions pertaining to policies written under the Hartford GAP Program. (See Article III of PMA, Ex. A.)

18.    The PMA required Evergreen to hold amounts collected under Hartford's GAP Program in a separate fiduciary trust account and further provided Hartford the right to seek an injunction to obtain monies not properly paid to Hartford pursuant to the PMA.

19.    Pursuant to Article IV of the PMA, Evergreen had no authority to handle claims except as set forth in a Claims Service Agreement ("CSA") between Hartford and Evergreen. A true and correct copy of the CSA is attached hereto as Exhibit "B" and is incorporated by reference herein. Pursuant to the CSA, Evergreen was to have the authority and responsibility to provide claims service in connection with the GAP business underwritten by Hartford pursuant to the PMA. Under the CSA, such claims servicing included creation and maintenance of claims files, both hard-copy and computer on-line files, and storage of such files.

20.    Pursuant to Article XVIII of the PMA ("Arbitration Provision"), all disputes that arose under the PMA were required to be submitted to arbitration. Specifically, the Arbitration Provision in the PMA states in relevant part:

> Arbitration  A. Submission to Arbitration.  In the event of any dispute between the Company and the Manager with reference to the interpretation, application, formation, enforcement or validity of this Agreement or any other agreement between them, or their rights with respect to any transaction involved, whether such dispute arises before or after termination of this Agreement, such dispute, upon written request of either party, shall be submitted to the decision of a board of arbitration composed of two arbitrators and an umpire meeting at the Company's offices in New York unless otherwise mutually agreed.  Notwithstanding the generality of the foregoing, the Company's right to exercise any of the options contained in ARTICLES XII., XIII., or XVI. shall not be limited by the submission of any dispute to arbitration.
>
> B.      Sole Remedy.  The parties agree that arbitration pursuant to the terms of this Article is the sole remedy for the resolution of disputes between them under this Agreement or any other agreement between them.  The board of arbitration will have complete and exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability, and shall only conduct the arbitration proceeding to resolve disputes between the parties to the Agreement, and not as a class action involving other parties.

21.    The Arbitration Provision also states, "The Arbitration shall be governed by the United States Arbitration Act, Title 9. U.S.C §1, et seq."

22.    On January 29, 2004, Evergreen notified Hartford that it was retaining certain premium funds due Hartford for enrollments under GAP policies as an "offset" for fees it claimed it was owed from Hartford.  Hartford immediately demanded that Evergreen remit the proper premiums and warned Evergreen that the withholding of premiums was a clear breach of the PMA.

-6-

23.    On February 5, 2004, Evergreen gave written notice to Hartford that it was canceling the CSA with Hartford.

24.    On or about February 17, 2004, instead of returning to Hartford the proper premiums it had "offset" with its January 29, 2004 remittance, Evergreen served Hartford with a Demand for Arbitration as to the issue of proper premium remittance.

25.    On February 18, 2004, Hartford gave written notice that it was terminating its Claims Servicing Agreement with Evergreen effective February 25, 2004.

26.    On or about March 18, 2004, Evergreen, through its counsel, informed Hartford that Evergreen would commence dissolution proceedings, but that it would continue to maintain its offices and meet its obligations under the PMA and CSA. Evergreen failed to honor that representation. Instead, on or about April 8 or 9, 2004, Evergreen shut its doors. For all intents and purposes, Evergreen vanished and ignored its obligations to Hartford.

## IV.
## BREACH OF THE AGREEMENTS

27.    Evergreen repeatedly failed to honor its obligations under the PMA, including its duties to produce business in accordance with the terms of the PMA and oversee and monitor the business generated under the agreement.

28.    For instance, Evergreen failed to monitor enrollments to ensure that they provided the necessary information and meet the requirements of the GAP program. Thousands of enrollments were accepted and processed that did not comply with Hartford underwriting guidelines.

29.    Evergreen breached its claims handling duties under the CSA.

30.    Evergreen breached the PMA by failing to provide Hartford with any evidence that Evergreen ever created or maintained a fiduciary trust account.  Instead, in remitting amounts collected on Hartford's GAP insurance business, Evergreen tendered payment to Hartford from several checking accounts maintained by Evergreen at PNC Bank.  Because it appears Evergreen took no action to ensure amounts collected on Hartford's behalf were deposited into one single, separate, fiduciary account, Hartford believes Evergreen commingled amounts held in trust for Hartford with Evergreen's general operating funds.

31.    On May 4, 2004, Hartford filed with this Court a Motion For A Temporary Restraining Order, Preliminary Injunction, and Attachment Order in Aid of Arbitration requesting that the Court freeze the assets of Evergreen and the Principals and order Evergreen to provide Hartford with access to its books and records.

32.    On May 14, 2005, Evergreen and the Principals filed oppositions to Hartford's motion in this Court.

33.    On June 8, 2004, the Court granted Hartford's motion and ordered that: (1) Evergreen establish a fiduciary account naming Hartford as the exclusive beneficiary; (2) Evergreen and the Principals not transfer or assign any assets of Evergreen; (3) Evergreen and the Principals identify to Hartford all assets held in Evergreen's name; (4) Evergreen's assets be attached up to the amount of $700,000; (5) Evergreen provide Hartford access to its books and records relating to policies issued on behalf of Hartford; and (6) Evergreen preserve all books and records relating to policies issued on behalf of Hartford.  The Court found that Evergreen had diverted Hartford trust fund assets of at least $700,000.  The Court further noted

-8-

that at least $400,000 of the $700,000 was missing since Evergreen claimed to have only about $300,000 left in its bank accounts.

## V.
## THE PRINCIPALS' OBLIGATION TO ARBITRATE THE DISPUTE

34.    Respondents Charles Caronia, Sr., Charles Caronia, Jr., and Gary Uphouse are individuals who, at all times mentioned herein, acted as principals of Evergreen and officers and/or directors of Evergreen. Hartford is informed and believes, and thereon alleges, that Charles Caronia, Sr. owned 60% of the stock of Evergreen, and that Gary Uphouse owned 40% of the stock of Evergreen. Hartford is informed and believes, and thereon alleges, that Andrejs Krutainis acted as a principal of Evergreen beginning in or about February 2002 and essentially ran the underwriting side of Evergreen from that time until April 2004 when Evergreen ceased doing business. Hartford is informed and believes, and thereon alleges, that Charles Caronia, Jr. acted as a principal of Evergreen beginning in or about late 2001 and essentially ran the claims administration side of Evergreen from that time until April 2004 when Evergreen ceased doing business.

35.    Hartford is informed and believes, and thereon alleges, that Charles Caronia, Sr., Gary Uphouse, Charles Caronia, Jr., and Andrejs Krutainis, as principals and officers of Evergreen, were responsible for executing the terms of the PMA and CSA on a day-to-day basis and performed all duties and responsibilities thereunder.

36.    Hartford is informed and believes, and thereon alleges, that Charles Caronia, Sr., Gary Uphouse, Charles Caronia, Jr., and Andrejs Krutainis received large bonuses as a result of acting as principals and officers of Evergreen. Hartford is informed and believes, and thereon

-9-

alleges, that each of the respondents named herein operated, dominated and controlled Evergreen such that Evergreen was run for their personal benefit and thereby became their alter ego.

37.    Caronia Sr. was Chairman of the Board and Chief Executive Officer of Evergreen. Hartford retained Evergreen, in part, based on Caronia Sr.'s experience and reputation in the insurance business.

38.    Uphouse was the Chief Operating Officer and President of Evergreen, and the second shareholder of Evergreen. Hartford was advised that Uphouse was responsible for overseeing Evergreen's business and was the main point of contact for Hartford.

39.    In or about September 2000, Krutainis was hired by Hartford and was involved in the underwriting of GAP insurance at Hartford. Krutainis was hired as Executive Vice-President by Evergreen in or about February 2002. In or about February 2002, Krutainis replaced Gary Uphouse as Chief Operating Officer at Evergreen.

40.    Caronia Jr. was Vice-President of Claims at Evergreen. Hartford was advised that Caronia Jr. was in charge of overseeing all aspects of Evergreen's claims handling on behalf of Hartford.

41.    In or about May 2004, Hartford was informed that, despite collecting millions of dollars in premiums for the benefit of Hartford, Evergreen had virtually no assets. Hartford was informed that Evergreen had approximately $360,000 spread out over three separate bank accounts and that the sums in those accounts, and other sums previously diverted to the Principals, was owed to Hartford as premium trust funds.

-10-

42.    Hartford is informed and believes, and thereon alleges, that Evergreen failed to remit millions of dollars in premiums that were collected while the PMA and CSA were in effect. Hartford is informed and believes, and thereon alleges, that during the periods of times that that PMA and CSA were in effect, the Principals diverted millions of dollars of Hartford trust funds to themselves for their own personal use and benefit.

## VI.
## DEMAND FOR ARBITRATION AND PRINCIPALS' REFUSAL TO ARBITRATE

43.    On or about April 30, 2004, Hartford served Evergreen and the Principals with a Demand for Arbitration.

44.    Hartford's arbitration demand convened an arbitration panel in New York, New York, and demanded that Evergreen and the Principals appoint an arbitrator within thirty (30) days after receipt of the demand.

45.    Hartford appointed Andrew S. Walsh, Esq. as its party arbitrator on or about April 30, 2004.

46.    On or about July 19, 2004, Evergreen served its Response to The Arbitration Demand Submitted by Hartford Fire Insurance Company.

47.    Evergreen appointed Bernd G. Heinze, Esq. as its party arbitrator.

48.    Pursuant to the arbitration provision in the PMA, the party arbitrators appointed David Thirkill as umpire.

49.    On February 25, 2005, Hartford and Evergreen participated in an Organizational Meeting in the arbitration with the party arbitrators and umpire. The umpire issued a scheduling order for the arbitration and ordered the parties to commence with discovery.

50.     The Principals have refused to submit the dispute to arbitration and have asserted that the Arbitration Provision does not apply to them.

51.     The Principals have not appointed an arbitrator and have failed and refused to comply with the demand.

52.     Hartford advised the arbitration panel that it was planning on filing a Petition with the Court to compel the Principals to arbitrate the dispute with Hartford. Accordingly, the arbitration panel has stayed the arbitration pending the outcome of this Court's decision regarding the Petition.

53.     Pursuant to 9 U.S.C. § 4, Hartford is entitled to an Order by this Court compelling the Principals to arbitrate the underlying dispute.

## VII.
### PRAYER FOR RELIEF

WHEREFORE, it is respectfully requested that this Court grant Hartford's petition and:

(a)     Compel the Principals to submit to the arbitration that was commenced by Hartford against Evergreen on or about April 30, 2004;

(b)     Award Hartford its attorneys fees and costs associated with bringing this Petition to Compel Arbitration;

(c)     Award Hartford any and all other relief that the Court deems just and proper.

