# EXHIBIT N

ARBITRATION BOARD CONVENED IN
NEW YORK, NEW YORK

---------------------------------------------------------------x
                                          :

| | |
|---|---|
| In the Matter of the Arbitration of | : |
| | : **HARTFORD FIRE** |
| HARTFORD FIRE INSURANCE COMPANY | : **INSURANCE COMPANY'S** |
| | : **CLOSING ARBITRATION** |
|            Claimant, | : **BRIEF** |
|    - against - | : |
| | : |
| THE EVERGREEN ORGANIZATION, INC., | : |
| CHARLES CARONIA, SR., GARY UPHOUSE; | : |
| CHARLES CARONIA, JR.; and | : |
| ANDREJS KRUTAINIS, | : |
| | : |
|            Respondent. | : |

---------------------------------------------------------------x

      Claimant Hartford Fire Insurance Company ("Hartford") hereby submits the following

Closing Arbitration Brief.

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................................................................... 1

II.  THE EVERGREEN INDIVIDUALS' WRONGFUL CONDUCT ............................ 3

III. HARTFORD'S CLAIMS ........................................................................................... 4

A.   Hartford Is Entitled To Recover Its Damages Resulting From Evergreen's
     Unauthorized Writing Of New JM&A Business. ................................................. 4

     1.   Evergreen Was Not Authorized To Write New JM&A Accounts In 2002 Without
          First Disclosing It To Hartford For Its Approval. ....................................... 4

     2.   Evergreen Individual Respondents Are Personally Liable For Evergreen's Writing Of
          New JM&A Business in 2002. .................................................................... 12

          (a)   Personal Liability For The Evergreen Individuals' Tortious Conduct ............. 12

          (b)   Personal Liability For Aiding And Abetting Evergreen's Conduct .......... 14

          (c)   Personal Liability As Subagents. ................................................................ 15

B.   Hartford Is Entitled To Recover Its Damages Resulting From The Evergreen
     Individual Respondents' Unauthorized Disclosure Of Confidential Documents of
     Hartford And Its Insureds. ................................................................................. 16

C.   Hartford Is Entitled To Recover Its Damages Resulting From Evergreen's
     Unauthorized Use Of Hartford Funds To Pay Reliance Claims. ........................ 20

D.   Uphouse And Caronia May Also Be Held Personally Liable As Alter Egos Of
     Evergreen ........................................................................................................... 22

IV.  EVERGREEN'S CLAIMS ....................................................................................... 25

A.   Evergreen's Claims For Offsets ......................................................................... 25

     (1)   Claims Servicing Fees ............................................................................... 25

     (2)   Terrorism Project Expenses ....................................................................... 28

     (3)   Countersignature Fees ............................................................................... 28

     (4)   Profit Sharing Commission ........................................................................ 28

50349773v1

## TABLE OF CONTENTS
### (CONTINUED)

Page

B.    Other Damages Claimed by Evergreen ....................................................................29

    (1)    Monies Due Arch Insurance Company .............................................................29

    (2)    Continuing Enrollment Fees...............................................................................30

V.    EVERGREEN'S LIABILITY IS NOT REDUCED BY
HARTFORD'S REINSURANCE ...................................................................................31

VI.    DAMAGES ......................................................................................................................32

VII.    CONCLUSION ................................................................................................................33

## TABLE OF AUTHORITIES

Page(s)

### CASES

ADT Operations, Inc. v. Chase Manhattan Bank, N.A.,
  662 N.Y.S.2d 190 (1997)................................................................................................5

Anonymous v. CVS Corp.,
  728 N.Y.S.2d 333 (2001)...............................................................................................5

Austin Powder Co. v. McCullough,
  216 A.D.2d 825, 628 N.Y.S.2d 855 .........................................................................22, 23

Board of Managers of Fairways at North Hills Condominium v. Fairway at North Hills,
  603 N.Y.S.2d 867 (App. Div. 1993)..............................................................................4

Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.,
  98 F.3d 13 (2d Cir. 1996) ........................................................................................23, 24

Brown v. Lockwood,
  76 A.D.2d 721, 432 N.Y.S.2d, 193 (2d Dept. 1980) .........................................................12

Cristallina, S.A. v. Christie, Manson & Woods Int'l, Inc.,
  502 N.Y.S.2d 165 (1986)...........................................................................................5, 14

Drucker v. Mige Associates II,
  639 N.Y.S.2d 365 (App. Div. 1996).............................................................................5, 20

Eastern States Elec. Contractors, Inc. v. William L. Crow Const. Co.,
  544 N.Y.S.2d 600 (App. Div. 1989)..............................................................................22

First Capital Asset Mgmt., Inc. v. N.A. Partners, LP,
  755 N.Y.S.2d 63, 300 A.D.2d 112 (2002)......................................................................22

Freeman v. Complex Computing Co., Inc.,
  119 F.3d 1044 (2d. Cir. 1997) ....................................................................................23

Hartford Accident & Indem. Co. v. American Express Co.,
  518 N.Y.S.2d 93 (1987)....................................................................................5, 20, 31

Kaufman v. Cohen,
  760 N.Y.S.2d 157, 307 A.D.2d 113 (2003).........................................................14, 15, 19

Kern v. Robert Currie Assocs.,
  632 N.Y.S.2d 75 (App. Div. 1995)................................................................................5

50349773v1

TABLE OF AUTHORITIES
(CONTINUED)

Page(s)

Mandelblatt v. Devon Stores, Inc.,
        521 N.Y.S.2d 672 (App. Div. 1987)............................................................5, 13

Manley v. Ambase Corp.,
        121 F. Supp. 2d 758 (S.D.N.Y. 2000) .................................................................15

Marra v. Katz,
        74 Misc. 2d 1010, 347 N.Y.S.2d 143 (1973)................................................15, 19

Moses v. Martin,
        360 F. Supp. 2d 533 (S.D.N.Y. 2004) ...............................................................22

S & K Sales Co. v. Nike,
        816 F.2d 843 (2nd Cir. 1987) ............................................................................14

Shindler v. Lamb,
        211 N.Y.S.2d 762 (Sup. Ct. 1959)................................................................19, 22

Van Wormer v. McCasland Truck Center Inc.,
        163 A.D.2d 632, 558 N.Y.S.2d 683 (1990)..................................................12, 19

Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,
        933 F.2d 131 (2d Cir. 1991) ........................................................................22, 23

STATUTES

Professions Code Section 17200 ...........................................................................16, 17

OTHER AUTHORITY

2A N.Y. Jur., *Agency and Independent Contractors* § 204 (2003) ..................................5

2A N.Y. Jur.2d, *Agency and Independent Contractors* § 212 (2003) ............................5

N.Y. Jur. 2d, *Agency and Independent Contractors* § 215 (2003) ...............................13

Restatement (Second) of Agency § 5(1)...............................................................15, 16

Restatement (Second) of Agency § 80(b)...................................................................15

Restatement (Second) of Agency § 381 .......................................................................5

Restatement (Second) of Agency § 428 ......................................................................16

50349773v1

## I.

## INTRODUCTION

Hartford Fire Insurance Company ("Hartford") entrusted The Evergreen Organization, Inc. ("Evergreen"), and its principals and officers, with the management of its GAP Program from July 1, 2000, through February 2004. Hartford initially felt comfortable in doing so since the Evergreen principals – Gary Uphouse ("Uphouse") and Charles Caronia, Sr. ("Caronia") – had run the same program for Reliance during the mid-to-late 1990s. Even after Hartford audited Evergreen in mid- and late 2001 and warned Evergreen that it had to improve its performance, Hartford felt comfortable in continuing with Evergreen as its program manager since it received written and oral assurances from Caronia, Evergreen's chairman, that new and renewed controls were in place and would be followed. This was solidified when Caronia agreed in January 2002 to hire Hartford's former GAP underwriter, Andrejs Krutainis ("Krutainis"), as Evergreen's Chief Operating Officer, and promised Hartford that Evergreen would implement all required underwriting and claims criteria.

