# EXHIBIT "A"



ARBITRATION BOARD CONVENED IN
NEW YORK, NEW YORK

-----------------------------------------------------------x
                                                           :
In the Matter of the Arbitration of                        :     **HARTFORD FIRE**
                                                           :     **INSURANCE COMPANY'S**
HARTFORD FIRE INSURANCE COMPANY                            :     **ARBITRATION BRIEF**
                                                           :
                                      Claimant,            :
                                                           :
            - against -                                    :
                                                           :
THE EVERGREEN ORGANIZATION, INC.,                          :     Hearing:  January 8, 2007
CHARLES CARONIA, SR., GARY UPHOUSE;                        :     Time:     9:00 a.m.
CHARLES CARONIA, JR.; and                                  :     Place:  Stroock & Stroock & Lavan
ANDREJS KRUTAINIS,                                         :             180 Maiden Lane
                                                           :             New York, NY 10038
                                      Respondent.          :
-----------------------------------------------------------x


        Claimant Hartford Fire Insurance Company ("Hartford") hereby submits the following

Arbitration Brief.

# I.
## INTRODUCTION

In July 2000, Hartford entered into agreements with The Evergreen Organization, Inc. ("Evergreen") by which Evergreen would serve as Hartford's program manager and claims servicer for its Guaranteed Automobile Protection ("GAP") business.[1]  Over the following 4 years, Evergreen and its principals breached many, if not most, of their fiduciary obligations to Hartford under those agreements.  Those breaches have caused Hartford to sustain millions of dollars in damages as will be shown during this arbitration.

Hartford recognizes that during the period 2000-2004 there were a number of factors that adversely affected the profitability (or lack thereof) of its GAP Program – over which the Respondents herein had no control.  There is no doubt that the economic downturn of the 2000-2002 time period, the tragic events of 9/11 and its aftermath, and the resultant drop in the car market affected many aspects of the Hartford GAP Program between 2000 and 2004.  Those issues are not the focus of this arbitration and Hartford is not seeking to recover damages from Respondents for those events.  Rather, the wrongful conduct of Evergreen and its principals is the basis for the following damages Hartford seeks here.

First, Evergreen breached its fiduciary duty when in January/February 2004 it withheld almost $800,000 in Hartford premium trust funds collected under GAP policies issued by Hartford.  Evergreen then attempted to use those withheld funds to offset monies it claimed Hartford owed it for claims management fees, profit sharing, countersignature fees and "terrorism" fees.  But, according to Evergreen's Final Statement of Damages, the majority of those withheld funds should not have been used to "offset" Hartford's premium trust funds since those amounts were not even owed by Hartford to Evergreen.  As to the amounts it still

---

[1] GAP insurance generally provides coverage for the monetary difference between the outstanding balance of a vehicle loan or lease and the actual cash value of that vehicle at the time of a constructive total loss to the vehicle.

50345448v4

contends it was entitled to use as offsets, Respondents cannot substantiate how they were calculated. Respondents have no substantive justification for their claims/offsets, and certainly cannot justify a withholding of premium trust funds in any event. Hartford is entitled to the $800,000 "offset" plus interest thereon for 3 years (January/February 2004 – January 2007).

Second, Evergreen, through its principals, paid claims under Reliance GAP policies with Hartford trust funds, while admitting that Hartford specifically told them they were not authorized to make any such payments whatsoever. Evergreen's principals have admitted that those payments were made to "curry favor" for Evergreen with the producers who made those claims. In other words, Evergreen used Hartford funds for "marketing" expenses to bolster its relationships with the producers sending them business. Those payments total approximately $1,065,000 *plus* at least 4 years of interest (i.e., late 2002/early 2003 to January 2007).

Third, Evergreen, and its principals, ignored all underwriting guidelines and restrictions when it wrote an account with JM&A – without the knowledge of Hartford. Respondents failed to obtain the proper support and documentation from JM&A to justify any underwriting and specifically the documentation that would allow a proper and informed rate quote for the GAP business it was considering underwriting. After Hartford found out that this account had been underwritten by Evergreen, where it had been specifically rejected the year before by Hartford's underwriters, it demanded that Evergreen obtain the written documentation and information to support the underwriting. Evergreen's principals claimed that they were getting the requested information yet never did, and instead continued to accept enrollments under those policies knowing that they had never properly underwritten it. Eventually, Hartford sustained a major loss on the JM&A account by paying out claims under the JM&A policies that were in excess of $5.3 million over the amount Evergreen remitted to it in premium.

Fourth, after Evergreen was terminated as a claims servicer and program manager, Evergreen's principals freely turned over confidential, proprietary documents to a third party (Mitsubishi Motors Credit of America, Inc. ("MMCA")) that was engaged in litigation with Hartford. This was a clear breach of the confidentiality provisions of Evergreen's program

-3-

manager's agreement with Hartford. The documents Evergreen's principals released to MMCA contained not only proprietary and confidential files of Hartford, but also of some of its largest insureds (e.g., Bank of America). Moreover, Hartford specifically instructed Evergreen not to reveal confidential information, yet Evergreen and its principals blatantly ignored that instruction and knowingly breached the agreements with Hartford. This breached allowed MMCA to use confidential documents of third party insured's claims to try and substantiate a baseless unfair trade practices claims against Hartford (which the federal court ultimately dismissed). By breaching its fiduciary duty, Evergreen and its principals caused Hartford to incur almost $100,000 in additional fees to defend baseless claims by MMCA regarding third party insureds and their private dealings with Hartford.

In sum, Hartford seeks damages for at least the following:

- January 2004 improper diversion of Hartford's premium trust funds ($696,453.34, plus interest from January 2004 ($208,936));

- February 2004 improper diversion of Hartford's premium trust funds ($93,208.06, plus interest from February 2004 ($27,196.32));

- Unauthorized payment of Reliance Insurance claims with Hartford funds to "curry favor" with Evergreen's customers (approximately $1,065,025, plus $400,000+ interest thereon from late 2002);

- Concealing and misrepresenting underwriting of JM&A account (net losses of at least $5,377,357, plus interest thereon).

- Attorneys fees and costs in defending claims in MMCA litigation created by Evergreen's principals providing confidential documents to MMCA in breach of their fiduciary duty (approximately $100,000)

The Evergreen Principals operated and dominated Evergreen to such an extent that the corporate form must be disregarded and the Principals should be held personally liable for Evergreen's liability and the damages caused Hartford under principles of alter ego liability. The Principals eschewed Evergreen's corporate form and diverted Hartford's trust funds, and others', for their own personal use and benefit. The Principals extracted from Evergreen's corporate operating account virtually all amounts submitted to Evergreen every month it was in

-4-

operation. That money went straight into the Principals' pockets. The Principals further operated Evergreen such that it was understaffed and unable to properly function as Hartford's program manager or claims servicer. As will be explained further below, the Principals' concealments and misrepresentations regarding its underwriting and claims servicing activities, as well as the siphoning off of Evergreen's assets, directly resulted in severe losses to Hartford and its withdrawal from the GAP insurance business altogether.