Date:   August 10, 2005

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP

By: _____/s/_____
    Kamilla Chaudhery  (KC-9635)
    James E. Fitzgerald (JF–5594)
    Adam S. Ross (AR–3671)

*Attorneys for Hartford Fire Insurance Company*
180 Maiden Lane
New York, New York 10038-4982
(212) 806-5400

-13-

# EXHIBIT L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Application of )

         )

HARTFORD FIRE INSURANCE COMPANY, )

         )

                Petitioner, )

         )

         )

         )

      -against- )

         )

THE EVERGREEN ORGANIZATION, INC., )
CHARLES A. CARONIA, GARY UPHOUSE, )
CHARLES CARONIA, JR., and ANDREJS )
KRUTAINIS, )

         )

                Respondents. )

         )

         )

         )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF VINCENT A. VITIELLO II IN SUPPORT OF HARTFORD'S MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND ATTACHMENT ORDER IN AID OF ARBITRATION

I, Vincent A. Vitiello II, declare as follows:

1.      I am the Vice President of Claims for Hartford Financial Products, a division of

Petitioner Hartford Fire Insurance Company ("Hartford") in this matter. I am one of the persons

at Hartford that is responsible for the administration of the Hartford GAP Program. I am also an

attorney duly licensed to practice law in the State of New Jersey, and have been so licensed since

1980. If called as a witness in this matter, I could and would competently testify to the following facts, all of which are within my personal, first-hand knowledge.

## The Parties and Their Agreements

2.      Hartford provides various forms of insurance to businesses throughout the United States. One of the lines of insurance written by Hartford is "GAP" insurance for vehicles. GAP insurance generally provides insurance coverage for the monetary difference between the outstanding balance of a vehicle loan or lease and the actual cash value of that vehicle at the time of a covered loss to the vehicle.

3.      Beginning in July 2000, Hartford retained The Evergreen Organization, Inc. ("Evergreen") to act as its exclusive program manager for its GAP business. Evergreen is an insurance brokerage firm located in Chester Springs, Pennsylvania and has advised Hartford that it is licensed as an insurance agent by the Pennsylvania Department of Insurance.

4.      Evergreen has been Hartford's exclusive program manager for GAP business since July 2000. Evergreen entered into a PMA ("PMA") with Hartford. A true and correct copy of the PMA is attached to this affidavit as Exhibit "A" and is incorporated by reference herein.

5.      Pursuant to the PMA, Evergreen agreed to faithfully perform the following duties for Hartford: solicitation of business; servicing of business; binding of risks; policy issuance; noticing of risks bound; quotation of premium rates; collection and remittance of premiums for GAP business written; timely accounting for GAP business; acting as a fiduciary for Hartford; maintaining the confidentiality of all documents generated in conducting Hartford's GAP business; promoting and safeguard the best interests of Hartford; and keeping and maintaining, for as long as Hartford requires, complete records and accounts of all GAP business and

transactions pertaining to policies written under the Hartford GAP Program. (See PMA, Article III, attached as Exhibit "A" hereto.)

6.    The PMA requires Evergreen to hold amounts collected under Hartford's GAP Program in a separate fiduciary trust account and further provides Hartford the right to seek an injunction to obtain monies not properly paid to Hartford pursuant to the agreement. Specifically, Article III of the PMA requires Evergreen:

> K.    <u>Fiduciary Capacity – Premium Trust Fund</u>.   *To act as a fiduciary for [Hartford] and to hold all premiums* and any other amounts collected and received on Policies for [Hartford] *in a fiduciary account separate and apart from all other funds of [Evergreen] or others* in a bank which is a member of the Federal Reserve System and insured by the Federal Deposit Insurance Corporation and which is approved in writing by [Hartford].  The bank account shall be designated by [Evergreen] in such a manner as to clearly establish that [Evergreen] is holding and acting as trustee for [Hartford] with respect to the funds in the account. (Emphases added.)

7.    The PMA also requires that Evergreen shall permit Hartford to audit the books and records of Evergreen relating to the Hartford GAP business.  Specifically, the PMA provides in Article III:

> W.    <u>Audit</u>.   To permit [Hartford] during the term of this Agreement and as frequently as [Hartford] considers necessary, to visit, inspect, examine, audit and verify, at [Evergreen's] offices or elsewhere, quarterly and at such additional times and as often as [Hartford] may deem appropriate, with or without prior notice, any of the properties, accounts, premium trust funds, files, documents, books, reports, work papers and other records belonging to or in the possession or control of [Evergreen] or of any other person relating to the Business covered by this Agreement. [Hartford] may make copies and extracts as may be reasonably necessary. [Hartford] may conduct any audit through any person or person it may designate. The Insurance Department of any state having jurisdiction over this Agreement shall have the right to exercise [Hartford's] rights of audit under this Section after consultation with the [Hartford].

8.    Pursuant to Article IV of the PMA, Evergreen has no authority to handle claims except as set forth in a CSA (the "CSA") between Hartford and Evergreen. A true and correct copy of the CSA is attached as Exhibit "B" to this affidavit and is incorporated by reference herein. Pursuant to the CSA, Evergreen had the authority and responsibility to provide claims services in connection with the GAP business underwritten by Hartford pursuant to the PMA. Under the CSA, such claims servicing includes creation and maintenance of claims files, both hard-copy and computer on-line files, and storage of such files.

9.    The CSA provides that all files concerning the claims handling by Evergreen are, and shall remain, the property of Hartford. (CSA, Article V.B, Ex. "B.") The CSA further provides that all files concerning claims shall be made available to Hartford for any purpose and that Hartford may inspect and audit Evergreen's records "with respect to any matter covered by this Agreement" between Hartford and Evergreen. (CSA, Articles V-C and IX-G, respectively, Ex. "B.")

## Termination of the Parties' Agreements

10.    On or about January 10, 2003, Hartford terminated the PMA, specifically terminating Evergreen's right to underwrite new insurance on behalf of Hartford. However, and pursuant to the PSA, Evergreen continued to have and provide certain duties and obligations under the PMA, including the charging, collection, receipt, accounting, and reporting for all premiums collected on policies written under the agreement. Evergreen remained obligated to act as a fiduciary with respect to such premiums. (PMA, Article XIV, "Continuing Duties of Manager After Termination," Ex. "A.")

11.    In August 2003, Hartford retained the independent auditing firm of Smart & Associates ("Smart") to inspect, review, and audit Evergreen's books, records, and files relating to the GAP business managed by Evergreen for Hartford. This inspection and audit has included

review of underwriting records and files, premium reports, and closed and open/pending claims files and documentation.

12.    I have been one of the persons on behalf of Hartford who has provided instruction and requests to Smart concerning the auditing services to perform and have been the principal liaison between Evergreen and Smart regarding the audit of Evergreen's records. Smart developed a team of audit personnel who have visited the Evergreen offices in Frazer, Pennsylvania on a daily basis and performed independent audit reviews at Evergreen's offices.

13.    Part of the audit services Hartford requested Smart to perform involved the inspection and inventory of closed Hartford GAP claims, which were located in Evergreen's offsite storage units and its offices in Frazer, Pennsylvania, so as to reconcile the claims with underwriting and premium remittance files.

14.    On February 5, 2004, Evergreen gave written notice to Hartford that it was canceling its agreements with Hartford.

15.    On February 18, 2004, Hartford gave written notice to Evergreen that Hartford was terminating the CSA effective February 25, 2004 and requested that Evergreen cooperate in the transition of files (both in hard copy and those stored electronically) in the Evergreen offices which relate to the Hartford GAP Business. On February 23 and 24, representatives of Hartford, Lee & Mason (Hartford's claim administrator replacing Evergreen), and Smart visited Evergreen's offices to assist in the transition of files and documents from Evergreen. At that time, these persons were permitted limited access to the Evergreen files.

## Evergreen's Refusal to Turn Over All Documents And Computer Filed Relating to Hartford's GAP Business

16.    Evergreen maintains files regarding each of its producers/sub-producers of Hartford GAP Business that contain, inter alia, information regarding the relationship between

Evergreen and the producer/sub-producer. Hartford understands that contained within these "Producer Files" is information regarding the specific financial arrangement Evergreen has with each producer of Hartford GAP Business and the method by which they calculate the premiums charged for Hartford GAP policies. Since Evergreen is no longer operating as Hartford's agent with regard to Hartford GAP Business, Hartford needs to work with the Hartford GAP Producers on a going-forward basis to, among other things, handle future enrollments under existing Hartford GAP policies, handle claims made under those policies, and process, where applicable, return of premiums to GAP policyholders. Hartford is unable to calculate return of premium without knowing how that premium and Evergreen's administrative fee, if any, were calculated. To the best of Hartford's knowledge, that information is only contained in the Evergreen Producer Files. At a meeting at Evergreen in November 2003, I asked Evergreen's principal and President, Gary Uphouse, to provide Hartford with a copy of Evergreen's Producer Files. He advised me that the files would be, if they had not already been, provided to Hartford. Hartford, however, never received a complete copy of Evergreen's Producer Files, and Evergreen and Mr. Uphouse have repeatedly refused to provide them to Hartford.

17.    On February 24, 2004, I again requested Mr. Uphouse to allow Evergreen to turn over the Producer Files to Hartford. Mr. Uphouse again refused that request.

18.    Hartford has recently received funds from GAP producers that are enrollment remittances with no explanation as to how those remittances were calculated. For example, Hartford does not know, and cannot determine from the documentation submitted with the remittances, what portion of the remittance should be paid to Evergreen, and what portion should be paid to Hartford. The issue is further complicated in that some remittances may incorporate cancellations and may reduce the remittances. Hartford cannot determine to whom, and in what

amount, the funds it is receiving should be allocated without full disclosure from Evergreen of the arrangements it had with producers of Hartford's GAP business, which is contained in Evergreen's Producer Files. Hartford must ascertain from Evergreen's Producer Files what financial arrangements Evergreen made with its producers and the basis upon which Evergreen then allocated the funds received from the producers to Hartford, Evergreen, and any other person or entity.

19.    I have been told by Smart & Associates that the information regarding Evergreen's agreements with producers — and how Evergreen calculated the allocations of premium funds received from producers to Hartford, itself, or others — are reflected in the producer files.

20.    Hartford's GAP Business written through Evergreen includes insurance written in almost all states in the United States. Hartford is required to investigate, process, and pay covered claims and to comply with the state regulations in each state in which it has its insurance issued. In order to properly fulfill its obligations to insureds, consumers, and state regulators, Hartford must be allowed full access to the books and records pertaining to the issuance of policies and the claims made thereunder so that it can properly account for policies and continue to process and pay claims thereunder. Hartford has had to rely on Evergreen for its records, and particularly the source documents regarding issuance of GAP policies, enrollments thereunder, and claims (closed, open, and pending).