It turns out that Evergreen's promises were hollow. Within months of Krutainis joining Evergreen, Messrs. Uphouse and Caronia negotiated an underwriting deal with producer JM&A in violation of just about everything that they assured Hartford they would do. They decided to underwrite one of the single largest accounts with no underwriting information to justify writing such an account or to justify the price they quoted. It became clear throughout the arbitration hearing that Caronia and Uphouse had no concern about the underwriting because they were not responsible for the resulting losses. They made their money from enrollment fees and, instead of honoring their fiduciary duty, took every opportunity to benefit themselves unjustly at the expense of Hartford.

1

Uphouse and Caronia personally extracted over $18 million from Evergreen, far more than the total amount of fees Evergreen should have ever collected as the managing general agent of Hartford's GAP program, which only received approximately $103 million in total premium. [*See* Exhibit "A" attached hereto.] Evergreen's officers' total lack of honor and duty was epitomized by their unilateral withholding of premium trust funds when they believed that their relationship with Hartford was coming to an end. They held on to Hartford's premiums under the guise of owed monies – for things like countersignature fees – and then siphoned those funds, thereby leaving the Evergreen accounts dissipated.

In the end, the Panel members even had to ask themselves: how did Uphouse and Caronia manage to take home over $18 million in less than 4 years? Quite simply, the numbers do not add up. Evergreen's principals could not explain it – indeed, Uphouse could not even explain why Evergreen wrote checks for $250,000 to his wife, who never worked for Evergreen! Only Caronia and Uphouse, and maybe Krutainis, actually know how they made so much money as program managers. It appears rather clear that Evergreen, which claims it only received income because of its role as Hartford's GAP Program manager, made millions from unreported "side deals" with the numerous producers who solicited and submitted GAP enrollments to Evergreen, which issued Hartford policies to cover those enrollments. As with JM&A, Evergreen's principals concealed material information from Hartford so that it could continue to act as its program manager and reap millions in "profits."

In the end, Hartford has been unable to determine exactly how much money Evergreen diverted from Hartford for its own use. What Hartford has been able to determine are certain documented instances of misconduct, for which it asks that the following specific damages (including pre-judgment interest) be awarded:

-2-

- Unauthorized writing of JM&A business. $6,939,960.60 ($4,796,243.00 in net losses, plus interest of $2,143,717.60).

- Interest only on unauthorized payment of $1 million-plus for Reliance claims. $555,918.55.

- Unauthorized and unjustified diversion and offset of premium trust funds. $1,000,279.35 ($789,661.40 premium, plus interest of $210,617.95)

- Unauthorized disclosure of confidential, proprietary information to Mitsubishi Motors Credit of America, Inc. ("MMCA"). $93,894.50 (no interest included)

**Total: $8,590,053.00**

[*See* Exhibits "B" (Itemized Damages) and "C" (Interest Calculations).]

While Evergreen is responsible for these damages, it shares that responsibility with the people who actually ran Evergreen. As set forth herein, the individual respondents acted as fiduciaries and are therefore liable for the consequences of their conduct. Evergreen was used simply as a conduit for their wrongful conduct. Evergreen should not be used as a shield to protect them from liability for the damages they caused.

## II.

## THE EVERGREEN INDIVIDUALS' WRONGFUL CONDUCT

The evidence presented establishes numerous breaches of contract, breaches of fiduciary duty, and fraudulent concealment by Caronia, Uphouse and Krutainis ("the Evergreen Individuals"), including, *inter alia:*

- Writing new JM&A business in 2002 without advising Hartford or obtaining Hartford's prior approval;

- Using Hartford funds to pay over $1 million in Reliance claims;

-3-

- Failing to create a trust account for the deposit of Hartford premium;

- Allowing a third party access to files containing confidential and/or proprietary information concerning Hartford and its insureds;

- Failing to obtain sufficient insurance policies to provide coverage for the conduct of Evergreen's directors, officers, and employees;

- Directing claims personnel to falsify documents in Evergreen's claim files to conceal Evergreen's fraudulent payments to insureds;[1] and

- Failing to accurately and timely track, process, and adjust Hartford GAP claims.

The Evergreen Individuals' conduct has caused Hartford to suffer millions of dollars in damages, for which Hartford is entitled to be compensated.

### III.

### HARTFORD'S CLAIMS

A. **Hartford Is Entitled To Recover Its Damages Resulting From Evergreen's Unauthorized Writing Of New JM&A Business.**

    1. **Evergreen Was Not Authorized To Write New JM&A Accounts In 2002 Without First Disclosing It To Hartford For Its Approval.**

As Hartford's GAP Program Manager, Evergreen was charged with, *inter alia*, soliciting and binding new risks on Hartford's behalf. As a result, Evergreen stood in a fiduciary relationship with Hartford. *See Board of Managers of Fairways at North Hills Condominium v. Fairway at North Hills*, 603 N.Y.S.2d 867, 869 (App. Div. 1993) (a "fiduciary" is one who transacts business, or handles money or property, which is not his, for the benefit of another person, as to whom he stands in relation). Indeed, the very essence of Evergreen's role as

---

[1] *See* Kelly Moffat deposition excerpts submitted to the panel.

Hartford's Program Manager was to transact business and handle premium on behalf of Hartford.[2]

A fiduciary owes a duty of undivided and undiluted loyalty to those whose interest a fiduciary is to protect. *See Drucker v. Mige Associates II*, 639 N.Y.S.2d 365, 366 (App. Div. 1996) (noting the fiduciary duty is a sensitive and inflexible rule of fidelity); *accord Hartford Accident & Indem. Co. v. American Express Co.*, 518 N.Y.S.2d 93, 97 (1987).

Moreover, an agent or fiduciary "is subject to a duty to use reasonable efforts to give his principal **information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have** and which can be communicated without violating a superior duty to a third person." *Cristallina, S.A. v. Christie, Manson & Woods Int'l, Inc.,* 502 N.Y.S.2d 165, 171 (1986) (emphasis added), quoting Restatement (Second) of Agency § 381; *see also* 2A N.Y. Jur.2d, *Agency and Independent Contractors* § 212 (2003) (noting an agent must promptly disclose information obtained during the period of engagement, which affects the transaction in which the agent is engaged, so that the principal may take steps to protect his or her interests).

---

[2] A fiduciary duty arises, even in a commercial transaction, where one party reposed trust and confidence in another who exercises discretionary functions for the party's benefit or possesses superior expertise on which the party relied. *See Anonymous v. CVS Corp.*, 728 N.Y.S.2d 333, 336-37 (2001); *see also* 2A N.Y. Jur., *Agency and Independent Contractors* § 204 (2003). A fiduciary duty may be created by express provision of contract, or by factors such as the parties' financial interdependence or their sharing of confidential and proprietary information. *ADT Operations, Inc. v. Chase Manhattan Bank, N.A.*, 662 N.Y.S. 2d 190, 192 (1997); *see also Kern v. Robert Currie Assocs.*, 632 N.Y.S.2d 75, 76 (App. Div. 1995) (holding contractual relationship may give rise to fiduciary duties regardless of whether contract itself includes specific words or language in that regard); *Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (App. Div. 1987) (recognizing the same conduct which may constitute breach of a contractual obligation may also constitute breach of duty arising out of relationship created by contract but which is independent of contract itself).