II.

## STATEMENT OF FACTS

A.    **Background on Evergreen**

Evergreen was incorporated in Pennsylvania in 1994 by H. Gary Uphouse ("Uphouse") and his wife Ann Uphouse. Evergreen did not file anything with the state other than its Articles of Incorporation (e.g., no bylaws, intent papers, etc.). Evergreen was originally located at 910 Evergreen Lane, Chester Springs, PA, which is also the Uphouses' home address. On or about February 1, 1996, Charles Caronia, Sr. ("Caronia, Sr."), purchased 60% of Evergreen's stock for $20,000. Uphouse and Caronia, Sr. were Evergreen's only shareholders.

On or about January 1, 1996, Caronia, Sr., on behalf of Evergreen, entered into a Program Manager's Agreement ("Reliance PMA") and a Claims Servicing Agreement ("Reliance CSA") with Reliance Insurance Company ("Reliance") to become Reliance's exclusive program manager and claims servicer for its entire GAP insurance program.[2]

In or about June 2000, Hartford purchased renewal rights in certain lines of Reliance's business including, but not limited to, renewal rights in Reliance's GAP insurance program. In or about October 2000, Hartford and Evergreen executed an amendment to the Reliance PMA and Reliance CSA to provide that Evergreen would act as program manager and claims servicer for the Hartford GAP business on the same terms and conditions as Evergreen had done for

---

[2] Prior to 1996, Uphouse had no background or experience in insurance and Caronia, Sr. had only limited experience in underwriting. Neither Uphouse nor Caronia, Sr. had any prior experience with underwriting GAP insurance, and neither had any experience whatsoever in claims handling.

Reliance.  Two years later, in September 2002, Hartford and Evergreen entered into a Hartford/Evergreen new PMA and CSA (hereinafter "PMA" and "CSA") regarding Evergreen's services to Hartford.

As program manager, Evergreen agreed to perform the following duties for Hartford:

> solicitation of business;

> servicing of business;

> binding of risks;

> policy issuance;

> noticing of risks bound;

> quotation of premium rates;

> collection and remittance of premiums for GAP business written;

> timely accounting for GAP business;

> acting as a fiduciary for Hartford;

> maintaining the confidentiality of all documents generated in conducting Hartford's GAP business;

> promoting and safeguarding the best interests of Hartford; and

> keeping and maintaining, for as long as Hartford requires, complete records and accounts of all GAP business and transactions pertaining to policies written under the Hartford GAP Program.

The PMA further required Evergreen to hold amounts collected under Hartford's GAP Program in a separate fiduciary trust account.  Specifically, Article III of the PMA requires:

> K.    Fiduciary Capacity – Premium Trust Fund.    To act as a fiduciary for [Hartford] and to hold all premiums and any other amounts collected and received on Policies for [Hartford] in a fiduciary account separate and apart from all other funds of Manager or others in a bank which is a member of the Federal Reserve System and insured by the Federal Deposit Insurance Corporation and which is approved in writing by [Hartford].  The bank account shall be designated by [Evergreen] in such a

-6-

> manner as to clearly establish that [Evergreen] is holding and acting as trustee for [Hartford] with respect to the funds in the account. (Emphases added.)

Under the CSA, claims servicing included creation, maintenance and storage of hard-copy and electronic claims files. The CSA also sets forth specific procedures for adjustment and payment of claims, including obtaining specific documentation required by Addendum #1 to the CSA (e.g., police reports, financing contracts, copies of primary insurance checks).

**B.    Hartford's Audits Of Evergreen's Work.**

In July 2001, Hartford conducted an audit of Evergreen. It was found that all business being underwritten by Evergreen was performed using one model and concluded that "[g]iven the diverse nature of the business this was unacceptable." It was further noted that "Evergreen is deemed to be antiquated in most instances," and that claims data was "not readily useable by underwriting or the actuarial department" to allow them to monitor problem accounts for possible rate increases and/or cancellations. Accordingly, Hartford concluded that Evergreen's management of Hartford's GAP program required substantial changes.

On September 11, 2001, Hartford's offices that ran the GAP Program were located in 7 World Trade Center in Manhattan, and therefore were destroyed by the tragedy that has become known as 9/11. In the aftermath of that event, Hartford conducted a second audit of Evergreen in late November 2001 with a team of Hartford representatives from claims, actuarial, legal, compliance, and underwriting. This audit was overseen by Hartford's lead underwriter on the GAP business, Andrejs Krutainis ("Krutainis"). The Hartford audit team concluded that the business processes of Evergreen and/or the controls on their execution were not acceptable. The audit team concluded that Evergreen had violated numerous provisions of the PMA and CSA, and that its price monitoring and claims handling was unacceptable.

On December 19, 2001, Krutainis, on behalf of Hartford, sent Caronia, Sr. a letter informing him of Evergreen's "overwhelming and material breach of its duties and responsibilities under the PMA agreement." Hartford further advised that it was suspending Evergreen's duties under the PMA and would terminate the agreement as of February 28, 2002

-7-

unless certain changes were immediately made. Hartford issued Evergreen new guidelines for underwriting, claims handling, and compliance. Caronia, Sr. immediately replied that all of the requested new guidelines would be complied with and that Evergreen would cure all of the underwriting, claims, compliance and legal problems that had been raised by Hartford's audit.

In late December/early January 2002, Caronia, Sr. offered Krutainis employment with Evergreen to help implement the changes requested in Krutainis' audit report. After Evergreen agreed to accept the requested changes in the audit report and to hire Krutainis to help implement them and become chief operating officer of Evergreen, Hartford agreed to keep Evergreen as its program manager and claims servicer.

C.    **Evergreen's Breaches Of The Program Manager's Agreement.**

In mid-2002, Hartford re-examine Evergreen's underwriting and the pricing on its entire GAP program. In many instances, Hartford determined that Evergreen was still repeatedly failing to honor its obligations under the PMA, including its duties to produce business in accordance with the PMA terms and to properly monitor the GAP business under the PMA.

One of the more egregious violations of the underwriting guidelines was Evergreen's underwriting of the JM&A Group ("JM&A") account. In July 2001, Evergreen made a proposal to Hartford to underwrite substantial GAP business from JM&A. Hartford, through Andrejs Krutainis, its lead underwriter at the time, rejected Evergreen's proposal to write business through JM&A because Krutainis determined that the projected loss ratio presented an unacceptable risk to Hartford. Hartford told Evergreen that it wanted to decline the JM&A account. Despite this clear instruction, six to nine months later, the Principals ignored Hartford's instructions and went ahead and wrote the JM&A business.

Evergreen offered JM&A a rate that was based on flawed underwriting principles, insufficient information and documentation, and that was far below what Evergreen should have offered. Thereafter, Evergreen issued policies for JM&A customers and began accepting enrollments. Evergreen, not Hartford, set the price on enrollments. In fact, Evergreen concealed from Hartford the fact that it had begun issuing policies to JM&A. Evergreen's own

-8-

internal communications demonstrate the Principals' concealment of the JM&A agreement from Hartford, their subsequent misrepresentation of the JM&A business, and the unauthorized acceptance of thousands of enrollments at inadequately low premium rates.