21.    Unfortunately, many of Hartford's own files relating to policies issued in 2000 and 2001 were located in its offices in 7 World Trade Center and therefore destroyed in the September 11, 2001 World Trade Center tragedy.

22.    On January 15, 2004, Hartford, through its wholly-owned subsidiary, Twin City Fire Insurance Company, instituted an action in the United States District Court for the Central District of California against Mitsubishi Motor Credit of America, Inc. ("MMCA"). I am overseeing that litigation with outside counsel. That case involves claims by Hartford against MMCA regarding the issuance of a GAP policy underwritten by Evergreen for Twin City and thousands of claims made under that policy. Prosecution of that case requires the use, and access to, underwriting and claims files maintained by Evergreen so that Federal Rule 26 disclosures and anticipated discovery can be properly handled. Evergreen's refusal to allow full access to its files by Hartford's auditors will seriously jeopardize Hartford's (and Twin City's) preparation and prosecution of that case, as well as compliance with the disclosure and discovery requirements thereunder.

23.    Hartford will suffer irreparable harm with its customers, consumers, policyholders, producers, and sub-producers of its GAP business if it is not permitted access to Evergreen's files regarding Hartford's GAP business such that it can properly verify underwriting information, premium remittances, and claims files documentation. Hartford will also suffer irreparable harm to its relationships and reputation with state regulators and departments of insurance if it is stymied in its efforts to perform its auditing functions and claims processing obligations by not having full access to the files regarding its GAP business in the possession of Evergreen.

24.    Prior to the February 25, 2004 CSA termination date, Hartford submitted several requests to Evergreen to download its access database and submit it to Hartford so that its new Claim Administrator (Lee & Mason Financial Services, Inc.) could evaluate and confirm coverage for Hartford GAP claims. When evaluating coverage for a claim, it must be determined

-8-



whether there is a Hartford GAP policy in force and whether the vehicle which is the subject of the loss was in fact enrolled under the policy. Hartford therefore must have information from Evergreen regarding details on GAP enrollments under Hartford GAP Policies placed by Evergreen. Such detail is a necessary part of the coverage evaluation performed with respect to each GAP claim.

25.     Evergreen agreed to download its computer files (including the access database) onto discs and provide them to Hartford. Evergreen recently supplied 21 discs containing information downloaded from its email database and computer hard drive. However, Hartford has determined that many of the documents which appear in the folders contained in these disks have been "locked," such that they are impossible to open. Moreover, the discs, and in particular Disc No. 17, which purportedly contains policy data, do not contain a download of Evergreen's access database. Rather, upon further review and analysis, the policy data on Disc No. 17, appears merely to contain a "query," which only provides a single, selected "snapshot" view of Evergreen's database, rather the actual database itself. Moreover, the disc does not contain enrollment information for Hartford's GAP business necessary for the processing of claims under Hartford's GAP policies.

26.     After demanding that Evergreen permit Hartford to inspect its computers, Evergreen agreed to allow an inspection to occur. I requested Hartford representatives to visit Evergreen's offices to inspect information on its computers regarding Hartford's GAP Business. The Hartford representatives went to Evergreen's offices on March 19, 2004, but were denied access to all computer files relating to Hartford's GAP business, and particularly all files relating to its Access database. Evergreen's failure to download and supply its Access database has prevented Hartford, and its agent, Lee & Mason, from performing complete coverage evaluations

for claims. This seriously jeopardizes Hartford's processing and adjustment of GAP claims and forces Hartford to adjust claims based upon incomplete coverage information.

### Evergreen's Failure to Create And Maintain A Fiduciary Trust Account And Commingling Of Accounts

27.     The parties' PMA requires Evergreen to create a fiduciary trust account for all amounts collected relating to Hartford's GAP insurance business. Specifically, Article III of the PMA provides as follows:

> K.     Fiduciary Capacity – Premium Trust Fund.     [Evergreen will] *act as a fiduciary for [Hartford] and to hold all premiums* and any other amounts collected and received on Policies for [Hartford] *in a fiduciary account separate and apart from all other funds of [Evergreen] or others* in a bank which is a member of the Federal Reserve System and insured by the Federal Deposit Insurance Corporation and which is approved in writing by [Hartford]. *The bank account shall be designated by [Evergreen] in such a manner as to clearly establish that [Evergreen] is holding and acting as trustee for [Hartford] with respect to the funds in the account.* (Emphases added.)

*        *        *

28.     Evergreen has failed to provide Hartford with any evidence that Evergreen ever created or maintained a fiduciary trust account. Instead, in remitting amounts collected on Hartford's GAP insurance business, Evergreen has tendered payment to Hartford from several checking accounts maintained by Evergreen at PNC Bank. For example, attached hereto as Exhibit "C" is a copy of a payment received from Evergreen drawn from a checking account numbered 861 219 3022. Evergreen has tendered checks to Hartford drawn from other accounts as well.

29.     Because it appears Evergreen has taken no action to ensure amounts collected on Hartford's behalf were deposited into one single, separate, fiduciary account, Hartford believes Evergreen has commingled amounts held in trust for Hartford with Evergreen's general

operating funds. Accordingly, Hartford must obtain an accounting from Evergreen as to all amounts collected on Hartford's behalf, as well as an accounting of the identity of any and all bank accounts held by Evergreen. Without such disclosures, it is impossible to identify Evergreen accounts that must be attached until an arbitration award is entered.

## Additional Breaches Of The Parties' Agreements

30.    Evergreen has repeatedly failed to honor its obligations under the PMA, including its duties to produce business in accordance with the terms of the PMA and oversee and monitor the business generated under the agreement.

31.    For instance, Evergreen failed to monitor enrollments to ensure that they provided the necessary information and not the requirements of the GAP program. Thousands of enrollments were accepted and processed that did not comply with Hartford underwriting guidelines.

32.    Evergreen also breached its claims handling duties under the CSA. Specifically, Evergreen failed to promptly advise Hartford of reported losses. It was Evergreen's responsibility to maintain a claims file for all reported claims and obtain the necessary documentation to process claims pursuant to their respective policy. Evergreen, however, failed to fulfill this obligation as well.

33.    Since termination of the CSA and transition of Evergreen's handling of Hartford's GAP claims on or about February 24, 2004, my office had arranged with Evergreen to have a representative of Smart & Associates pick up mail relating to Hartford's GAP Business from Evergreen's offices each day so that there would be no lag in obtaining mail regarding Hartford's GAP Business. Smart would then overnight that mail pick-up to Lee & Mason for processing. On April 12, 2004, I was advised by Smart that Evergreen had a few days earlier stopped providing the mail to Smart and that in fact the doors to Evergreen's offices were locked and the

offices were empty. On April 13, 2004, I was provided with a copy of correspondence sent to "All Producers" from Charles Caronia, Sr., "CEO" of Evergreen on April 5, 2004, that "The Evergreen Organization, Inc. will cease business operations April 8, 2004." A true and correct copy of this April 5, 2004 correspondence is attached hereto as Exhibit "D."

34.    Within the past two weeks, Evergreen has shut its doors and has failed to maintain the most basic services, such as mail delivery and the answering of its telephones.

35.    Because Hartford continues to receive claims on GAP policies written since July 2000, when Hartford first retained Evergreen as the exclusive program manager for Hartford's GAP business, and because Evergreen has refused to fully and completely disclose all files and records relating to Hartford's GAP business, Hartford is unable to calculate with any certainty its total liability on GAP policies issued since July 2000. However, Hartford estimates this liability will exceed many millions of dollars.

36.    Hartford has advised all producers, of which it has knowledge, that further amounts collected relating to Hartford's GAP insurance business must be remitted to Hartford's new agent Lee & Mason, or Evergreen directly; nevertheless, further amounts have been tendered directly to Evergreen.

I declare under penalty of perjury and under the laws of the United States of America and the State of New York that the foregoing is true and correct.

Executed this 30th day of April, 2004 at New York, New York

_____

Vincent A. Vitiello II

# EXHIBIT M

ARBITRATION BOARD CONVENED IN
NEW YORK, NEW YORK

-----------------------------------------------------------------x
                                            :
In the Matter of the Arbitration of         :        **HARTFORD FIRE**
                                            :        **INSURANCE COMPANY'S**
HARTFORD FIRE INSURANCE COMPANY             :        **ARBITRATION BRIEF**
                                            :
                              Claimant,      :
                                            :
            - against -                      :
                                            :
THE EVERGREEN ORGANIZATION, INC.,            :        Hearing: January 8, 2007
CHARLES CARONIA, SR., GARY UPHOUSE;          :        Time:   9:00 a.m.
CHARLES CARONIA, JR.; and                    :        Place:  Stroock & Stroock & Lavan
ANDREJS KRUTAINIS,                           :                180 Maiden Lane
                                            :                New York, NY 10038
                              Respondent.    :
-----------------------------------------------------------------x


        Claimant Hartford Fire Insurance Company ("Hartford") hereby submits the following

Arbitration Brief.

## I.
## INTRODUCTION

In July 2000, Hartford entered into agreements with The Evergreen Organization, Inc. ("Evergreen") by which Evergreen would serve as Hartford's program manager and claims servicer for its Guaranteed Automobile Protection ("GAP") business.[1]  Over the following 4 years, Evergreen and its principals breached many, if not most, of their fiduciary obligations to Hartford under those agreements.  Those breaches have caused Hartford to sustain millions of dollars in damages as will be shown during this arbitration.

Hartford recognizes that during the period 2000-2004 there were a number of factors that adversely affected the profitability (or lack thereof) of its GAP Program – over which the Respondents herein had no control.  There is no doubt that the economic downturn of the 2000-2002 time period, the tragic events of 9/11 and its aftermath, and the resultant drop in the car market affected many aspects of the Hartford GAP Program between 2000 and 2004.  Those issues are not the focus of this arbitration and Hartford is not seeking to recover damages from Respondents for those events.  Rather, the wrongful conduct of Evergreen and its principals is the basis for the following damages Hartford seeks here.

First, Evergreen breached its fiduciary duty when in January/February 2004 it withheld almost $800,000 in Hartford premium trust funds collected under GAP policies issued by Hartford.  Evergreen then attempted to use those withheld funds to offset monies it claimed Hartford owed it for claims management fees, profit sharing, countersignature fees and "terrorism" fees.  But, according to Evergreen's Final Statement of Damages, the majority of those withheld funds should not have been used to "offset" Hartford's premium trust funds since those amounts were not even owed by Hartford to Evergreen.  As to the amounts it still

---

[1] GAP insurance generally provides coverage for the monetary difference between the outstanding balance of a vehicle loan or lease and the actual cash value of that vehicle at the time of a constructive total loss to the vehicle.