50349773v1

Under its Program Manager's Agreement with Hartford, Evergreen was charged with binding risks "only in accordance with [the guidelines set forth herein] and any other underwriting and pricing standards from time to time established by [Hartford], in writing...." [Exhibit 70, Program Manager's Agreement ("PMA"), Article III, Section C.] Following its November 2001 audit of Evergreen – and in an effort to reduce mounting losses on its GAP Program – Hartford substantially restricted Evergreen's authority to write new GAP business.[3] In furtherance of this, and at the suggestion of David McElroy, Evergreen hired Krutainis in January 2002 to immediately take over operational and underwriting control of Evergreen from Uphouse. [Hearing at 541:10-542:5, 543:2-7; 544:2-9 (Caronia); Hearing at 993:23-994:8, 995:19-996:11 (McElroy); Hearing at 1194:15-1196:14 (Krutainis); Hearing at 1261:7-1262:2 (Steinberg).] Evergreen and Hartford understood that Uphouse was to be removed completely from the underwriting function at Evergreen. [Hearing at 994:16-22 (McElroy); Hearing at 1196:22-1198:2 (Krutainis); Hearing at 1262:3-1263:2 (Steinberg).]

As part of its effort to limit Evergreen's writing of new GAP business, Hartford also issued additional, written underwriting criteria on December 19, 2001, stating that **"Evergreen has no authority to quote or bind any risk [for] any account in excess of $25,000 annualized written premium"** and that such risks **"must be submitted to [Hartford] for review and approval."** [Exhibit 25 at p. 3 (emphases added).] Accordingly, Evergreen had an unequivocal duty to disclose to Hartford its writing of new GAP accounts under its general duties as Hartford's agent and fiduciary and pursuant to its express, obligations set forth in the PMA and Hartford's written underwriting criteria. Uphouse and Caronia admit they received and read the

---

[3] Hartford had already conducted an audit of Evergreen in July 2001, during which Hartford determined that the underwriting model on the GAP program needed to be altered. [Exhibit 24.]

-6-

December 19, 2001, Audit Letter (the "Audit Letter"), responded to Hartford about the letter, and even discussed the requirements set forth in the letter with Krutainis and McElroy. [Hearing at 100:2-20, 104:5-105:4, and 145:14-23 (Uphouse); Hearing at 518:16-24, 519:1-15, and 527:5-8 (Caronia); Exhibits 26-27.] Moreover, neither Uphouse nor Caronia objected to underwriting criteria set forth in the Audit Letter. [Hearing at 105:22-107:6 (Uphouse); Hearing 519:16-520:1 (Caronia).] Indeed, they agreed to them.

Evergreen, however, ignored Hartford's explicit written instructions and agreed to write new JM&A accounts without first disclosing this fact to Hartford. On July 11, 2002, Uphouse and Caronia, on behalf of Evergreen, entered into a General Agency Agreement[4] (i.e., a "producer agreement") with JM&A to allow JM&A to produce qualified GAP insurance business through Evergreen. [Exhibit 104; Hearing at 141:1-23 ( Uphouse).] The agreement with JM&A was a new agreement to produce a substantial amount of business that had not previously been produced through JM&A. The new JM&A agreement was to produce business through a private label program with hundreds of dealerships, many of which produced business in excess of $25,000 annualized written premium. [Exhibit 104, Sections 2, 4; Panel Exhibit 2; Hearing at 1187:18-1192:11 (Krutainis).]

It was Uphouse and Caronia, through Evergreen, that performed all underwriting (however slim or non-existent it was) on this new JM&A business, which included requesting information from JM&A, deciding to accept the risk, setting the enrollment price and ultimately binding the account. [Hearing at 146:18-147:3 (Uphouse).] In reality, Uphouse performed no underwriting at all. Indeed, Uphouse admitted that before he agreed to write such a substantial new book of business, he:

---

[4] The General Agency Agreement was executed by Fidelity Insurance Agency, a JM&A related entity.

-7-

- **failed to obtain any financial documentation** to support a loss history on the new JM&A business];

- **failed to consider the underwriting criteria** set forth in the December 19, 2001, Audit Letter; and

- **did not even know the actual premium rate** JM&A was charging insureds.

[Hearing at 143:19-144:10, 277:7-16, and 147:23-148:18 (Uphouse).]

Uphouse and Caronia further admitted that Evergreen did not disclose the new JM&A business to Hartford for its prior approval. [Hearing at 146:14-17 and 256:23-257:3 (Uphouse); and 538:24-539:5 (Caronia).] In addition, Uphouse did not even disclose Evergreen's writing of this JM&A business to Krutainis (who supposedly replaced Uphouse as the person responsible for GAP underwriting at Evergreen) until *after* the policies had already been issued. [Hearing at 141:24-142:6 and 149:9-150:2 (Uphouse), and 793:10-794:2, 819:20-820:3 (Krutainis).] Caronia testified that he would have expected Krutainis to be involved in the underwriting of the JM&A business in July 2002 as "any piece of paper emanating from Mr. Uphouse's desk per Mr. McElroy would go through Mr. Krutainis."[5] [Hearing at 542:6-543:7 (Caronia).] Krutainis testified that he "wasn't thrilled" when he learned of the new JM&A business later in July 2002, and was surprised that the JM&A account was written by Uphouse without his involvement. [Hearing at 1206:22-1208:14 (Krutainis).] This is probably because he knew that he had rejected the JM&A GAP business when Evergreen presented it to him while at Hartford one year earlier - at approximately the same rate.[6]

---

[5] One wonders whether this was because Caronia and Uphouse thought that Krutainis would tell his old boss (Hartford) and destroy their deal with JM&A, or whether they just didn't wanted to cut Krutainis out of their deal so they would not have to pay him a $1/enrollment fee.

[6] In July 2001, Caronia presented a new segment of JM&A business to Hartford, which Caronia called the "Great American" business. At that time, Evergreen had been doing a very

-8-

More than two months later – on September 30, 2002 – and for the first time, Krutainis mentioned the underwriting of the new JM&A account to Hartford's underwriter, Ian Steinberg.[7] [Hearing at 899:24-900:5 (Krutainis); Hearing at 1265:12-1267:6 (Steinberg).] Ironically, Hartford and Evergreen personnel had met in early July 2002 to establish rate increases on the entire GAP portfolio in an effort stem the losses on the GAP business, but Evergreen had made no mention of the new JM&A business. [Hearing at 1288:17-1289:5 (Steinberg).]

Immediately upon learning of the new JM&A business, Steinberg and Ron Helmeci, a Hartford actuary, objected to the binding of the account and demanded that Krutainis provide information and documentation to support Evergreen's decision to write the new JM&A business. [Exhibits 45, 46, 51, 52, and 56; Hearing at 822:19-823:22 (Krutainis); Hearing at 1267:21-1268:7 and 1338:3-9 (Steinberg).] In response, Krutainis requested information and documentation from JM&A, but JM&A refused to provide it to Evergreen. [Exhibits 45 and 46; Hearing at 825:5-826:7 (Krutainis).] Hartford continued to make requests for information on the new JM&A accounts, but Krutainis intentionally avoided contact with Hartford personnel and told them that he would get it. [Ex. 46; Hearing at 827:18-829:1 (Krutainis).] Despite Hartford's repeated requests, Krutainis failed to provide to Hartford documentation showing detailed loss data on the new JM&A business. [Hearing at 154:18-155:4 (Uphouse); Hearing at

---

small amount of GAP business with JM&A, strictly in Mississippi. [Hearing 135:14-17 (Uphouse).] Krutainis, on behalf of Hartford, rejected the business based on the information that JM&A provided to Evergreen because the proposed premium amount ($34) would not even cover the expected losses on the account. [Exhibits 41 and 101; Hearing at 137:1-19, 138:16-19, and 251:4-19 (Uphouse); Hearing at 800:7-20 and 803:15-804:4 (Uphouse).]

[7] Evergreen has argued that Hartford was on notice of the new JM&A business as soon as it began receiving monthly enrollment reports listing JM&A enrollments and the premium on the JM&A enrollments. However, Harford did not receive the August/September 2002 enrollment bordereaux reflecting new JM&A accounts until October or November 2002. [Hearing at 842:20-843:16 (Krutainis); Hearing at 1108:11-1110:1 (Helmeci).]

832:14-833:14, 834:8-835:4, and 854:23-855:10 (Krutainis); Hearing at 1112:23-1113:3
(Helmeci); Hearing at 1270:21-1271:3 (Steinberg).]