In September 2002, Hartford learned for the first time that Evergreen had begun to issue policies and accept enrollments from JM&A, which was contrary to Hartford's earlier instructions not to do so. Hartford demanded from Evergreen an underwriting and pricing analysis. Evergreen could not do that since Evergreen had failed to obtain an analysis of JM&A's loss history, other than some information that was only "anecdotal." In September 2002, after accepting enrollments for over three months, Evergreen requested from JM&A for the first time loss and underwriting data.

In November 2002, Krutainis told Uphouse that the underwriting data used by Evergreen to underwrite the JM&A account was based on an erroneous assumption regarding a 120% cap on the MSRP/NADA, which was not, in fact, placed on the JM&A business. At the same time, the number of enrollments on the JM&A account had increased by over 10,000 enrollments per month.

In January 2003, after being promised by Evergreen that it would provide proper back-up underwriting information about JM&A, but failing to do so, Hartford advised Evergreen that Hartford would not accept the risk on the JM&A account.

D.    **Evergreen's Breaches Of The Claims Servicing Agreement.**

Evergreen failed to obtain necessary and required documentation to substantiate claims prior to issuing payment. In particular, Evergreen failed to request documentation specifically required by Hartford's policies to substantiate claims (e.g., police reports). Evergreen only began to request the required documentation after Hartford's November 2001 Audit uncovered Evergreen's failures in this regard. Evergreen processed thousands of claims without regard to their validity and/or the exclusions under the Hartford GAP policies. Instead, Evergreen consistently paid claims that were deficient in some manner. Evergreen's and the Principals' motivation to pay these claims was twofold.

First, Evergreen was paid claims servicing fees by Hartford on a flat fee basis for "claims administered" under the CSA. In other words, if Evergreen did not pay a claim, it would not get paid claims servicing fees by Hartford. However, Evergreen did not employ sufficient staff to request and assemble all Required Documentation and properly adjust all claims submitted for payment. Thus, Evergreen instructed its claims adjusters to pay claims even if they were not ripe for payment or, in some instances, even excluded by the policy.

Second, Evergreen's business depended upon further enrollments under the Hartford policies. Evergreen's refusal to pay claims directly impacted its customers' willingness to submit further enrollments on existing policies, and also affected its ability to obtain further customers in this emerging marketplace for GAP insurance. Evergreen therefore paid claims to encourage its customers to submit further enrollments under the policies.

For one producer in particular, Life of the South, Evergreen's Vice President in charge of claims, Charles Caronia, Jr. ("Caronia Jr."), instructed Evergreen's claims adjusters to falsify documents so that Evergreen could make payment with Hartford funds on those claims. According to e-mails and testimony of its adjusters, Evergreen instructed its claims handlers to provide coverage to Life of the South customers for not only basic GAP coverage, but also for up to two past due payments on the loan or lease underlying the GAP claim, *even though the Life of the South GAP contracts did not provide for such coverage.* Ultimately, Evergreen fraudulently paid the Life of the South claims using Hartford's funds.

In January 2004 – after Hartford placed auditors on-site at Evergreen's offices to oversee Evergreen's day-to-day operations – Caronia, Jr., attempted to conceal Evergreen's fraudulent conduct on the Life of the South account. Specifically, Caronia, Jr., instructed Evergreen's claims handlers to go into Evergreen's claim files, retrieve the GAP contracts on all Life of the South claims, throw the actual GAP contract in the trash, and replace it with a "fake" contract that provided coverage for not only basic GAP coverage, but also up to two past due payments on the enrolled loan or lease. Apparently, Evergreen was attempting to curry favor with Life of the South by providing extended GAP coverage that was not actually

-10-



owed to Life of the South's customers, but which had apparently been marketed as such to its customers.[3]

E.    **Unauthorized Payment Of Reliance Claims.**

In late June 2000, Reliance was forced to exit the GAP business and thereafter cancelled its GAP policies on or about June 30, 2000.  Hartford issued its first GAP policies to Evergreen's customers effective July 1, 2000.   According to Caronia, Sr., Evergreen's customers with GAP policies through Reliance continued to request payment of those claims even after the Reliance policies were canceled.  Hartford specifically disclaimed coverage for any claims on vehicles enrolled prior to July 1, 2000, as they were not enrolled under the Hartford GAP program and Hartford was not responsible for payment of those claims.  Specifically, David McElroy, Vice President of Hartford, told Caronia, Sr. – on more than one occasion – that Hartford was not responsible for claims that pre-dated the Hartford policies (i.e., those dating to before July 1, 2000), and that Hartford would not approve payment of those claims under any circumstances.

The Principals, Caronia, Sr. and Uphouse, have both testified that Evergreen paid Reliance Claims, but only did so with Evergreen's own funds.  The truth is different.

In or about July 2000, Hartford set up a "zero-balance" account at Fleet Bank, account no. 942-783-9383 ("Fleet Account"), that was funded by Hartford for the payment of Hartford claims.  Evergreen was authorized to pay Hartford claims directly out of the Fleet Account pursuant to the terms of the CSA.   In early 2004, Hartford performed an analysis of Evergreen's payment of claims out of the Fleet Account.  Hartford determined Evergreen had been using the funds deposited by Hartford into the Fleet Account to pay Reliance claims.  Caronia, Sr. admitted that he unilaterally decided to pay claims received by Evergreen on enrollments accepted under Reliance GAP insurance policies in order to "curry favor" with its customers.  Caronia, Sr. further admitted that he directed these claims be paid to dissuade

---

[3]  Charles Caronia, Jr. has admitted that the President of Life of the South, Dale Ballard, was a close friend of his father, Charles Caronia, Sr.

50345448v4

Evergreen's customers from taking their business to another provider. However, despite such admissions, both Caronia, Sr. and Uphouse testified that Evergreen did not pay Reliance claims with Hartford funds. Hartford performed a reconciliation that analyzed the Cert Date (i.e., enrollment date) on all claims paid out of the Fleet Account. Hartford determined that Evergreen had paid a total of 479 Reliance claims in the amount of $1,065,000 directly out of Hartford's funds that were placed the Fleet Account.

F.    **Evergreen's Failure To Preserve Amounts Collected On Hartford's Behalf.**

The PMA required Evergreen to create a fiduciary trust account for all amounts collected relating to Hartford's GAP insurance business. The PMA expressly required that any bank account utilized by Evergreen for the deposit of funds received on behalf of Hartford "shall be designated by [Evergreen] in such a manner as to clearly establish that [Evergreen] is holding and acting as trustee for [Hartford] with respect to the funds in the account."

Despite these requirements, Evergreen failed to provide Hartford with any evidence that Evergreen ever created or maintained a fiduciary trust account. Instead, Evergreen would remit to Hartford premiums collected relating to Hartford's GAP insurance business from one of several checking accounts maintained by Evergreen at PNC Bank. Evergreen took no action to ensure amounts collected on Hartford's behalf were deposited into a single, separate, fiduciary account as required under the PMA. Evergreen and the Principals were therefore commingling amounts held in trust for Hartford along with Evergreen's general operating funds.