-2-

contends it was entitled to use as offsets, Respondents cannot substantiate how they were calculated. Respondents have no substantive justification for their claims/offsets, and certainly cannot justify a withholding of premium trust funds in any event. Hartford is entitled to the $800,000 "offset" plus interest thereon for 3 years (January/February 2004 – January 2007).

Second, Evergreen, through its principals, paid claims under Reliance GAP policies with Hartford trust funds, while admitting that Hartford specifically told them they were not authorized to make any such payments whatsoever. Evergreen's principals have admitted that those payments were made to "curry favor" for Evergreen with the producers who made those claims. In other words, Evergreen used Hartford funds for "marketing" expenses to bolster its relationships with the producers sending them business. Those payments total approximately $1,065,000 *plus* at least 4 years of interest (i.e., late 2002/early 2003 to January 2007).

Third, Evergreen, and its principals, ignored all underwriting guidelines and restrictions when it wrote an account with JM&A – without the knowledge of Hartford. Respondents failed to obtain the proper support and documentation from JM&A to justify any underwriting and specifically the documentation that would allow a proper and informed rate quote for the GAP business it was considering underwriting. After Hartford found out that this account had been underwritten by Evergreen, where it had been specifically rejected the year before by Hartford's underwriters, it demanded that Evergreen obtain the written documentation and information to support the underwriting. Evergreen's principals claimed that they were getting the requested information yet never did, and instead continued to accept enrollments under those policies knowing that they had never properly underwritten it. Eventually, Hartford sustained a major loss on the JM&A account by paying out claims under the JM&A policies that were in excess of $5.3 million over the amount Evergreen remitted to it in premium.

Fourth, after Evergreen was terminated as a claims servicer and program manager, Evergreen's principals freely turned over confidential, proprietary documents to a third party (Mitsubishi Motors Credit of America, Inc. ("MMCA")) that was engaged in litigation with Hartford. This was a clear breach of the confidentiality provisions of Evergreen's program

-3-

manager's agreement with Hartford. The documents Evergreen's principals released to MMCA contained not only proprietary and confidential files of Hartford, but also of some of its largest insureds (e.g., Bank of America). Moreover, Hartford specifically instructed Evergreen not to reveal confidential information, yet Evergreen and its principals blatantly ignored that instruction and knowingly breached the agreements with Hartford. This breached allowed MMCA to use confidential documents of third party insured's claims to try and substantiate a baseless unfair trade practices claims against Hartford (which the federal court ultimately dismissed). By breaching its fiduciary duty, Evergreen and its principals caused Hartford to incur almost $100,000 in additional fees to defend baseless claims by MMCA regarding third party insureds and their private dealings with Hartford.

In sum, Hartford seeks damages for at least the following:

- January 2004 improper diversion of Hartford's premium trust funds ($696,453.34, plus interest from January 2004 ($208,936));

- February 2004 improper diversion of Hartford's premium trust funds ($93,208.06, plus interest from February 2004 ($27,196.32));

- Unauthorized payment of Reliance Insurance claims with Hartford funds to "curry favor" with Evergreen's customers (approximately $1,065,025, plus $400,000+ interest thereon from late 2002);

- Concealing and misrepresenting underwriting of JM&A account (net losses of at least $5,377,357, plus interest thereon).

- Attorneys fees and costs in defending claims in MMCA litigation created by Evergreen's principals providing confidential documents to MMCA in breach of their fiduciary duty (approximately $100,000)

The Evergreen Principals operated and dominated Evergreen to such an extent that the corporate form must be disregarded and the Principals should be held personally liable for Evergreen's liability and the damages caused Hartford under principles of alter ego liability. The Principals eschewed Evergreen's corporate form and diverted Hartford's trust funds, and others', for their own personal use and benefit. The Principals extracted from Evergreen's corporate operating account virtually all amounts submitted to Evergreen every month it was in

-4-

operation. That money went straight into the Principals' pockets. The Principals further operated Evergreen such that it was understaffed and unable to properly function as Hartford's program manager or claims servicer. As will be explained further below, the Principals' concealments and misrepresentations regarding its underwriting and claims servicing activities, as well as the siphoning off of Evergreen's assets, directly resulted in severe losses to Hartford and its withdrawal from the GAP insurance business altogether.

## II.

## STATEMENT OF FACTS

### A.    Background on Evergreen

Evergreen was incorporated in Pennsylvania in 1994 by H. Gary Uphouse ("Uphouse") and his wife Ann Uphouse. Evergreen did not file anything with the state other than its Articles of Incorporation (e.g., no bylaws, intent papers, etc.). Evergreen was originally located at 910 Evergreen Lane, Chester Springs, PA, which is also the Uphouses' home address. On or about February 1, 1996, Charles Caronia, Sr. ("Caronia, Sr."), purchased 60% of Evergreen's stock for $20,000. Uphouse and Caronia, Sr. were Evergreen's only shareholders.

On or about January 1, 1996, Caronia, Sr., on behalf of Evergreen, entered into a Program Manager's Agreement ("Reliance PMA") and a Claims Servicing Agreement ("Reliance CSA") with Reliance Insurance Company ("Reliance") to become Reliance's exclusive program manager and claims servicer for its entire GAP insurance program.[2]

In or about June 2000, Hartford purchased renewal rights in certain lines of Reliance's business including, but not limited to, renewal rights in Reliance's GAP insurance program. In or about October 2000, Hartford and Evergreen executed an amendment to the Reliance PMA and Reliance CSA to provide that Evergreen would act as program manager and claims servicer for the Hartford GAP business on the same terms and conditions as Evergreen had done for

---

[2] Prior to 1996, Uphouse had no background or experience in insurance and Caronia, Sr. had only limited experience in underwriting. Neither Uphouse nor Caronia, Sr. had any prior experience with underwriting GAP insurance, and neither had any experience whatsoever in claims handling.

-5-

Reliance. Two years later, in September 2002, Hartford and Evergreen entered into a Hartford/Evergreen new PMA and CSA (hereinafter "PMA" and "CSA") regarding Evergreen's services to Hartford.

As program manager, Evergreen agreed to perform the following duties for Hartford:

> ➢ solicitation of business;
>
> ➢ servicing of business;
>
> ➢ binding of risks;
>
> ➢ policy issuance;
>
> ➢ noticing of risks bound;
>
> ➢ quotation of premium rates;
>
> ➢ collection and remittance of premiums for GAP business written;
>
> ➢ timely accounting for GAP business;
>
> ➢ acting as a fiduciary for Hartford;
>
> ➢ maintaining the confidentiality of all documents generated in conducting Hartford's GAP business;
>
> ➢ promoting and safeguarding the best interests of Hartford; and
>
> ➢ keeping and maintaining, for as long as Hartford requires, complete records and accounts of all GAP business and transactions pertaining to policies written under the Hartford GAP Program.

The PMA further required Evergreen to hold amounts collected under Hartford's GAP Program in a separate fiduciary trust account. Specifically, Article III of the PMA requires:

> K.    Fiduciary Capacity – Premium Trust Fund.    To act as a fiduciary for [Hartford] and to hold all premiums and any other amounts collected and received on Policies for [Hartford] in a fiduciary account separate and apart from all other funds of Manager or others in a bank which is a member of the Federal Reserve System and insured by the Federal Deposit Insurance Corporation and which is approved in writing by [Hartford]. The bank account shall be designated by [Evergreen] in such a

> manner as to clearly establish that [Evergreen] is holding and
> acting as trustee for [Hartford] with respect to the funds in the
> account. (Emphases added.)

Under the CSA, claims servicing included creation, maintenance and storage of hard-copy and electronic claims files. The CSA also sets forth specific procedures for adjustment and payment of claims, including obtaining specific documentation required by Addendum #1 to the CSA (e.g., police reports, financing contracts, copies of primary insurance checks).

### B.    Hartford's Audits Of Evergreen's Work.

In July 2001, Hartford conducted an audit of Evergreen. It was found that all business being underwritten by Evergreen was performed using one model and concluded that "[g]iven the diverse nature of the business this was unacceptable." It was further noted that "Evergreen is deemed to be antiquated in most instances," and that claims data was "not readily useable by underwriting or the actuarial department" to allow them to monitor problem accounts for possible rate increases and/or cancellations. Accordingly, Hartford concluded that Evergreen's management of Hartford's GAP program required substantial changes.

On September 11, 2001, Hartford's offices that ran the GAP Program were located in 7 World Trade Center in Manhattan, and therefore were destroyed by the tragedy that has become known as 9/11. In the aftermath of that event, Hartford conducted a second audit of Evergreen in late November 2001 with a team of Hartford representatives from claims, actuarial, legal, compliance, and underwriting. This audit was overseen by Hartford's lead underwriter on the GAP business, Andrejs Krutainis ("Krutainis"). The Hartford audit team concluded that the business processes of Evergreen and/or the controls on their execution were not acceptable. The audit team concluded that Evergreen had violated numerous provisions of the PMA and CSA, and that its price monitoring and claims handling was unacceptable.

On December 19, 2001, Krutainis, on behalf of Hartford, sent Caronia, Sr. a letter informing him of Evergreen's "overwhelming and material breach of its duties and responsibilities under the PMA agreement." Hartford further advised that it was suspending Evergreen's duties under the PMA and would terminate the agreement as of February 28, 2002

-7-

unless certain changes were immediately made. Hartford issued Evergreen new guidelines for underwriting, claims handling, and compliance. Caronia, Sr. immediately replied that all of the requested new guidelines would be complied with and that Evergreen would cure all of the underwriting, claims, compliance and legal problems that had been raised by Hartford's audit.

In late December/early January 2002, Caronia, Sr. offered Krutainis employment with Evergreen to help implement the changes requested in Krutainis' audit report. After Evergreen agreed to accept the requested changes in the audit report and to hire Krutainis to help implement them and become chief operating officer of Evergreen, Hartford agreed to keep Evergreen as its program manager and claims servicer.

C.    **Evergreen's Breaches Of The Program Manager's Agreement.**

In mid-2002, Hartford re-examine Evergreen's underwriting and the pricing on its entire GAP program. In many instances, Hartford determined that Evergreen was still repeatedly failing to honor its obligations under the PMA, including its duties to produce business in accordance with the PMA terms and to properly monitor the GAP business under the PMA.