Ultimately, Hartford performed its own analysis of the JM&A business and determined
that the rate it was receiving ($36/$37 per enrollment) was only about 40% of the minimum rate
that should have been charged ($92 per enrollment). [Exhibit 60; Hearing at 1120:5-1121:13 and
1153:6-16 (Helmeci).] Even Krutainis admitted that the price was below the rate targets that
Hartford had set. [Exhibit 54; Hearing at 853:17-855:7 (Krutainis).] The price was obviously
inadequate considering Hartford rejected the JM&A business only a year earlier at $34 per
enrollment, and in the year since then the 9/11 attacks had sent the used car market – and thus the
entire GAP industry – into a tailspin. [Hearing at 1148:22-1150:14 and 1154:16-1155:10
(Helmeci).] However, by the time Hartford was able to perform its own analysis of the new
JM&A business, JM&A had already been submitting tens of thousands of enrollments to
Evergreen for several months. [Exhibits 56, 58, and 60; Hearing at 1271:4-1272:19 (Steinberg).]

In January 2003, Hartford declared that Evergreen's unauthorized acceptance of the new
JM&A business to be a further default under the PMA and that Hartford was rejecting the JM&A
risk bound by Evergreen. [Exhibits 53 and 61; Hearing at 1274:5-24 and 1345:14-1346:24
(Steinberg).]

Evergreen has argued that because it was accepting enrollments from JM&A in 2001 and
earlier, the JM&A accounts it wrote in 2002 were not "new accounts" that had to be disclosed to
Hartford for its approval. This is a disingenuous argument at best and belied by the following
facts. First, the few hundred JM&A enrollments that Evergreen was accepting each month on
behalf of Hartford prior to 2002 only came from one state – Mississippi. Second, Evergreen
knew that this was an entirely new JM&A account – in fact it entered into a separate agency

-10-

agreement with JM&A in July 2002. Third, by December 2002, Evergreen was accepting enrollments from thirty-three dealerships, under the JM&A family, that each had over $25,000 in annualized premium. [*See* Exhibit "D", attached hereto.] Fourth, during his efforts to place GAP coverage with Arch Insurance after Hartford terminated its PMA with Evergreen, Krutainis himself admitted in a June 9, 2003, e-mail to the President of Arch that "while [Evergreen] had a business relationship with [JM&A] for several years, we only really started to do business with them a year ago." [Exhibit 64 (emphasis added).]

Evergreen has also argued that almost immediately after Hartford implemented new written underwriting criteria in December 2001 to stem its losses on its GAP program, the parties agreed to waive that very criteria. Besides making no sense whatsoever, Evergreen's contention is not supported by any evidence. Instead, the testimony of current and former Hartford personnel confirm that Hartford never waived the requirements set forth in the Audit Letter. [Hearing at 1034:5-11 and 1045:15-1046:6 (McElroy); Hearing at 1153:17-1154:4 (Helmeci); Hearing at 1263:3-21 and 1290:10-15 (Steinberg).] Moreover, Evergreen has presented no evidence of any written modification of the PMA, as required by the parties' agreement. [*See* Exhibit 70, PMA at Article XIX, Section G.]

In light of the above, the evidence presented establishes that: (1) Hartford implemented new underwriting criteria that required Evergreen to submit for prior authorization any GAP account exceeding $25,000 in annual premium, (2) the parties did not waive these underwriting criteria, (3) Evergreen wrote new JM&A accounts in 2002 that far exceeded $25,000 in annual premium, and (4) Evergreen made no effort to submit this new business to Hartford for prior approval and instead concealed the new JM&A accounts.

Evergreen has argued that even if it did wrongfully conceal its writing of new JM&A business in 2002, Hartford suffered no damages because it could have cancelled the JM&A business at any time. However, Hartford could not simply cancel the JM&A account policies without cause. Indeed, state regulations and amendatory endorsements prohibited cancellation of a GAP policy without a showing of fraud, change in risk, or other required criteria. [Hearing at 1042:19-1044:10 (McElroy); Hearing at 1291:12-1293:20 (Steinberg); Hearing at 971:18-974:2 (Krutainis); Exhibit 101A.] There was no evidence that JM&A had misrepresented anything from Evergreen, Hartford's underwriting agent. In fact, JM&A simply refused to make representations and provide documentation about its business – if Evergreen ever actually even asked it to do so. In any event, Evergreen wrote the business without the documentation and information it should have had. These facts provided no basis to cancel a GAP policy. As a result, Hartford was saddled with risks that Evergreen improperly accepted from JM&A beginning in 2002.

## 2.    Evergreen Individual Respondents Are Personally Liable For Evergreen's Writing Of New JM&A Business in 2002.

### (a)    Personal Liability For The Evergreen Individuals' Tortious Conduct

A corporation's directors and officers are personally liable for any tort they commit themselves or in which they personally participate. *See Van Wormer v. McCasland Truck Center Inc.*, 163 A.D.2d 632, 635, 558 N.Y.S.2d 683 (1990). A corporate director or officer is personally liable for fraudulent concealment if (1) he concealed a material fact, (2) he knew of the concealment, (3) he concealed a fact to induce the plaintiff to rely upon it, (4) the plaintiff rightfully relied on the concealment, and (5) the plaintiff's was injured as a result of its reliance. *See Brown v. Lockwood*, 76 A.D.2d 721, 730, 432 N.Y.S.2d, 193, 196 (2d Dept. 1980); see also

-12-

2A N.Y. Jur. 2d, Agency and Independent Contractors § 215 (2003) (agent is prohibited from acting in any manner inconsistent with his or her agency or trust).

Here, the Evergreen Individual Respondents are personally liable for fraudulent concealment and breach of fiduciary duty because of their concealment of the underwriting of the JM&A account. As set forth above, the evidence shows that Uphouse and Caronia were required to disclose to Hartford the new JM&A business they were considering in 2002 before they ultimately agreed to accept it on Hartford's behalf. Uphouse and Caronia, however, chose not to advise Hartford of the writing of this new business, perhaps because they knew Hartford would reject the risk since Hartford had previously rejected this very account only one year earlier and Hartford was trying to reduce the size of its GAP program to a more manageable and profitable level. Moreover, once Krutainis learned about the new JM&A business, he also withheld this crucial information from Hartford for months. The failure to advise Hartford – for more than *two months* – that Evergreen had bound Hartford to one of the largest risks in the entire Hartford GAP program was nothing short of fraudulent concealment by the Evergreen Individual Respondents.

The Evergreen Individual Respondents have argued that, at most, they merely breached their contractual duties owed to Hartford. But the mere fact that their conduct was also a breach of the PMA in no way eliminates their liability for their breach of fiduciary duty and fraudulent concealment. *See, e.g., Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (App. Div. 1987) (recognizing the same conduct which may constitute breach of a contractual obligation may also constitute breach of duty arising out of relationship created by contract but which is independent of contract itself).

-13-

Ultimately, Uphouse, Caronia and Krutainis concealed material information from Hartford in furtherance of their attempt to bring in a substantial volume of new GAP business as quickly as possible, without regard to any underwriting of the new risk or to Hartford's express, written underwriting criteria (which required prior disclosure to, and approval by, Hartford). At its very core, the Evergreen Individuals' conduct was an egregious breach of fiduciary duty and a fraudulent concealment. *See Cristallina, S.A. v. Christie, Manson & Woods Int'l, Inc.*, 502 N.Y.S.2d 165, 171 (1986) (agent or fiduciary "is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person") (emphasis added).

### (b)    Personal Liability For Aiding And Abetting Evergreen's Conduct

Uphouse, Caronia and Krutainis are also personally liable under New York law for aiding and abetting a breach of fiduciary duty where (1) a fiduciary breached its obligations to another, (2) the individual knowingly induced or participated in the breach, and (3) the plaintiff suffered damages as a result of the breach. *See Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169, 307 A.D.2d 113 (2003); *see also S & K Sales Co. v. Nike*, 816 F.2d 843, 847-848 (2nd Cir. 1987).