H.    **Evergreen's Offset Calculation And Other Alleged Damages.**

On January 29, 2004, Evergreen notified Hartford that it was retaining certain premium funds, due Hartford for enrollments under GAP policies, as an "offset" for fees it claimed it was owed from Hartford. Since that withholding was a clear breach of the PMA, Hartford immediately advised Evergreen that its actions constituted a breach of the PMA and demanded that Evergreen remit the proper premiums. Evergreen refused, and has persisted in that refusal today.

-12-

Evergreen's original claim for offset contained four (4) components: Claims Fees, Terrorism Project Expenses, Countersignature Fees, and Profit Sharing Due. Evergreen has since abandoned its claim for Terrorism Project Expenses, Countersignature fees and the majority of its claim for claims servicing fees.

(1)    **Claims Fees:** The CSA states that Evergreen is only entitled to payment for claims administered. The former head of claims for the GAP business at Hartford testified that Evergreen was entitled to fees only for claims that were actually paid. Evergreen's January 29, 2004 Offset Calculation lists various alleged fees owed by Hartford for years 2002 through 2004 for the administration of claims. However, Evergreen failed to provide any documentation to support its calculations or that shows the actual number of claims paid. In its December 30, 2006 Arbitration Brief, Evergreen has abandoned the majority of those claims handling fees. The only remaining fees it seeks are those entitled "Claims administered without payment as of 12/03 (declined, no gap, etc.) (4,367 @ $40)", in the amount of $174,680.00. Again, however, Evergreen has failed to provide documentation to support these calculations. Evergreen is not entitled to fees for claims paid absent proof that those claims were in fact paid. In addition, by Evergreen's own admission, the claims handling fees at issue are those that were not in fact paid. Evergreen therefore was not entitled to offset those fees, and is not entitled to them now.

(2)    **Profit Sharing Claim:** The Hartford Offset Calculation calls for a profit commission calculation as of April 15, 2002 in the amount of $189,681.00. However, Evergreen's Principals have been unable to explain how this amount was calculated or to provide the documentation to support any calculation. The reality is that as of August 15, 2002, there was no profit on the GAP business. Thus, Evergreen, was not entitled to any profit sharing or any offset from premium trust funds for a fictitious profit share.

Evergreen's December 30, 2006 Arbitration Brief lists two other items of "damages".

(1)    **Monies Due Arch Insurance Company:**    Apparently, Evergreen placed GAP business with Arch Insurance Company ("Arch") after Hartford terminated the PMA. Hartford

-13-



has no connection with Arch whatsoever and is certainly not obligated to pay monies due Arch by Evergreen. The monies held in trust are Hartford's premium trust funds and should not be released to cover other of Evergreen's outstanding debts. Indeed, Evergreen's counsel raised this argument in 2004 before USDC Judge Kaplan in opposing the Court's order to freeze Evergreen's assets. The Court did not buy that argument, and neither should this Panel.

(2)    **Continuing Enrollment Fees:**    Steinberg testified as his deposition that Evergreen may be entitled to enrollment fees obtained by Hartford during 2004 and 2005, despite the cancellation of the PMA. Harford is preparing the calculation for these damages, which are far less than the $800,000 calculated by Evergreen.

I.    <u>Domination And Control By Caronia, Sr. And Uphouse.</u>

Evergreen is owned by Charles Caronia, Sr. (60%) and Gary Uphouse (40%). The Principals, along with Krutainis and Caronia, Jr., operated, dominated and controlled Evergreen for their own personal benefit.

Charles Caronia, Sr., was Chairman of the Board and Chief Executive Officer of Evergreen and one of the two principal shareholders in the company.[4] Caronia, Sr. regularly communicated with Hartford regarding Evergreen's operations under the PMA and CSA, especially after Hartford identified potential problems in the administration of its GAP program.

Gary Uphouse was the President of Evergreen and is the second principal shareholder in the company. Uphouse was responsible for overseeing Evergreen's business by maintaining the appearance of propriety through communications with Hartford as well as Hartford's customers. Uphouse oversaw the handling of claims and assisted in the underwriting of new business until early 2002. Uphouse was removed by Caronia, Sr. from the day-to-day operations due to his failure to operate Evergreen at a level acceptable to Hartford.

---

[4] Hartford is informed and believes that Caronia, Sr. is personally financing Evergreen's arbitration with his own personal funds. Evergreen has no available assets because they were frozen by the District Court to pay for the diverted premium trust funds.

-14-

50345448v4

By 2002, Evergreen had hired two more senior executives, Andrejs Krutainis and Charles Caronia, Jr. (Charles Caronia, Sr.'s son), to help manage Hartford's GAP business. These four individuals operated and controlled Evergreen and were responsible for executing Evergreen's duties enumerated in the PMA and the CSA. Under their direction, the Principals were able to use Evergreen to divert Hartford trust funds for their own benefit and to defraud Hartford of millions of dollars.

- Charles Caronia, Sr., and Gary Uphouse were Evergreen's only shareholders and acted as fiduciaries to Hartford. They represented to Hartford that Evergreen was fulfilling its obligations under the PMA and CSA. As found by the District Court in May 2004, Evergreen, at the direction and with the authorization of Messrs. Uphouse and Caronia, Sr. diverted Hartford premium trust funds of at least $700,000 to Respondents – this was a breach of fiduciary duty with no excuse. However, as set forth in affidavit filed by Mr. Uphouse, *there is less than $400,000 in Evergreen's bank accounts* to cover those trust amounts.[5] Those accounts were frozen and Evergreen's assets attached by order of the District Court. Clearly, Evergreen does not have sufficient funds to even pay back premium trust funds that the District Court has ruled were diverted from what should have been fiduciary accounts established for the sole benefit of Hartford.

- Based on financial documents that have been produced thus far by Respondents, Messrs. Caronia, Sr. and Uphouse withdrew *over $12 million* from Evergreen's operating accounts (the same accounts to which Hartford premium amounts were deposited) between late 2000 and early 2004, and *another $2 million* out of a separate Evergreen bank account used to "pass through" commissions on Canadian GAP accounts directly to Caronia, Sr. and Uphouse. It is clear that Evergreen was essentially looted and now has insufficient funds to pay Hartford the premium moneys that were to be held in trust, not to mention the lack of funds to pay for the other wrongful conduct that has caused Hartford millions of dollars in damages. In addition, Caronia, Sr. and Uphouse each paid themselves $360,000 in annual salary from Evergreen's operating accounts during the years Evergreen was Hartford's program manager and claims servicer. In short, Caronia and Uphouse reaped almost *$17 million* between them from the Hartford GAP program.