One of the more egregious violations of the underwriting guidelines was Evergreen's underwriting of the JM&A Group ("JM&A") account. In July 2001, Evergreen made a proposal to Hartford to underwrite substantial GAP business from JM&A. Hartford, through Andrejs Krutainis, its lead underwriter at the time, rejected Evergreen's proposal to write business through JM&A because Krutainis determined that the projected loss ratio presented an unacceptable risk to Hartford. Hartford told Evergreen that it wanted to decline the JM&A account. Despite this clear instruction, six to nine months later, the Principals ignored Hartford's instructions and went ahead and wrote the JM&A business.

Evergreen offered JM&A a rate that was based on flawed underwriting principles, insufficient information and documentation, and that was far below what Evergreen should have offered. Thereafter, Evergreen issued policies for JM&A customers and began accepting enrollments. Evergreen, not Hartford, set the price on enrollments. In fact, Evergreen concealed from Hartford the fact that it had begun issuing policies to JM&A. Evergreen's own

-8-

internal communications demonstrate the Principals' concealment of the JM&A agreement from Hartford, their subsequent misrepresentation of the JM&A business, and the unauthorized acceptance of thousands of enrollments at inadequately low premium rates.

In September 2002, Hartford learned for the first time that Evergreen had begun to issue policies and accept enrollments from JM&A, which was contrary to Hartford's earlier instructions not to do so. Hartford demanded from Evergreen an underwriting and pricing analysis. Evergreen could not do that since Evergreen had failed to obtain an analysis of JM&A's loss history, other than some information that was only "anecdotal." In September 2002, after accepting enrollments for over three months, Evergreen requested from JM&A for the first time loss and underwriting data.

In November 2002, Krutainis told Uphouse that the underwriting data used by Evergreen to underwrite the JM&A account was based on an erroneous assumption regarding a 120% cap on the MSRP/NADA, which was not, in fact, placed on the JM&A business. At the same time, the number of enrollments on the JM&A account had increased by over 10,000 enrollments per month.

In January 2003, after being promised by Evergreen that it would provide proper back-up underwriting information about JM&A, but failing to do so, Hartford advised Evergreen that Hartford would not accept the risk on the JM&A account.

D.    **Evergreen's Breaches Of The Claims Servicing Agreement.**

Evergreen failed to obtain necessary and required documentation to substantiate claims prior to issuing payment. In particular, Evergreen failed to request documentation specifically required by Hartford's policies to substantiate claims (e.g., police reports). Evergreen only began to request the required documentation after Hartford's November 2001 Audit uncovered Evergreen's failures in this regard. Evergreen processed thousands of claims without regard to their validity and/or the exclusions under the Hartford GAP policies. Instead, Evergreen consistently paid claims that were deficient in some manner. Evergreen's and the Principals' motivation to pay these claims was twofold.

-9-

First, Evergreen was paid claims servicing fees by Hartford on a flat fee basis for "claims administered" under the CSA. In other words, if Evergreen did not pay a claim, it would not get paid claims servicing fees by Hartford. However, Evergreen did not employ sufficient staff to request and assemble all Required Documentation and properly adjust all claims submitted for payment. Thus, Evergreen instructed its claims adjusters to pay claims even if they were not ripe for payment or, in some instances, even excluded by the policy.

Second, Evergreen's business depended upon further enrollments under the Hartford policies. Evergreen's refusal to pay claims directly impacted its customers' willingness to submit further enrollments on existing policies, and also affected its ability to obtain further customers in this emerging marketplace for GAP insurance. Evergreen therefore paid claims to encourage its customers to submit further enrollments under the policies.

For one producer in particular, Life of the South, Evergreen's Vice President in charge of claims, Charles Caronia, Jr. ("Caronia Jr."), instructed Evergreen's claims adjusters to falsify documents so that Evergreen could make payment with Hartford funds on those claims. According to e-mails and testimony of its adjusters, Evergreen instructed its claims handlers to provide coverage to Life of the South customers for not only basic GAP coverage, but also for up to two past due payments on the loan or lease underlying the GAP claim, *even though the Life of the South GAP contracts did not provide for such coverage*. Ultimately, Evergreen fraudulently paid the Life of the South claims using Hartford's funds.

In January 2004 – after Hartford placed auditors on-site at Evergreen's offices to oversee Evergreen's day-to-day operations – Caronia, Jr., attempted to conceal Evergreen's fraudulent conduct on the Life of the South account. Specifically, Caronia, Jr., instructed Evergreen's claims handlers to go into Evergreen's claim files, retrieve the GAP contracts on all Life of the South claims, throw the actual GAP contract in the trash, and replace it with a "fake" contract that provided coverage for not only basic GAP coverage, but also up to two past due payments on the enrolled loan or lease. Apparently, Evergreen was attempting to curry favor with Life of the South by providing extended GAP coverage that was not actually

-10-

owed to Life of the South's customers, but which had apparently been marketed as such to its customers.[3]

### E.    Unauthorized Payment Of Reliance Claims.

In late June 2000, Reliance was forced to exit the GAP business and thereafter cancelled its GAP policies on or about June 30, 2000. Hartford issued its first GAP policies to Evergreen's customers effective July 1, 2000. According to Caronia, Sr., Evergreen's customers with GAP policies through Reliance continued to request payment of those claims even after the Reliance policies were canceled. Hartford specifically disclaimed coverage for any claims on vehicles enrolled prior to July 1, 2000, as they were not enrolled under the Hartford GAP program and Hartford was not responsible for payment of those claims. Specifically, David McElroy, Vice President of Hartford, told Caronia, Sr. – on more than one occasion – that Hartford was not responsible for claims that pre-dated the Hartford policies (i.e., those dating to before July 1, 2000), and that Hartford would not approve payment of those claims under any circumstances.

The Principals, Caronia, Sr. and Uphouse, have both testified that Evergreen paid Reliance Claims, but only did so with Evergreen's own funds. The truth is different.

In or about July 2000, Hartford set up a "zero-balance" account at Fleet Bank, account no. 942-783-9383 ("Fleet Account"), that was funded by Hartford for the payment of Hartford claims. Evergreen was authorized to pay Hartford claims directly out of the Fleet Account pursuant to the terms of the CSA. In early 2004, Hartford performed an analysis of Evergreen's payment of claims out of the Fleet Account. Hartford determined Evergreen had been using the funds deposited by Hartford into the Fleet Account to pay Reliance claims. Caronia, Sr. admitted that he unilaterally decided to pay claims received by Evergreen on enrollments accepted under Reliance GAP insurance policies in order to "curry favor" with its customers. Caronia, Sr. further admitted that he directed these claims be paid to dissuade

---

[3]  Charles Caronia, Jr. has admitted that the President of Life of the South, Dale Ballard, was a close friend of his father, Charles Caronia, Sr.

-11-

Evergreen's customers from taking their business to another provider. However, despite such admissions, both Caronia, Sr. and Uphouse testified that Evergreen did not pay Reliance claims with Hartford funds. Hartford performed a reconciliation that analyzed the Cert Date (i.e., enrollment date) on all claims paid out of the Fleet Account. Hartford determined that Evergreen had paid a total of 479 Reliance claims in the amount of $1,065,000 directly out of Hartford's funds that were placed the Fleet Account.

F.    **Evergreen's Failure To Preserve Amounts Collected On Hartford's Behalf.**

The PMA required Evergreen to create a fiduciary trust account for all amounts collected relating to Hartford's GAP insurance business. The PMA expressly required that any bank account utilized by Evergreen for the deposit of funds received on behalf of Hartford "shall be designated by [Evergreen] in such a manner as to clearly establish that [Evergreen] is holding and acting as trustee for [Hartford] with respect to the funds in the account."

Despite these requirements, Evergreen failed to provide Hartford with any evidence that Evergreen ever created or maintained a fiduciary trust account. Instead, Evergreen would remit to Hartford premiums collected relating to Hartford's GAP insurance business from one of several checking accounts maintained by Evergreen at PNC Bank. Evergreen took no action to ensure amounts collected on Hartford's behalf were deposited into a single, separate, fiduciary account as required under the PMA. Evergreen and the Principals were therefore commingling amounts held in trust for Hartford along with Evergreen's general operating funds.

H.    **Evergreen's Offset Calculation And Other Alleged Damages.**

On January 29, 2004, Evergreen notified Hartford that it was retaining certain premium funds, due Hartford for enrollments under GAP policies, as an "offset" for fees it claimed it was owed from Hartford.   Since that withholding was a clear breach of the PMA, Hartford immediately advised Evergreen that its actions constituted a breach of the PMA and demanded that Evergreen remit the proper premiums. Evergreen refused, and has persisted in that refusal today.

-12-

Evergreen's original claim for offset contained four (4) components: Claims Fees, Terrorism Project Expenses, Countersignature Fees, and Profit Sharing Due. Evergreen has since abandoned its claim for Terrorism Project Expenses, Countersignature fees and the majority of its claim for claims servicing fees.

(1)    **Claims Fees:** The CSA states that Evergreen is only entitled to payment for claims administered. The former head of claims for the GAP business at Hartford testified that Evergreen was entitled to fees only for claims that were actually paid. Evergreen's January 29, 2004 Offset Calculation lists various alleged fees owed by Hartford for years 2002 through 2004 for the administration of claims.    However, Evergreen failed to provide any documentation to support its calculations or that shows the actual number of claims paid. In its December 30, 2006 Arbitration Brief, Evergreen has abandoned the majority of those claims handling fees.    The only remaining fees it seeks are those entitled "Claims administered without payment as of 12/03 (declined, no gap, etc.) (4,367 @ $40)", in the amount of $174,680.00. Again, however, Evergreen has failed to provide documentation to support these calculations.    Evergreen is not entitled to fees for claims paid absent proof that those claims were in fact paid. In addition, by Evergreen's own admission, the claims handling fees at issue are those that were not in fact paid. Evergreen therefore was not entitled to offset those fees, and is not entitled to them now.

(2)    **Profit Sharing Claim:** The Hartford Offset Calculation calls for a profit commission calculation as of April 15, 2002 in the amount of $189,681.00.    However, Evergreen's Principals have been unable to explain how this amount was calculated or to provide the documentation to support any calculation. The reality is that as of August 15, 2002, there was no profit on the GAP business. Thus, Evergreen, was not entitled to any profit sharing or any offset from premium trust funds for a fictitious profit share.

Evergreen's December 30, 2006 Arbitration Brief lists two other items of "damages".

(1)    **Monies Due Arch Insurance Company:**    Apparently, Evergreen placed GAP business with Arch Insurance Company ("Arch") after Hartford terminated the PMA. Hartford

-13-

has no connection with Arch whatsoever and is certainly not obligated to pay monies due Arch by Evergreen. The monies held in trust are Hartford's premium trust funds and should not be released to cover other of Evergreen's outstanding debts. Indeed, Evergreen's counsel raised this argument in 2004 before USDC Judge Kaplan in opposing the Court's order to freeze Evergreen's assets. The Court did not buy that argument, and neither should this Panel.