A person "knowingly participates in a breach of fiduciary duty" when he or she provides "substantial assistance" to the primary violator. *Kaufman*, 760 N.Y.S.2d at 170. "Substantial assistance" occurs when a defendant enables the breach to occur by affirmatively assisting, concealing, or failing to act when required to do so. *Id.*

Here, the Evergreen Individuals' concealed the very fact that Evergreen was writing new JM&A business beginning in 2002, in direct violation of Hartford's written underwriting criteria. The evidence clearly demonstrates that the Evergreen Individuals knew about – and were

-14-

actually responsible for – Evergreen's unauthorized writing of the new JM&A business in 2002 and deliberately concealed this from their fiduciary, Hartford. Accordingly, the Evergreen Individuals cannot escape personally liability for "substantially assisting" Evergreen's breach of fiduciary duty by deliberately assisting the breach, concealing information, and failing to act when required to do so. *See Kaufman*, 760 N.Y.S.2d at 170.

(e)    <strong><u>Personal Liability As Subagents.</u></strong>

Uphouse, Caronia and Krutainis are also personally liable under New York law as "subagents" for the unauthorized acceptance of new JM&A business beginning in 2002. A subagent is "a person appointed by an agent empowered to [appoint such a subagent] to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible." *Manley v. Ambase Corp.*, 121 F.Supp. 2d 758, 772 (S.D.N.Y. 2000) (citing Restatement (Second) of Agency § 5(1) (1958)).

The authority for an agent (such as Evergreen) to appoint its officers and directors as subagents "is inferred from authority to conduct a transaction for the principal for the performance of which the agent is to be responsible if…the agent is a corporation, partnership, or other organization." *Id.* (citing Restatement (Second) of Agency § 80(b)). Specifically, the authority of a corporation to appoint a subagent to perform the tasks of the agent may be inferred because "<u>one employing a corporation as an agent necessarily knows that the corporation must act through agents and hence consents to the use of its employees as subagents.</u>" *Id.* (emphasis added) (citing Restatement (Second) of Agency § 5, cmt. d).

A subagent is in fact himself an agent of the principal, even though there is no actual privity of contract between the subagent and the principal. *See Marra v. Katz*, 74 Misc.2d 1010,

-15-

1013, 347 N.Y.S.2d 143, 146 (1973) ("courts have had the greatest difficulty in understanding that a subagent is in fact an agent of the principal").

Here, Uphouse, Caronia and Krutainis are personally liable to Hartford because they engaged in acts that amount to a breach of Evergreen's fiduciary duty owed to Hartford. *See* Restatement (Second) of Agency, Section 5, comment "d" ("a subagent performing acts which the appointing agent has authorized him to perform in accordance with an authorization from the principal is an agent of the principal and affects the relations of the principal to third persons as fully as if the appointing agent had done such acts."); *see also* Restatement (Second) of Agency § 428, cmt. "e" (imposing liability on the subagent for anything received by him on account of, and to be in trust for, the principal).

B.    **Hartford Is Entitled To Recover Its Damages Resulting From The Evergreen Individual Respondents' Unauthorized Disclosure Of Confidential Documents of Hartford And Its Insureds.**

As Hartford's agent and fiduciary, Evergreen owed a duty of utmost loyalty to Hartford and was therefore not entitled to turn over to third parties any confidential or proprietary records relating to Hartford's GAP program or Hartford's insureds. Article III, subsection N, of the PMA explicitly confirms this and requires Evergreen to obtain *prior written consent* from Hartford before it turns over confidential information relating to Hartford's GAP Program. Ignoring its duties, the Evergreen Individuals in the late summer/early fall of 2004 turned over to MMCA boxes of documents relating to Hartford's entire GAP program as well as computer hard drives from some of the Evergreen Individuals' computers.

MMCA was trying to find anything it could to support its baseless claim for violation of California Business and Professions Code Section 17200, which was premised upon unfounded

-16-

allegations of unfair or fraudulent business practices by Hartford. Evergreen affirmatively facilitated MMCA's fishing expedition by releasing documents relating to every element of Hartford's GAP Program. Uphouse was aware that a lawsuit was pending between Hartford and MMCA. [Hearing at 168:15-169:2 (Uphouse).] Moreover, Uphouse admitted he knew Evergreen's files had confidential information in them regarding Hartford's insureds other than MMCA. Despite this, Uphouse testified that he authorized the production of Evergreen's confidential files to MMCA's counsel without obtaining authorization to produce those files, even though he was aware that Hartford's counsel advised his attorney that production of those confidential files was not authorized by Hartford. [Hearing at 172:20-173:2, 173:18-174:10 and 175:12-18 (Uphouse).]

As a result of Evergreen's unauthorized, improper release to MMCA of such sensitive, confidential, and proprietary material, MMCA was able to prosecute a meritless claim for violation of California Business and Professions Code Section 17200 based upon unfounded allegations of unfair or fraudulent business practices. MMCA used documents from Evergreen regarding Hartford's other insureds. It allowed MMCA to ask questions at depositions about those insureds, seek further discovery about those insureds (which was denied), file frivolous motions about those insureds and other confidential Hartford information it had wrongfully received from Evergreen. As a result of these disclosures, Hartford had to engage in substantial additional discovery in that case. Ultimately, MMCA dismissed its 17200 claim with prejudice, but only after Hartford incurred $93,894.50 in fees and costs to defend its own interests and the privacy interests of its insureds. [Exhibit 96.]

Evergreen and the Evergreen Individuals do not deny that they turned over confidential information regarding Hartford and its insureds other than MMCA. Evergreen argues that it has

-17-

no liability for its production of documents to MMCA because (a) it was compelled to release material relating to Hartford's GAP Program pursuant to a subpoena issued in litigation that was pending in the U.S. District Court, Central District of California, between MMCA and Hartford, and (b) it relied upon the advice of its counsel in releasing the material to MMCA. First, an attorney may issue a subpoena in litigation pending in the U.S. District Court, Central District of California, without a specific court order. Such a subpoena may include overly broad requests for production and may seek documents that are wholly irrelevant to the pending litigation. Hartford's counsel specifically advised Evergreen's counsel that it could not release such documents and that, if necessary, Hartford would file a motion for protective order. The Evergreen Individuals' response was to ignore that instruction and simply release confidential documents to MMCA without first advising Hartford that it was doing so. Evergreen failed to give Hartford any chance to limit the scope of MMCA's subpoena.[8] Second, there is no "advice of counsel" defense to a claim for breach of contract or breach of fiduciary duty.

Under New York law, it is generally held that where the wrongful act of a defendant has involved the plaintiff in litigation with others, or placed the plaintiff in such relation with others as makes it necessary to incur expense to protect his or her interest, such expenses, including attorneys' fees, should be treated as the legal consequences of the original wrongful act, and may be recovered as damages. To recover fees and costs under this principle, the plaintiff must establish that (1) it became involved in a legal dispute either because of a breach of contract by the defendant or because of defendant's tortious conduct (that is, that the party sought to be charged with the fees was guilty of a wrongful or negligent act or breach of agreement), (2) the

---

[8] Ultimately, Magistrate Judge Marc Goldman held that the production of documents relating to Hartford's entire GAP program was unwarranted, and therefore upheld Hartford's objections to the production of its such documents from Hartford's own records.

-18-

litigation was with a third party, not with the defendant from whom the fees are sought to be recovered, (3) the attorneys' fees were incurred in that third-party litigation, and (4) the fees and expenses incurred were the natural and necessary consequences of the defendant's act (i.e., proximate cause). *See Shindler v. Lamb*, 211 N.Y.S.2d 762, 765 (Sup. Ct. 1959). Each of these elements has been met here. Accordingly, Hartford seeks to recover the attorneys' fees and costs it incurred as a result of Evergreen's release of records relating to Hartford's entire GAP program (including other insureds), which was a breach of contract and breach of fiduciary duty. Hartford is entitled to damages of $93,894.50, which represents the amount of attorneys' fees and costs Hartford incurred in opposing discovery motions and filing motions for summary judgment on issues relating to MMCA's 17200 claim.