- Andrejs Krutainis was Evergreen's Chief Operating Officer and was charged with fulfilling Evergreen's obligations under the PMA. Krutainis breached his duties by approving the acceptance of enrollments that did not comply with Hartford underwriting guidelines. Krutainis personally benefited from this conduct because

[5] In fact, Evergreen never had a separate premium trust account and instead commingled Hartford's premium trust funds with Evergreen operating accounts.

-15-

5034544v4



his compensation was directly linked to the increase in enrollments in the Hartford GAP program.

- Charles Caronia, Jr., was in charge of claims handling for Evergreen. Caronia, Jr., breached his duties by authorizing the payment of claims without obtaining the necessary documentation to process claims pursuant to the Hartford GAP policies and the terms of the CSA and PMA. Caronia, Jr., also was the owner of Powerguard International, Inc., which was one of Evergreen's producers. Caronia, Jr., therefore personally benefited by improper payment of claims.

- Collectively, the Evergreen Principals conspired together to operate Evergreen for their own personal gain and benefit. Indeed, it appears from financial records so far produced that they used the Evergreen accounts (the same ones in which Hartford's premium trust funds were supposed to be held) to pay the principals million of dollars each year. It is no wonder that there is no money left in the Evergreen accounts (except less than $400,000 in frozen funds). Quite simply, the Evergreen Principals looted Evergreen of Hartford money.

**J.    The Arbitration.**

On or about April 30, 2004, Hartford served a Demand for Arbitration on Evergreen and the Principals and filed a Verified Petition with the Federal Court. On May 4, 2004, Hartford filed a Motion For A Temporary Restraining Order, Preliminary Injunction, and Attachment Order in Aid of Arbitration against Evergreen and the Principals requesting that the Federal Court freeze the assets of Evergreen and order Evergreen to provide Hartford with access to its books and records.

On June 8, 2004, the Court granted Hartford's motion and ordered that: (1) Evergreen establish a fiduciary account naming Hartford as the exclusive beneficiary; (2) Evergreen and the Principals not transfer or assign any assets of Evergreen; (3) Evergreen and the Principals identify to Hartford all assets held in Evergreen's name; (4) Evergreen's assets be attached up to the amount of $700,000; (5) Evergreen provide Hartford access to its books and records relating to policies issued on behalf of Hartford; and (6) Evergreen preserve all books and records relating to policies issued on behalf of Hartford. The Court found that Evergreen had diverted Hartford trust fund assets of at least $700,000. The Court further found that at least $400,000 of the $700,000 was "missing" since Evergreen claimed that it only had

-16-

approximately $300,000 in its bank accounts. Hartford now knows that the missing funds and many more are in the pockets of the Evergreen Principals.

## III.

## ARGUMENT

A.    Evergreen's Breaches Of Fiduciary Duties Under The PMA And CSA.

A fiduciary duty arises, even in a commercial transaction, where one party reposed trust and confidence in another who exercises discretionary functions for the party's benefit or possesses superior expertise on which the party relied. *Anonymous v. CVS Corp.*, 728 N.Y.S.2d 333, 336-37 (2001).[6] A "fiduciary" is one who transacts business, or handles money or property, which is not his, for the benefit of another person, as to whom he stands in relation. *Board of Managers of Fairways at North Hills Condominium v. Fairway at North Hills*, 603 N.Y.S.2d 867, 869 (App. Div. 1993). A fiduciary duty may be created by express provision of contract, or by factors such as the length of the relationship of the parties, their financial interdependence, and their sharing of confidential and proprietary information. *ADT Operations, Inc. v. Chase Manhattan Bank, N.A.*, 662 N.Y.S. 2d 190, 192 (1997); *see also Kern v. Robert Currie Assocs.*, 632 N.Y.S.2d 75, 76 (App. Div. 1995) (holding contractual relationship may give rise to fiduciary duties regardless of whether contract itself includes specific words or language in that regard); *Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672, 676 (App. Div. 1987) (recognizing the same conduct which may constitute breach of a contractual obligation may also constitute breach of duty arising out of relationship created by contract but which is independent of contract itself).

The PMA states:

"Fiduciary Capacity – Premium Trust Fund. To act as a fiduciary

for the Company and to hold all premiums and any other

---

[6] New York law applies in this Arbitration pursuant to the PMA.

-17-

50345448v4

amounts collected and received on Policies for Company in a

fiduciary account. . ."

PMA, Article III, Par. K (emphasis in original).   Evergreen, and its Principals, were charged with the obligations of producing qualified business under the PMA, and with the handling and payment of claims under the CSA.  Hartford's and Evergreen's interests were so intertwined that a fiduciary relationship necessarily was created.  Indeed, because Evergreen was Hartford's disclosed agent, it had a fiduciary duty to its principal.  *See* 2A N.Y. Jur., *Agency and Independent Contractors* § 204 (2003).

A fiduciary owes a duty of undivided and undiluted loyalty to those whose interest a fiduciary is to protect.  *Drucker v. Mige Associates II*, 639 N.Y.S.2d 365, 366 (App. Div. 1996); *accord Hartford Accident & Indem. Co. v. American Express Co.*, 518 N.Y.S.2d 93, 97 (1987). This is a sensitive and inflexible rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty.  *Drucker*, 639 N.Y.S.2d at 366.

In addition to the fiduciary duties discussed above, "[a]n agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person." *Cristallina, S.A. v. Christie, Manson & Woods Int'l, Inc.*, 502 N.Y.S.2d 165, 171 (1986), quoting Restatement (Second) of Agency § 381. An agent is under a general duty to disclose information promptly to his or her principal so that the principal may seasonably take any steps, which he or she deems essential to his or her interests.  An agent breaches the duty of good faith and loyalty where he or she fails to disclose information obtained during the period of engagement, which affects the transaction in which the agent is engaged, so that the principal may take steps to protect his or her interests. 2A N.Y. Jur.2d, *Agency and Independent Contractors* § 212 (2003).

An agent is also under a duty "not to continue to render service which subjects the principal to risk of expense if it reasonably appears to him to be impossible or impracticable for

-18-

50345448v4

him to accomplish the objects of the principal." *Cristallina, S.A.*, 502 N.Y.S.2d at 172, fn. 7, quoting Restatement (Second) of Agency § 384. Where an agent is selected because of its special fitness for the performance of the duties to be undertaken, the principal is entitled to rely on the agent's judgment and integrity. An agent has an implied good faith obligation to use best efforts to promote the principal's interests – not to work contrary to them. *Id.* at 172.

Evergreen, through its Principals, repeatedly failed to honor its obligations under the PMA and CSA. First, the Principals failed to create a fiduciary trust account for all amounts collected relating to Hartford's GAP insurance business, as required by the PMA. Both Caronia, Sr. and Uphouse have admitted they never created or maintained a separate fiduciary trust account. Instead, Evergreen remitted to Hartford premiums collected relating to Hartford's GAP insurance business from one of several checking accounts maintained by Evergreen at PNC Bank. These Evergreen accounts were created by Caronia, Sr. and Uphouse.