(2)    **Continuing Enrollment Fees:**    Steinberg testified as his deposition that Evergreen may be entitled to enrollment fees obtained by Hartford during 2004 and 2005, despite the cancellation of the PMA. Harford is preparing the calculation for these damages, which are far less than the $800,000 calculated by Evergreen.

I.    **Domination And Control By Caronia, Sr. And Uphouse.**

Evergreen is owned by Charles Caronia, Sr. (60%) and Gary Uphouse (40%). The Principals, along with Krutainis and Caronia, Jr., operated, dominated and controlled Evergreen for their own personal benefit.

Charles Caronia, Sr., was Chairman of the Board and Chief Executive Officer of Evergreen and one of the two principal shareholders in the company.[4] Caronia, Sr. regularly communicated with Hartford regarding Evergreen's operations under the PMA and CSA, especially after Hartford identified potential problems in the administration of its GAP program.

Gary Uphouse was the President of Evergreen and is the second principal shareholder in the company. Uphouse was responsible for overseeing Evergreen's business by maintaining the appearance of propriety through communications with Hartford as well as Hartford's customers. Uphouse oversaw the handling of claims and assisted in the underwriting of new business until early 2002. Uphouse was removed by Caronia, Sr. from the day-to-day operations due to his failure to operate Evergreen at a level acceptable to Hartford.

---

[4] Hartford is informed and believes that Caronia, Sr. is personally financing Evergreen's arbitration with his own personal funds. Evergreen has no available assets because they were frozen by the District Court to pay for the diverted premium trust funds.

-14-

50345448v4

By 2002, Evergreen had hired two more senior executives, Andrejs Krutainis and

Charles Caronia, Jr. (Charles Caronia, Sr.'s son), to help manage Hartford's GAP business.

These four individuals operated and controlled Evergreen and were responsible for executing

Evergreen's duties enumerated in the PMA and the CSA. Under their direction, the Principals

were able to use Evergreen to divert Hartford trust funds for their own benefit and to defraud

Hartford of millions of dollars.

- Charles Caronia, Sr., and Gary Uphouse were Evergreen's only shareholders and acted as fiduciaries to Hartford. They represented to Hartford that Evergreen was fulfilling its obligations under the PMA and CSA. As found by the District Court in May 2004, Evergreen, at the direction and with the authorization of Messrs. Uphouse and Caronia, Sr. diverted Hartford premium trust funds of at least $700,000 to Respondents – this was a breach of fiduciary duty with no excuse. However, as set forth in affidavit filed by Mr. Uphouse, *there is less than $400,000 in Evergreen's bank accounts* to cover those trust amounts.[5] Those accounts were frozen and Evergreen's assets attached by order of the District Court. Clearly, Evergreen does not have sufficient funds to even pay back premium trust funds that the District Court has ruled were diverted from what should have been fiduciary accounts established for the sole benefit of Hartford.

- Based on financial documents that have been produced thus far by Respondents, Messrs. Caronia, Sr. and Uphouse withdrew *over $12 million* from Evergreen's operating accounts (the same accounts to which Hartford premium amounts were deposited) between late 2000 and early 2004, and *another $2 million* out of a separate Evergreen bank account used to "pass through" commissions on Canadian GAP accounts directly to Caronia, Sr. and Uphouse. It is clear that Evergreen was essentially looted and now has insufficient funds to pay Hartford the premium moneys that were to be held in trust, not to mention the lack of funds to pay for the other wrongful conduct that has caused Hartford millions of dollars in damages. In addition, Caronia, Sr. and Uphouse each paid themselves $360,000 in annual salary from Evergreen's operating accounts during the years Evergreen was Hartford's program manager and claims servicer. In short, Caronia and Uphouse reaped almost *$17 million* between them from the Hartford GAP program.

- Andrejs Krutainis was Evergreen's Chief Operating Officer and was charged with fulfilling Evergreen's obligations under the PMA. Krutainis breached his duties by approving the acceptance of enrollments that did not comply with Hartford underwriting guidelines. Krutainis personally benefited from this conduct because

---

[5] In fact, Evergreen never had a separate premium trust account and instead commingled Hartford's premium trust funds with Evergreen operating accounts.

his compensation was directly linked to the increase in enrollments in the Hartford GAP program.

- Charles Caronia, Jr., was in charge of claims handling for Evergreen. Caronia, Jr., breached his duties by authorizing the payment of claims without obtaining the necessary documentation to process claims pursuant to the Hartford GAP policies and the terms of the CSA and PMA. Caronia, Jr., also was the owner of Powerguard International, Inc., which was one of Evergreen's producers. Caronia, Jr., therefore personally benefited by improper payment of claims.

- Collectively, the Evergreen Principals conspired together to operate Evergreen for their own personal gain and benefit. Indeed, it appears from financial records so far produced that they used the Evergreen accounts (the same ones in which Hartford's premium trust funds were supposed to be held) to pay the principals million of dollars each year. It is no wonder that there is no money left in the Evergreen accounts (except less than $400,000 in frozen funds). Quite simply, the Evergreen Principals looted Evergreen of Hartford money.

### J.    The Arbitration.

On or about April 30, 2004, Hartford served a Demand for Arbitration on Evergreen and the Principals and filed a Verified Petition with the Federal Court. On May 4, 2004, Hartford filed a Motion For A Temporary Restraining Order, Preliminary Injunction, and Attachment Order in Aid of Arbitration against Evergreen and the Principals requesting that the Federal Court freeze the assets of Evergreen and order Evergreen to provide Hartford with access to its books and records.

On June 8, 2004, the Court granted Hartford's motion and ordered that: (1) Evergreen establish a fiduciary account naming Hartford as the exclusive beneficiary; (2) Evergreen and the Principals not transfer or assign any assets of Evergreen; (3) Evergreen and the Principals identify to Hartford all assets held in Evergreen's name; (4) Evergreen's assets be attached up to the amount of $700,000; (5) Evergreen provide Hartford access to its books and records relating to policies issued on behalf of Hartford; and (6) Evergreen preserve all books and records relating to policies issued on behalf of Hartford. The Court found that Evergreen had diverted Hartford trust fund assets of at least $700,000. The Court further found that at least $400,000 of the $700,000 was "missing" since Evergreen claimed that it only had

-16-

approximately $300,000 in its bank accounts.  Hartford now knows that the missing funds and many more are in the pockets of the Evergreen Principals.

## III.

## ARGUMENT

### A.    Evergreen's Breaches Of Fiduciary Duties Under The PMA And CSA.

A fiduciary duty arises, even in a commercial transaction, where one party reposed trust and confidence in another who exercises discretionary functions for the party's benefit or possesses superior expertise on which the party relied. *Anonymous v. CVS Corp.*, 728 N.Y.S.2d 333, 336-37 (2001).[6]  A "fiduciary" is one who transacts business, or handles money or property, which is not his, for the benefit of another person, as to whom he stands in relation. *Board of Managers of Fairways at North Hills Condominium v. Fairway at North Hills*, 603 N.Y.S.2d 867, 869 (App. Div. 1993).  A fiduciary duty may be created by express provision of contract, or by factors such as the length of the relationship of the parties, their financial interdependence, and their sharing of confidential and proprietary information.  *ADT Operations, Inc. v. Chase Manhattan Bank, N.A.,* 662 N.Y.S. 2d 190, 192 (1997); *see also Kern v. Robert Currie Assocs.*, 632 N.Y.S.2d 75, 76 (App. Div. 1995) (holding contractual relationship may give rise to fiduciary duties regardless of whether contract itself includes specific words or language in that regard); *Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (App. Div. 1987) (recognizing the same conduct which may constitute breach of a contractual obligation may also constitute breach of duty arising out of relationship created by contract but which is independent of contract itself).

The PMA states:

> "Fiduciary Capacity – Premium Trust Fund.  To act as a fiduciary
> for the **Company** and to hold all premiums and any other

---

[6] New York law applies in this Arbitration pursuant to the PMA.

amounts collected and received on **Policies** for **Company** in a
fiduciary account. . ."

PMA, Article III, Par. K (emphasis in original).    Evergreen, and its Principals, were
charged with the obligations of producing qualified business under the PMA, and with the
handling and payment of claims under the CSA. Hartford's and Evergreen's interests were so
intertwined that a fiduciary relationship necessarily was created. Indeed, because Evergreen
was Hartford's disclosed agent, it had a fiduciary duty to its principal. *See* 2A N.Y. Jur.,
*Agency and Independent Contractors* § 204 (2003).

A fiduciary owes a duty of undivided and undiluted loyalty to those whose interest a
fiduciary is to protect. *Drucker v. Mige Associates II*, 639 N.Y.S.2d 365, 366 (App. Div.
1996); *accord Hartford Accident & Indem. Co. v. American Express Co.*, 518 N.Y.S.2d 93, 97
(1987). This is a sensitive and inflexible rule of fidelity, barring not only blatant self-dealing,
but also requiring avoidance of situations in which fiduciary's personal interest possibly
conflicts with the interest of those owed a fiduciary duty. *Drucker*, 639 N.Y.S.2d at 366.

In addition to the fiduciary duties discussed above, "[a]n agent is subject to a duty to
use reasonable efforts to give his principal information which is relevant to affairs entrusted to
him and which, as the agent has notice, the principal would desire to have and which can be
communicated without violating a superior duty to a third person." *Cristallina, S.A. v. Christie,
Manson & Woods Int'l, Inc.*, 502 N.Y.S.2d 165, 171 (1986), quoting Restatement (Second) of
Agency § 381. An agent is under a general duty to disclose information promptly to his or her
principal so that the principal may seasonably take any steps, which he or she deems essential
to his or her interests. An agent breaches the duty of good faith and loyalty where he or she
fails to disclose information obtained during the period of engagement, which affects the
transaction in which the agent is engaged, so that the principal may take steps to protect his or
her interests. 2A N.Y. Jur.2d, *Agency and Independent Contractors* § 212 (2003).

An agent is also under a duty "not to continue to render service which subjects the
principal to risk of expense if it reasonably appears to him to be impossible or impracticable for

-18-

him to accomplish the objects of the principal." *Cristallina, S.A.*, 502 N.Y.S.2d at 172, fn. 7, quoting Restatement (Second) of Agency § 384. Where an agent is selected because of its special fitness for the performance of the duties to be undertaken, the principal is entitled to rely on the agent's judgment and integrity. An agent has an implied good faith obligation to use best efforts to promote the principal's interests – not to work contrary to them. *Id.* at 172.