The Evergreen Individuals – rather than Evergreen – were responsible for the release of these documents to MMCA, since Evergreen had already shut down operations by the time the documents were released in the latter part of 2004. Accordingly, the Evergreen individuals are personally liable for their breach of fiduciary duty. *See Van Wormer*, 163 A.D.2d at 635, 558 N.Y.S.2d 683 (1990) (a corporation's directors and officers are personally liable for any tort they commit themselves or in which they personally participate). Alternatively, the Evergreen Individuals may be held personally liable for aiding and abetting Evergreen's breach of fiduciary duty or as subagents who breached their fiduciary duties owed to Hartford. *See Kaufman*, 760 N.Y.S.2d at 170 (individuals may be liable for breach of fiduciary duty by affirmatively assisting, concealing, and failing to act when required to do so); *Marra v. Katz*, 74 Misc.2d 1010, 1013, 347 N.Y.S.2d 143, 146 (1973) (recognizing individual employees of agent may be deemed subagents of principal).

-19-

C.    **Hartford Is Entitled To Recover Its Damages Resulting From Evergreen's**
      **Unauthorized Use Of Hartford Funds To Pay Reliance Claims**

As Hartford's fiduciary, Evergreen was required to follow Hartford's explicit and
unequivocal instructions that it only disburse Hartford funds as Hartford instructed.  *See Drucker
v. Mige Associates II*, 639 N.Y.S.2d 365, 366 (App. Div. 1996) (a fiduciary owes a duty of
undivided and undiluted loyalty to those whose interest a fiduciary is to protect).  Evergreen,
however, disregarded Hartford's instructions in breach of its fiduciary duty.

In late June 2000, Reliance was forced to exit the GAP business and thereafter cancelled
its Reliance GAP policies on or about June 30, 2000.  Hartford issued new GAP policies to
provide coverage on a going-forward basis on only those enrollments submitted to Evergreen on
or after July 1, 2000.  Accordingly, Hartford specifically disclaimed coverage for any claims on
vehicles enrolled prior to July 1, 2000 ("Reliance Claims"), as they were not enrolled under the
Hartford GAP program and Hartford was not responsible for payment of those claims.  [Hearing
at 985:10-986:12, 1018:5-1019:23, and 1057:12-1058:2 (McElroy).]  Caronia admitted that
McElroy unequivocally instructed him that Hartford was not responsible for claims on
enrollments pre-dating the Hartford policies (i.e., those before July 1, 2000), and that Hartford
could not and would not approve payment of those claims under any circumstances.  [Hearing at
563:19-565:16, 570:4-571:2, and 572:3-576:13 (Caronia).]

In or about February 2001, Hartford provided Evergreen with drafts (i.e., checks) that
were only to be used to pay Hartford GAP claims.  [Hearing at 1230:18-1231:14 (Burke);
Hearing at 567:4-9 and 701:15-702:5 (Caronia); Hearing at 113:7-14 (Uphouse).]  Then on April
1, 2001, Hartford created a "zero-balance" trust account at Fleet Bank (Account No. 942-783-
9383) that Hartford funded for the sole purpose of paying Hartford GAP claims.  [Exhibit 75;

-20-

Hearing at 1230:18-1231:14 (Burke); Hearing at 122:1-3 (Uphouse).] Despite Hartford's

explicit instructions, Evergreen proceeded to pay Reliance claims using Hartford funds.

[Hearing at 211:21-212:14 (Uphouse).] Why? Caronia and Uphouse testified that it was to curry

favor with their clients (the GAP Producers). [Hearing at 127:12-17 (prior deposition testimony

of Uphouse)].

In early 2004, Hartford performed an analysis of Evergreen's payment of claims from

Hartford drafts and out of the Fleet bank account. [Ex. 74.] Hartford determined that Evergreen

had used approximately $1,065,000 of Hartford's funds to wrongfully pay a total of 479 Reliance

claims from February 2001 through April 2001. [Ex. 74.]

Caronia and Uphouse admitted that they unilaterally decided to pay claims received by

Evergreen on enrollments accepted under Reliance GAP insurance policies in order to maintain

Evergreen's customers and to dissuade Evergreen's customers from taking their business to

another provider. [Hearing at 572:22-572:5 (Caronia); Hearing at 122:10-123:1 and 126:4-

127:17 (Uphouse).] This was a blatant breach of the fiduciary duty owed to Hartford. *See id.* at

366 (a fiduciary is barred from entering situations in which its personal interest possibly conflicts

with the interest of those owed a fiduciary duty).

Hartford was recently reimbursed by Reliance for the approximately $1 million in claims

that Evergreen improperly paid in 2001. Evergreen argues that Hartford now has no claim for

Evergreen's payment of Reliance claims because of this reimbursement. However, Hartford has

not been made whole by Reliance's reimbursement because Hartford was denied use for 5+ years

of the approximately $1 million of Hartford funds that Evergreen improperly disbursed to

Reliance insureds. Hartford is entitled to interest in the amount of $555,918.55 (at 9%, the legal

-21-

rate of pre-judgment interest in New York) for being deprived the use of its funds.[9] *See, e.g.,*
*Shindler v. Lamb*, 211 N.Y.S.2d 762, 765 (Sup. Ct. 1959) (noting "the loss incurred in the
deprivation of the use of plaintiff's moneys is also treated as a legal consequence of defendants'
alleged original wrongful act and recoverable as an item of damages").

## D. <u>Uphouse And Caronia May Also Be Held Personally Liable As Alter Egos Of Evergreen</u>

An individual shareholder or principal may be held personally liable for a corporation's
conduct where: (1) he exerts complete domination and control over the corporation with respect
to the transaction at issue; (2) such domination and control was used to commit a fraud or other
wrong against the plaintiff; and (3) the control and misuse caused the plaintiff's injuries. *First
Capital Asset Mgmt., Inc. v. N.A. Partners, LP*, 755 N.Y.S.2d 63, 66, 300 A.D.2d 112, 116
(2002); *see also Eastern States Elec. Contractors, Inc. v. William L. Crow Const. Co.*, 544
N.Y.S.2d 600 (App. Div. 1989).

Under New York law, the corporate veil will be pierced to achieve equity "[w]hen a
corporation has been so dominated by an individual or another corporation and its separate entity
so ignored that it primarily transacts the dominator's business instead of its own and can be
called the other's alter ego." *Austin Powder Co. v. McCullough*, 216 A.D.2d 825, 827, 628
N.Y.S.2d 855; *see also Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933
F.2d 131, 138-139 (2d Cir. 1991). "Allegations of a lack of corporate formalities, commingling
of funds, and self-dealing may be sufficient to support a claim seeking to pierce the corporate
veil." *See Moses v. Martin*, 360 F.Supp.2d 533, 541-542 (S.D.N.Y. 2004).

---

[9] See Exhibit "B" to this brief for calculation of the pre-judgment interest on the payment
of Reliance claims.

-22-

Domination and control by the principals of a corporation are demonstrated by the absence of corporate formalities, inadequate capitalization, and/or use of corporate funds for personal rather than corporate purposes. *See Austin Powder Co. v. McCullough*, 628 N.Y.S.2d (App. Div. 1995) "In making this determination, courts look to a variety of factors, including the intermingling of corporate and personal funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 17-18 (2d Cir. 1996). In making such a determination, "[n]o one factor is decisive." *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1053 (2d. Cir. 1997).

Courts may also pierce the corporate veil where the individual officers use a corporation to commit a fraud for which there may be no remedy against the corporation. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131 (2d Cir. 1991).