Second, the PMA required Evergreen to produce business in accordance with the terms of the PMA and to oversee and monitor the business. Evergreen, and its Principals failed to do so. In fact, Evergreen, through Gary Uphouse (and later Andrejs Krutainis), failed to monitor enrollments under Hartford GAP Policies to ensure that they provided the necessary information and met the requirements of the GAP Program. Thousands of enrollments were issued that did not comply with Hartford underwriting guidelines, which would later result in millions of dollars in claimed losses. In particular, the Principals directly approved the issuance of a policy to JM&A and acceptance of enrollments, despite the fact that they knew the JM&A business did not comply with Hartford's underwriting guidelines.

Third, the CSA set forth specific requirements for Evergreen's handling of GAP claims. For instance, the CSA required Evergreen to promptly advise Hartford of reported losses, to maintain a claims file for all reported claims, and to obtain the necessary documentation to process claims pursuant to the Hartford GAP policies and the terms of the CSA. Evergreen, under the direction of Uphouse (and later Charles Caronia, Jr.), failed to fulfill this obligation. Instead, they consistently authorized the payment of claims without obtaining the necessary

-19-

documentation (e.g., police reports). This resulted in the payment of millions of dollars in claims that Evergreen was not authorized to pay pursuant to the CSA. Incredibly, Caronia, Jr., actually instructed claims adjusters to falsify policies under the Life of the South account so Evergreen could issue payment of claims and collect claims servicing fees from Hartford.

Fourth, as discussed above, Caronia, Sr. authorized payment of Reliance Claims with Hartford funds in order to "curry favor" with producers and keep their business with Evergreen. This overt and intentional breach of his fiduciary obligations as CEO of Evergreen deprived Hartford of over $1 million dollars in trust funds.

### B.  The Principals' Personal Liability.

#### 1.  The Principals Are Personally Liable For Aiding And Abetting Evergreen's Breach Of Fiduciary Duty.

The Principals may be held personally liable if they aided and abetted Evergreen in breaching its fiduciary duties to Hartford. Under New York law, to prove the claim of aiding and abetting breach of fiduciary duty, a plaintiff must establish that: (1) a fiduciary breached its obligations to another; (2) the defendant knowingly induced or participated in the breach; and, (3) the plaintiff suffered damages as a result of the breach. *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169, 307 A.D.2d 113 (2003); *see also S & K Sales Co. v. Nike*, 816 F.2d 843, 847-848 (2nd Cir. 1987).

A person knowingly participates in a breach of fiduciary duty when he or she provides "substantial assistance" to the primary violator. *Kaufman*, 760 N.Y.S.2d at 170. Substantial assistance occurs when a defendant affirmatively assists, helps, conceals, or fails to act when required to do so, thereby enabling the breach to occur. *Id.* The inaction of an alleged aider and abettor, however, constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff. *Id.*

The concealments by Evergreen and its Principals of facts relating to fees and premiums collected by Evergreen under Hartford's GAP Program was a breach of fiduciary duty. In addition, Evergreen's refusal to follow Hartford's guidelines and instructions in handling

-20-

claims is a further breach of fiduciary duty.  These breaches are demonstrated by the unauthorized underwriting of the JM&A account, the unauthorized payment of Reliance Claims with Hartford funds, the falsifying of documents on Life of the South claims, and the baseless and fraudulent offset and retention of Hartford trust funds.

Evergreen's Principals are personally liable if they "knowingly induced or participated in the breach." *Kaufman*, 760 N.Y.S 2d at 169.  The evidence clearly demonstrates that as to the above-enumerated breaches, the Principals knew about, and controlled, those transactions. The Principals personally profited greatly from those transactions, and directly caused Hartford to suffer severe losses.  The Principals should therefore be held individually and personally liable for these transactions.

2.     **The Principals Are Personally Liable As Subagents.**

The Principals may also be held individually liable for breach of fiduciary duty because they acted as subagents of Hartford.  The law provides that an agent, such as Evergreen, is in a highly fiduciary relationship to the principal, such as Hartford, and can always be asked to account for its acts. *See* 2A *N.Y. Jur.2d Agency and Independent Contractors* § 205.  A subagent is "a person appointed by an agent empowered to [appoint such a subagent] to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible." *Manley v. Ambase Corp.*, 121 F.Supp. 2d 758, 772 (S.D.N.Y. 2000) (*citing* Restatement (Second) of Agency § 5(1) (1958)).  The authority for an agent such as Evergreen to appoint its officers and directors as subagents "is inferred from authority to conduct a transaction for the principal for the performance of which the agent is to be responsible if...the agent is a corporation, partnership, or other organization." *Id.* (*citing* Restatement (Second) of Agency § 80(b)).  Specifically, the authority of a corporation to appoint a subagent to perform the tasks of the agent may be inferred because "*one employing a corporation as an agent necessarily knows that the corporation must act*

-21-

50345448v4

*through agents and hence consents to the use of its employees as subagents." Id.* (emphasis added) (*citing* Restatement (Second) of Agency § 5, cmt. d).[7]

A subagent is in fact himself an agent of the principal, even though there is no actual privity of contract between the subagent and the principal. *Marra v. Katz*, 74 Misc.2d 1010, 1013, 347 N.Y.S.2d 143, 146 (1973) ("courts have had the greatest difficulty in understanding that a subagent is in fact an agent of the principal"). Once established as subagents, the Principals may be held personally liable as individuals to Hartford to the extent they engaged in acts that would be deemed to be a breach of Evergreen's fiduciary duty owed to Hartford. *See* Restatement (Second) of Agency, Section 5, comment "d" ("a subagent performing acts which the appointing agent has authorized him to perform in accordance with an authorization from the principal is an agent of the principal and affects the relations of the principal to third persons as fully as if the appointing agent had done such acts."); *see also* Restatement (Second) of Agency § 428, cmt. "e" (imposing liability on the subagent for anything received by him on account of, and to be in trust for, the principal).

As discussed above, the Principals transacted and controlled all of Evergreen's business. The Principals negotiated the PMA and CSA between Hartford and Evergreen and were charged by Evergreen and Hartford with executing the obligations under those agreements. The Principals, in their capacity as subagents of Hartford, spearheaded the acts that caused the most quantifiable damages to Hartford (e.g., underwriting of JM&A, payment of Reliance Claims). Specifically, the failure of the Principals to monitor losses and to properly adjust claims, and to pay unsubstantiated claims, all resulted from their control and supervision

---

[7] It should be noted as well under both the Reliance PMA, Evergreen's authority was to be terminated if there was a change in ownership of Evergreen and/or if Charles Caronia was not involved in the management of Evergreen. The Hartford PMA had the same provision, but added Krutainis as a "key man employee" whose departure from Evergreen would trigger Hartford's right to terminate Evergreen. Clearly, Evergreen appointed the Principals as subagents and their running of Evergreen was a condition to the continuation of the PMA.

-22-

of Evergreen.  These individuals should therefore be held individually and personally liable for the perpetrated wrongs as subagents of Hartford.