Evergreen, through its Principals, repeatedly failed to honor its obligations under the PMA and CSA. First, the Principals failed to create a fiduciary trust account for all amounts collected relating to Hartford's GAP insurance business, as required by the PMA.   Both Caronia, Sr. and Uphouse have admitted they never created or maintained a separate fiduciary trust account.   Instead, Evergreen remitted to Hartford premiums collected relating to Hartford's GAP insurance business from one of several checking accounts maintained by Evergreen at PNC Bank. These Evergreen accounts were created by Caronia, Sr. and Uphouse.

Second, the PMA required Evergreen to produce business in accordance with the terms of the PMA and to oversee and monitor the business. Evergreen, and its Principals failed to do so.  In fact, Evergreen, through Gary Uphouse (and later Andrejs Krutainis), failed to monitor enrollments under Hartford GAP Policies to ensure that they provided the necessary information and met the requirements of the GAP Program. Thousands of enrollments were issued that did not comply with Hartford underwriting guidelines, which would later result in millions of dollars in claimed losses. In particular, the Principals directly approved the issuance of a policy to JM&A and acceptance of enrollments, despite the fact that they knew the JM&A business did not comply with Hartford's underwriting guidelines.

Third, the CSA set forth specific requirements for Evergreen's handling of GAP claims. For instance, the CSA required Evergreen to promptly advise Hartford of reported losses, to maintain a claims file for all reported claims, and to obtain the necessary documentation to process claims pursuant to the Hartford GAP policies and the terms of the CSA. Evergreen, under the direction of Uphouse (and later Charles Caronia, Jr.), failed to fulfill this obligation. Instead, they consistently authorized the payment of claims without obtaining the necessary

-19-

documentation (e.g., police reports). This resulted in the payment of millions of dollars in claims that Evergreen was not authorized to pay pursuant to the CSA. Incredibly, Caronia, Jr., actually instructed claims adjusters to falsify policies under the Life of the South account so Evergreen could issue payment of claims and collect claims servicing fees from Hartford.

Fourth, as discussed above, Caronia, Sr. authorized payment of Reliance Claims with Hartford funds in order to "curry favor" with producers and keep their business with Evergreen. This overt and intentional breach of his fiduciary obligations as CEO of Evergreen deprived Hartford of over $1 million dollars in trust funds.

B.    The Principals' Personal Liability.

1.    The Principals Are Personally Liable For Aiding And Abetting Evergreen's Breach Of Fiduciary Duty.

The Principals may be held personally liable if they aided and abetted Evergreen in breaching its fiduciary duties to Hartford. Under New York law, to prove the claim of aiding and abetting breach of fiduciary duty, a plaintiff must establish that: (1) a fiduciary breached its obligations to another; (2) the defendant knowingly induced or participated in the breach; and, (3) the plaintiff suffered damages as a result of the breach. *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169, 307 A.D.2d 113 (2003); *see also S & K Sales Co. v. Nike*, 816 F.2d 843, 847-848 (2nd Cir. 1987).

A person knowingly participates in a breach of fiduciary duty when he or she provides "substantial assistance" to the primary violator. *Kaufman*, 760 N.Y.S.2d at 170. Substantial assistance occurs when a defendant affirmatively assists, helps, conceals, or fails to act when required to do so, thereby enabling the breach to occur. *Id.* The inaction of an alleged aider and abettor, however, constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff. *Id.*

The concealments by Evergreen and its Principals of facts relating to fees and premiums collected by Evergreen under Hartford's GAP Program was a breach of fiduciary duty. In addition, Evergreen's refusal to follow Hartford's guidelines and instructions in handling

-20-

claims is a further breach of fiduciary duty. These breaches are demonstrated by the unauthorized underwriting of the JM&A account, the unauthorized payment of Reliance Claims with Hartford funds, the falsifying of documents on Life of the South claims, and the baseless and fraudulent offset and retention of Hartford trust funds.

Evergreen's Principals are personally liable if they "knowingly induced or participated in the breach." *Kaufman*, 760 N.Y.S 2d at 169. The evidence clearly demonstrates that as to the above-enumerated breaches, the Principals knew about, and controlled, those transactions. The Principals personally profited greatly from those transactions, and directly caused Hartford to suffer severe losses. The Principals should therefore be held individually and personally liable for these transactions.

## 2.    The Principals Are Personally Liable As Subagents.

The Principals may also be held individually liable for breach of fiduciary duty because they acted as subagents of Hartford. The law provides that an agent, such as Evergreen, is in a highly fiduciary relationship to the principal, such as Hartford, and can always be asked to account for its acts. *See* 2A *N.Y. Jur.2d Agency and Independent Contractors* § 205. A subagent is "a person appointed by an agent empowered to [appoint such a subagent] to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible." *Manley v. Ambase Corp.*, 121 F.Supp. 2d 758, 772 (S.D.N.Y. 2000) (*citing* Restatement (Second) of Agency § 5(1) (1958)). The authority for an agent such as Evergreen to appoint its officers and directors as subagents "is inferred from authority to conduct a transaction for the principal for the performance of which the agent is to be responsible if...the agent is a corporation, partnership, or other organization." *Id.* (*citing* Restatement (Second) of Agency § 80(b)). Specifically, the authority of a corporation to appoint a subagent to perform the tasks of the agent may be inferred because "*one employing a corporation as an agent necessarily knows that the corporation must act*

-21-

50345448v4

*through agents and hence consents to the use of its employees as subagents.*" *Id.* (emphasis added) (*citing* Restatement (Second) of Agency § 5, cmt. d).[7]

A subagent is in fact himself an agent of the principal, even though there is no actual privity of contract between the subagent and the principal. *Marra v. Katz*, 74 Misc.2d 1010, 1013, 347 N.Y.S.2d 143, 146 (1973) ("courts have had the greatest difficulty in understanding that a subagent is in fact an agent of the principal"). Once established as subagents, the Principals may be held personally liable as individuals to Hartford to the extent they engaged in acts that would be deemed to be a breach of Evergreen's fiduciary duty owed to Hartford. *See* Restatement (Second) of Agency, Section 5, comment "d" ("a subagent performing acts which the appointing agent has authorized him to perform in accordance with an authorization from the principal is an agent of the principal and affects the relations of the principal to third persons as fully as if the appointing agent had done such acts."); *see also* Restatement (Second) of Agency § 428, cmt. "e" (imposing liability on the subagent for anything received by him on account of, and to be in trust for, the principal).

As discussed above, the Principals transacted and controlled all of Evergreen's business. The Principals negotiated the PMA and CSA between Hartford and Evergreen and were charged by Evergreen and Hartford with executing the obligations under those agreements. The Principals, in their capacity as subagents of Hartford, spearheaded the acts that caused the most quantifiable damages to Hartford (e.g., underwriting of JM&A, payment of Reliance Claims). Specifically, the failure of the Principals to monitor losses and to properly adjust claims, and to pay unsubstantiated claims, all resulted from their control and supervision

---

[7] It should be noted as well under both the Reliance PMA, Evergreen's authority was to be terminated if there was a change in ownership of Evergreen and/or if Charles Caronia was not involved in the management of Evergreen. The Hartford PMA had the same provision, but added Krutainis as a "key man employee" whose departure from Evergreen would trigger Hartford's right to terminate Evergreen. Clearly, Evergreen appointed the Principals as subagents and their running of Evergreen was a condition to the continuation of the PMA.

-22-

of Evergreen. These individuals should therefore be held individually and personally liable for the perpetrated wrongs as subagents of Hartford.

### 3.    The Principals Are Personally Liable For Their Fraudulent Conduct.

Directors and officers of a corporation will be held liable to the extent they personally commit or participate in the commission of a tort. *Van Wormer v. McCasland Truck Center Inc.*, 163 A.D.2d 632, 635, 558 N.Y.S.2d 683 (1990); *see also Loeffler v. McShane*, 372 Pa. Super. 442, 446, 539 A.2d 876, 878 (1988). Thus, to the extent the Principals committed fraud, they should be held individually liable.

A defendant is liable for fraud if it is shown that:

(1)    he made a misrepresentation or concealment of a material fact,

(2)    he had knowledge of the misrepresentation or concealment,

(3)    the misrepresentation or concealment was made for the purpose of inducing the other party to rely upon it,

(4)    the other party rightfully relied on the misrepresentation or concealment,

(5)    that reliance caused injury to the other party. *Brown v. Lockwood*, 76 A.D.2d 721, 730, 432 N.Y.S.2d, 193, 196 (2d Dept. 1980). In addition, an agent is prohibited from acting in any manner inconsistent with his or her agency or trust. 2A N.Y. Jur. 2d, *Agency and Independent Contractors* § 215 (2003).

An agent may not have interests in the subject transaction which are adverse to those of his or her principal. *Id.* If an agent acts adversely to the principal in any part of a transaction within the agency, *he or she is guilty of fraud*, unless it appears that the agent made a full disclosure of the facts to the principal, that he or she took no unfair advantage of the principal, or that the principal acquiesced in such acts of the agent. *Id.*

The Principals are personally liable for fraud based upon their misrepresentation and concealment of the underwriting of the JM&A account and their falsifying of GAP contracts on Life of the South claims. Initially, Hartford instructed Evergreen not to underwrite the JM&A

-23-

50345448v4

account and relied on Evergreen's representation that it would refrain from doing so. However, months later Hartford discovered that Evergreen had in fact underwritten the JM&A business.

Hartford immediately requested underwriting and loss data on the account. Eventually, Evergreen provided Hartford with data, but that data was false in material respects. The data provided by Evergreen had erroneous loss severity and loss frequency information, and falsely included a cap on MSRP/NADA of 120% on all enrollments. Hartford initially relied on the data provided by Evergreen as it was acting in a fiduciary capacity. However, once new loss data began to come in on the account directly from losses under the Hartford GAP program, Hartford conducted an independent analysis and determined that the information provided by Evergreen was false. Hartford also determined that the number of enrollments coming in were over 10,000 per month over what was represented by Evergreen.

By this time, Hartford had already accepted thousands upon thousands of enrollments and its loss future was set. Hartford ceased accepting enrollments in an effort to cut its losses; however, Hartford was obligated to continue to pay claims on all prior enrollments. The Principals' own COO, Krutainis, testified that it was Caronia, Sr. and Uphouse who underwrote the JM&A account. Thus, the Principals should be held individually and personally liable for the damages sustained by Hartford on the JM&A account.