There is ample evidence here to warrant personally holding Uphouse and Caronia liable as alter egos of Evergreen. Uphouse and Caronia used Evergreen to perpetrate a fraud upon Hartford, treated the assets of Evergreen as their own, paid Ann Uphouse (Gary Uphouse's wife) over a quarter-million dollars out of Evergreen accounts even though she was never an employee of Evergreen, and failed to create a fiduciary trust account on behalf of Hartford. [Hearing at 180:9-24 (Uphouse); Exhibit 99.][10] Moreover, Uphouse blatantly disregarded the PMA's

---

[10] When referring to funds kept in Evergreen's First Union/Wachovia account, Uphouse testified, "I thought it was my money, I could split it up any way I wanted to." In fact these funds were Evergreen's money received from the Canadian producers for Evergreen's services. Indeed, the checks were made payable to Evergreen. Yet, every penny from those commissions was given to Caronia and Uphouse. [Hearing at 180:18-19 (Uphouse).]

-23-

requirement that Evergreen obtain a \$5 million professional errors and omissions policy, a \$5 million comprehensive general liability policy, and \$3 million blanket employee dishonesty bond, as required by the PMA. [Hearing at 90:12-93:12 (Uphouse), Exhibit 34, Exhibit 70, Article IX.][11] As a result, Uphouse and Caronia were able to intermingle Hartford's premium with Evergreen's operating funds and siphon off over \$18 million for their personal use, leaving Evergreen with essentially no assets to cover Evergreen's debts.[12]

In light of the above, it is evident that several factors exist here that warrant holding Uphouse and Caronia personally liable as alter egos of Evergreen. Some of them include:

- the intermingling of corporate and personal funds
- commission of a fraud in concealing the writing of the JM&A account
- undercapitalization of the corporation, resulting in personal payment of Evergreen's debts by the principals
- siphoning off of funds by dominant shareholder[s]
- intentional failure to obtain sufficient insurance to protect Evergreen's assets

See *Bridgestone/Firestone, Inc.*, 98 F.3d at 17-18.

Uphouse and Caronia should be held personally responsible to Hartford here. They personally breached their fiduciary duties and allowed Evergreen to be run as their own ATM. They siphoned off all of the money from Evergreen and left it insolvent. Equity demands that they be held personally liable for Evergreen's debts – including those owed to Hartford.

---

[11] In fact, in October 2002, Uphouse requested from Evergreen's insurance broker a quote for a \$5 million professional errors and omissions policy, but purchased only \$1 million in coverage. [Exhibit 34.]

[12] Caronia and Uphouse confirmed that an \$80,000 bill from Arch Insurance for monies owed by Evergreen was paid personally by them (based on a 60/40 split) because Evergreen's assets had been frozen by the federal court in May 2004. If the corporation was not their personal piggybank, they would not have directly paid an \$80,000 debt of Evergreen.

-24-

IV.

## EVERGREEN'S CLAIMS

In the first instance, Evergreen is not entitled to any payment of monies from Hartford in this arbitration since it already *took* what it claims it was owed. If anything, it owes that money back to Hartford, plus interest as set forth below.

### A.    Evergreen's Claims For Offsets

On or about January 29, 2004, and again on February 26, 2004, Evergreen notified Hartford, without any authority, that it was retaining certain premium funds, due Hartford for enrollments under GAP policies, as an "offset" for fees it claimed it was owed from Hartford. [Exhibits 1 and 3.] However, Evergreen did not submit complete invoices or bills for the amounts it offset. Hartford immediately advised Evergreen that its actions were a breach of the PMA and demanded that Evergreen remit the proper premiums.  Evergreen refused.

Evergreen's original claim for offset contained four (4) components:

- Claims Fees

- Terrorism Project Expenses

- Countersignature Fees

- Profit Sharing Due. Evergreen has since abandoned its claim for Countersignature fees.

(1)    **Claims Servicing Fees:** Evergreen's January 29 and February 26, 2004 Offset Calculations list various alleged fees owed by Hartford for years 2002 through 2004 for the administration of claims. Within those lists are fees for (1) claims paid and (2) claims administered without payment (e.g., declined, no gap, etc.). [Exhibits 1 and 3.] As to the latter category, Evergreen has never provided any breakdown of which claims were declined, no gap, or simply pending. Indeed, Hartford was provided with no listing of these claims and therefore

-25-

cannot even evaluate which claims they are. Despite the fact that Krutainis testified that such a breakdown could have been performed from Evergreen's files, Evergreen never provided it. Hartford suspects this is because Evergreen could never substantiate the list if it was scrutinized. Thus, Evergreen has failed to provide a sufficient basis for anything other than claims that were actually paid. However, even if it had provided a breakdown, Hartford contends that Evergreen would not be entitled to any fees for three reasons.

First, Evergreen is not entitled to any further claims handling fees because of its many breaches of the Claims Servicing Agreement ("CSA"), as detailed throughout the arbitration hearing and in this brief above. In fact, Evergreen withheld Hartford's trust funds without even submitting invoices to Hartford for its January and February 2004 claims handling fees. [Hearing at 166:4-168:14 (Uphouse).] Mr. Vitiello testified that Hartford withheld payment for claims handling fees as a result of Evergreen's many breaches of the CSA (e.g., failure to maintain files, failure to obtain and even request proper documentation to determine coverage and calculate GAP amount; falsification of claims documentation (testimony of Kelly Moffat); failure to maintain confidentiality of Hartford's business records, etc.) [Hearing at 358:21-360:4 and 426:7-20 (Vitiello).] New York law clearly holds that a party to a contract is not entitled to further performance if that party is in material breach of the contract. Evergreen has no basis upon which to enforce any term of the contract because of its material breaches.

Second, *if* Evergreen is entitled to any claims fees, it would only be for those claims that have actually been paid – not claims that were pending and had not been fully administered. The parties' course of dealing dictates this result. The CSA states that Evergreen is only entitled to payment for claims administered. [Exhibit 71.] The former head of claims for the GAP business at Hartford, Vincent Vitiello, testified that the parties interpreted this provision to mean

-26-

that Evergreen was entitled to fees only for claims actually paid. [Hearing at 349:18-350:10 (Vitiello).] Mr. Caronia and Mr. Uphouse also testified that throughout the course of the relationship between Hartford and Evergreen under both the Reliance CSA and the Hartford CSA, Evergreen billed for, and Hartford paid, claims handling fees only when Evergreen had actually paid a claim. [Hearing at 580:24-584:16 (Caronia); Hearing at 288:17-289:17 (Uphouse).] In fact, Mr. Vitiello testified that the one time Evergreen submitted an invoice for claims handling fees for other than claims paid, he refused to pay the invoice and Evergreen submitted a new invoice to reflect only claims that Evergreen actually paid. [Hearing at 350:11-354:11, 420:5-16, and 421:24-422:15 (Vitiello); Exhibits 8, 9, and 10.] Evergreen knew it was only entitled to claims handling fees, if any, for claims actually paid.

Third, with respect to claims that were not paid, but for which Evergreen offset fees under the heading that they were "administered," Evergreen has failed to provide any list of such claims or to distinguish within those thousands of claims which ones were denied, which ones had no gap, or which ones were still pending and at what stage of the claims process they were pending. It is also unclear what stage of the claims process those claims were at, or whether those claims were simply taken in and indexed (if even that), denied, or if they were even Hartford claims (vs. Reliance claims, for example). Thus, Hartford (as well as the Panel) is unable to question, much less substantiate, the categorization of "administered" claims. Ironically, Evergreen's Krutainis testified that Evergreen was capable of providing such a breakdown, but never did. Therefore, Evergreen cannot justify entitlement to fees for administered, unpaid claims.

-27-

Hartford is entitled to recoup from Evergreen the offset amount for all claims handling fees ($546,548.06, plus interest) or, at a minimum, for those claims not categorized as "paid" ($365,688.06, plus interest).