      3.    <u>The Principals Are Personally Liable For Their Fraudulent Conduct.</u>

Directors and officers of a corporation will be held liable to the extent they personally commit or participate in the commission of a tort.  *Van Wormer v. McCasland Truck Center Inc.*, 163 A.D.2d 632, 635, 558 N.Y.S.2d 683 (1990); *see also Loeffler v. McShane*, 372 Pa. Super. 442, 446, 539 A.2d 876, 878 (1988).  Thus, to the extent the Principals committed fraud, they should be held individually liable.

A defendant is liable for fraud if it is shown that:

    (1)    he made a misrepresentation or concealment of a material fact,

    (2)    he had knowledge of the misrepresentation or concealment,

    (3)    the misrepresentation or concealment was made for the purpose of inducing the other party to rely upon it,

    (4)    the other party rightfully relied on the misrepresentation or concealment,

    (5)    that reliance caused injury to the other party.  *Brown v. Lockwood*, 76 A.D.2d 721, 730, 432 N.Y.S.2d, 193, 196 (2d Dept. 1980).  In addition, an agent is prohibited from acting in any manner inconsistent with his or her agency or trust.  2A N.Y. Jur. 2d, *Agency and Independent Contractors* § 215 (2003).

An agent may not have interests in the subject transaction which are adverse to those of his or her principal.  *Id.*  If an agent acts adversely to the principal in any part of a transaction within the agency, *he or she is guilty of fraud*, unless it appears that the agent made a full disclosure of the facts to the principal, that he or she took no unfair advantage of the principal, or that the principal acquiesced in such acts of the agent.  *Id.*

The Principals are personally liable for fraud based upon their misrepresentation and concealment of the underwriting of the JM&A account and their falsifying of GAP contracts on Life of the South claims.  Initially, Hartford instructed Evergreen not to underwrite the JM&A

-23-

account and relied on Evergreen's representation that it would refrain from doing so. However, months later Hartford discovered that Evergreen had in fact underwritten the JM&A business.

Hartford immediately requested underwriting and loss data on the account. Eventually, Evergreen provided Hartford with data, but that data was false in material respects. The data provided by Evergreen had erroneous loss severity and loss frequency information, and falsely included a cap on MSRP/NADA of 120% on all enrollments. Hartford initially relied on the data provided by Evergreen as it was acting in a fiduciary capacity. However, once new loss data began to come in on the account directly from losses under the Hartford GAP program, Hartford conducted an independent analysis and determined that the information provided by Evergreen was false. Hartford also determined that the number of enrollments coming in were over 10,000 per month over what was represented by Evergreen.

By this time, Hartford had already accepted thousands upon thousands of enrollments and its loss future was set. Hartford ceased accepting enrollments in an effort to cut its losses; however, Hartford was obligated to continue to pay claims on all prior enrollments. The Principals' own COO, Krutainis, testified that it was Caronia, Sr. and Uphouse who underwrote the JM&A account. Thus, the Principals should be held individually and personally liable for the damages sustained by Hartford on the JM&A account.

C.    **The Principals Are Also Personally Liable As Alter Egos Of Evergreen.**

To pierce the corporate veil and hold the alter ego of a corporation liable for damages caused by the corporation, there is a three-part test under New York law that requires a showing of: (1) complete domination and control by the shareholder(s) over the corporation with respect to the transaction at issue; (2) such domination and control was used to commit a fraud or other wrong against the plaintiff; and (3) the control and misuse caused the plaintiff's injuries. *First Capital Asset Mgmt., Inc. v. N.A. Partners, LP,* 755 N.Y.S.2d 63, 66, 300 A.D.2d 112, 116 (2002); *see also Eastern States Elec. Contractors, Inc. v. William L. Crow Const. Co.,* 544 N.Y.S.2d 600 (App. Div. 1989).

-24-

50345448v4

Under New York law, the corporate veil will be pierced to achieve equity "[w]hen a corporation has been so dominated by an individual or another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego." *Austin Powder Co. v. McCullough*, 216 A.D.2d 825, 827, 628 N.Y.S.2d 855; *see also Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138-139 (2d Cir. 1991). "Allegations of a lack of corporate formalities, commingling of funds, and self-dealing may be sufficient to support a claim seeking to pierce the corporate veil." *See Moses v. Martin*, 360 F.Supp.2d 533, 541-542 (S.D.N.Y. 2004).

Domination and control by the principals of a corporation are demonstrated by the absence of corporate formalities, inadequate capitalization, and/or use of corporate funds for personal rather than corporate purposes. *See Austin Powder Co. v. McCullough*, 628 N.Y.S.2d (App. Div. 1995) "In making this determination, courts look to a variety of factors, including the intermingling of corporate and personal funds, undercapitalization of the corporation, failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 17-18 (2d Cir. 1996), citing *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600-01 (2d Cir. 1989) (citing cases). In making such a determination, "[n]o one factor is decisive." *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1053 (2d Cir. 1997). "[A]lthough there is no mechanical rule as to how many and to what degree the factors outlined in Wrigley must be present to pierce the corporate veil, the courts apply the preexisting and overarching principle 'that liability is imposed to reach an equitable result.'" *Bridgestone/Firestone*, 98 F.3d at 18, quoting, *Brunswick Corp. v. Waxman*, 599 F.2d 34, 36 (2d Cir. 1979) (citations omitted).

Gary Uphouse provided the initial capitalization to Evergreen along with his wife, Ann Uphouse, in the amount of $30,000. Two years later, Caronia, Sr. purchased Ann Uphouse's shares in Evergreen for $20,000. Neither Caronia, Sr. or Uphouse ever put another dime of

-25-

50345448v4

capital into Evergreen. Rather, Caronia, Sr. and Uphouse used Evergreen's operating account as if it were their own personal bank account. Every month after premium fees were collected, Uphouse issued to himself (40%) and Caronia, Sr. (60%) checks directly from Evergreen's corporate operating account in whatever amounts remained after operating expenses were paid. These large sums of money were not linked to their salaries. Remarkably, Uphouse (and Evergreen) failed to prepare any financial statements and kept no record or accounting of the method or calculation of these monthly "dividend" checks.

The following chart illustrates the total known payments made to Caronia, Sr. and Uphouse out of Evergreen's corporate accounts from 2000 through 2004:

| GARY UPHOUSE | |
|---|---|
| YEAR | TOTALS |
| 2000 | $322,293.16 |
| 2001 | $1,456,811.06 |
| 2002 | $1,547,131.13 |
| 2003 | $1,361,208.70 |
| 2004 | $1,427,585.90 |
| Total | $4,925,748.05 |

| CHARLES CARONIA, SR. | |
|---|---|
| YEAR | TOTALS |
| 2000 | $665,190.39 |
| 2001 | $2,286,670.40 |
| 2002 | $2,714,087.32 |
| 2003 | $2,867,415.48 |
| 2004 | $249,836.63 |
| Total | $8,783,200.22 |

These amounts *do not* include Caronia, Sr.'s and Uphouse's annual $360,000 salaries over the years. In addition, in 2002 and 2003, Uphouse issued checks directly out of a second Evergreen corporate account directly to his wife, Ann Uphouse, in the amount of $239,508, *despite the fact she was never employed by Evergreen in any capacity and never provided any*

-26-

*services whatsoever to Evergreen during those years.*[1] Simply put, Caronia, Sr. and Uphouse used Evergreen's operating funds for themselves and family members.