### C.    The Principals Are Also Personally Liable As Alter Egos Of Evergreen.

To pierce the corporate veil and hold the alter ego of a corporation liable for damages caused by the corporation, there is a three-part test under New York law that requires a showing of: (1) complete domination and control by the shareholder(s) over the corporation with respect to the transaction at issue; (2) such domination and control was used to commit a fraud or other wrong against the plaintiff; and (3) the control and misuse caused the plaintiff's injuries. *First Capital Asset Mgmt., Inc. v. N.A. Partners, LP*, 755 N.Y.S.2d 63, 66, 300 A.D.2d 112, 116 (2002); *see also Eastern States Elec. Contractors, Inc. v. William L. Crow Const. Co.*, 544 N.Y.S.2d 600 (App. Div. 1989).

-24-

Under New York law, the corporate veil will be pierced to achieve equity "[w]hen a corporation has been so dominated by an individual or another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego." *Austin Powder Co. v. McCullough*, 216 A.D.2d 825, 827, 628 N.Y.S.2d 855; *see also Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138-139 (2d Cir. 1991). "Allegations of a lack of corporate formalities, commingling of funds, and self-dealing may be sufficient to support a claim seeking to pierce the corporate veil." *See Moses v. Martin*, 360 F.Supp.2d 533, 541-542 (S.D.N.Y. 2004).

Domination and control by the principals of a corporation are demonstrated by the absence of corporate formalities, inadequate capitalization, and/or use of corporate funds for personal rather than corporate purposes. *See Austin Powder Co. v. McCullough*, 628 N.Y.S.2d (App. Div. 1995) "In making this determination, courts look to a variety of factors, including the intermingling of corporate and personal funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 17-18 (2d Cir. 1996), *citing William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600-01 (2d Cir. 1989) (citing cases). In making such a determination, "[n]o one factor is decisive." *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1053 (2d. Cir. 1997). "[A]lthough there is no mechanical rule as to how many and to what degree the factors outlined in Wrigley must be present to pierce the corporate veil, the courts apply the preexisting and overarching principle 'that liability is imposed to reach an equitable result.'" *Bridgestone/Firestone*, 98 F.3d at 18, quoting, *Brunswick Corp. v. Waxman*, 599 F.2d 34, 36 (2d Cir. 1979) (citations omitted).

Gary Uphouse provided the initial capitalization to Evergreen along with his wife, Ann Uphouse, in the amount of $30,000. Two years later, Caronia, Sr. purchased Ann Uphouse's shares in Evergreen for $20,000. Neither Caronia, Sr. or Uphouse ever put another dime of

-25-

capital into Evergreen. Rather, Caronia, Sr. and Uphouse used Evergreen's operating account as if it were their own personal bank account. Every month after premium fees were collected, Uphouse issued to himself (40%) and Caronia, Sr. (60%) checks directly from Evergreen's corporate operating account in whatever amounts remained after operating expenses were paid. These large sums of money were not linked to their salaries. Remarkably, Uphouse (and Evergreen) failed to prepare any financial statements and kept no record or accounting of the method or calculation of these monthly "dividend" checks.

The following chart illustrates the total known payments made to Caronia, Sr. and Uphouse out of Evergreen's corporate accounts from 2000 through 2004:

| GARY UPHOUSE | |
|---|---|
| YEAR | TOTALS |
| 2000 | $322,293.16 |
| 2001 | $1,456,811.06 |
| 2002 | $1,547,131.13 |
| 2003 | $1,361,208.70 |
| 2004 | $1,427,585.90 |
| Total | $4,925,748.05 |

| CHARLES CARONIA, SR. | |
|---|---|
| YEAR | TOTALS |
| 2000 | $665,190.39 |
| 2001 | $2,286,670.40 |
| 2002 | $2,714,087.32 |
| 2003 | $2,867,415.48 |
| 2004 | $249,836.63 |
| Total | $8,783,200.22 |

These amounts *do not* include Caronia, Sr.'s and Uphouse's annual $360,000 salaries over the years. In addition, in 2002 and 2003, Uphouse issued checks directly out of a second Evergreen corporate account directly to his wife, Ann Uphouse, in the amount of $239,508, *despite the fact she was never employed by Evergreen in any capacity and never provided any*

-26-

*services whatsoever to Evergreen during those years.*[8] Simply put, Caronia, Sr. and Uphouse used Evergreen's operating funds for themselves and family members.

Evergreen, through its Principals, Caronia, Sr. and Uphouse, failed to abide by numerous corporate formalities:

- The Principals were the only two directors of Evergreen, and were also the only two shareholders.

- Evergreen did not hold directors' meetings or shareholders' meetings, but instead executed documents entitled "waiver" or "consent" in lieu of these meetings. These documents were identical year after year and essentially meaningless.

- Evergreen issued "dividend" checks out of its operating account every month, but failed to keep an accounting or record of the calculations for those dividends. Uphouse simply made an ad hoc determination based on Evergreen's operating budget for that month.

- Evergreen had an accountant, bank accounts, and paid taxes, but it did not maintain financial statements.

The Principals' domination and control of Evergreen through the commingling of corporate funds, failure to conduct shareholders' or directors' meetings, and use of Evergreen's corporate accounts as their own personal ATM machines are all actions sufficient to demonstrate a domination and control sufficient to pierce the corporate veil and open them up to personal liability based on alter ego principles.

Courts may also allow the corporate veil to be pierced to reach the alter ego of a corporation where the individual officers have used the corporation to commit a fraud for which there may be no remedy against the corporation. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131 (2d Cir. 1991); *see also U.S. v. Golden Acres, Inc.*, 702 F.Supp. 1097 (D.Del. 1988).

Finally, it is important to note that piercing the corporate veil is an equitable remedy by virtue of which the law will disregard the separate existence of a corporation and impose

---

[8] Indeed, at his deposition, Mr. Uphouse had no explanation for why such corporate monies had been paid to his wife.

-27-

liability directly on the shareholders for the acts or obligations of the corporation. The doctrine has also been used to impose liability on corporate officers and directors. *See* 45 *Am. Jur. Proof of Facts 3d* 1 (2004). Hartford has limited recourse against Evergreen directly since the Principals siphoned off Evergreen's assets and closed its doors – right after it failed to remit premium trust monies to Hartford and paid the principals huge "dividends." Equity therefore dictates that the Principals be held individually liable for Evergreen's breaches of its contract, breach of fiduciary duty, fraud, and negligence.

### D. Negligence

Negligence of an insurance broker or managing general agent is based upon a duty of care owed by the agent to its principal. To prove negligence, the plaintiff must show: (1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered injury as a result of that breach of duty. 79 N.Y. Jur. 2d *Negligence* § 9 (2003). Professionals, such as insurance brokers, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties. *Kohl v. Green*, 651 N.Y.S. 2d 744, 745 (App. Div. 1997). A claim of professional negligence merely requires proof that there was a departure from accepted standards of practice that caused injury. *D.D. Hamilton Textiles, Inc. v. The Estate of Theodore Mate*, 703 N.Y.S.2d 451 (App. Div. 2000).

As discussed above, Evergreen (as controlled by the Principals), breached a reasonable standard of care in its underwriting and claims handling practices by:

- Failing to obtain adequate loss data from producers pursuant to the PMA;
- Binding unauthorized risks in contravention of the PMA;
- Failing to monitor the producer accounts in accordance with the Hartford's guidelines;
- Failing to investigate claims and obtain all documentation required by the CSA;
- Paying claims without obtaining sufficient documentation;
- Paying invalid claims.

-28-

Each of these acts by Evergreen provides an independent basis for negligence liability based on Evergreen's breaches of the PMA, CSA, Hartford's underwriting and claims handling guidelines, as well as a reasonable standard of care in the industry.

      E.    **Conversion**

As discussed above in the context of a breach of fiduciary duty claim, the individual officers can be held liable to the extent they improperly disposed of funds rightly belonging to Hartford. *See Fireman's Fund Insurance Company v. Allied Programs Corp.*, 1993 WL 481344 at *7 (S.D.N.Y. 1993) (officers of corporation can be held individually liable for conversion of funds held in trust for an insurance company and for breach of their fiduciary duty if they were personally responsible for the breach of duty or if they knew or should have known of the conversion). At a minimum, the Principals used Hartford trust funds to pay Reliance Claims in order to curry favor with their customers. The Principals should be held personally liable for the conversion of those funds. In addition, an analysis of the Offset Calculation demonstrates that Evergreen and the Principals had no basis to offset the funds that should have been held in trust for Hartford. Those funds were deposited directly into the pockets of the Principals and they should be held personally liable for conversion of those funds.

      F.    **Failure To Maintain Adequate Insurance Coverage.**

Evergreen was required by the PMA to maintain errors and omissions insurance with $5 million in limits, general liability coverage with $5 million in limits and a blanket dishonesty bond with limits of $3 million each year. In blatant disregard of its obligations under the PMA, Evergreen (through Uphouse) purposefully chose to obtain only an E&O policy with $1 million in limits – hardly the $13 million worth of insurance it promised to maintain under the PMA. Uphouse intentionally misrepresented and/or concealed the amount of coverage he obtained on behalf of Evergreen and sought to maintain only very minimal insurance (i.e., it even undercapitalized its insurance). To the extent that Evergreen is unable to pay the amount of any award in this matter – either through its own assets or its errors and omissions coverage

-29-

– the Principals will be personally liable for any shortfall due to their intentional failure to maintain the required insurance coverage for Evergreen.

### G.    Hartford Is Entitled To Recover Its Attorneys fees and Costs.

Hartford is entitled to recover its attorneys fees and costs in this proceeding pursuant to the terms of the PMA. The PMA states, "The remaining costs of the arbitration proceedings or any other costs relating to the arbitration may be allocated by the board." As a result of the pervasive breaches of fiduciary duties under the PMA, fraudulent conduct in the underwriting of business and handling of claims, and fraudulent offset of Hartford's trust funds, Hartford has been forced to pay substantial fees and incur substantial costs to recover money that is owed. Thus, Hartford is entitled to an award of its attorneys fees and costs in pursuing this action. Hartford will present evidence regarding its attorneys fees and costs at the hearing.

### IV.

### CONCLUSION

The Principals ran the Hartford GAP Program for their own personal gain and ignored their fiduciary obligations to Hartford. As Directors and Officers of Evergreen, their actions gave rise to the allegations at issue in this arbitration and caused the damages sustained by Hartford. For all the foregoing reasons, Evergreen and its Principals (Charles Caronia, Sr., Gary Uphouse, Andrejs Krutainis, and Charles Caronia, Jr.) should be held individually and personally liable for the acts perpetrated against Hartford.

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP
JAMES E. FITZGERALD
S.V. STUART JOHNSON
REID A. WINTHROP

By:    _James E. Fitzgerald_
    James E. Fitzgerald
    Attorneys for Claimant
    Hartford Fire Insurance Company

-30-