(2)    **Terrorism Project Expenses:**  Evergreen failed to establish through documentary evidence or testimony how or why it is entitled to such fees. Uphouse testified that Caronia had a conversation with someone at Hartford regarding these expenses, but this was hearsay that was never actually substantiated by any testimony of Caronia, much less any written authorization. [Hearing at 161:24-162:20 (Uphouse).]  Since Evergreen failed to substantiate this expense, Hartford is entitled to recoup these fees in the amount of $5,284.34.

(3)    **Countersignature Fees:**  Evergreen has abandoned its claim for Countersignature Fees and represented to the Panel that it would return to Hartford the $48,148 offset. [Hearing at 600:12-602:6 (Caronia); Hearing at 158:11-159:12 and 161:3-11 (Uphouse).] Evergreen's recognition that this element of its offset was in fact baseless is another indication of the general improprieties committed by Evergreen in this offset calculation.

(4)    **Profit Sharing Commission:**  Evergreen's Offset Calculation calls for a profit commission calculation as of April 15, 2002, in the amount of $189,681.00. The Evergreen Individuals could not explain how this amount was calculated or provide the documentation to support any calculation. Uphouse and Caronia testified that Krutainis was responsible for the calculation. However, Krutainis was unable to produce the documents he used to create the calculation, and was unable to state with any certainty where he obtained the numbers or how they were input into the calculation. [Hearing at 862:13-868:1 and 871:1-19 (Krutainis).]  In addition, Krutainis admitted that he knew in early 2002 that losses on the Hartford GAP business were developing in a far worse manner than previously expected. [Hearing at 868:15-869:2

-28-

(Krutainis).] In fact, Krutainis testified that the Hartford actuaries on the GAP program, Ron

Helmeci and Claude Yoder, shared such information with him. [Hearing at 870:17-24

(Krutainis).] The reality is that there was no profit on the GAP business as of 2002. [Hearing at

1001:6-19 (McElroy); Hearing at 1242:16-1243:13 (Steinberg).] This was substantiated by the

testimony of Ian Steinberg, who testified that the actual numbers as of December 31, 2001, were

first identified in Hartford's June 2002 Reserve Review. [Hearing at 1243:14-1252:10

(Steinberg); Ex. 7.] As can be seen form that Reserve Review, there was no profit on which to

base a profit participation entitlement by Evergreen. Steinberg also testified that he spoke with

Krutainis in the second half of 2002 and advised him that there was no profit on the business,

and that Krutainis did not disagree. [Hearing at 1252:11-1253:17 (Steinberg).] Krutainis knew

that there was no justification for a profit participation and never claimed such until he, Caronia

and Uphouse decided to *take* their own profit from premium trust funds. Evergreen was not

entitled to any profit sharing and was clearly not entitled to offset premium trust funds with a

bogus profit claim that they could not even document.

## B.    Other Damages Claimed by Evergreen

Evergreen's December 30, 2006, Arbitration Brief lists two other items of "damages".

### (1)    Monies Due Arch Insurance Company

Evergreen's December 30 Brief listed this as a category of damages sought by Evergreen.

Apparently, Evergreen placed GAP business with Arch Insurance Company ("Arch") after

Hartford terminated the PMA. Hartford has no privity of contract with Arch whatsoever and is

certainly not obligated to pay monies due Arch by Evergreen. The monies held in trust are

Hartford's premium trust funds and should not be released to cover Evergreen's outstanding

debts to third parties. The Panel heard no evidence to the contrary. In fact, Caronia and

-29-

Uphouse personally paid that amount and offered no evidence that it "loaned" its own money to Evergreen to pay its debts. Thus, there is no evidence that Evergreen has any such debt and it is therefore not entitled to any monies from the frozen bank account.

### (2)    Continuing Enrollment Fees

Hartford concedes that if Evergreen had not breached the PMA it would have been entitled to enrollment fees on the 22,678 enrollments that Hartford accepted after it terminated Evergreen as its managing agent for GAP. However, Evergreen's multiple acts of misfeasance, malfeasance and nonfeasance void any such claim. If it had not so materially breached the PMA, Evergreen would be entitled to the $5 per enrollment for the 22,678 enrollments (i.e., $113,390)

A final note is in order regarding Evergreen's claim. Since Evergreen has been shut down, if it were to receive any monies in this arbitration they would be paid off to Caronia and Uphouse on the basis of their 60/40 split. Haven't they profited enough off of the losses they created for Hartford? Adding insult to injury would be repugnant.

-30-

V.

## EVERGREEN'S LIABILITY IS NOT REDUCED

## BY HARTFORD'S REINSURANCE

Evergreen has argued that Hartford is entitled to 50% of its damages because of its 50% quota share reinsurance agreement with Swiss Re. Evergreen's argument has no basis in law or fact.

First, Evergreen's argument is unfounded in law. Evergreen has not, and cannot, cite any New York law that an insurer's rights against a managing general agent for its wrongful conduct regarding a line of business is somehow limited by the mere existence of reinsurance on that line of business. The reason is simple – this is not the law in New York.

Second, Evergreen has not, and cannot, cite any evidence to support its position that Hartford's reinsurance somehow reduces in half its damages relating to its losses on the GAP program. Simply put, Hartford's reinsurance agreement is with Swiss Re. Evergreen is not a party to that reinsurance agreement. Nor are Hartford's GAP insureds. Thus, Hartford – not Swiss Re – had the obligation to pay insureds for claims made on Hartford GAP policies. What Hartford thereafter does with respect to its reinsurer is of no consequence to Hartford's causes of against Evergreen in this arbitration.[13] Any indemnification agreement that Hartford may have with Swiss Re does not affect Evergreen's obligation for its own wrongful conduct at issue here.

In light of the above, there is no basis in law or fact for to reduce by 50% any of Hartford's damages claimed in this arbitration.

---

[13] Also, Evergreen has introduced no evidence that Hartford has assigned Swiss Re any rights in its claims asserted against Evergreen in this arbitration.

-31-

## VI.

## DAMAGES

Hartford requests that the Panel award the following damages:

1.    Unauthorized writing of JM&A business.  $6,939,960.60

   ($4,796,243.00 in net losses, plus interest of $2,143,717.60).

2.    Interest on unauthorized payment of $1 million-plus for Reliance claims.  $555,918.55.

3.    Unauthorized and unjustified diversion and offset of premium trust funds.  $1,002,180.40

   ($789,661.40 premium, plus interest of $210,617.95).

4.    Unauthorized disclosure of confidential, proprietary information to Mitsubishi Motors
      Credit of America, Inc. ("MMCA").  $93,894.50 (no interest included).

5.    Attorneys' fees and costs of this arbitration: To be submitted separately.

[*See* Exhibits "B" and "C", attached hereto, for a further explanation of Hartford's damage
calculations.]

Respondents will likely claim that Hartford is not entitled to an award of prejudgment
interest for the damages it claims. However, this is a compensable item of damages under New
York law. The amount paid was a certain amount and the interest has been calculated from the
last certain date under each category. [*See* Exhibit "C", attached hereto, for a detailed
description of the pre-judgment interest amounts (calculated at 9% under New York law).]

Hartford also claims as an item of damages its attorneys' fees and costs pursuant to the
PMA and CSA, and New York law. A statement of those fees and costs will be submitted at a
later date.

-32-

VII.

## CONCLUSION

The Evergreen Individuals ran the Hartford GAP Program for their own personal gain and ignored their fiduciary obligations to Hartford. As directors and officers of Evergreen, their actions gave rise to the allegations at issue in this arbitration and caused the damages sustained by Hartford. For all the foregoing reasons, Evergreen and the Evergreen Individuals should be held individually and personally liable for the acts perpetrated against Hartford.

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP
JAMES E. FITZGERALD
S.V. STUART JOHNSON
REID A. WINTHROP

By: _____
        James E. Fitzgerald
        Attorneys for Claimant
        Hartford Fire Insurance Company

-33-

50349773v1