Evergreen, through its Principals, Caronia, Sr. and Uphouse, failed to abide by numerous corporate formalities:

- The Principals were the only two directors of Evergreen, and were also the only two shareholders.

- Evergreen did not hold directors' meetings or shareholders' meetings, but instead executed documents entitled "waiver" or "consent" in lieu of these meetings. These documents were identical year after year and essentially meaningless.

- Evergreen issued "dividend" checks out of its operating account every month, but failed to keep an accounting or record of the calculations for those dividends. Uphouse simply made an ad hoc determination based on Evergreen's operating budget for that month.

- Evergreen had an accountant, bank accounts, and paid taxes, but it did not maintain financial statements.

The Principals' domination and control of Evergreen through the commingling of corporate funds, failure to conduct shareholders' or directors' meetings, and use of Evergreen's corporate accounts as their own personal ATM machines are all actions sufficient to demonstrate a domination and control sufficient to pierce the corporate veil and open them up to personal liability based on alter ego principles.

Courts may also allow the corporate veil to be pierced to reach the alter ego of a corporation where the individual officers have used the corporation to commit a fraud for which there may be no remedy against the corporation. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131 (2d Cir. 1991); *see also U.S. v. Golden Acres, Inc.*, 702 F.Supp. 1097 (D.Del. 1988).

Finally, it is important to note that piercing the corporate veil is an equitable remedy by virtue of which the law will disregard the separate existence of a corporation and impose

---

[1] Indeed, at his deposition, Mr. Uphouse had no explanation for why such corporate monies had been paid to his wife.



liability directly on the shareholders for the acts or obligations of the corporation. The doctrine has also been used to impose liability on corporate officers and directors. *See* 45 *Am. Jur. Proof of Facts 3d* 1 (2004). Hartford has limited recourse against Evergreen directly since the Principals siphoned off Evergreen's assets and closed its doors – right after it failed to remit premium trust monies to Hartford and paid the principals huge "dividends." Equity therefore dictates that the Principals be held individually liable for Evergreen's breaches of its contract, breach of fiduciary duty, fraud, and negligence.

### D.    Negligence

Negligence of an insurance broker or managing general agent is based upon a duty of care owed by the agent to its principal. To prove negligence, the plaintiff must show: (1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered injury as a result of that breach of duty. 79 N.Y. Jur. 2d *Negligence* § 9 (2003). Professionals, such as insurance brokers, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties. *Kohl v. Green*, 651 N.Y.S. 2d 744, 745 (App. Div. 1997). A claim of professional negligence merely requires proof that there was a departure from accepted standards of practice that caused injury. *D.D. Hamilton Textiles, Inc. v. The Estate of Theodore Mate*, 703 N.Y.S.2d 451 (App. Div. 2000).

As discussed above, Evergreen (as controlled by the Principals), breached a reasonable standard of care in its underwriting and claims handling practices by:

- Failing to obtain adequate loss data from producers pursuant to the PMA;
- Binding unauthorized risks in contravention of the PMA;
- Failing to monitor the producer accounts in accordance with the Hartford's guidelines;
- Failing to investigate claims and obtain all documentation required by the CSA;
- Paying claims without obtaining sufficient documentation;
- Paying invalid claims.

-28-

50345448v4

Each of these acts by Evergreen provides an independent basis for negligence liability based on Evergreen's breaches of the PMA, CSA, Hartford's underwriting and claims handling guidelines, as well as a reasonable standard of care in the industry.

E.    **Conversion**

As discussed above in the context of a breach of fiduciary duty claim, the individual officers can be held liable to the extent they improperly disposed of funds rightly belonging to Hartford.  *See Fireman's Fund Insurance Company v. Allied Programs Corp.*, 1993 WL 481344 at *7 (S.D.N.Y. 1993) (officers of corporation can be held individually liable for conversion of funds held in trust for an insurance company and for breach of their fiduciary duty if they were personally responsible for the breach of duty or if they knew or should have known of the conversion).  At a minimum, the Principals used Hartford trust funds to pay Reliance Claims in order to curry favor with their customers.  The Principals should be held personally liable for the conversion of those funds.  In addition, an analysis of the Offset Calculation demonstrates that Evergreen and the Principals had no basis to offset the funds that should have been held in trust for Hartford.  Those funds were deposited directly into the pockets of the Principals and they should be held personally liable for conversion of those funds.

F.    **Failure To Maintain Adequate Insurance Coverage.**

Evergreen was required by the PMA to maintain errors and omissions insurance with $5 million in limits, general liability coverage with $5 million in limits and a blanket dishonesty bond with limits of $3 million each year.  In blatant disregard of its obligations under the PMA, Evergreen (through Uphouse) purposefully chose to obtain only an E&O policy with $1 million in limits – hardly the $13 million worth of insurance it promised to maintain under the PMA.  Uphouse intentionally misrepresented and/or concealed the amount of coverage he obtained on behalf of Evergreen and sought to maintain only very minimal insurance (i.e., it even undercapitalized its insurance).  To the extent that Evergreen is unable to pay the amount of any award in this matter – either through its own assets or its errors and omissions coverage

-29-



– the Principals will be personally liable for any shortfall due to their intentional failure to maintain the required insurance coverage for Evergreen.

### G.    Hartford Is Entitled To Recover Its Attorneys fees and Costs.

Hartford is entitled to recover its attorneys fees and costs in this proceeding pursuant to the terms of the PMA. The PMA states, "The remaining costs of the arbitration proceedings or any other costs relating to the arbitration may be allocated by the board." As a result of the pervasive breaches of fiduciary duties under the PMA, fraudulent conduct in the underwriting of business and handling of claims, and fraudulent offset of Hartford's trust funds, Hartford has been forced to pay substantial fees and incur substantial costs to recover money that is owed. Thus, Hartford is entitled to an award of its attorneys fees and costs in pursuing this action. Hartford will present evidence regarding its attorneys fees and costs at the hearing.

### IV.

### CONCLUSION

The Principals ran the Hartford GAP Program for their own personal gain and ignored their fiduciary obligations to Hartford. As Directors and Officers of Evergreen, their actions gave rise to the allegations at issue in this arbitration and caused the damages sustained by Hartford. For all the foregoing reasons, Evergreen and its Principals (Charles Caronia, Sr., Gary Uphouse, Andrejs Krutainis, and Charles Caronia, Jr.) should be held individually and personally liable for the acts perpetrated against Hartford.

Respectfully submitted,

STROOCK & STROOCK & LAVAN LLP
JAMES E. FITZGERALD
S.V. STUART JOHNSON
REID A. WINTHROP

By:    _James E. Fitzgerald_
James E. Fitzgerald
Attorneys for Claimant
Hartford Fire Insurance Company

-30-